# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 22-2230

KATIE SCZESNY, JAMIE RUMFIELD, DEBRA HAGEN, and MARIETTE VITTI,

*Plaintiffs-Appellants*

v.

THE STATE OF NEW JERSEY, GOVERNOR PHILIP MURPHY (in his official and personal capacities),

*Defendants-Appellees*,

On appeal from No. 3-22-cv-02314 in the United States District Court of New Jersey's denial of a preliminary injunction pursuant to *Fed. R. Civ. P.* 65

# NATIONS IN ACTION'S SUPPLEMENTAL APPENDIX

## IN SUPPORT OF PLAINTIFFS-APPELLANTS FOR REVERSAL OF DISTRICT COURT'S ORDER APPLYING RATIONAL BASIS REVIEW IN DUE PROCESS CHALLENGE TO COVID-19 INJECTION MANDATES

Deana Pollard Sacks
CA Bar No. 145192
Sacks Law Firm
2323 S. Shepherd Drive, Suite 825
Houston, Texas 77019
Telephone: 713.927.9935
deanapollardsacks@icloud.com
Attorney for Amicus Curiae

# INDEX OF SUPPLEMENTAL APPENDIX

AMICUS APPENDIX 4: *Plaintiff Psychologist v. Order of Psychologists of Tuscany* r.g. 7360/2022 (Ordinary Court of Florence, July 6, 2022) ..........................................................................1

AMICUS APPENDIX 5: *Reynolds v. Clarke*, 1 Str. 634, 93 Eng. Rep. 747 (K.B. 1726).................................................................. 5

AMICUS APPENDIX 6: Records of the United States Nuremberg War Crimes Trials *United States of America v. Karl Brandt etal*. (case I) November 21, 1946 – August 20, 1947, National Archives Microfilm Publications Pamphlet Describing M887 (Washington 1974) .......................................................11

AMICUS APPENDIX 7: American Law Institute, A CONCISE RESTATEMENT OF TORTS, Sec. 18-19 *Battery: Offensive Contact* (3rd ed. 2013) ..........................................................................30

AMICUS APPENDIX 8: Berman, Mitchell N., *Coercion Without Baselines: Unconstitutional Conditions in Three Dimensions*, 90 GEO. L.J. 1, 5-6, 10 (2001).....................................36

AMICUS APPENDIX 9: *Brown v. Kendall*, 60 Mass. 292 (1850).......................150

AMICUS APPENDIX 10: Dobbs, Dan B., THE LAW OF TORTS (2000)...............155

AMICUS APPENDIX 11: Epstein, Richard A., *Foreword: Unconstitutional Conditions, State Power, and the Limits of Consent*, 102 HARV. L. REV. 5, 7 (1988-1989)........183

AMICUS APPENDIX 12: Gould, Stephen Jay, *Carrie Buck's Daughter*, 2 CONST. COMMENT 331 (1985) ..........................................................................286

CERTIFICATE OF SERVICE ..........................................................................294

AMICUS  APPENDIX 4: *Plaintiff Psychologist v. Order of Psychologists of Tuscany* r.g. 7360/2022 (Ordinary Court of Florence, July 6, 2022)

**Appendix 4**

N.R.G. 2022/7360
(TRANSLATION)

## ORDINARY COURT OF FLORENCE

02 second civil section

**In the interlocutory proceedings registered under No. r. g. 7360/2022 brought by ... under the patronage of ...  lawyer BENASSI RAUL (BNSRLA711A10G687J); electively domiciled at VIALE BELFIORE, 32 50144 FIRENZE at the offices of the lawyer STORI ROBERTO ATTORNEY**

against

**ORDER OF PSYCHOLOGISTS OF TUSCANY** (F.C. 92009700458)
**DEFENDANT**

The Judge Dr. Susanna Zanda,
read the urgent precautionary appeal for the suspension of the measure taken by the Council of the Order of Psychologists of Tuscany dated 19. 10. 2021, by which the applicant was suspended from the exercise of the profession of psychologist, for failure to comply with the obligation to vaccinate as per Decree Law No. 44/2021 art. 4 converted into Law No. 76/2021;
noted that the suspension from the practice of the profession is likely to jeopardize primary individual goods such as the right to his livelihood and the right to work referred to in Article 4 understood as an expression of the freedom of the person and his dignity, guaranteed precisely by the freedom from need;
noted that the establishment of an adversarial procedure could cause irreparable damage to the appellant's primary rights, and it is necessary to proceed 'inaudita altera parte', in view also of the time which has already elapsed following the proceedings before the Regional Administrative Court initiated by the appellant and concluded by judgment No 1565/21 of 6 May 2002, which became final and which overturned the decision of the Regional Administrative Court of Tuscany (TAR TOSCANA), which declined jurisdiction precisely on the ground that the appellant's primary rights had been compromised;
held, therefore, that the decision of the TAR appears to be admissible;
noted that, in fact, the ... cannot practise the profession of psychologist and support herself with her work for a period of several months from October 2021;
that she has annexed how the exercise of the profession constitutes her only source of livelihood;
noted that this freedom and right to work, acquired by birth on the basis of Article 4 of the Constitution, is in this case impermissibly 'granted' by the Order to which she belongs after undergoing an injection treatment against Sars Cov 2, on the basis of DL 44/21;

given that the purpose of this Decree-law converted into law is to prevent the disease and ensure safe conditions in the health sector;

noted, however, that this aim is unattainable because it is the AIFA reports themselves which state that;

considering, in fact, that AIFA's reports both contemporaneous with the suspension of Dr. ... and the most recent reports of January and May 2022, and even more the reports of European supervisory institutions such as Euromomo or Eudravigilance, show a phenomenon opposite to what was intended to be achieved with the vaccination, that's to say a spread of contagion with the formation of multiple viral variants and the numerical prevalence of infections and deaths among those vaccinated with three doses;

considering that Article 32, paragraph 2, of the Italian Constitution is in root not applicable, even if we want to disregard the violation of the rule of law, precisely because of the lack of benefits for the community

in fact, having noted that Article 32 of the 'personocentric' constitutional charter after the experience of Nazi-fascism does not permit medical experimentation that is invasive of the person without his free and informed consent

whereas informed consent is not conceivable when the components of the serums and the mechanism of their operation are, as in this case, covered not only by industrial secrecy but also, incomprehensibly, by 'military' secrecy

whereas, therefore, after two years we still do not know the components of the serums nor their medium and long-term effects as written by the manufacturers themselves, whereas we know that in the short term they have already caused thousands of deaths and serious adverse events

in view of the fact that Article 32 of the Italian Constitution and, consistently, the various international conventions signed by Italy prohibit the imposition of medical treatment without the consent of the person concerned because his or her DIGNITY would be infringed, a value underpinning the many provisions of our rigid Constitution and substantiating Article 1 of the Constitution (not surprisingly) of Germany

considering that consent must be free and informed and in this case Dr. ... does not legitimately intend to give it

given that the vaccination requirement imposed in order to be able to work infringes Articles 4, 32 and 36 of the Constitution, which, by placing 'the person' at the centre and defending him or her above all from the State, does not allow the State and all its central and peripheral apparatus (such as professional orders) to impose any obligation to undergo health treatment without the consent of the person concerned;

given that our legal system and international treaties unequivocally prohibit any experimental treatment suggestive of human beings, and that there are regulations such as n. 953/21 and EU resolutions such as No 2361/21 which specifically prohibit member states from discriminating on the basis of Sars Cov 2 vaccination status; whereas, on the other hand, the Tuscany Order of Psychologists is in breach of this immediately applicable legislation and is undeniably discriminating against Dr ... compared with vaccinated colleagues who can continue to work despite having the

same chance of becoming infected and transmitting the virus;

considered that for these reasons there is also the alleged "fumus boni iuris" i.e. the unlawful imposition by the Order of belonging to an injection treatment that has already caused serious adverse events and death, and in the end with a substantial "acceptance of the risk" of occurrence of such harmful events for Dr. ...

on the other hand, the health authorities of the Region of Tuscany and the Council of the Order of Psychologists of Tuscany can not be unaware of the spread of contagion despite the fact that 80/90% of the population is vaccinated against Sars Cov 2 and are also aware or should be aware of the spread of contagion among vaccinated with three doses, the adverse events also serious and fatal of vaccinated subjects; it is, in fact, data published by the Ministry of Health itself, so it seems illegitimate both the issuance and the subsequent continued failure to withdraw in self-defense by the Order of belonging, that measure of suspension of . .. taken on 19 Oct 2021 and still in force until 31 Dec. 2022;

held that for these reasons Dr ... cannot be forced, in order to be able to support herself and her family, to undergo these experimental injection treatments which are so invasive that they insinuate themselves into her DNA, altering it in a way which could be irreversible, with effects which cannot as yet be foreseen for her life and health;

whereas, from an epidemiological point of view, the condition of the vaccinated person is not dissimilar to that of the unvaccinated person, since both can become infected, develop the disease and transmit contagion;

Considering that, therefore, the imposition of compulsory vaccination in order to carry out the profession is wholly discriminatory and in breach of the European Regulation No 953/2021 self-executing which prohibits discrimination of European citizens based on vaccination status;

having regard to Council of Europe Resolution No 2361/2021; Regulations (EC) 726/2004 (Art, 14 bis) and 507/2006;

having regard to the decision of the Court of Justice of the EU, 11 July, 2019, No, 716/17, which states: *'any national court called upon to rule within the scope of its competence has, as an organ of a Member State, the obligation to disapply any national provision contrary to a provision of Union law that has direct effect in the dispute before it';* see Constitutional Court Conformity No.95 /2017 (on the GO's (Ordinary Court) obligation to immediately disapply the domestic source conflicting with European Union law and "on the contrary" Cass, Civ. Sez. I Ord., 18/10/2018, no. 26292; Cass. Civ. Sec. I Ord, 06/06/2018, no. 14638; sentence of the Court of Florence 1855/2021; cass. L, cass. Sentence no. 26897 of 21/12/2009: *The national judge must disapply the rule of the domestic legal system, due to incompatibility with community law, both in the case in which the conflict arises with a discipline produced by the organs of the EEC by means of a regulation, and in the case in which the contrast is determined by general rules of the community legal system, derived from the interpretation of the system itself by the Court of Justice of the European*

*Communities, in the exercise of the tasks attributed to it by articles 169 and 177 of the Treaty of 25 March 2009. 169 and 177 of the Treaty of 25 March 1957, made executive by law no. 1203 of 14 October 1957. (see Conf. Sent. Cass. 3841/2002);*

having regard to Articles 1, 2, 3, 4, 32 and 36 of the Constitution

having regard to the numerous orders of referral to the Constitutional Court of the decree-laws imposing the 4 anti-Sars Cov 2 injection treatments for the exercise by citizens of fundamental rights and freedoms (e.g. order of referral of the Council for Justice Sicily Region and numerous TARs)

having regard to the conforming rulings of revocation of suspension from work for failure to comply with the obligation to vaccine sent. Court of Padua of 28.4.22; Court of Sassari of 9.6.22; Court of Velletri 14.12.2021; TAR Lombardy 26.4.2022 in rg 562/2022 (case of a veterinarian suspended from the register); Court of Rome 14.6.22; TAR Lombardy n. 1397 of 16.6.22; various sent. Of TAR Piedmont and various sentences of TAR Rome (on personnel of the army, healthcare and teachers);

**for the reasons**
**The Court**
**Having regard to art. 669 paragraph 2 sexies code of civil procedure and 700 c.c.p.**

**suspends the provision of the Order of Psychologists of Tuscany of ... prohibiting Dr. ... to exercise the profession of psychologist until she undergoes the injection treatment against Sars Cov 2, thus authorising the exercise of the profession without undergoing the injection treatment, working in any mode (both in the presence or remotely) in the same way as colleagues vaccinated.**
Sets for confirmation, modification or revocation of the provision in cross-examination the hearing of **15 Sept. 2022, 10,00 a.m.**

Florence on 6 July 2022

The Judge
Dr Susanna Zanda

AMICUS APPENDIX 5: *Reynolds v. Clarke*, 1 Str. 634, 93 Eng. Rep. 747 (K.B. 1726)

Appendix 5

**8 MOD. 272.**        TRINITY TERM, 10 GEO. 1.   IN B. R.        193

false; and though it were a right judgment, and he thought it to be wrong, and so intended it, it would be partiality and corruption; and the Scripture says, that *"a thief is better than a man accustomed to lying;"* and therefore none of the cases cited come up to this case; so taken all together they are scandalous words.

And the plaintiff had judgment.

**[272]** CASE 186. REYNOLDS *against* CLERK. Tuesday, 16 June 1725.

If a man has a right to the use of a yard in common with the owner, he does not commit *a trespass* by entering into the yard in order to fix a water-spout to his house; but if any injury is done to the owner of the yard, in consequence of fixing such spout, he may recover *damages* in an *action on the case.*—S. C. 1 Stra. 334, 634. S. C. Fortes. 212. S. C. 2 Ld. Ray. 1399.

Trespass *vi et armis* against the defendant for entering into the plaintiff's house and yard, and fixing *a spout* on his own house, for conveying the rain water from his house into the said yard, *ratione cujus aqua currebat in stabulum* of the plaintiff, *et occasione inde* rotted the timber, &c. whereas before the water dropped from the eaves of the defendant's house into the said yard, and then did no damage, *ad damnum, &c.*

The defendant pleaded *not guilty* as to all, except entering the house and yard and fixing the spout on his own house; and as to that he justified, for that T. S. being seised in fee as well of the plaintiff's as of the defendant's house, which was adjoining to the yard belonging to the plaintiff's house, by indenture conveyed the house and yard to the plaintiff, with an exception in the deed of the free use of the yard, &c. to the said T. S. and to all the tenants and occupiers of the defendant's house, which house was afterwards conveyed to the defendant; and averred that the spout so fixed was necessary for the use of the defendant's house, and so justified by virtue of that exception.

And upon a demurrer to this plea,

It was insisted *for the plaintiff,* that this justification was not good, because the spout was a nuisance to him; and though T. S. might justify the fixing it to one house, when both were in his possession, yet when both were sold to different persons, one of them cannot justify for a nuisance done to the other (*a*); and in this case the defendant had neither an express nor an implied power to set up any spout, especially when it would be a nuisance to the plaintiff. The use of this yard reserved to the defendant, is no more than *an easement* to his house, and not to be used to any other purpose; and the nature of a nuisance is such, that if it be of necessity, that is, if it be necessary or beneficial to him who made it, and another buy the land in which the nuisance was made, in such case the nuisance is purged; and if afterwards the lands come into different hands, it is not abatable; but if it is an unnecessary nuisance, it is only a suspension thereof when in one hand, and afterwards coming into different hands, it is abatable. But there are some privileges so very necessary as not to be extinguished by *unity of possession,* as paths to a mill, &c. for they shall revive as soon as the tenements come to different **[273]** hands again. Now, in this case the defendant having erected this nuisance after the tenements came to different hands, there can be no colour for him to justify.

The counsel *for the defendant* took no notice of the objection made on the other side, but insisted, that the plaintiff was mistaken in his action, because *trespass* would not lie for fixing a spout on his own house; but that if the plaintiff had any damage thereby, he ought to bring an *action on the case* to recover what he was damnified, for he had a licence to enter the yard, and could not be a trespasser for entering and fixing the spout on his own house. Besides, the defendant has averred in this plea, that the fixing this spout is for the necessary use of his house, which the plaintiff has confessed by the demurrer (*a*); therefore, when he justified the entering into the yard, the consequence thereof cannot be a trespass.

Secondly, the consequential damage in rotting the timber, is a description and part

_____

(*a*) Year Book 11 Hen. 7, pl. 25. Hob. 131. Poph. 166, 172. Dyer, 295, pl. 19.
(*a*) 8 Co. 146.

K. B. XVII.—7

194          TRINITY TERM, 10 GEO. 1.    IN B. R.          8 MOD. 274.

of the original trespass; for whatever comes under a *virtute cujus*, or a *per quod*, or *ratione inde*, cannot be traversed, being no new charge, only a further description of the former charge (*b*).    The plea therefore is good, though it do not particularly answer the rotting of the foundation, since that is only aggravation.

The reply *for the plaintiff*. It is now insisted on by the defendant, that the plaintiff has mistaken his action, but not the defendant's innocence, and that an *action on the case* is the proper action for the plaintiff, which is very true, and so is a *quod permittat*; but yet *trespass* is likewise a proper action; for it cannot be denied, but that the freehold and inheritance of this yard is in the plaintiff, and that the defendant has only the bare use of it, and by misusing it he is a trespasser.    It is true likewise, that the defendant had licence to enter the yard, but every licence must have a reasonable construction; for can it ever be intended, that because he had leave to enter the yard, and had the use thereof, that he might justify the throwing down the plaintiff's house?

The Chief Justice, upon the first arguing of this case, said, that this licence was granted by special words, so could not be so extensive as otherwise it would have been; for the case is no more than a grant of the house and yard; and to except the yard would be void as to the freehold; therefore the exception must be intended to some particular purpose, as to the use thereof, to walk in, or to go to the pump, and in such case he is to do no damage to the freehold; and if this licence be in any manner misused, to the prejudice of him who has the freehold, he who misuses it is *a trespasser*, as if he dig up the yard, &c. but the use which was made of it in this case, was to enter and fix a spout to his own house; now, though the original act was lawful, as done to his own house, yet he may be a trespasser, when the immediate consequence of such an act is injurious to his neighbour; for [274] suppose a man has a water-course running through his ground, and his neighbour diverts it, this is no trespass; but if, by diverting it, he turned it on his neighbour's house, it would be a trespass. The *per quod* is only the description of the trespass.

For which reason the Chief Justice and another Judge held this action of trespass was a proper action: but two other Judges were of a contrary opinion.

Fortescue, Justice. The defendant ought to have used the house as when both houses were in the possession of one man, then the water dropped from the eaves, and no spout was fixed; so that the fixing the spout is *a nusance* to the plaintiff.    I do not think the *per quod* to be merely a further description of the trespass, because it was fully described before.    The entry into the yard is no trespass: a man having the use of a yard, may make all the common ordinary uses of it.    An action of trespass is a possessory action, and must be founded on some act which disturbs the possession; this is not like the case of throwing filth, rubbish, &c. into a man's yard.    Trespass is where an act is done immediately to the prejudice of another (*a*): and an action on the case is founded on an act which mediately tends to the damage of another (*b*); and this seems the true difference between an action of trespass and on the case, *ubere tuo ut alienum non lædas*.    If one shooting at a bird destroy another's decoy, an action on the case only lies.    In this case there is no immediate trespass done; he might enter into the yard; he might fix a spout to his own house, and for the consequent mediate damage arising from thence, an action on the case would have been the plaintiff's remedy.

Raymond, Justice. The affixing the spout was a lawful act; but since its consequence is a nusance to the plaintiff, the defendant is answerable for it.    The only question is, whether an action on the case, or trespass *vi et armis*, ought to have been brought?    A distinction has been made between an act mediately or immediately prejudicing another.    I remember the case of diverting a water-course mentioned by the Chief Justice, it was a west country cause, *Courtney* v. *Collett* (*c*).    The plaintiff

---

(*b*) 8 Co. 10.    1 Vent. 54, 340.    T. Jones, 110.
(*a*) See 1 Ld. Ray. 188, 272.    2 Wils. 313.    3 Wils. 409, 412.    2 Bl. Rep. 894, 897.    3 Burr. 1114, 1559.    2 Term Rep. 225.
(*b*) Cro. Eliz. 219.    Cro. Jac. 446.
(*c*) Lee, who afterwards argued for the plaintiff, cited this case as follows, and said he had it from Serjeant Carthew's notes.    Hil. 9 Will. 3, *Courtney* v. *Collett*.    Trespass *vi et armis* by Sir William Courtney *quare clausum fregit, et in solo piscariam cepit; necnon*

**8 MOD. 275.**          TRINITY TERM, 10 GEO. 1.   IN B. R.                    195

brought an action of trespass *vi et armis*, for that the defendant having a water-course running through his land diverted the same, *per quod* the plaintiff's grounds were over-flowed; after *not guilty* and a verdict for the plaintiff, it was moved in arrest of judgment and insisted on, that an *action upon the case* was the proper remedy, since the original act of diverting the water-course being in his own land was lawful; but the Court held the action of trespass maintainable, since the *per quod* could not be looked upon only as a description of the trespass (*a*), and accordingly the plaintiff had his judgment: which case is a full proof, that an action of trespass may be brought where the original act was no trespass; for diverting the water-course was not a trespass immediately prejudicial to the plaintiff.

Pratt, Chief Justice. The better opinion then has been, that wherever a damage is done, the party damaged is at liberty to bring either an action of trespass or an action on the case.

Fortescue, Justice. It seems odd to make a man a trespasser, for doing a lawful act within his own grounds.

Raymond, Justice. If the act stops there, it is odd, not else.

*Adjournatur.*

Afterwards, in Trinity term, in the eleventh year of George the First, this point was argued again;

The question being, whether trespass lies for entering his yard, and setting a spout on his own house?

It was argued, that it did not, but that an *action on the case* was the proper remedy. It was admitted, that where the original act is a wrong actually done, in such case trespass lies, but where the original act was lawful, and consequential damages ensue, there an action on the case is the proper remedy. The complaint against the defendant is for a nonfeasance, viz. he did not take care that this spout should not damnify the plaintiff's house; and it is certain that trespass will not lie for a *nonfeasance*: if the defendant had undertaken to cure the plaintiff's horse, and by his negligence the horse had died, yet trespass would not lie against him, though the horse was the property of another man; but in this case the house was his own. The case of *Edwards* v. *Hallender* (*b*) is full in point, which was thus: The plaintiff had a cellar, and the defendant had a warehouse over that cellar, on which he laid so great a burthen, that the floor broke and fell into the cellar and spoiled three butts of wine; and it was adjudged, that an action on the case, and not an action of trespass, lay against the defendant.

**[275]** It was argued *for the plaintiff* that *trespass* is the proper action; for though it was lawful for the defendant to fix the spout on his own house, yet he ought not to do it in such a manner so as immediately to trespass his neighbour; like the case of *Preston* v. *Mercer* (*c*), which was trespass *vi et armis* for causing stinking water in his yard to run to the walls of the plaintiff's house, and piercing them so that it run into his cellar; after a verdict for the plaintiff, it was moved in arrest of judgment, that trespass *vi et armis* would not lie against the defendant, because a man cannot be a trespasser with force and arms in his own ground; he ought to bring an action on the case; but judgment was given for the plaintiff.

To which *it was answered*, that the original act was a wrong done, viz. by causing stinking water to run to the walls of the plaintiff's house, which differs from the principal case, and so is no authority for the plaintiff.

*de eo quod fregit et asportavit* the flood gates, and opened the sluices, *per quod* the water came upon the plaintiff's pool. After a verdict for the plaintiff, Gould, Serjeant, moved in arrest of judgment, because the latter part of the declaration charged a fact proper only for an action upon the case. But by the Court, an action of trespass is maintainable for the latter facts as well as for the first.—*Note to the former Edition.*

(*a*) Raymond, when he afterwards delivered the resolution of the Court on the second argument, being then Chief Justice, gave a different account of this case from what he does here, and declared that the above account given of it from his memory was mistaken. Stra. 635.

(*b*) Poph. 46.   Cro. Eliz. 285.   2 Leon. 93.

(*c*) Hard. 60.

196                    TRINITY TERM, 10 GEO. 1.    IN B. R.              8 MOD. 276.

Raymond, Chief Justice. The case of *Preston* v. *Mercer (a)* was a proper action of trespass, for the declaration charged that the defendant did *make* the water to run, which is an immediate *tort.* In the case of *Courtney* v. *Collett (b)* there was matter laid proper for an action of trespass; the question arose on what followed the *necnon,* whether it should be taken as aggravation of the former trespass, or as the description of a new one, and by my notes it does not appear that judgment was ever given *(c)*. The bounds of all actions ought to be preserved; the right rule and distinction is, that where the act itself is unlawful and prejudicial, trespass must be brought; but if the act is lawful, and only by consequence a damage to the plaintiff, he must bring *case.* In the case of *Leveridge* v. *Boscall (d)*, which was trespass on the case, the declaration was, that the plaintiff was possessed of a barn and a river adjoining; that the defendant dug two trenches, and thereby diverted the water of the river; and after verdict Pratt, Serjeant, moved in arrest of judgment, because the action ought to have been trespass *vi et armis;* but the plaintiff had his judgment; for the declaration not specifying in whose ground the defendant dug the trenches, it shall be presumed to be in his own ground, and then, the first act being lawful, was no *tort* to the plaintiff; and the consequential damage only affected the plaintiff, which was proper for trespass on the case. I think this action is not maintainable.

Powys, Justice, of the same opinion.

Fortescue, Justice. Trespass upon the case, and trespass *vi et armis,* are different in name and in their nature; for the one is called an action for a nuisance, and the other are called *actiones injuriarum;* the one must be brought for a wrong done immediately to the person or his possession, the other for a consequential damage. This action is brought for a wrong done to the possession, but not immediately; because the defendant had a right to come into the yard, and to fix a spout to his own house. If logs are laid in the highway by which any person is hurt, he must bring case *(e)*; but if the hurt is received by logs thrown at the person, he must bring trespass *vi et armis.* Case must be brought for making sluices in a man's own ground, by which my land is overflowed *(a)*. The objection to the case of *Courtney* v. *Collett* was, that trespass *vi et armis* and trespass *on the case* could not be joined in one declaration; no judgment was given that I can find in my notes; in some cases I think those two actions might be joined. It not appearing in that case whose the flood-gates were, they might be the defendant's own, and then trespass on the case ought to be brought. In this case the fixing the spout was lawful; so was the entering the yard by virtue of the reservation which gives a right to use the yard as well as the pump, &c.

Reynolds, Justice, of the same opinion.

Judgment for the defendant *(b)*.

CASE 187.   WADDY *against* NEWTON.

Where the acres mentioned in a fine or common recovery shall be taken by computation, and not by the Statute de Terris Mensurandis.

Upon a special verdict in ejectment, the case was thus:—Tenants in tail covenanted to levy *a fine* and suffer a *common recovery* of the lands now in question, and of a fishery; and accordingly levied the fine thereof by the name of one hundred and twenty acres of land in Stockwell-Hall, in the county of, &c. and of ten acres *aqua cooperta;* and declared the use thereof to himself and his heirs. **[276]** But there being many more than one hundred and forty acres statute measure, the defendant, who was heir in tail, would contest the right to all above those hundred and forty acres.

The plaintiff thereon brought an ejectment, and suggested that the whole estate

---

(a) Hardres, 60.          (b) 1 Ld. Raym. 272.          (c) See 11 Mod. 164.
(d) Stra. 636.   2 Ld. Ray. 402.     (e) Stra. 636.          (a) 1 Roll. Abr. 104.
    (b) See *Gates* v. *Bayley*, 2 Wils. 313.   *Scott* v. *Shepherd*, 2 Bl. Rep. 892.   *Hawker*
v. *Birbeck*, 2 Burr. 1556.   *Morgan* v. *Hughes*, 2 Term Rep. 225.

<u>AMICUS APPENDIX 6</u>: Records of the United States Nuremberg War Crimes Trials *United States of America v. Karl Brandt etal.* (case I) November 21, 1946 – August 20, 1947, National Archives Microfilm Publications Pamphlet Describing M887 (Washington 1974)

NATIONAL ARCHIVES MICROFILM PUBLICATIONS

PAMPHLET DESCRIBING M887

# Records of the United States Nuernberg War Crimes Trials United States of America v. Karl Brandt et al. (Case I) November 21,1946-August 20,1947



NATIONAL ARCHIVES AND RECORDS SERVICE

GENERAL SERVICES ADMINISTRATION

WASHINGTON: 1974

Appendix 6

**GERALD R. FORD**
*President of the United States*

**ARTHUR F. SAMPSON**
*Administrator of General Services*

**JAMES B. RHOADS**
*Archivist of the United States*

The records reproduced in the microfilm publication

are from

*National Archives Collection of World War II*

*War Crimes Records*

*Record Group 238*

Appendix 6

RECORDS OF THE UNITED STATES NUERNBERG WAR CRIMES TRIALS
*UNITED STATES OF AMERICA* V. *KARL BRANDT ET AL.* (CASE I)
NOVEMBER 21, 1946-AUGUST 20, 1947

On the 46 rolls of this microfilm publication are reproduced the records of Case I (*United States of America* v. *Karl Brandt et al.*, or the "Medical" Case), 1 of the 12 trials of war criminals conducted by the U.S. Government from 1946 to 1949 at Nuernberg subsequent to the International Military Tribunal held in the same city. These records consist of German- and English-language versions of official transcripts of court proceedings, prosecution and defense briefs, and final pleas of the defendants as well as prosecution and defense exhibits and document books in one language or the other. Also included in this publication are a minute book, the official court file, order and judgment books, clemency petitions, and finding aids to the documents.

The transcripts of this trial, assembled in 2 sets of 30 bound volumes (1 set in German and 1 in English), are the recorded daily trial proceedings. The prosecution and defense briefs and answers are also in both languages but unbound, as are the final pleas of the defendants delivered by counsel or defendants and submitted by the attorneys to the court. The unbound prosecution exhibits, numbered 1-570, are essentially those documents from various Nuernberg record series offered in evidence by the prosecution in this case. The defense exhibits, also unbound, are predominantly affidavits by various persons. They are arranged by name of defendant and thereunder numerically. Both prosecution document books and defense document books consist of full or partial translations of exhibits into the English language. Loosely bound in folders, they provide an indication of the order in which the exhibits were presented before the tribunal.

The minute book, in one bound volume, is a summary of the transcripts. The official court file, in four bound volumes, includes the progress docket, the indictment, amended indictment, and the service thereof; appointments and applications of defense counsel and defense witnesses and prosecution comments thereto; defendants applications for documents; motions; uniform rules of procedures; and appendixes. The order and judgment books, in two bound volumes, represent the signed orders, judgments, and opinions of the tribunal as well as sentences and commitment papers. Clemency petitions of the defendants, in five bound volumes, were directed to the military governor, the Judge Advocate General, the U.S. district court, the Secretary of Defense, and the Supreme Court of the United States. The finding aids summarize transcripts, exhibits, and the official court file.

Case I was heard by U.S. Military Tribunal I from November 21, 1946, to August 20, 1947. The records of this case, as the

1

records of the other Nuernberg and Far East (IMTFE) war crimes trials, are part of the National Archives Collection of World War II War Crimes Records, Record Group 238.

The Brandt case was 1 of 12 separate proceedings held before several U.S. Military Tribunals at Nuernberg in the U.S. Zone of Occupation in Germany against officials or citizens of the Third Reich, as follows:

| Case No. | United States v. | Popular Name | No. of Defendants |
|---|---|---|---|
| 1 | Karl Brandt et al. | Medical Case | 23 |
| 2 | Erhard Milch | Milch Case (Luftwaffe) | 1 |
| 3 | Josef Altstoetter et al. | Justice Case | 16 |
| 4 | Oswald Pohl et al. | Pohl Case (SS) | 18 |
| 5 | Friedrich Flick et al. | Flick Case (Industrialist) | 6 |
| 6 | Carl Krauch et al. | I. G. Farben Case (Industrialist) | 24 |
| 7 | Wilhelm List et al. | Hostage Case | 12 |
| 8 | Ulrich Greifelt et al. | RuSHA Case (SS) | 14 |
| 9 | Otto Ohlendorf et al. | Einsatzgruppen Case (SS) | 24 |
| 10 | Alfried Krupp et al. | Krupp Case (Industrialist) | 12 |
| 11 | Ernst von Weizsaecker et al. | Ministries Case | 21 |
| 12 | Wilhelm von Leeb et al. | High Command Case | 14 |

Authority for the proceedings of the International Military Tribunal against the major Nazi war criminals derived from the Declaration on German Atrocities (Moscow Declaration) released November 1, 1943, Executive Order 9547 of May 2, 1945, the London Agreement of August 8, 1945, the Berlin Protocol of October 6, 1945, and the Charter of the International Military Tribunal.

Authority for the 12 subsequent cases stemmed mainly from Control Council Law 10 of December 20, 1945, and was reinforced by Executive Order 9679 of January 16, 1946; U.S. Military Government Ordinances Nos. 7 and 11 of October 18, 1946, and February 17, 1947, respectively; and U.S. Forces, European Theater General Order 301 of October 24, 1946. The procedures applied by U.S. Military Tribunals in the subsequent proceedings were patterned after those of the International Military Tribunal and further developed in the 12 cases, which required over 1,200 days of court sessions and generated more than 330,000 transcript pages.

2

Appendix 6

The crimes charged in the Brandt case consisted largely of medical experiments performed on defenseless concentration camp inmates against their will; "euthanasia" carried out on the mentally defective, the physically sick, the aged, and ethnic and racial groups; and the murder of concentration camp inmates for the express purpose of collecting skulls and skeletons for the Anatomical Institute of the Reich University of Strassburg. The following medical experiments were conducted:

1. High altitude: to investigate effects of low pressure on persons.
2. Freezing: to test human resistance to extemely low temperatures.
3. Malaria: to develop controls over the recurring nature of the disease.
4. Mustard gas: part of a general research program in gas warfare.
5. Sulfanilamide: to test the efficacy of the drug in bone muscle and nerve regeneration and bone transplantation.
6. Seawater: to test methods of rendering seawater potable.
7. Epidemic jaundice: to develop an antitoxin against the disease.
8. Sterilization: to test techniques for preventing further propagation of the mentally and physically defective.
9. Typhus: to investigate the value of various vaccines.
10. Poison: to test the efficacy of certain poisons.
11. Incendiary bomb: to find better treatment for phosphorus burns.

The prosecution alleged and the judgment confirmed that these experiments were not isolated acts of individual doctors and scientists on their own responsibility but that they were the result of high-level policy and planning. They were carried out with particular brutality, often disregarding all established medical practice. Consequently, large numbers of the victims died in the course of or as a result of the experiments.

The euthanasia program was the direct result of a directive by Hitler of September 1, 1939. It resulted in the secret killing not only of aged, insane, incurably ill, and deformed German citizens in sanatoriums in Germany but also in the clandestine murder of foreign workers. The killing in gas chambers and by injections in the sanatoriums served as a proving ground for these forerunners of much larger installations in the mass extermination camps.

In addition to these experiments, over 100 concentration camp inmates were killed for the purpose of obtaining their skeletons. Their ghastly remains were found in Strassburg by Allied troops.

3

The transcripts of the Brandt case include the indictments of the following 23 persons all of whom were physicians except defendants Rudolf Brandt, Viktor Brack, and Wolfram Sievers:

Karl Brandt:  Personal physician to Adolf Hitler, Gruppen-fuehrer in the SS and Generalleutnant (Major General) in the Waffen SS, Reichskommissar fuer Sanitaets- und Gesund-heitswesen (Reich Commissioner for Health and Sanitation), and member of the Reichsforschungsrat (Reich Research Council).

Kurt Blome:  Deputy [of the] Reichsgesundheitsfuehrer (Reich Health Leader) and Plenipotentiary for Cancer Research in the Reich Research Council.

Rudolf Brandt:  Standartenfuehrer (Colonel) in the Allgemeine SS, Persoenlicher Referent von Himmler (Personal Admin-istrative Officer to Reichsfuehrer SS Himmler), and Min-isterial Counselor and Chief of the Ministerial Office in the Reich Ministry of the Interior.

Joachim Mrugowsky:  Oberfuehrer (Senior Colonel) in the Waffen SS, Oberster Hygieniker, Reichsarzt SS und Polizei (Chief Hygienist of the Reich Physician SS and Police), and Chef des Hygienischen Institutes der Waffen SS (Chief of the Hygienic Institute of the Waffen SS).

Helmut Poppendick:  Oberfuehrer in the SS and Chef des Persoenlichen Stabes des Reichsarztes SS und Polizei (Chief of the Personal Staff of the Reich Physician SS and Police).

Wolfram Sievers:  Standartenfuehrer in the SS, Reich Manager of the "Ahnenerbe" Society and Director of its Institut fuer Wehrwissenschaftliche Zweckforschung (Institute for Military Scientific Research), and Deputy Chairman of the Managing Board of Directors of the Reich Research Council.

Karl Genzken:  Gruppenfuehrer in the SS and Generalleutnant in the Waffen SS and Chef des Sanitaetsamts der Waffen SS (Chief of the Medical Department of the Waffen SS).

Karl Gebhardt:  Gruppenfuehrer in the SS and Generalleutnant in the Waffen SS, personal physician to Reichsfuehrer SS Himmler, Oberster Kliniker, Reichsarzt SS und Polizei (Chief Surgeon of the Staff of the Reich Physician SS and Police), and President of the German Red Cross.

Viktor Brack:  Oberfuehrer in the SS and Sturmbannfuehrer (Major) in the Waffen SS and Oberdienstleiter, Kanzlei des Fuehrers der NSDAP (Chief Administrative Officer in the Chancellery of the Fuehrer to the NSDAP).

4

Appendix 6

Waldemar Hoven: Hauptsturmfuehrer (Captain) in the Waffen
SS and Chief Physician of the Buchenwald Concentration Camp.

Herta Oberheuser: Physician at the Ravensbrueck Concentration
Camp and assistant physician to the defendant Gebhardt at the
hospital at Hohenlychen.

Fritz Fischer: Sturmbannfuehrer in the Waffen SS and assist-
ant physician to the defendant Gebhardt at the hospital
at Hohenlychen.

Siegfried Handloser: Generaloberstabsarzt (Lieutenant
General, Medical Service), Heeressanitaetsinspekteur
(Medical Inspector of the Army), and Chef des Wehr-
machtsanitaetswesens (Chief of the Medical Services of the
Armed Forces).

Paul Rostock: Chief Surgeon of the Surgical Clinic in
Berlin, Surgical Adviser to the Army, and Amtschef der
Dienststelle Medizinische Wissenschaft und Forschung
(Chief of the Office for Medical Science and Research)
under the defendant Karl Brandt, Reich Commissioner for
Health and Sanitation.

Oskar Schroeder: Generaloberstabsarzt; Chef des Stabes,
Inspekteur des Luftwaffe-Sanitaetswesens (Chief of Staff
of the Inspectorate of the Medical Service of the Luftwaffe);
and Chef des Sanitaetswesens der Luftwaffe (Chief of the
Medical Service of the Luftwaffe).

Hermann Becker-Freyseng: Stabsarzt in the Luftwaffe
(Captain, Medical Service of the Air Force) and Chief of
the Department for Aviation Medicine of the Medical Service
of the Luftwaffe.

Georg August Weltz: Oberfeldarzt in the Luftwaffe (Lieu-
tenant Colonel, Medical Service of the Air Force) and
Chief of the Institut fuer Luftfahrtmedizin (Institute for
Aviation Medicine) in Munich.

Wilhelm Beiglboeck: Consulting physician to the Luftwaffe.

Gerhard Rose: Generalarzt of the Luftwaffe (Brigadier
General, Medical Service of the Air Force); Vice President,
Chief of the Department for Tropical Medicine, and Professor
of the Robert Koch Institute; and Hygienic Adviser for
Tropical Medicine to the Chief of the Medical Service of
the Luftwaffe.

Siegfried Ruff: Director of the Department for Aviation
Medicine at the Deutsche Versuchsanstalt fuer Luftfahrt
(German Experimental Institute for Aviation).

5

Hans Wolfgang Romberg:  Physician on the staff of the Depart-
ment for Aviation Medicine at the German Experimental Institute
for Aviation.

Konrad Schaefer:  Physician on the staff of the Institute for
Aviation Medicine in Berlin.

Adolf Pokorny:  Physician, specialist in skin and venereal
diseases.

The indictment consisted of four counts.  Count one charged
participation in a common design or conspiracy to commit war crimes
or crimes against humanity.  The ruling of the tribunal disregarded
this count, hence no defendant was found guilty of the crime charged
in count one.  Count two was concerned with war crimes and count
three, with crimes against humanity.  Fifteen defendants were found
guilty, and eight were acquitted on these two counts.  Ten defendants
were charged under count four with membership in a criminal organiza-
tion and were found guilty.

The transcripts also contain the arraignment and plea of each
defendant (all pleaded not guilty), opening and closing statements
of defense and prosecution, and the judgment and sentences, which
acquitted 7 of the 23 defendants (Blome, Pokorny, Romberg, Rostock,
Ruff, Schaefer, and Weltz).  Death sentences were imposed on
defendants Brack, Karl Brandt, Rudolf Brandt, Hoven, Gebhardt,
Mrugowsky, and Sievers, and life imprisonment on Fischer, Genzken,
Handloser, Rose, and Schroeder; varying terms of years were given
to defendants Becker-Freyseng, Beiglboeck, Oberheuser, and
Poppendick.

The English-language transcript volumes are arranged numer-
ically, 1-30; pagination is continuous, 1-11538.  The German-
language transcript volumes are numbered 1a-30a and paginated
1-11756.  The letters at the top of each page indicate morning,
afternoon, and evening sessions.  The letter "C" designates com-
mission hearings (to save court time and to avoid assembling
hundreds of witnesses at Nuernberg, in most of the cases one or
more commissions took testimony and received documentary evidence
for consideration by the tribunals).  Several hundred pages are
added to the transcript volumes and given number plus letter
designations, such as page number 1044a.  Page 1 in volume 1
(English) is preceded by pages numbered 001-039, while the last
page of volume 28 (English) is followed by pages numbered 1-48.

Of the many documents assembled for possible prosecution use,
570 were chosen for presentation as evidence before the tribunal.
These consisted largely of orders, directives, and reports on
medical experiments or the euthanasia program; several interrogation
reports; affidavits; and excerpts from the *Reichsgesetzblatt* (the
official gazette of Reich laws) as well as correspondence.  A number

6

of the medical reports were accompanied by series of photographs
and charts of various experiments.

The first item in the arrangement of the prosecution exhibits
is usually a certificate listing the document number, a short
description of the exhibit, and a statement on the location of
the original document of the exhibit.  The certificate is followed
by the document, the actual prosecution exhibit (most of which are
photostats), and a few mimeographed articles with an occasional
carbon of the original.  In rare cases, the exhibits are followed
by translations or additional certificates.  A few exhibits are
original documents, such as:

| Exhibit No. | Doc. No. | Exhibit No. | Doc. No. |
|---|---|---|---|
| 301 | NO-1314 | 410 | NO-158 |
| 307 | NO-120 | 441 | NO-1730 |
| 309 | NO-131 | 443 | NO-890 |
| 310 | NO-132 | 451 | NO-732 |
| 357 | 1696 PS | 462 | NO-1424 |
| 362 | 628 PS | 507 | NO-365 |
| 368 | NO-817 | 546 | NO-3347 |
| 403 | 616 PS | | |

No certificate is attached to several exhibits, including
exhibits 433, 435-439, 462, 559, and 561.  Following exhibit 570
is a tribunal exhibit containing the interrogation of three
citizens of the Netherlands.  Number 494 was not assigned, and
exhibit 519 is followed by 519a and 519b.

Other than affidavits, the defense exhibits consist of newspaper
clippings, reports, personnel records, *Reichsgesetzblatt* excerpts,
and other items.  There are 901 exhibits for the defendants.  The
defense exhibits are arranged by name of defendant and thereunder by
exhibit number, each followed by a certificate wherever available.

The translations in the prosecution document books are
preceded by indexes listing prosecution document numbers, biased
descriptions, and page numbers of the translation.  They are
generally listed in the order in which the prosecution exhibits
were introduced into evidence before the tribunal.  Pages 81-84
of prosecution document book 1 are missing.  Books 12, 16, and
19 are followed by addenda.  The document books consist largely
of mimeographed pages.

The defense document books are similarly arranged.  Each
book is preceded by an index giving document numbers, description,
and page number for each exhibit.  The corresponding exhibit
numbers are generally not provided.  There are several unindexed
supplements to numbered document books.  Prosecution and defense
briefs are arranged alphabetically by names of defendants; final
pleas and defense answers to prosecution briefs follow a similar

7

scheme.  Pagination is consecutive, yet there are many pages where an "a" or "b" is added to the numeral.

The English-language final pleas, closing briefs, and replies to prosecution briefs of several defendants are missing, as are a few German-language closing briefs and replies to prosecution briefs.

At the beginning of roll 1 are filmed key documents from which Tribunal I derived its jurisdiction: the Moscow Declaration, U.S. Executive Orders 9547 and 9679, the London Agreement, the Berlin Protocol, the Charter of the International Military Tribunal, Control Council Law 10, U.S. Military Government Ordinances 7 and 11, and U.S. Forces, European Theater General Order 301. Following these documents of authorization is a list of the names and functions of the members of Tribunal I and counsels.

These documents are followed by the transcript covers giving such information as name and number of case, volume numbers, language, page numbers, and inclusive dates.  They are followed by summaries of the daily proceedings providing an additional finding aid for the transcripts.  The exhibits are listed in an index, which notes type of exhibit, exhibit number and name, corresponding document number and document book and page, a short description of the exhibit, and the date when it was offered in court.  The official court file is indexed in the court docket, which is followed by a list of witnesses.

Not filmed were records duplicated elsewhere in this microfilm publication, such as prosecution and defense document books in the German language that are largely duplications of prosecution and defense exhibits already microfilmed or opening statements of prosecution and defense, which can be found in the transcripts of the proceedings.

The records of the Brandt case are closely related to other microfilmed records in Record Group 238, specifically prosecution exhibits submitted to the International Military Tribunal, T988; NI (Nuernberg Industrialist) Series, T301; NOKW (Nuernberg Armed Forces High Command) Series, T1119; NG (Nuernberg Government) Series, T1139; and records of the Milch case, M888, the List case, M893, the Greifelt case, M894, and the Ohlendorf case, M895. In addition, the record of the International Military Tribunal at Nuernberg has been published in *Trial of the Major War Criminals Before the International Military Tribunal* (Nuernberg, 1947), 42 vols.  Excerpts from the subsequent proceedings have been published as *Trials of War Criminals Before the Nuernberg Military Tribunal Under Control Council Law No. 10* (U.S. Government Printing Office: 1950-53), 15 vols.  The Audiovisual Archives Division of the National Archives and Records Service holds motion picture records and photographs of all 13 trials and tape recordings of the International Military Tribunal proceedings.

8

Appendix 6

John Mendelsohn wrote these introductory remarks and arranged the records for microfilming in collaboration with George Chalou.

9

Appendix 6

CONTENTS

Appendix 6

ROLL                          DESCRIPTION

Finding Aids                          Inclusive Dates
1       Documents of Authorization
        List of Tribunal Members
        Covers of Transcripts
        Minute Book
        Prosecution and Defense
          Exhibit Index
        Court Docket
        List of Witnesses

        Transcript Volumes
        (English Version)
2              1              Nov. 21-Dec. 12, 1946
               2              Dec. 13-19, 1946
               3              Dec. 20, 1946-Jan. 6,
                              1947
3              4              Jan. 7-10, 1947
               5              Jan. 13-16, 1947
               6              Jan. 17-29, 1947
4              7              Jan. 30-Feb. 5, 1947
               8              Feb. 6-11, 1947
               9              Feb. 12-19, 1947
5              10             Feb. 20-26, 1947
               11             Feb. 27-Mar. 4, 1947
               12             Mar. 5-11, 1947
6              13             Mar. 12-20, 1947
               14             Mar. 21-28, 1947
               15             Mar. 31-Apr. 8, 1947
7              16             Apr. 9-15, 1947
               17             Apr. 16-23, 1947
               18             Apr. 24-30, 1947
8              19             May 1-7, 1947
               20             May 8-14, 1947
               21             May 15-21, 1947
9              22             May 22-June 2, 1947
               23             June 3-9, 1947
               24             June 10-14, 1947
10             25             June 16-19, 1947
               26             June 20-24, 1947
               27             June 25-28, 1947
11             28             June 30-July 9, 1947
               29             July 14-17, 1947
               30             July 18-Aug. 20, 1947

        Prosecution Exhibits
12             1-138
13             139-300
14             301-450

11

Appendix 6

| ROLL | DESCRIPTION |
|------|-------------|

15             451-570
               Tribunal Exhibit

               Prosecution Document Books

| Book | Title |
|------|-------|
16 | 1 | Document Authentication, Positions Held by Defendants |
| 2 | High-Altitude Experiments |
| 3 | Freezing Experiments |
| 4 | Malaria Experiments |
| 5 | Seawater Experiments |
| 6 | Sterilization Experiments |
| 7 | Extermination of TB Poles |
| 8 | Jaundice Experiments |
| 9 | Jewish Skeleton Collection |
| 10 | Various Experiments |
| 11 | Blood Coagulation and Phlegmone Experiments |
| 12 | Typhus Experiments |
| 12 Addendum | Typhus Experiments |
| 13 | Mustard Gas (Lost Gas) Experiments |
17 | 14 pt. 1 | Euthanasia |
| 14 pt. 2 | Euthanasia |
| 14 pt. 3 | Euthanasia |
| 15 | Euthanasia |
| 16 | Euthanasia |
| 16 Addendum | Euthanasia |
| 17 | Euthanasia |
| 18 | No Title |
| 19 | No Title |
| 19 Addendum | No Title |

               Transcript Volumes
               (German Version)

18 | 1a | Nov. 21-Dec. 12, 1946 |
| 2a | Dec. 13-19, 1946 |
| 3a | Dec. 20, 1946-Jan. 6, 1947 |
19 | 4a | Jan. 7-10, 1947 |
| 5a | Jan. 13-16, 1947 |
| 6a | Jan. 17-29, 1947 |
20 | 7a | Jan. 30-Feb. 5, 1947 |
| 8a | Feb. 6-11, 1947 |
| 9a | Feb. 12-19, 1947 |
21 | 10a | Feb. 20-26, 1947 |
| 11a | Feb. 27-Mar. 4, 1947 |
| 12a | Mar. 5-11, 1947 |
22 | 13a | Mar. 12-20, 1947 |
| 14a | Mar. 21-28, 1947 |
| 15a | Mar. 31-Apr. 8, 1947 |

Appendix 6

| ROLL | | DESCRIPTION |
|------|------|------|
| 23 | 16a | Apr. 9-15, 1947 |
| | 17a | Apr. 16-23, 1947 |
| | 18a | Apr. 24-30, 1947 |
| 24 | 19a | May 1-7, 1947 |
| | 20a | May 8-14, 1947 |
| | 21a | May 15-21, 1947 |
| 25 | 22a | May 22-June 2, 1947 |
| | 23a | June 3-9, 1947 |
| | 24a | June 10-14, 1947 |
| 26 | 25a | June 16-19, 1947 |
| | 26a | June 20-24, 1947 |
| | 27a | June 25-28, 1947 |
| 27 | 28a | June 30-July 9, 1947 |
| | 29a | July 14-17, 1947 |
| | 30a | July 18-Aug. 20, 1947 |

| | Defense Exhibits | Nos. |
|------|------|------|
| 28 | Becker-Freyseng | 1-66 |
| | Beiglboeck | 1-38 |
| | Blome | 1-25 |
| | Brack | 1-55 |
| 29 | Brandt, K. | 1-103 |
| | Brandt, R. | 1-21 |
| | Gebhardt | 1-45 |
| | Genzken | 1-23 |
| | Handloser | 1-72 |
| 30 | Hoven | 1-20 |
| | Mrugowsky | 1-115 |
| | Oberheuser | 1 |
| | Pokorny | 1-30 |
| | Poppendick | 1-24 |
| 31 | Romberg | 1-6 |
| | Rose | 1-63 |
| | Rostock | 1-13 |
| | Ruff | 1-32 |
| | Schaefer | 1-40 |
| | Schroeder | 1-26 |
| | Sievers | 1-59 |
| | Weltz | 1-24 |

| | Defense Document Books | |
|------|------|------|
| 32 | Becker-Freyseng | I-V,2 |
| | Beiglboeck | I-II,3 |
| | Blome | I-Supplement 5 |
| | Brack | I-II,5 |
| 33 | Brandt, K. | I-Supplement 4 |
| | Brandt, R. | I-Miscellaneous Documents |
| | Fischer, Gebhardt, Oberheuser | I-Miscellaneous Documents |

13

Appendix 6

| ROLL | DESCRIPTION | |
|------|-------------|---|
| | Genzken | I-Supplement 2 |
| | Handloser | I-Miscellaneous Documents |
| 34 | Hoven | I-Supplement 1 |
| | Mrugowsky | I-Supplement 3 |
| | Pokorny | |
| | Poppendick | I-Supplement 3 |
| | Romberg | I-Supplement 1 |
| 35 | Rose | I-Supplement 4 |
| | Rostock | I-Supplement 1 |
| | Ruff | I-Supplement 7 |
| | Schaefer | I-Supplement |
| | Schroeder | I-III |
| | Sievers | I-Supplement |
| | Weltz | I-III |

Other Items

| | | |
|------|-------------|---|
| 36 | Prosecution Closing Statements and Briefs on All Defendants (English and German Versions) | |
| 37 | Final Pleas, Closing Briefs, and Answers to Prosecution Briefs (English Version) by Defendants: Becker-Freyseng, Beiglboeck, Blome, Brack, K. Brandt | |
| 38 | R. Brandt, Fischer, Gebhardt, Genzken, Handloser, Hoven, Mrugowsky, Oberheuser, Pokorny, Poppendick, Romberg, Rose | |
| 39 | Rostock, Ruff, Schroeder, Sievers, Weltz | |
| | Final Pleas, Closing Briefs, and Answers to Prosecution Briefs (German Version) by Defendants: Becker-Freyseng, Beiglboeck, Blome, Brack | |
| 40 | K. Brandt, R. Brandt, Fischer, Gebhardt, Genzken, Handloser, Hoven, Mrugowsky | |
| 41 | Oberheuser, Pokorny, Poppendick, Romberg, Rose, Rostock, Ruff, Schaefer, Schroeder, Sievers, Weltz | |
| 42 | Minute Book | Vol. 31 |
| | Official Court File | Vol. 32 |
| | Official Court File | Vol. 33 |
| 43 | Official Court File | Vol. 34 |
| | Official Court File | Vol. 35 |
| | Order and Judgment Book | Vol. 36 |
| 44 | Order and Judgment Book | Vol. 37 |
| | Defendants Clemency Petitions | Vol. 38 |
| 45 | Defendants Clemency Petitions | Vol. 39 |
| | Defendants Clemency Petitions | Vol. 40 |
| 46 | Defendants Clemency Petitions | Vol. 41 |
| | Defendants Clemency Petitions | Vol. 42 |

14

NOTES

Appendix 6

Appendix 6

NOTES

<u>AMICUS APPENDIX 7</u>: American Law Institute, A CONCISE RESTATEMENT OF TORTS, Sec. 18-19 *Battery: Offensive Contact* (3rd ed. 2013)



# A Concise Restatement of TORTS

### Third Edition

The American Law Institute

Appendix 7

# THE AMERICAN LAW INSTITUTE

# A Concise Restatement
## of
# TORTS

## Third Edition

Compiled
by
ELLEN M. BUBLICK
Dan B. Dobbs Professor of Law

University of Arizona
James E. Rogers College of Law



ST. PAUL, MN
AMERICAN LAW INSTITUTE PUBLISHERS
2013

Mat #41431944

CHAPTER 2. INTENTIONAL HARM TO PERSONS

that the actor know or have reason even to suspect that the other is in the vicinity of the third person whom the actor intends to affect and, therefore, that he should recognize that his act, though directed against the third person, involves a risk of causing bodily harm to the other so that the act would be negligent toward him.

**Illustration:**

> 3. A and B are trespassers upon C's land. C sees A but does not see B, nor does he know that B is in the neighborhood. C throws a stone at A. Immediately after C has done so, B raises his head above a wall behind which he has been hiding. The stone misses A but strikes B, putting out his eye. C is subject to liability to B.

## § 18.  Battery: Offensive Contact

*Restatement of the Law Second, Torts*

> **(1)  An actor is subject to liability to another for battery if**
>
> > **(a)  he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and**
> >
> > **(b)  an offensive contact with the person of the other directly or indirectly results.**
>
> **(2)  An act which is not done with the intention stated in Subsection (1, a) does not make the actor liable to the other for a mere offensive contact with the other's person although the act involves an unreasonable risk of inflicting it and, therefore, would be negligent or reckless if the risk threatened bodily harm.**

**Comment:**

*c. Meaning of "contact with another's person."* In order to make the actor liable under the rule stated in this Section, it is not necessary that he should bring any part of his own body in contact with another's person. It is enough that he intentionally cause his clothing or anything held or attached to him to come into such contact. So too, he is liable under the rule stated in this Section if he throws a substance, such as water, upon the other or if he sets a dog upon him. . . . All that is necessary is that the actor intend to cause the other, directly or indirectly, to come in contact with a foreign substance in a manner which the other will reasonably regard as offensive. Thus, if the actor daubs with filth a towel which he expects another to use in wiping his face with the expectation that the other will smear his face with it and the other does so, the actor is liable as fully as though he had directly thrown the filth in the other's face or had otherwise smeared his face with it. . . .

21

Appendix 7

## A CONCISE RESTATEMENT OF TORTS 3d

Since the essence of the plaintiff's grievance consists in the offense to the dignity involved in the unpermitted and intentional invasion of the inviolability of his person and not in any physical harm done to his body, it is not necessary that the plaintiff's actual body be disturbed. Unpermitted and intentional contacts with anything so connected with the body as to be customarily regarded as part of the other's person and therefore as partaking of its inviolability is actionable as an offensive contact with his person. There are some things such as clothing or a cane or, indeed, anything directly grasped by the hand which are so intimately connected with one's body as to be universally regarded as part of the person. On the other hand, there may be things which are attached to one's body with a connection so slight that they are not so regarded. The line of distinction is very difficult to draw. It is a thing which is felt rather than one to be defined, since it depends upon an emotional reaction. Thus, the ordinary man might well regard a horse upon which he is riding as part of his personality but, a passenger in a public omnibus or other conveyance would clearly not be entitled so to regard the vehicle merely because he was seated in it. . . .

   *d. Knowledge of contact.* In order that the actor may be liable under the statement in this Subsection, it is not necessary that the other should know of the offensive contact which is inflicted upon him at the time when it is inflicted. The actor's liability is based upon his intentional invasion of the other's dignitary interest in the inviolability of his person and the affront to the other's dignity involved therein. This affront is as keenly felt by one who only knows after the event that an indignity has been perpetrated upon him as by one who is conscious of it while it is being perpetrated.

### Illustrations:

   1. A, a surgeon, while B is under anesthesia, makes an examination of her person to which she has not given her consent. A is subject to liability to B.

   2. A kisses B while asleep but does not waken or harm her. A is subject to liability to B.

## § 19.   What Constitutes Offensive Contact

*Restatement of the Law Second, Torts*

> **A bodily contact is offensive if it offends a reasonable sense of personal dignity.**

### Caveat:

   The Institute expresses no opinion as to whether the actor is liable if he inflicts upon another a contact which he knows will be offensive to another's known but abnormally acute sense of personal dignity.

22

**Comment:**

Appendix 7

*a.* In order that a contact be offensive to a reasonable sense of personal dignity, it must be one which would offend the ordinary person and as such one not unduly sensitive as to his personal dignity. It must, therefore, be a contact which is unwarranted by the social usages prevalent at the time and place at which it is inflicted.

**Illustrations:**

1. A flicks a glove in B's face. This is an offensive touching of B.

2. A, while walking in a densely crowded street, deliberately but not discourteously pushes against B in order to pass him. This is not an offensive touching of B.

3. A, who is suffering from a contagious skin disease, touches B's hands, thus putting B in reasonable apprehension of contagion. This is an offensive touching of B.

4. A, a child, becomes sick while riding in B's taxicab. B takes hold of A in order to help her. This is not an offensive touching.

## C. ASSAULT

### § 21.   Assault

*Restatement of the Law Second, Torts*

> (1)  An actor is subject to liability to another for assault if
>
> (a)  he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and
>
> (b)  the other is thereby put in such imminent apprehension.
>
> (2)  An action which is not done with the intention stated in Subsection (1, a) does not make the actor liable to the other for an apprehension caused thereby although the act involves an unreasonable risk of causing it and, therefore, would be negligent or reckless if the risk threatened bodily harm.

**Comment on Subsection (1):**

*c.* In order that the actor shall be liable under the rule stated in this Section, it is only necessary that his act should cause an apprehension of an immediate contact, whether harmful or merely offensive. It is not necessary that it should directly or indirectly cause any tangible and material harm to the other. If, however,

23

<u>AMICUS APPENDIX 8</u>: Berman, Mitchell N., *Coercion Without Baselines: Unconstitutional Conditions in Three Dimensions*, 90 GEO. L.J. 1, 5-6, 10 (2001)





DATE DOWNLOADED: Wed May 11 18:47:16 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Mitchell N. Berman, Coercion without Baselines: Unconstitutional Conditions in Three
Dimensions, 90 GEO. L.J. 1 (2001).

ALWD 7th ed.
Mitchell N. Berman, Coercion without Baselines: Unconstitutional Conditions in Three
Dimensions, 90 Geo. L.J. 1 (2001).

APA 7th ed.
Berman, M. N. (2001). Coercion without baselines: unconstitutional conditions in
three dimensions. Georgetown Law Journal, 90(1), 1-112.

Chicago 17th ed.
Mitchell N. Berman, "Coercion without Baselines: Unconstitutional Conditions in Three
Dimensions," Georgetown Law Journal 90, no. 1 (November 2001): 1-112

McGill Guide 9th ed.
Mitchell N. Berman, "Coercion without Baselines: Unconstitutional Conditions in Three
Dimensions" (2001) 90:1 Geo LJ 1.

AGLC 4th ed.
Mitchell N. Berman, 'Coercion without Baselines: Unconstitutional Conditions in Three
Dimensions' (2001) 90(1) Georgetown Law Journal 1

MLA 9th ed.
Berman, Mitchell N. "Coercion without Baselines: Unconstitutional Conditions in Three
Dimensions." Georgetown Law Journal, vol. 90, no. 1, November 2001, pp. 1-112.
HeinOnline.

OSCOLA 4th ed.
Mitchell N. Berman, 'Coercion without Baselines: Unconstitutional Conditions in Three
Dimensions' (2001) 90 Geo LJ 1

Provided by:
Biddle Law Library

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your license, please use:
   *Copyright Information*

Appendix 8

Appendix 8

# ARTICLE

## Coercion Without Baselines: Unconstitutional Conditions in Three Dimensions

MITCHELL N. BERMAN*

### TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. THE CONDITIONAL OFFER PROBLEM . . . . . . . . . . . . . . . . . . . . . . 8

II. COERCION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A. COERCION IN THE LITERATURE . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B. COERCION WITHOUT BASELINES . . . . . . . . . . . . . . . . . . . . . . . . 15

III. THREE DIMENSIONS OF CONSTITUTIONAL VIOLATION . . . . . . . . . . . 19

    A. EFFECTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    B. PURPOSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    C. CONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IV. THE ANALYSIS IN BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    A. UNCONSTITUTIONALLY COERCIVE PROPOSALS . . . . . . . . . . . . . . 30

        1. The Supreme Court's Analysis in *South Dakota v. Dole* . . . . 30

        2. Interlude: Of Rights and Penalties . . . . . . . . . . . . . . . . . . 32

        3. Why *Dole* Was Wrongly Decided . . . . . . . . . . . . . . . . . . 36

    B. UNCONSTITUTIONAL, BUT NONCOERCIVE, PROPOSALS . . . . . . . . . 42

    C. CONSTITUTIONALLY PERMISSIBLE PROPOSALS . . . . . . . . . . . . . . 44

    D. SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

* Assistant Professor, The University of Texas School of Law. I am grateful to: Doug Laycock for invaluable comments and criticisms on earlier drafts; Larry Alexander, Rich Friedman, Mark Gergen, Heather Gerken, Susan Klein, Brian Leiter, Dick Markovits, Jack Nowlin, Jonathan Pratter, John Robertson, James Boyd White, Ernie Young, and participants at a law faculty colloquium at the University of Texas for additional helpful suggestions; the Fondren Foundation Centennial Chair for Faculty Excellence for generous financial support; and John Elia, Gillian Flory, and Kent Hofmann for very able research assistance. © 2001 Mitchell N. Berman.

1

Appendix 8

V.  REPRESENTATIVE APPLICATIONS ......................... 48

    A.  FEDERALISM .................................... 49

        1.  Vertical Limits on Conditional Offers Extended by the National Government ......................... 50

        2.  Vertical Limits on Conditional Offers Extended by States ...................................... 59

        3.  Horizontal Limits on Conditional Offers Extended by States ...................................... 70

    B.  INDIVIDUAL LIBERTIES ............................ 77

        1.  The First Amendment: Speech .................... 77

            a.  *Coercion* ............................... 78

            b.  *Effects* ................................. 81

            c.  *Purposes* ............................... 82

        2.  The First Amendment: Religion ................... 84

        3.  The Fifth Amendment: Takings ................... 89

        4.  The Sixth Amendment: Plea Bargaining ............. 98

        5.  Abortion ................................... 103

CONCLUSION ........................................... 110

INTRODUCTION

The Twenty-First Amendment, let us suppose, authorizes the states to regulate alcohol consumption as they wish; Congress, however, conditions five percent of otherwise allocable federal highway funds on each state's raising its minimum drinking age to twenty-one. Consistent with the Fifth and Fourteenth Amendments, the states may not effect a physical occupation of private property without paying just compensation; the California Coastal Commission, however, offers landowners a zoning variance on the condition that they dedicate a public easement over part of their private beachfront. The First Amendment grants individuals broad freedom of speech; the federal government, however, conditions public broadcast funds on recipient stations' refraining from editorializing. It also conditions public health funds for family planning on recipient clinics' refraining from advocating or counseling abortion.

As readers will no doubt recognize, each of these situations implicates the so-called unconstitutional conditions problem, a puzzle that arises whenever the government offers to provide a gratuitous benefit conditioned upon the offeree's

2001]                    COERCION WITHOUT BASELINES                    3

waiver of a constitutional right.[1] It has been recognized for well over a century and appears in dozens of doctrinal contexts. Despite early judicial assertions that such offers are, on the one hand, always permissible[2] or, on the other, always unconstitutional,[3] it is now universally recognized that such conditional offers are sometimes constitutionally permissible and sometimes not. Indeed, correctly understood, that is all the famed and contentious unconstitutional conditions doctrine holds.[4] The persistent challenge, consequently, has been to articulate some coherent or at least intelligible principles or tests by which to determine which offers fall into which category—to explicate, in other words, a theory to support the doctrine. Regrettably, more than a century of judicial and scholarly attention to the problem has produced few settled understandings.

The Supreme Court's failure to provide coherent guidance on the subject is, alas, legendary.[5] Consider the instances noted above. In *South Dakota v.*

---

1. *See, e.g.*, Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 HARV. L. REV. 1413, 1421 (1989); Lynn A. Baker, *Conditional Federal Spending After Lopez*, 95 COLUM. L. REV. 1911, 1921 & n.36 (1995) (citing formulations by other authors); David Cole, *Beyond Unconstitutional Conditions: Charting Spheres of Neutrality in Government Funded Speech*, 67 N.Y.U. L. REV. 675, 679–80 (1992); Thomas W. Merrill, *Dolan v. City of Tigard: Constitutional Rights as Public Goods*, 72 DENV. U. L. REV. 859, 859, 860 (1995).

2. *See, e.g.*, W. Union Tel. Co. v. Kansas, 216 U.S. 1, 53 (1910) (Holmes, J., dissenting) ("Even in the law the whole generally includes its parts. If the State may prohibit, it may prohibit with the privilege of avoiding the prohibition in a certain way."). This was Justice Holmes's long-held view of the matter. As he put it in an oft-quoted aphorism dating from his days on the Massachusetts bench, a policeman "may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 220 (1892); *see also* Frost & Frost Trucking Co. v. R.R. Comm'n, 271 U.S. 583, 602 (1926) (Holmes, J., dissenting); Commonwealth v. Davis, 162 Mass. 510, 511 (1895), *aff'd*, 167 U.S. 43 (1897). *But see, e.g.*, Missouri *ex rel.* Burnes v. Duncan, 265 U.S. 17, 24 (1924); Kenney v. Supreme Lodge, 252 U.S. 411, 414 (1920).

3. *See, e.g.*, Regan v. Taxation With Representation, 461 U.S. 540, 545 (1983) (observing that "the government may not deny a benefit to a person because he exercises a constitutional right"); *Frost & Frost Trucking Co.*, 271 U.S. at 593–94 ("[A]s a general rule, the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited, and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights.").

4. *See, e.g.*, Richard A. Epstein, *The Supreme Court, 1987 Term—Foreword: Unconstitutional Conditions, State Power, and the Limits of Consent*, 102 HARV. L. REV. 4, 6–7 (1988); Merrill, *supra* note 1, at 859; S. Chesterfield Oppenheim, *Unconstitutional Conditions and State Powers*, 26 MICH. L. REV. 176, 183 (1927). This point is worth emphasizing in view of the frequency with which the doctrine is described as holding "that government may not grant a benefit on the condition that the beneficiary surrender a constitutional right, even if the government may withhold that benefit altogether." Sullivan, *supra* note 1, at 1415; *see, e.g.*, LAURENCE H. TRIBE, CONSTITUTIONAL LAW § 10-8, at 681 & n.29 (2d ed. 1988); Martin H. Redish & Daniel J. LaFave, *Seventh Amendment Right to Jury Trial in Non-Article III Proceedings: A Study in Dysfunctional Constitutional Theory*, 4 WM. & MARY BILL RTS. J. 407, 440–41 (1995). This description is mistaken—even if qualified to mean only that the government may not grant a benefit on condition that the beneficiary surrender a constitutional right without a justification sufficient to permit infringement of that right. Surely, the State of Texas is not obligated to provide me with the benefit of employment. But nobody believes that, having offered to hire me as a law professor, the state is barred from conditioning its offer on my agreeing not to exercise my undoubted First Amendment right to unleash a steady torrent of four-letter words when addressing my students.

5. For one pithy rehearsal of some of the decisions signaling the Supreme Court's apparent befuddlement, see Sullivan, *supra* note 1, at 1416–17.

Appendix 8

*Dole*,[6] the Court upheld Congress's condition on the disbursement of highway funds on the ground, inter alia, that the proposal was not "so coercive as to pass the point at which 'pressure turns into compulsion.' "[7] Three days later, in *Nollan v. California Coastal Commission*,[8] the Court invalidated the Commission's conditional offer of a building permit, deeming it "not a valid regulation of land use but 'an out-and-out plan of extortion.' "[9] In so doing, the Court did not so much as mention *Dole*. The rule against editorializing was struck down as a violation of the First Amendment in *FCC v. League of Women Voters*,[10] while the restrictions on abortion counseling were upheld several years later in *Rust v. Sullivan*.[11] Implausibly distinguishing *League of Women Voters*, the *Rust* Court explained that "here the Government is not denying a benefit to anyone, but is instead simply insisting that public funds be spent for the purposes for which they were authorized."[12] The seeming incongruities reflected in these few recent cases are far from exceptional. As Professor Seth Kreimer wryly commented of other unconstitutional conditions cases, the judicial opinions have "manifested an inconsistency so marked as to make a legal realist of almost any reader."[13]

As constitutional theory abhors a vacuum, scholars have not been shy to proffer their own, widely divergent, resolutions of the unconstitutional conditions problem. Professor Kreimer, for example, has argued that courts should distinguish "threats" and "offers" depending upon whether the government's proposal would improve or worsen the individual's position (as measured by three separate baselines), and should subject only "threats" to heightened scrutiny unless the right discouraged by an "offer" is held to be inalienable.[14] Professor Richard Epstein, in contrast, has defended the doctrine as an indirect, or second-best, means of curing costs associated with monopoly, collective action problems, or externalities, by proposing that the state's power to condition the provision of a good or service be eliminated when the state can be

---

6. 483 U.S. 203 (1987).

7. *Id.* at 211 (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)).

8. 483 U.S. 825 (1987).

9. *Id.* at 837 (quoting *J.E.D. Associates, Inc. v. Town of Atkinson*, 432 A.2d 12, 14–15 (N.H. 1981)).

10. 468 U.S. 364, 399–402 (1984).

11. 500 U.S. 173 (1991).

12. *Id.* at 196. The point in text is not to insist that *League of Women Voters* and *Rust* are necessarily indistinguishable, but only to reject the Court's proposed distinction, namely that, in *Rust*, "the Government is not denying a benefit to anyone." It was *both* insisting that public funds be spent for their authorized purposes *and* denying a benefit to those clinics that refused to comply with the gag rule.

13. Seth Kreimer, *Allocational Sanctions: The Problem of Negative Rights in a Positive State*, 132 U. PA. L. REV. 1293, 1304 (1984); *see also, e.g.*, Brooks R. Fudenberg, *Unconstitutional Conditions and Greater Powers: A Separability Approach*, 43 UCLA L. REV. 371, 379 (1995) ("What is interesting is not simply that the Justices fail to engage the other side's argument, but that they fail to grapple even with their *own* previous and apparently conflicting statements."); Louis Michael Seidman, *Reflections on Context and the Constitution*, 73 MINN. L. REV. 73, 75 (1988) (observing that unconstitutional conditions cases "display wildly inconsistent results").

14. Kreimer, *supra* note 13, at 1351–95.

expected to choose the remaining alternative—providing the good uncondition-ally or not at all—that would maximize total social surplus.[15] And Dean Kathleen Sullivan, after briefly criticizing the approaches advanced by Kreimer and Epstein,[16] has emphasized systemic concerns, urging courts to apply height-ened scrutiny to any governmental condition that threatens to skew the balance of power between government and rightsholders, or the distribution of rights among rightsholders, or to create a de facto caste hierarchy in the enjoyment of constitutional rights.[17]

But these efforts, and those by other distinguished scholars, have left most observers unpersuaded.[18] Indeed, a growing chorus of influential voices has begun to maintain that the search for any "comprehensive theory of unconstitu-tional conditions is ultimately futile."[19] Accordingly, unconstitutional condi-tions theorizing over the past decade has tended to occupy narrower conceptual spaces. In place of the attempts to provide a unified theory of unconstitutional conditions across diverse doctrinal categories, scholars have offered descriptive and prescriptive theories of unconstitutional conditions limited to particular subject areas, with speech, religion, abortion, takings, plea bargaining, public assistance, and federal funding for states all generating substantial literatures.[20] But even these more modest efforts have been criticized as overly ambitious. Professor Cass Sunstein, most notably, has argued that any recourse to an unconstitutional conditions framework is unhelpful.[21] Because, "[i]n a crucial sense, all constitutional cases are unconstitutional conditions cases," he would have us abandon the notion that the label "unconstitutional conditions cases"

---

15. Epstein, *supra* note 4. Epstein's argument is significantly extended and revised in RICHARD A. EPSTEIN, BARGAINING WITH THE STATE (1993).

16. Sullivan, *supra* note 1, at 1450 & n.151, 1418 & nn.17–18.

17. *See id.* at 1489–1505.

18. *See, e.g.*, LOUIS MICHAEL SEIDMAN & MARK V. TUSHNET, REMNANTS OF BELIEF: CONTEMPORARY CONSTITUTIONAL ISSUES 76–77 (1996); Lynn A. Baker, *The Prices of Rights: Toward a Positive Theory of Unconstitutional Conditions*, 75 CORNELL L. REV. 1185, 1186 (1990) ("Despite wide acknowledgment of the doctrine's importance in modern constitutional law, attempts to explain how it arises or what it does have largely been unsuccessful.").

19. William P. Marshall, *Towards a Nonunifying Theory of Unconstitutional Conditions: The Example of the Religion Clauses*, 26 SAN DIEGO L. REV. 243, 243–44 (1989); *see also* Larry Alexander, *Impossible*, 72 DENV. U. L. REV. 1007 (1995); Frederick Schauer, *Too Hard: Unconstitutional Condi-tions and the Chimera of Constitutional Consistency*, 72 DENV. U. L. REV. 989, 990 (1995) (proposing that the unconstitutional conditions problem is "intractable because we are looking for coherent principles and usable doctrines in areas of policy where questions of degree predominate, and where seemingly arbitrary lines are necessary to settle temporarily, but not to resolve in any deeper sense, intrinsically competing policy objectives").

20. Anything approaching a comprehensive list of this voluminous literature would consume pages. Some of the more important contributions are cited *infra* Part V.

21. Professor Sunstein initially developed his argument in Cass R. Sunstein, *Why the Unconstitu-tional Conditions Doctrine Is an Anachronism (With Particular Reference to Religion, Speech, and Abortion)*, 70 B.U. L. REV. 593 (1990) [hereinafter Sunstein, *Anachronism*]. It appears, in revised form, as chapter ten in CASS R. SUNSTEIN, THE PARTIAL CONSTITUTION (1993). For an earlier sketch, see Cass R. Sunstein, *Is There an Unconstitutional Conditions Doctrine?*, 26 SAN DIEGO L. REV. 337 (1989) [hereinafter Sunstein, *Doctrine*].

6                THE GEORGETOWN LAW JOURNAL              [Vol. 90:1

describes a meaningful category and replace it with searching inquiry into the nature of governmental interferences with a constitutional right as well as the strength and legitimacy of the state's justifications.[22]

This Article attempts to effect a compromise of sorts between these two poles—the one aspiring to a useful metatheory of unconstitutional conditions that could operate independent of doctrinal particularities, and the other insisting that analysis of each conditional governmental offer is properly driven only by the rules specific to the doctrinal area in which the offer arises, without regard for any principles claimed common to a general "unconstitutional conditions problem." In a nutshell, the compromise works like this: I will argue that any given conditional governmental offer is (presumptively) unconstitutional if it is coercive, and that coercion has a coherent meaning supplied by bedrock constitutional logic that transcends the particularities that govern a specific region of constitutional law. Put otherwise, the notion of coercion is supplied by conceptual analysis, not by substantive constitutional interpretation.[23] But, my argument continues, the converse does not hold. It does not necessarily follow from the fact that a given governmental offer is presumptively unconstitutional that it is coercive. Even a noncoercive proposal may prove to be unconstitutional, and determining whether it is will require recourse to contingent and particularized rules of constitutional law, not to general principles of unconstitutional conditions. In short, the Article presents and defends a new unified theory of unconstitutional conditions—a theory that centers on coercion, but that also directs, in systematic fashion, how and when particularistic constitutional doctrine enters into the overall calculus.

The argument unfolds in five parts. Part I describes the scope of this project by articulating the formal structure of unconstitutional conditions cases. That is,

---

22. SUNSTEIN, *supra* note 21, at 292–93. I hope I am understanding Sunstein's argument correctly, but admit to some confusion regarding just what he believes should be repudiated. Although he straightforwardly declares that "the unconstitutional conditions doctrine should be abandoned," *id.* at 292; Sunstein, *Anachronism, supra* note 21, at 594, the ambiguous signals he sends concerning just what the doctrine is renders this proclamation somewhat opaque. In his article, Sunstein describes the doctrine as "hold[ing] that although government may choose not to provide certain benefits altogether, it may not condition the conferral of a benefit, once provided, on a beneficiary's waiver of a constitutional right." *Id.* at 593 n.2. This is certainly worth disavowing, but as we have seen, it is not a plausible statement of the doctrine. *See supra* note 4. It is perhaps for this reason that this definition of the doctrine is absent from the book. Unfortunately, this leaves Sunstein appearing to affirm a conception of the doctrine as a negative of "the claim that the government's power not to create a regulatory program necessarily includes the lesser power to impose on that program whatever conditions it chooses." SUNSTEIN, *supra* note 21, at 291; *see* Sunstein, *Anachronism, supra* note 21, at 594. This is a fine articulation of the unconstitutional conditions doctrine but not one whose abandonment Sunstein could reasonably be understood to advocate. Perhaps part of the confusion stems from use of the poorly understood word "doctrine." *See* L.A. Zaibert, *Philosophical Analysis and the Criminal Law,* 4 BUFF. CRIM. L. REV. 101, 112–13 & n.25 (2000) (bemoaning the lack of any systematic treatment of the meaning of the term "doctrine," and asking, "[I]s a doctrine a hypothesis, a thesis, a view, a rule of thumb, or a requirement?").

23. For a succinct statement of the difference between conceptual and substantive analyses, see JOSEPH RAZ, PRACTICAL REASON AND NORMS 10 (2d ed. 1990).

it describes the universe of cases that my solution to the unconstitutional conditions problem will be designed to cover. This will be brief.

Part II sets forth the conception of coercion that will do most of the heavy lifting. The suggestion that a notion of coercion will furnish the key to unlocking the unconstitutional conditions puzzle is nothing new, having long been proposed by courts and commentators alike. The contemporary scholarly consensus, however, holds that operationalizing coercion depends upon inescapably arbitrary and manipulable baselines, and is therefore unworkable. This Part demonstrates that the scholarly consensus is wrong. Borrowing from analyses of coercion in the philosophical literature, I construct a notion of coercion that is sufficiently nonarbitrary in definition and determinate in application to do the work required of it.

Part III takes a step back and situates the coercion-based explanation presented in Part II within a broader conceptual framework. In my view, courts and theorists have often been hampered in their efforts to determine whether a given conditional offer (or given class of conditional offers) *does* violate the Constitution because they have proceeded without any systematic conception of the ways in which state action in general (and thus conditional offers, in particular) *could* be unconstitutional. While it is hardly my goal to furnish a fully comprehensive vision of the respects in which the Constitution's duties and prohibitions operate, I argue here that such a taxonomy at least begins with a trichotomy of the ways in which the Constitution constrains government. Thus, Part III identifies three fundamental facets or dimensions of state action with which the Constitution is concerned—be it via prohibitory or mandatory commands, absolute or defeasible. Specifically, the Constitution polices the effects of government action, the purposes for which government acts, and the conduct in which the government engages (that is, the things government does). Coercion is an example of forbidden governmental conduct. This taxonomy of constitutional restraints on government power, although undeniably rudimentary, is important. Even if we determine that a given conditional offer does not constitute coercion, we cannot pronounce it constitutional until we have assessed it across the dimensions of purpose and effect.

Even by this point of the Article, much of the argument will have remained, necessarily, abstract. Part IV illustrates the concrete operation of the analysis by focusing on a paradigmatic case of an unconstitutionally coercive conditional offer—*South Dakota v. Dole*. In the process, it introduces the critical concept of an unconstitutional penalty. To oversimplify only slightly, I argue that constitutional logic dictates that state action that burdens exercise of a constitutional right for the purpose of either discouraging or punishing assertion of that right is itself presumptively unconstitutional. Employing this notion, and terming such state action a "penalty," Part IV demonstrates that the offer at issue in *Dole* was unconstitutionally coercive for threatening to impose an unconstitutional penalty. The Part continues by briefly illustrating how we can determine—now by paying close attention to provision-specific constitutional doctrine—whether a

8    THE GEORGETOWN LAW JOURNAL    [Vol. 90:1

given noncoercive conditional offer is nonetheless unconstitutional. After these demonstrations, the two basic pieces of my analysis should be clear: first, how to ascertain whether a given proposal is unconstitutionally coercive (an inquiry that is itself parasitic upon, but not reducible to, the notion of an unconstitutional penalty); and second, the need to systematically assess all proposals across all three dimensions of constitutional restraint: effects, purposes, and conduct. A summary of the analysis appears at the end of Part IV. Readers who prefer to start with an article's introduction and conclusion may find it helpful to look here too.

Last, Part V builds upon the skeletal treatment of Part IV by applying the three-dimensional theory to a variety of conditional benefit cases, actual and hypothetical, implicating concerns of both constitutional structure and individual rights. By systematically inquiring into purposes, effects, and coercion, this Part endeavors to show when the Court got it right, why it got things wrong, and how it should analyze the conditional benefits cases that will doubtlessly continue to arise.

## I. THE CONDITIONAL OFFER PROBLEM

The unconstitutional conditions doctrine, I have claimed, holds only that some conditional offers of governmental largesse are unconstitutional. This is true, but not very illuminating. What we need, of course, is a theory, an analytical method, a set of principles, rules, or standards to undergird or effectuate the doctrine. We need, in short, a way to separate the constitutional from the unconstitutional. Developing and defending such an account will be the burden of the body of this Article. But, we may first ask, on what will the account operate? What will our theory purport to sort into constitutional and unconstitutional? Following common usage, we may say that our task is to identify the contours of the unconstitutional conditions *problem*.[24]

A promising answer is already near at hand, as unconstitutional conditions problems are said to emerge whenever government conditions a benefit it is not obligated to provide on waiver of a constitutional right. As Kathleen Sullivan explains,

> unconstitutional conditions problems arise when government offers a benefit on condition that the recipient perform or forego an activity that a preferred constitutional right normally protects from government interference. The "exchange" thus has two components: the conditioned government *benefit* on the one hand and the affected constitutional *right* on the other.[25]

---

24. Put another way, we are looking for the boundaries or the coverage of the unconstitutional conditions doctrine. *Cf.* Kent Greenawalt, *Criminal Coercion and Freedom of Speech*, 78 Nw. U. L. REV. 1081, 1089 (1984) ("In a broad sense, every constitutional case can be said to raise a boundary problem, requiring delineation of the coverage of the constitutional provision involved. Often, however, the general applicability of a constitutional provision will not be in doubt; the only crucial issue will be how it applies to the circumstances presented. A case involves boundaries in my narrower sense when the applicability of a constitutional provision is genuinely in question.").

25. Sullivan, *supra* note 1, at 1421–22.

2001]                    COERCION WITHOUT BASELINES                         9

This may prove ultimately correct, but it is not, I wish to argue, very useful. Consider, for example, a challenge to a state law that prohibits police officers from sporting beards.[26] I assume that, whatever analytical method we ultimately employ to resolve such challenges, the eventual outcome will effectively turn upon a judicial assessment of the character and strength of a claimed liberty interest to grow facial hair. However, under Dean Sullivan's formulation—the conventional formulation—the question of whether this liberty interest rises to a constitutional right (or, as she puts it, a "preferred" constitutional right) determines not only whether the condition is unconstitutional, but whether the law even presents an unconstitutional conditions problem. This is unfortunate, for whether a preferred right is involved may prove controversial or uncertain. Indeed, if the state had not previously imposed a direct ban on the wearing of beards, it is precisely this case that is likely to determine whether people do enjoy a constitutional right to grow facial hair.

Imagine a different law, one permitting a certain class of individuals to remain in their homes and lead their regular lives if and only if they do $x$. At first blush, we may reason that the state is offering merely the continued enjoyment of our constitutional rights, not a "benefit" that the state "is permitted but not compelled to provide."[27] If so, the law might well be unconstitutional, but it does not present an "unconstitutional condition." It is, I think, infelicitous that we should be drawn to make this distinction at all. In this case, moreover, it may prove hasty. For suppose that this were a 1943 federal law providing that persons of Japanese ancestry living on the West Coast must report to federal "relocation centers" if they do not agree to submit to a lie detector test designed to test their loyalty to the United States. After the Supreme Court's 1944 *Korematsu* decision,[28] it seems that the law does offer a "benefit," that the case therefore does raise an unconstitutional conditions problem, and (very possibly) that the offer is constitutional. Had *Korematsu* been decided the other way, though, we may intuit that the offer would then be unconstitutional. But what is gained by concluding in addition (as per the conventional account) that the case no longer raises an unconstitutional conditions problem? And if we make that move, how are we to characterize the law before (or absent) *Korematsu*—how can we know whether the benefit offered is the sort of "benefit" sufficient to constitute an unconstitutional conditions problem?

My point is simple. Sullivan's statement of the unconstitutional conditions problem requires us, at the outset, to determine (1) whether the demand implicates a "preferred" constitutional right, and (2) whether the benefit offered is "gratuitous," yet neither determination is quite as mechanical and uncontroversial as one may think. More particularly, "preferred rights" and "gratuitous

---

26. *See* Kelley v. Johnson, 425 U.S. 238 (1976).

27. Sullivan, *supra* note 1, at 1422.

28. Korematsu v. United States, 323 U.S. 214 (1944).

Appendix 8

benefits" do not come to our attention predefined.[29] Sometimes, indeed, they emerge as the product of an unconstitutional conditions case, not as an input. Therefore, if we wish to demarcate the category of potential unconstitutional conditions in a way that does not itself depend upon contestable and subjective judgments of constitutional law, this definition will not do. Furthermore, we should strive for as objective an articulation as is possible of the doctrine's coverage. Differences of opinion regarding whether a particular unconstitutional conditions case is unconstitutional are unavoidable. It seems preferable (though not, concededly, essential) to avoid additional disagreements over whether the challenged law even presents an unconstitutional conditions problem at all. Limiting the possible loci of argument serves analytical clarity. Even more importantly, it provides some protection against the "definitional stop" by which substantive argumentation is concealed under the cover of value-neutral definition.[30]

If this is so, then we are better off with a definition of the unconstitutional conditions problem that is purely formal. As a first cut, let us propose that the problem arises—thus, that the unconstitutional conditions doctrine may confer protection—every time the government engages in conduct that has the logical structure of a biconditional: if $\sim x$, then $y$; and if $x$, then $\sim y$.[31] This formalization will enable us to use terms that reappear throughout the literature and that are subjects of contestation, but in an objective, nonevaluative way. This is especially valuable given the extent to which the history of the unconstitutional conditions doctrine has been characterized by battles over nomenclature—as over whether the liberty interest implicated is a "right" or a "privilege,"[32] whether the government proposal is a "threat" or an "offer,"[33] and whether withholding of the putative benefit amounts to a

---

29. This, I believe, is the "crucial sense" in which, according to Professor Sunstein, "all constitutional cases are unconstitutional conditions cases." *See supra* text accompanying note 22. As Sunstein proceeds to explain, "[t]here is no fundamental or metaphysical difference between the unconstitutional conditions case (welfare benefits will be eliminated for those who criticize the government) and the ordinary constitutional case (people who criticize the government must pay a fine)." SUNSTEIN, *supra* note 21, at 293.

30. The definitional stop is introduced in H.L.A. HART, PUNISHMENT AND RESPONSIBILITY 5–6 (1968).

31. As it turns out, this is slightly overstated. Some conditional proposals are more properly conceived as polyconditionals. More importantly for unconstitutional conditions purposes, it is conceivable that some unusual conditional proposals really are uniconditionals. That is to say, some governmental proposals of the form "if $\sim x$ then $y$" might not imply "if $x$ then $\sim y$." But if so, they will be exceptional enough that, rather than manipulate our initial working definition of the unconstitutional conditions problem to accommodate them, I think it more advisable to proceed with the somewhat imperfect, but adequate, statement in text, and then to massage or qualify it later as may prove necessary.

32. *See generally* Rodney A. Smolla, *The Reemergence of the Right-Privilege Distinction in Constitutional Law: The Price of Protesting Too Much*, 35 STAN. L. REV. 69 (1982); William W. Van Alstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law*, 81 HARV. L. REV. 1439 (1968).

33. *See infra* note 56.

"penalty" or "nonsubsidy."[34]

Let us therefore stipulate the following conventions: The biconditional as a whole is the "conditional proposal" (or simply the "proposal"), and the individual conditionals that are its component parts are the "offer" (that in which the consequent is the more desirable to the recipient of the proposal) and the "threat" (that in which the consequent is the less desirable). For ease of exposition, I will assume that the actor prefers $y$ to $\sim y$, and that the government which makes the proposal prefers $\sim x$ to $x$. It follows that "if $\sim x$ then $y$" is the offer, making $\sim x$ the "demand" and $y$ the "benefit."

For a quick illustration of how this terminology works, reconsider the law requiring all police officers to be clean-shaven. Notice that it consists of an "offer" ("if you do not grow a beard, you are eligible to be hired as a police officer") conjoined to a "threat" ("if you do grow a beard, you are not eligible to be hired as a police officer"). The "demand" is that the offeree "not grow a beard"; the "benefit" is eligibility to become a police officer. Because it is thus formalizable as a conditional proposal, the law necessarily presents an unconstitutional conditions problem. There is no need to determine at the outset— perhaps ahead of settled constitutional law—whether anyone has a constitutional right to grow a beard.

One final caveat. The reader may have noticed that standard equal protection cases share the identical formal structure I have proposed for unconstitutional conditions cases: if $\sim x$ then $y$; and if $x$ then $\sim y$. School segregation, for example, is reasonably well represented by the biconditional: If you are white, then you may attend school $A$; if you are not white, then you may not attend school $A$.[35] Yet it is customary to view equal protection and unconstitutional conditions as representing distinct spheres within constitutional law.[36] To accommodate our linguistic intuitions and norms of constitutional practice, I am happy to further define the unconstitutional conditions problem as involving those offers conditioned on conduct rather than status. Indeed, this is implied by the terms I have proposed above; we ordinarily think of "offers" and "threats" as being conditioned on specific action by the recipient, and "demands" especially imply that the addressee must perform a specified action (rather than be in a specified condition). Unfortunately, given the notorious slipperiness of some of our familiar conduct and status categories (think, for instance, of pregnancy, marital status, homosexuality, being a felon, religion, even sex and gender), this qualification may seem to reintroduce precisely the difficulties I sought to avoid by articulating the unconstitutional conditions problem in formal terms.

This apparent difficulty can be elided, however, by interpreting "conduct" or

---

34. *See, e.g.,* Sullivan, *supra* note 1, at 1439 ("The penalty/nonsubsidy distinction has increasingly determined the outcomes of unconstitutional conditions challenges. 'Penalties' coerce; 'nonsubsidies' do not."). This distinction has been especially relied upon in the abortion cases. *See infra* Part V.B.5.

35. We may want to add a second biconditional: If you are not white, then you may attend school $B$; if you are white, then you may not attend school $B$.

36. *See, e.g.,* Sullivan, *supra* note 1, at 1426–27.

12          THE GEORGETOWN LAW JOURNAL          [Vol. 90:1

"action" liberally. Let us stipulate, accordingly, that any and every state action that embodies biconditional form raises an unconstitutional conditions problem so long as any party wants to characterize the precedent upon which the conditional operates as conduct rather than—or in addition to—status. Put another way, my formal definition of the unconstitutional conditions problem accommodates all cases in which the nature of the precedent as status or conduct is contestable. No definitional stop here. What this means is that some conditional offers may be reasonably analyzed under two separate analytical constructs—those of equal protection and unconstitutional conditions. Though this sort of duplication of constitutional coverage may provoke qualms, I would counsel patience. First, it may prove that analysis under these two distinct tracks yields identical conclusions.[37] Second, even insofar as an unconstitutional conditions analysis of a given case generates a different outcome than would obtain under a standard equal protection inquiry, perhaps that is the fault of existing equal protection doctrine. Perhaps, in short, a sounder understanding of the unconstitutional conditions problem can engender better equal protection doctrine (though this is a question I leave for another day).

## II. COERCION

That the unconstitutional conditions doctrine may be explainable by reference to coercion is intuitive. Surely, the standard dictionary definition of "coerce"—"to compel to an act or choice by force, threat or other pressure"[38]—captures the essence of what appears to be wrong in many unconstitutional conditions cases. Furthermore, it is customary in the philosophical literature to formalize coercion as a property of biconditionals.[39] Not surprisingly, then, the Supreme Court has flirted for generations with the notion that conditional offers may prove unconstitutional by reason of their being coercive,[40] and the possibility has drawn close scholarly attention at least since Seth Kreimer's important article of nearly two decades ago.[41] The scholarship has concluded that coercion is a dead end.[42] I intend to argue that this conclusion is mistaken.

---

37. Indeed, I suspect that the Court's recent recognition of "classes of one" for purposes of equal protection jurisprudence, *see* Vill. of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam), will only bring these two areas of doctrine closer.

38. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 439 (1993).

39. *See, e.g.,* Harry G. Frankfurt, *Coercion and Moral Responsibility, in* ESSAYS ON FREEDOM OF ACTION 65, 66 (Ted Honderich ed., 1973); Vinit Haksar, *Coercive Proposals (Rawls and Gandhi)*, 4 POL. THEORY 65, 66 (1976). I have argued elsewhere that this is slightly overstated, *see* Mitchell N. Berman, *The Normative Functions of Coercion Claims*, 8 LEGAL THEORY (forthcoming Mar. 2002), but for reasons that need not concern us at present.

40. For a comprehensive review of the case law, see Sullivan, *supra* note 1, at 1428–42.

41. Kreimer, *supra* note 13. For further elaborations, see Seth F. Kreimer, *Government "Largesse" and Constitutional Rights: Some Paths Through and Around the Swamp*, 26 SAN DIEGO L. REV. 229 (1989).

42. *See infra* note 55.

Appendix 8

### A. COERCION IN THE LITERATURE

Drawing on explorations of coercion from moral philosophy,[43] Professor Kreimer argued that whether a particular conditional offer of governmental benefits is coercive will be informed by three separate considerations—what he labels the "baselines" of "history," "equality," and "prediction."[44] The historical baseline measures the benefits that the offeree enjoys at the time of the conditional offer; the equality baseline is set by the benefits enjoyed by parties "similarly situated" to the claimant;[45] and the prediction baseline reflects, simply, what the government would in fact do if it "could not impose the condition in question, or could not take the exercise of constitutional rights into account."[46] A conditional proposal that would put the offeree worse off than she would be "in the normal course of events"[47] as measured by all three baselines is a "threat"—which is to say, coercive. A proposal that would put the offeree worse off than none of the three baselines is an "offer"—hence, not coercive. What about a proposal that would leave the offeree worse off than some baseline(s), and better off than the other(s)? Well, Kreimer conceded, that presents a tough case.[48]

Kreimer's analysis provoked sustained attention and substantial criticism. Three principal criticisms stand out. The first challenges the utility of any multiple-baseline account. Invariably cases will arise in which different baselines point in different directions. But when a conditional offer is coercive as measured against one baseline but not coercive as measured against another, the need to choose between them is said to render the solution fatally indeterminate.[49] The second and third criticisms contest individual baselines, not the difficulties engendered by the interplay among the three. Although Kreimer's solution employed the three baselines of history, equality, and prediction, each falls into one or the other of the two general categories of baselines as previous works in moral theory had defined them: positive ("history" and "prediction") and normative ("equality").[50] And, the arguments went, neither positive nor

---

43. The seminal work in the field is Robert Nozick, *Coercion, in* PHILOSOPHY, SCIENCE AND METHOD: ESSAYS IN HONOR OF ERNEST NAGEL 440 (Sidney Morgenbesser et al. eds., 1969). Of the other contributions upon which Kreimer drew, *see* Kreimer, *supra* note 13, at 1353 n.220, the most important include Daniel Lyons, *Welcome Threats and Coercive Offers*, 50 PHILOSOPHY 425 (1975); and Frankfurt, *supra* note 39.

44. *See* Kreimer, *supra* note 13, at 1351–78. Although Kreimer's explication of coercion-based approaches to the unconstitutional conditions puzzle is especially elaborate, it does not comprise the whole of his solution. Kreimer supplements his three-baseline analysis with the argument that some conditional benefits, even if not coercive, will be unconstitutional for proposing that offerees relinquish inalienable constitutional rights. *See id.* at 1378–93.

45. *Id.* at 1365.

46. *Id.* at 1372.

47. *Id.* at 1353.

48. *Id.* at 1374–78.

49. *See, e.g.*, Epstein, *supra* note 4, at 13.

50. Kreimer plainly appreciates that operationalizing the "equality" baseline requires normative judgment. *See* Kreimer, *supra* note 13, at 1370–71.

Appendix 8

normative baselines prove satisfactory. Positive baselines were criticized as speculative, contestable, and, most of all, irrelevant; for, as Professor Kenneth Simons remarked, it is generally accepted that we cannot get an "ought" from an "is."[51] Normative baselines were dismissed as empty or arbitrary under a negative Constitution: Because the state has no constitutional obligation to provide these "gratuitous" benefits, judgments as to whether the state "should" provide them requires recourse to extraconstitutional considerations.[52]

Some scholars writing in Kreimer's wake sought to modify his approach to meet these objections. Professor Peter Westen, for instance, responded to the first of the above criticisms by arguing that a proposal is coercive if it would "leave a person worse off *either* than he otherwise expects to be *or* than he ought to be for refusing to do the proponent's bidding."[53] And Professor Simons sought to defang the first and third objections by proposing that we rely on a predictive baseline alone, such that a proposal is a "threat" and thus properly subject to some form of heightened judicial scrutiny if the state would grant the benefit had it not been permitted to attach the objected-to condition.[54] No theorist, however, addressed all of the critics' concerns—at least not to the critics' satisfaction. Today's overwhelming scholarly consensus, accordingly, is that coercion-based theories of unconstitutional conditions are doomed to failure because they necessarily rely upon the now-discredited faith in some form of preexisting baseline.[55]

---

51. Kenneth W. Simons, *Offers, Threats, and Unconstitutional Conditions*, 26 SAN DIEGO L. REV. 289, 310 (1989); *see, e.g.*, Seidman, *supra* note 13, at 78–79.

52. *See, e.g.*, Seidman, *supra* note 13, at 79 (explaining that a normative baseline "requires a determination of the decision-making environment that people have a right to expect" and that requires recourse to extraconstitutional sources); *see also infra* notes 57–61 and accompanying text.

53. Peter Westen, *"Freedom" and "Coercion"—Virtue Words and Vice Words*, 1985 DUKE L.J. 541, 586–87 [hereinafter Westen, *Virtue Words*]; *see also id.* at 575 ("I believe that there is a set of baselines that successfully distinguishes burdens from benefits and threats from offers for purposes of distinguishing coercive from noncoercive proposals. Commentators have failed thus far to identify the set because they have assumed that the choice was between either identifying a single baseline for all statements of coercion or leaving it to advocates to choose baselines willy-nilly."); *id.* at 586–87 (contending "that while neither a prescriptive nor an expectation baseline suffices by itself, the two baselines together account for all cases of coercion . . . . Coercion consists of conditional promises to leave a person worse off *either* than he otherwise expects to be *or* than he ought to be for refusing to do the proponent's bidding"). Although Westen's article is not specifically addressed to the unconstitutional conditions problem, it is, I think, fairly read in such a vein, given Professor Westen's long-standing interest in the topic. *See* Peter Westen, *Incredible Dilemmas*, 66 IOWA L. REV. 741 (1981); Peter Westen, *The Rueful Rhetoric of Rights*, 33 UCLA L. REV. 977 (1986).

54. Simons, *supra* note 51, at 312. Simons characterizes his solution as a way to distinguish exploitative from nonexploitative proposals (rather than coercive from noncoercive), but concedes that he uses the term "somewhat loosely." *Id.* at 309 n.66. For our purposes, this preference for "exploitation" over "coercion" is of only linguistic import. Either the proposed baseline is sensible and workable, or it is not.

55. *See, e.g.*, SEIDMAN & TUSHNET, *supra* note 18, at 84 (concluding that coercion-based theories of unconstitutional conditions require "baselines from which burdens and benefits can be measured; yet no obvious method for generating such baselines suggests itself"); Larry Alexander, *Understanding Constitutional Rights in a World of Optional Baselines*, 26 SAN DIEGO L. REV. 175 *passim* (1989); Cole, *supra* note 1, at 696 n.82 ("Because unconstitutional conditions doctrine seeks to establish general

Appendix 8

## B. COERCION WITHOUT BASELINES

The critics are right that previous efforts to solve the unconstitutional conditions puzzle by reference to coercion have not succeeded. But commentators have been too quick to conclude that any recourse to notions of coercion will be unavailing.

Start with a frequent definition of coercion from the philosophical literature: A conditional proposal is coercive if it would be wrong to carry out the act threatened.[56] Of course, this claim—employing a single normative baseline—runs straight into one of the principal objections to prior theories. Kathleen Sullivan, for instance, agrees that "any useful conception of coercion is irreducibly normative."[57] But this, she says, is precisely the problem. "Without a theory of autonomy, utility, fairness, or desert, one cannot tell when choice has been wrongfully constrained."[58] And any such theories, no matter how persuasive or attractive as matters of moral and political theory, "cannot be derived from the post-1937 Constitution it-

---

principles for conditions affecting all constitutional rights, the search for a general baseline is elusive."); Fudenberg, *supra* note 13, at 410–13; Merrill, *supra* note 1, at 859 n.4 (distinguishing between coercive and noncoercive proposals "requires the identification of an appropriate 'baseline,' and it turns out this is contestable"); Seidman, *supra* note 13, at 78–79; Sullivan, *supra* note 1, at 1442–56; Kathleen M. Sullivan, *Unconstitutional Conditions and the Distribution of Liberty*, 26 SAN DIEGO L. REV. 327, 328 (1989) ("[T]he notion [of coercion] is fatally elusive in unconstitutional conditions cases, where the government benefits at issue are gratuitous . . . . In a world without baselines, coercion cannot be tracked."); Sunstein, *Doctrine*, *supra* note 21, at 344–45 (concluding that the unconstitutional conditions doctrine is inadequate because, inter alia, "it focuses attention" on the "largely immaterial" and "extraordinarily complex" question of "whether there is a 'threat' (penalty) or an 'offer' (subsidy)").

56. *See, e.g.*, Martin Gunderson, *Threats and Coercion*, 9 CANADIAN J. PHIL. 247 (1979); Haksar, *supra* note 39, at 68–70; Cheyney C. Ryan, *The Normative Concept of Coercion*, 89 MIND 481 (1980). As Kreimer's own approach reflects, *see supra* text accompanying note 47, it is customary since Nozick to use the word "threat" as the label for a coercive proposal, thus requiring a distinction between "threats" and "offers." *See generally* Berman, *supra* note 39; Westen, *Virtue Words*, *supra* note 53. Recall that as I employ the terms, in contrast, neither has normative significance. *See supra* p. 11. As we have seen, every conditional benefits case is biconditional in form. I propose to call the conditional that holds out the consequent that the recipient would prefer the "offer," and the other conditional (to withhold the benefit) the "threat." By this definition, every case of conditional benefits contains both a threat and an offer. *Cf.* E. Allan Farnsworth, *Coercion in Contract Law*, 5 U. ARK. LITTLE ROCK L.J. 329, 332–33 (1982) (making a similar point with respect to contractual proposals). Whether to label the proposal as a whole a "threat" or an "offer" will depend not on any particular "test" in the sense of a formula that will hold true for all cases, but rather on a context-sensitive judgment about the "feel" of the proposal. And the feel may be a function of, among other things, the prior relationship of the parties and the magnitude of the proposed departures from various baselines. In short, every proposal with which we are interested could conceivably be characterized as either a threat or an offer (because it necessarily contains both), and which is the more plausible (or more fitting) characterization is more a subject for rhetoric, psychology, and phenomenology than of constitutional analysis. So nothing in what follows will depend on attaching the label of "threat" or "offer" to the conditional proposal. Following prevailing custom, I often refer to the proposal itself as a conditional offer. The critical question will be whether the proposal, however denominated, is coercive. For *that* question I do propose a test.

57. Sullivan, *supra* note 1, at 1428.

58. *Id.*

**Appendix 8**

self."[59] Consequently, "[t]o hold that conditions coerce recipients because they make them worse off with respect to a benefit than they *ought* to be runs against the ground rules of the negative Constitution on which the unconstitutional conditions problem rests."[60] Put otherwise, because it is not open to one purporting to do constitutional law to argue that the benefits at issue "ought" to be provided, the proposal cannot be labeled coercive. Years earlier, the philosopher Michael Bayles had reached a similar conclusion: "If the government is not morally obligated to provide the benefits independent of the conditions, their addition does not deprive recipients of legitimately expectable benefits. Thus no harm or coercion is involved."[61]

This objection, though facially persuasive, in fact trades on an ambiguity in what it means for the act threatened (withholding the benefit) to be "wrong." Understandably, Sullivan and Bayles read it to signify *morally* wrong. In Bayles's view, it simply is not morally wrong for the state to withhold the types of benefits at issue in unconstitutional conditions cases. And for Sullivan, whether such withholding is morally wrong is constitutionally irrelevant. However, it is a mistake to suppose that moral and political theories supply the sole benchmarks of wrongfulness. For although, as Sullivan rightly observes, "any useful conception of coercion is irreducibly normative," it does not follow that the relevant normative judgments must come from outside of the law. Even the most steadfast legal positivist can still recognize that, from a perspective *within* legal discourse, many rules of law have normative force. To take only the most salient example, criminal prohibitions do not merely announce possible consequences for particular courses of conduct, but also direct that such conduct should not be engaged in. Similarly, constitutional prohibitions (and affirmative duties) purport to declare what the state may not (or must) do.

There exists, in short, a variety of discourses or systems in which normative judgments of coercion may take hold. Revising our earlier definition to make this plain, we may say that a conditional proposal is coercive within a particular normative discourse, and thus presumptively prohibited, if it contains a threat, conditioned upon specified action or inaction by a recipient of the proposal, to do what it would be wrong *within that discourse* for the threatener to do.[62] For

---

59. *Id.* "Moreover," she continues, "even a satisfying normative theory of coercion would give only an incomplete account of unconstitutional conditions. Conditions on benefits, like other government actions, can burden constitutional rights even when they do not rise to the level of coercion." *Id.* at 1428. This last observation is exactly right (although "rising to the level" misleadingly implies that the line demarcating coercive proposals is one of degree, rather than of kind)—which is exactly why we need the three-dimensional approach.

60. *Id.* at 1450.

61. Michael D. Bayles, *Coercive Offers and Public Benefits*, 55 PERSONALIST 139, 143–44 (1974).

62. Sullivan anticipates this claim only to reject it by observing that the law often treats as "coercion" threats to perform acts that are themselves legal. *See, e.g.*, Sullivan, *supra* note 1, at 1443–46 (raising, among other supposed counterexamples, the crime of blackmail and the defense of duress in contract law). In fact, though, this supposed objection founders upon two separate ambiguities. *Cf.* Samuel Dubois Cook, *Coercion and Social Change, in* NOMOS XIV: COERCION 107, 115 (J.

Appendix 8

our purposes, there is no difficulty in identifying the relevant normative discourse. It is the discourse defined and constituted by the Constitution itself (as interpreted). Therefore, a conditional offer by government is coercive for purposes of constitutional law—hence presumptively unconstitutional—if it would violate the Constitution for the state to carry out its threat.[63] Put another

---

Roland Pennock & John W. Chapman eds., 1972) ("In concept, dimensions, and the realities of phenomena, coercion is indeed laden with ambiguity, complexity, and elusive ingredients."). The first ambiguity arises from the fact, once again, that claims of coercion operate simultaneously in different normative discourses. It is true that a proposal is not legally coercive unless the act threatened is illegal. But it is not true that blackmail is *legally* coercive. Rather, as I have attempted to demonstrate elsewhere, it is *morally* coercive because it threatens what it is (probably) morally wrongful for the particular actor to do. *See* Mitchell N. Berman, *The Evidentiary Theory of Blackmail: Taking Motives Seriously*, 65 U. Chi. L. Rev. 795 (1998). It is then made criminal because it is morally wrong. In short, whereas the highwayman's threat ("your money or your life") is both legally and morally coercive (i.e., is coercive within two separate normative discourses), the blackmail threat ("$1,000 or I'll tell your spouse of your infidelities") is illegal only by virtue of its being morally coercive. On this view, the puzzle about blackmail concerns why the act threatened—which I have just claimed is morally wrongful—is not itself criminalized, thereby making the blackmail threat legally as well as morally coercive. And the answer trades on the evidentiary value of the blackmail threat: Without it we are much less secure in judging that the act threatened is wrongful. Blackmail, then, is not a counter-example to the claim I have advanced in text.

If blackmail illustrates the first ambiguity besetting coercion talk, the duress example manifests the second. Judgments of coercion respond to different normative needs. They serve both to censure the making of a coercive proposal and to excuse (fully or partially) the acting in the face of coercive pressure. The rub is that the conditions that constitute coercion (or coerciveness) in the two contexts are wholly different. (For development of this perhaps cryptic claim, see Berman, *supra* note 39.) Thus, a legal conclusion that some party, *B*, "was coerced" to perform some action *x* means only that conditions exist sufficient to excuse *B* from (some portion of) the ordinary consequences that attend the doing of *x*; it does not mean that the conditions necessarily exist sufficient to blame some other party, *A*. But it is this latter type of coercion claim that interests us when assessing the constitutionality of state action. As I will explain shortly, *see infra* notes 150–53 and accompanying text, the failure to distinguish these two senses is largely responsible for the consistent inadequacy of the Court's many efforts to operationalize coercion in the unconstitutional conditions arena.

To exploit (or adapt) Dworkin's familiar distinction between concepts and conceptions, *see* Ronald Dworkin, Taking Rights Seriously 134–36 (1978), we may say that the latter confusion is an artifact of there being two different concepts of coercion (relating to notions of censure and excuse), while the former is caused by the various conceptions of the first concept (relating to the different discourses in which normative judgments obtain).

63. It follows from this definition that threats of criminal sanction are not coercive in the *constitutional* sense, insofar as it is constitutionally permissible for the state to impose the punishment threatened. Although this may seem a fatal consequence given that criminal punishment is generally thought the paradigmatic use of coercive power by the state, the objection is defanged once we (again) take care not to shift unreflectively between normative discourses. Criminal sanctions constitute the central case of coercion within political theory because of that discipline's core concern with justifying the use of force by the state. But justifying all uses of force by the state is not a critical issue within American constitutional theory (and very possibly within any constitutional theory) because from a perspective internal to the constitutional system, the fundamental question of whether the state's use of force is justifiable has already been resolved. Put simply, if a discourse accepts the use of penal sanctions by the state as presumptively legitimate, then the threatened use of such sanctions cannot be "coercive" if that is to mean presumptively wrongful. Because American constitutional law presumably does accord a rebuttable presumption of legitimacy to the state's imposition of penal sanctions, whereas political and moral theories presumably do not, threatened criminal penalties are "coercive" in the latter discourses albeit not in the former.

way, the conditional offer of a benefit is coercive in the constitutional sense if withholding the benefit offered (that is, doing $\sim y$) would be unconstitutional.[64] Coercion thus remains a normative concept even though notions of *moral* wrongfulness need play no role.[65]

Having thus operationalized the concept of coercion, it may appear that we have expended a lot of effort merely to reencounter the foundational problem. As Professor Larry Alexander puts it, the unconstitutional conditions problem arises because in a world of "constitutionally optional baselines" no recipients of the proposal

> can complain that they are worse off than they would be were the government [to carry out its threat]. (At least that is so if their being worse off is measured by their preferences.) And, if they are not worse off than they *could* be constitutionally, how can they claim infringement of their constitutional rights?[66]

This is the intuition behind the greater-includes-the-lesser argument: If the state can withhold the benefit entirely, the offeree cannot be worse off by receiving the benefit conditionally; and if the conditional offer cannot make her worse off, then nor can it plausibly violate her constitutional rights.

This argument provokes a variety of rejoinders. One denies the premise as a practical matter. When political restraints operate to foreclose the government from withholding the benefit categorically, the thinking goes, a conditional offer really does leave the offeree worse off.[67] Another response rejects the absolutist conception of welfare that implicitly informs the challenge. Insofar as some measures of well-being are comparative, it is entirely plausible that an indi-

---

64. To be sure, we could translate this inquiry into baseline terms by proposing that a proposal is coercive if it threatens to put the offeree worse off than she would be under a "constitutional-rights" baseline. But why? Once we have understood what it means for a conditional government offer to be constitutionally coercive, to import baseline terminology is wholly unilluminating, if not positively obscuring.

65. This is not to say, of course, that moral judgments are utterly foreign to the constitutional analysis. Moral analysis impinges on this constitutional conception of coercion in two principal ways. First, although it is ultimately a positive question whether it would infringe the Constitution for the state to do as it threatens, it is one that, depending upon one's particular theory of constitutional interpretation, may prove richly informed by considerations of political morality and justice. Second, regardless of how one would generate these (first-order) constitutional conclusions in the first place, one may care to query whether a constitutionally coercive proposal is morally coercive as well. Presumably yes if the act threatened would be constitutionally wrong *because* it is morally wrong. If the act threatened would be unconstitutional but not (by your lights) immoral, then whether the proposal is coercive in a moral, as well as a constitutional, normative discourse depends upon whether the governmental actors have a moral obligation to obey the Constitution.

66. Alexander, *supra* note 55, at 177. Note that my formalization of the unconstitutional conditions puzzle includes even those cases in which it would be implausible to contend that the state could withhold the benefit entirely. Of course, the unconstitutionality of the conditional proposal in such cases is too plain to provoke much attention.

67. This is a particular focus of Professor Epstein. *See, e.g.,* Epstein, *supra* note 4, at 28–38; *see also* Kreimer, *supra* note 13, at 1313.

2001]                    COERCION WITHOUT BASELINES                    19

vidual may be better off in a world in which the benefit at issue is withheld entirely than in a world in which it is offered on a condition that she, but not others, would reject. When such forms of equality-type interests are constitutionalized—under the Equal Protection Clause or elsewhere—withholding even gratuitous benefits to some, but not all, may well be unconstitutional.[68]

Even when equality-type interests are not at stake, keep in mind that the coercion question is not whether the government is obligated to provide the benefit at issue to any particular claimant, but whether, having made the conditional offer, withholding the benefit is constitutional. This may make a difference. As Kathleen Sullivan puts it, a gratuitous benefit is one that the government is permitted, but neither forbidden nor compelled, to provide.[69] If government's purposes for action matter, this means only that there are at least some reasons (perhaps many) that would make nonprovision constitutionally unproblematic. It does not necessarily follow that the benefit could be withheld for any reason or no reason at all.[70] If the failure to provide even a gratuitous benefit could be unconstitutional if supported by the wrong sorts of purposes, then the blithe assertion that the state acts constitutionally in withholding it can only be meant in an epistemic sense—that is, to signify that we have no reason to doubt its constitutionality.

It follows that there are at least two ways in which the unconditional and conditional withholding of the same benefit may meaningfully differ. First, the two acts may be driven by different purposes, so the one is constitutional while the other is not. Second, they may be driven by the same purpose, and both be unconstitutional, but we may be able to discover the unconstitutionality only in the latter case, thanks to the condition's evidentiary value.

In any event, it is unnecessary at this stage to ruminate further about all the circumstances in which carrying out the act threatened may be unconstitutional even though the state is constitutionally permitted not to advance the offer in the first place. We have said enough to caution against a rush to any categorical judgment: Perhaps selective, conditional withholding of a given benefit is constitutional; perhaps it is not. We will explore the matter in greater depth in Part IV. Before doing so, though, a different sort of objection to a coercion-based theory of unconstitutional conditions demands our attention.

## III. THREE DIMENSIONS OF CONSTITUTIONAL VIOLATION

We saw that the principal objection to coercion-based theories of unconstitutional conditions was that coercion was arbitrary and manipulable. The preceding section rebuts that objection. A second objection holds that even if coercion

---

68. *See, e.g.*, Simons, *supra* note 51, at 295.

69. Sullivan, *supra* note 1, at 1422.

70. This objection has been made before. *See, e.g.*, John H. Garvey, *The Powers and Duties of Government*, 26 SAN DIEGO L. REV. 209, 224 (1989), *revised and reprinted in* JOHN H. GARVEY, WHAT ARE FREEDOMS FOR? ch. 12 (1996).

Appendix 8

could be made to work, it is insufficient and therefore not useful.[71] The short answer to this objection is to grant the premise, but reject the conclusion. It is true that a conditional offer can be unconstitutional even if not coercive. But it is wrong to conclude from this that coercion is unhelpful. The proper lesson is only that a full account of unconstitutional conditions must supplement a coercion-based explanation with something else. That suggestion, I recognize, is likely to excite the suspicion that the move to supplement coercion effectively reduces my coercion-based account to the ad hoccery that the skeptics insist really underlies all unconstitutional conditions theorizing. This Part seeks to demonstrate that this suspicion is misplaced by sketching the start of a tax-onomy of how any state action (be it a conditional offer or anything else) *could* violate the Constitution and by showing how coercion fits within the taxonomy.

Any test that purports to determine whether a given conditional offer is unconstitutional presupposes some notion—albeit often unarticulated or even inchoate—of how it may be unconstitutional. The question of how the state could violate the Constitution is ordinarily answered by reference to rights, powers, or duties. Thus, state action may be held unconstitutional because, for example, it "violates an individual right" or "exceeds government powers" or "breaches a government duty." And some previous contributions to the unconsti-tutional conditions literature have proceeded by supposing that the key to its resolution rests in identifying the correct conceptual framework.[72] That these efforts have not yet met with great success recommends a different approach,

---

71. *See, e.g.*, Sullivan, *supra* note 1, at 1450–56.

72. The most notable contribution along these lines is by John Garvey. *See* Garvey, *supra* note 70. In brief, Professor Garvey argues that claims that conditional offers of government benefits violate constitutional rights are more plausible if we think of constitutional rights as correlating with govern-ment duties rather than with limits on government power. Although much in Garvey's argument is insightful and persuasive, it has much greater force in explaining why the unconstitutional conditions doctrine is sound—that is, why the greater-includes-the-lesser intuition fails—than in helping to identify the proper contours of its protection.

A second proposed reconceptualization of ordinary constitutional rights that offers to assist resolution of unconstitutional conditions cases is perhaps best exemplified in the work of Professors Richard Fallon and Richard Pildes. *See* Richard H. Fallon, Jr., *Individual Rights and the Powers of Government*, 27 GA. L. REV. 343 (1993); Richard H. Pildes, *Avoiding Balancing: The Role of Exclusionary Reasons in Constitutional Law*, 45 HASTINGS L.J. 711 (1994); *see also* Geoffrey P. Miller, *Rights and Structure in Constitutional Theory*, 8 SOC. PHIL. & POL'Y 196 (1991) (expressing similar views). Each argues that, in addition to conceiving of constitutional rights (and the concomitant limits they impose on government power) as serving the immediate, particularistic interests of the individual rightsholder, we should think of rights as marking limits on government power that are recognized for systemic reasons largely independent of concerns about the impact the exercise of government power would work in the individual case. Thus, some individual rights serve much the same instrumental function in helping to preserve individual liberty over the long run as do paradigmatically structural constitutional arrange-ments as federalism and the separation of powers. Although neither Fallon nor Pildes develops his arguments specifically to serve a theory of unconstitutional conditions, each does claim that the reconceptualization he advocates should assist unconstitutional conditions theorizing. Fallon, *supra*, at 385–88; Pildes, *supra*, at 736–41. Some types of conditional offers for seemingly gratuitous benefits, their arguments go, may be unconstitutional precisely for threatening to aggrandize government power, not principally—or perhaps at all—because they threaten to harm or even to disadvantage individual offerees. Though I think the bedrock point here sound and important, precisely how this reconceptualiza-

Appendix 8

perhaps functional rather than conceptual. That is, whereas the first set of answers focus on the *senses* in which government action (or inaction) may be constitutionally offensive, a functional approach examines the *ways* that government action may run afoul of the Constitution. And this leads to a taxonomy of the dimensions or incidents of government action that may violate the Constitution.

In brief, my claim is that the Constitution can be violated by government action in three principal ways: (1) by the consequences, or *effects*, that the government causes or permits to obtain; (2) by the *purposes* for which government acts or fails to act; and (3) by the *conduct* that the government engages in or intentionally foregoes, which is to say, the *things* that government does or fails to do.[73] If any instance of governmental action is unconstitutional, it will be by virtue of its unconstitutional effects, its unconstitutional purpose, its unconstitutional conduct, or by some combination of these bases.[74]

Now, having just asserted that these are the ways state action can violate the Constitution, I want to forswear promptly any intention to catalogue all the effects, purposes, and types of conduct that should be understood to be unconstitutional, either absolutely or presumptively. For the most part, whether any particular constitutional provision should be interpreted to demand heightened justification when the state does certain things or acts for certain purposes or causes certain consequences—that is, whether any particular conduct, purpose, or effect should be deemed a constitutional infringement[75]—is a matter for

---

tion can help pave the way to develop a method to resolve the unconstitutional conditions problem remains obscure.

73. Professor Charles Fried recently advanced this same argument in nearly identical terms. *See* Charles Fried, *Types*, 14 CONST. COMMENT. 55 (1997) (distinguishing "effects," "intents," and "acts"). For a distinct but analogous taxonomy preceding Fried's, see Paul Brest, Palmer v. Thompson: *An Approach to the Problem of Unconstitutional Legislative Motivation*, 1971 SUP. CT. REV. 95, 103 (analyzing "[t]he paradigm law" in "three components or attributes: (a) an operative rule, (b) objectives (or purposes), and (c) effects (or consequences or impact)"). My analysis here differs from Fried's in two principal respects. First, Fried employs his trichotomy to classify not just state action but also the private action upon which the state operates. *See* Fried, *supra*, at 69–74. I am less certain that this single analytical framework is profitably applied so broadly. Second, as I will explain shortly, *see infra* text accompanying notes 112–13, the extent to which my "conduct" category and Fried's "act" category are the same is not clear. That said, I share Fried's conviction that attention to these three dimensions of constitutional infringement can add substantially to our understanding of a myriad of constitutional doctrines. Fried argues, for instance, that balancing tests are probably appropriate means to police infringing effects but not infringing purposes, Fried, *supra*, at 75, and also that analogical reasoning is most useful with respect to act-scrutiny, *id.* at 81–82.

74. I am inclined to think that each of these three sources of unconstitutionality often operates independently. But nothing in my argument about unconstitutional conditions depends on the relative frequency of these three dimensions of unconstitutionality, alone or in combination. I claim only that effects, purposes, conduct, and various combinations thereof, account for all (or substantially all) violations of the Constitution.

75. For the customary distinction between constitutional "infringements" and constitutional "violations," pursuant to which an infringement provokes a constitutional demand of special justification that, if not satisfied, constitutes a violation, see, for example, Frederick Schauer, *A Comment on the Structure of Rights*, 27 GA. L. REV. 415, 425 n.38 (1993); and Judith Jarvis Thomson, *Some Ruminations on*

Appendix 8

substantive argumentation, not conceptual analysis. The same is true with regard to the question of what type of justificatory test should be employed to measure whether any given infringement amounts to a constitutional violation.[76] By and large, therefore, my resolution of the unconstitutional conditions problem will not require me to challenge provision-specific constitutional doctrine.[77] Parts IV and V will be concerned with demonstrating how we can advance our understanding of unconstitutional conditions cases simply by appreciating this taxonomy, while remaining agnostic regarding just which purposes, effects, and conduct should be held unconstitutional. Before reaching that demonstration, though, it may prove useful to flesh out these concepts a little better.

## A. EFFECTS

That state action may violate the Constitution by virtue of the effects (or consequences) it produces is too well appreciated to require extended comment.[78] A few illustrations will suffice. Under the much-maligned *Pike* balancing test of dormant Commerce Clause jurisprudence, for example, state or local regulations are liable to be held unconstitutional by reason of their adverse effects on interstate commerce.[79] Similarly, under the "undue burden" standard of *Planned Parenthood v. Casey*,[80] "state regulation [that] has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an

*Rights*, 19 ARIZ. L. REV. 45, 47 (1977). Thus, an "infringement" is a presumptive violation, and a "violation" is an unjustified infringement. (Though under doctrines that render particular government actions invalid per se, infringements and violations are necessarily the same thing.)

76. To be clear, whether a particular conditional offer that is determined to be an infringement is, furthermore, a violation (while of ultimate importance to the parties to the case) is not central to this project, for it has little or nothing to do with unraveling the unconstitutional conditions problem and much to do with the vagaries of the justificatory doctrine the Supreme Court has crafted to govern that particular area of constitutional law. This distinction between infringements and violations is assuredly not meant to deny, however, that analysis and evaluation of the various tests the Court has developed to ascertain whether an infringement is a violation (that is, its manifold justificatory tests) constitute important avenues of constitutional scholarship. They are simply avenues we need not travel to reach our intended destination. Important explorations in this genre include T. Alexander Aleinikoff, *Constitutional Law in the Age of Balancing*, 96 YALE L.J. 943 (1987); Richard H. Fallon, Jr., *The Supreme Court, 1996 Term—Foreword: Implementing the Constitution*, 111 HARV. L. REV. 54 (1997); Charles Fried, *Constitutional Doctrine*, 107 HARV. L. REV. 1140 (1994); and Kathleen M. Sullivan, *The Supreme Court, 1991 Term—Foreword: The Justices of Rules and Standards*, 106 HARV. L. REV. 22 (1992).

77. My claim that one thing the state presumptively may not do is to engage in coercion is not an exception to the statement in text. That coercion is a type of presumptively constitutionally forbidden conduct is a general axiom of constitutional logic and therefore not dependent upon interpretation of individual constitutional provisions (although determining whether the state has engaged in coercion sometimes will require attention to particularistic constitutional doctrine).

78. Though Fallon concludes that effects triggers are not actually as prevalent as some think. *See* Fallon, *supra* note 76, at 84.

79. Pike v. Bruch Church, Inc., 397 U.S. 137 (1970). For criticism of the view that (nondiscriminatory) effects should ever be seen to violate the dormant Commerce Clause, see *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, 486 U.S. 888, 895 (1988) (Scalia, J., concurring).

80. 505 U.S. 833 (1992).

Appendix 8

abortion of a nonviable fetus" violates a woman's right to choose an abortion.[81]

The effects of state action have traditionally been subject to especially close scrutiny under the First Amendment. Under *United States v. O'Brien*,[82] for example, a law that burdens expressive conduct is unconstitutional, even absent any bad state purposes, unless "it furthers an important or substantial governmental interest; and the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."[83] And for close to thirty years, the Court subjected applications of even neutral laws of general applicability to a form of heightened scrutiny as infringing the Free Exercise Clause when they had the effect of burdening religious practice.[84] Laws infringe the Establishment Clause, furthermore, if they have the primary effect of promoting or inhibiting religion.[85]

### B. PURPOSES

Roughly, a governmental "purpose" refers to the state of affairs that decision-makers seek to achieve by their action or inaction.[86] Its near-synonyms in constitutional discourse include "motives," "objectives," "ends," and "aims."[87]

---

81. *Id.* at 877. This test is examined and compared to other effects tests in Gillian E. Metzger, Note, *Unburdening the Undue Burden Standard: Orienting* Casey *in Constitutional Jurisprudence*, 94 COLUM. L. REV. 2025 (1994).

82. 391 U.S. 367 (1968).

83. *Id.* at 377.

84. *See, e.g.*, Sherbert v. Verner, 374 U.S. 398 (1963). *Sherbert* was effectively overruled (though formally distinguished) in *Employment Division v. Smith*, 494 U.S. 872 (1990).

85. *See* Lemon v. Kurtzman, 403 U.S. 602 (1971).

86. *See, e.g.*, Brest, *supra* note 73, at 104.

87. Of all these terms, "purposes" and "motives" have attracted by far the most attention. The prevailing view in constitutional scholarship—which I will not here problematize—is that they are identical. *See, e.g., id.* at 104 n.55; J. Morris Clark, *Legislative Motivation and Fundamental Rights in Constitutional Law*, 15 SAN DIEGO L. REV. 953, 956 (1978); Theodore Eisenberg, *Disproportionate Impact and Illicit Motive: Theories of Constitutional Adjudication*, 52 N.Y.U. L. REV. 36, 41 & 106 n.321 (1977); John Hart Ely, *Legislative and Administrative Motivation in Constitutional Law*, 79 YALE L.J. 1205, 1217–21 (1970); Jill E. Evans, *Challenging the Racism in Environmental Racism*, 40 ARIZ. L. REV. 1219 n.377 (1998); Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. CHI. L. REV. 413, 426 n.40 (1996); Donald H. Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause*, 84 MICH. L. REV. 1091, 1143 (1986); Larry G. Simon, *Racially Prejudiced Governmental Actions: A Motivation Theory of the Constitutional Ban Against Racial Discrimination*, 15 SAN DIEGO L. REV. 1041, 1060–61 (1978).

"Aims," according to Professor Fallon, means "objective" purposes, rather than subjective ones. *See* Fallon, *supra* note 76, at 73 & n.99. For the distinction, see *infra* note 102 and accompanying text. Another closely allied term, "interests," most often refers to the ends advanced to justify state action that—for whatever reason—has provoked a demand for heightened justification. I will not here be interested in interests because, as already noted, *see supra* note 76, I take no position in this Article on how constitutional infringements should be justified. To repeat, then, this analysis provisionally accepts whatever particular tests—strict scrutiny, intermediate scrutiny, ad hoc balancing, per se invalidity, and so on—that the judiciary has developed to evaluate whether constitutional "infringements" are saved from being "violations." Nothing in my proposed solution to the unconstitutional conditions problem turns on the specific doctrines the judiciary adopts to effectuate the need for justification. For wide-ranging views on interest-scrutiny, see the essays collected in *Conference on Compelling Govern-*

But whatever they are called, and wherever a putatively bad purpose may lie within a chain of nested purposes,[88] the purposes animating state action, like its effects, constitute familiar respects in which the Constitution can be violated.

Again, a few illustrations will make the point.[89] Most famously, statutes that do not facially discriminate against protected classes provoke heightened scrutiny under equal protection law only if adopted for the purpose of discriminating against a protected class; disparate effects are not enough to infringe the Constitution.[90] Similarly, under the contemporary free exercise jurisprudence that has replaced the effects test of *Sherbert*,[91] strict scrutiny remains appropriate when a facially neutral law was adopted for the purpose of disfavoring a particular religious practice.[92] Pursuant to what is probably the most secure (albeit rarely used) component of the battered, but not yet beaten, *Lemon* test of Establishment Clause jurisprudence, a purpose to promote religious practice is unconstitutional.[93] Additionally, a protectionist purpose or effect is presumptively unconstitutional under the dormant Commerce Clause;[94] a purpose to censor expression is presumptively unconstitutional under the First Amendment;[95] and, as seen above, a woman's right to abort a nonviable fetus is violated by state action undertaken for the purpose of placing a substantial

---

*ment Interests: The Mystery of Constitutional Analysis*, 55 ALB. L. REV. 535–761 (1992). For an insightful treatment of the issue in the context of equal protection cases, see RICHARD S. MARKOVITS, MATTERS OF PRINCIPLE: LEGITIMATE LEGAL ARGUMENT AND CONSTITUTIONAL INTERPRETATION 224–31 (1998).

88. *See, e.g.*, Regan, *supra* note 87, at 1138–39.

89. Professor Fallon presents some of these illustrations in Fallon, *supra* note 76, at 91–94, in which he concludes that purpose scrutiny plays an especially prominent role in contemporary constitutional doctrine.

90. *See* Pers. Admin. v. Feeney, 442 U.S. 256 (1979); Washington v. Davis, 426 U.S. 229 (1976).

91. 374 U.S. 398 (1963).

92. *Smith* itself had no occasion expressly to consider whether a purpose to disfavor a religious practice was sufficient to provoke heightened scrutiny. In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), however, a plurality of the Court answered this question in the affirmative, *see id.* at 540–42 (Kennedy, J.); *id.* at 578 (Blackmun, J., concurring), over the objection of Justice Scalia and Chief Justice Rehnquist, who would take judicial cognizance of "the object of the laws at issue" but not "the subjective motivation of the lawmakers," *see id.* at 557–59 (Scalia, J., concurring). *But see id.* at 562 n.3 (Souter, J., concurring) (seeming to remain agnostic on this precise question).

93. Lemon v. Kurtzman, 403 U.S. 602, 612–13 (1971). Cases applying the purpose strand of *Lemon* to invalidate government conduct include *Edwards v. Aguillard*, 482 U.S. 578, 594 (1987); and *Wallace v. Jaffree*, 472 U.S. 38, 56 (1985).

94. *See, e.g.*, Kassel v. Consol. Freightways, 450 U.S. 662 (1981); City of Philadelphia v. New Jersey, 437 U.S. 617, 627–28 (1978). For a persuasive argument that only protectionist purpose, not protectionist effect, should provoke this exacting scrutiny (and furthermore, that this is largely what the Court's holdings reflect, notwithstanding unfortunate dicta), see Regan, *supra* note 87.

95. *See, e.g.*, R.A.V. v. City of St. Paul, 505 U.S. 377, 386 (1992) ("The government may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed."); Barnes v. Glen Theatre, 501 U.S. 560, 569–70 (1991) (plurality opinion); *id.* at 590–94 (White, J., dissenting); Regan v. Taxation With Representation, 461 U.S. 540, 548 (1983). For an extended argument that First Amendment doctrine is principally, if not exclusively, geared toward policing state purposes, see Kagan, *supra* note 87.

Appendix 8

obstacle in her way.[96] Just last Term, finally, the Court held programmatic purposes relevant to the Fourth Amendment when it declared unconstitutional highway checkpoint programs in which the primary purpose was the discovery and interdiction of narcotics.[97]

Given these many examples of the demonstrably significant role that governmental purpose plays in contemporary constitutional doctrine, the wide scholarly agreement on its propriety and feasibility should not surprise.[98] And while skepticism does periodically surface in both judicial and academic writings,[99] it would strain this already long Article past the breaking point to address these issues adequately. It will be enough, I hope, to acknowledge that much of the analysis that follows does depend upon the correctness of my beliefs that the constitutionality of a given state action sometimes depends upon the purposes that animated the state actors, and that judicial investigation of such purposes, even of multimember bodies, is appropriate and manageable.[100]

---

96. Planned Parenthood v. Casey, 505 U.S. 833, 877 (1992).

97. City of Indianapolis v. Edmond, 531 U.S. 32 (2000).

98. Thus Don Regan could observe in 1986 that "[p]roponents of motive review now argue nearly unopposed." Regan, *supra* note 87, at 1143. That is a fair description of the state of the literature today as well. For a recent contribution, in addition to the sources already mentioned, see Ashutosh Bhagwat, *Purpose Scrutiny in Constitutional Analysis*, 85 CAL. L. REV. 297 (1997). This was not always the case. The seminal works challenging the then-prevailing wisdom that legislative purposes were either constitutionally irrelevant or not fit for judicial examination are Brest, *supra* note 73; and Ely, *supra* note 87. For additional literature, see the articles collected in Symposium, *Legislative Motivation*, 15 SAN DIEGO L. REV. 925 (1978).

99. The principal judicial critic of purpose scrutiny is Justice Scalia. *See infra* notes 101–02. His counterpart in the academy (on this point) appears to be Professor Larry Alexander. *See, e.g.,* Larry Alexander, *Constitutional Theory and Constitutionally Optional Benefits and Burdens*, 11 CONST. COMMENT. 287 (1994) [hereinafter Alexander, *Constitutional Theory*]; Larry Alexander, *Correspondence: Affirmative Action and Legislative Purpose*, 107 YALE L.J. 2679, 2683 (1998); Larry A. Alexander, *Introduction: Motivation and Constitutionality*, 15 SAN DIEGO L. REV. 925 (1978) [hereinafter Alexander, *Motivation*]. In the unconstitutional conditions literature, Seth Kreimer has been a particularly influential critic of purpose scrutiny. *See* Kreimer, *supra* note 13, at 1327–40; *see also* Baker, *supra* note 18, at 1193 & n.18 (claiming that the Court and academic commentators have largely abandoned purpose-based analyses of unconstitutional conditions, and citing Kreimer's criticisms in particular); Michael E. Hartmann, *Tiers for Fears, Fears of Tiers*, 40 WAYNE L. REV. 1401, 1438 n.132 (1991) (quoting Kreimer approvingly). Although Kreimer argues in part that a purpose-based analysis of unconstitutional conditions does not produce the correct outcomes, most of his criticisms attack the feasibility or propriety of purpose scrutiny more generally.

100. Any marginal note attempting to substantiate this claim is bound to be inadequate. With that concession, though, a few remarks on the subject are appropriate. The heart of the point is that constitutional constraints are addressed initially (not to mention principally) to government officials with authority to make decisions. Those constraints tell such decisionmakers, among other things, you may not do thing *x*, or you may not seek to achieve state of affairs *y*. It follows that the decisionmaker acts unconstitutionally if she proceeds to act for the purpose of achieving the constitutionally forbidden objective. For the most persuasive statements of this view, see Paul Brest, *The Conscientious Legislator's Guide to Constitutional Interpretation*, 27 STAN. L. REV. 585, 589–94 (1975); and Regan, *supra* note 87, at 1144–47. For similar views, see Paul Brest, *Reflections on Motive Review*, 15 SAN DIEGO L. REV. 1141, 1142 (1978); and Jed Rubenfeld, *Correspondence: The Purpose of Purpose Analysis*, 107 YALE L.J. 2685, 2686 (1998). Works that also approve purpose scrutiny, but emphasize a distinct concern with the expressive meaning of bad government purposes include Elizabeth S. Anderson & Richard H. Pildes, *Expressive Theories of Law: A Skeptical Overview*, 148 U. PA. L. REV. 1503 (2000);

Appendix 8

That said, doubts exist not just about the legitimacy of purpose scrutiny *tout court*, but also about precisely what questions the courts should ask if undertaking it. Three issues deserve mention, just to be put aside. First, there is some disagreement over whether bad purposes alone can violate the Constitution, or whether they do so only when producing bad effects.[101] Second, commentators debate whether the judiciary may inquire into the actual "subjective" purposes

---

Paul Brest, *The Supreme Court, 1975 Term—Foreword: In Defense of the Anti-Discrimination Principle*, 90 HARV. L. REV. 1 (1976); Clark, *supra* note 87; and Simon, *supra* note 87.

The usual objection to this view assumes that the same consequences could constitutionally have been brought about had the state actors operated with good purposes rather than bad. And "unless . . . motivation makes some difference in the effects of government action on individuals," Larry Alexander argues, "it is hard to see why it matters." Alexander, *Constitutional Theory, supra* note 99, at 304. Certainly Alexander is right that, "ultimately, effects in the world are all that matter, even conceding the materiality of motivation." *Id.* at 306. But the key word here is "ultimately." Although any rule of constitutional law should be explicable on the basis of the difference it would have for individuals, the causal relationship may, in some circumstances, be extremely indirect and even probabilistic. Therefore, Alexander's claim that "[l]aws are unconstitutional because of their predicted effects over an indefinite period of time," *id.* at 302, is not quite right. Rather, *constitutional rules* exist "because of their predicted effects over an indefinite period of time." And while some of those rules will, in turn, require investigation of the predicted effects of individual laws, some of those rules will not. In short, that the measure of a rule of constitutional law should be its effects does not entail that that rule must assess instances of governmental action on the basis of *their* effects. *See* Fallon, *supra* note 72, at 375 (observing that "rights and rules in our constitutional scheme resemble the rights and rules that would exist under a system of rule utilitarianism. Rules result from a balance of interests, but, once in place, exert an independent claim to obedience"); *see also* Matthew Adler, *Rights Against Rules: The Moral Structure of American Constitutional Law*, 97 MICH. L. REV. 1 (1998) (developing this insight); Michael C. Dorf, *Incidental Burdens on Fundamental Rights*, 109 HARV. L. REV. 1175, 1238 (1996) (discussing equal protection doctrine). This does not mean, of course, that constitutional rights must serve a consequentialist ethic. *Cf.* Schauer, *supra* note 75, at 425 n.36 (explaining that nonconsequentialism can "recogniz[e] the place for *instrumental* rules and rights").

It is instructive at this point to revisit Alexander's earlier retort to a coercion-based analysis of unconstitutional conditions. *See supra* note 66 and accompanying text; *see also* Alexander, *Constitutional Theory, supra* note 99, at 288 ("How is it that one can have a constitutional complaint over conditions attached to or inequalities in the distribution of a benefit that one has no constitutional right to in the first place? Unless that question can be given an answer, much of constitutional law will lack a solid theoretical foundation."). It is now apparent that insistence that the effects, rather than purposes, of government actions constitute the appropriate touchstone of (un)constitutionality arises from the very same individual-rights-based perspective that underlies the greater-includes-the-lesser dogma—namely, a fixation on the way that discrete laws impact upon discrete individuals. Alexander's long-standing fascination with the unconstitutional conditions doctrine and his resistance to inquiries into legislative purposes thus spring from the very same source. Consequently, the realization that government action may be constitutionally forbidden because the practice under which it falls (which it instantiates) is likely to produce bad results over the long run justifies, at once, both (1) the turn from an individual-rights lens through which to scrutinize the unconstitutional conditions doctrine to one that focuses either on governmental duties (as per Garvey) or on systemic rights (as per Fallon and Pildes), and (2) the consequent (partial) reliance on theories of impermissible government purposes.

101. Under the heading "purpose scrutiny makes strange bedfellows," two of the most prominent contemporary advocates of the latter position are Justice Antonin Scalia and Professor Laurence Tribe. *See Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 559–60 (1993) (Scalia, J., concurring); *Edwards v. Aguillard*, 482 U.S. 578, 639 (1987) (Scalia, J., dissenting); Laurence H. Tribe, *The Mystery of Motive: Public and Private*, 1993 SUP. CT. REV. 1, 23. The Supreme Court has apparently not resolved the question of whether "purposes in the air" can ever violate the Constitution. *See United States v. Armstrong*, 517 U.S. 456, 469 n.3 (1996). For some thoughts, see *infra* note 251.

animating decisionmakers or is limited to investigating "objective" purposes.[102] And third, whatever the answers to the first two questions, scholars have proposed different standards regarding the role that a bad purpose must play in the decisionmaking process in order to taint the end product. As Larry Alexander put it, theories of proscribed purposes may focus on "causally necessary" purposes, "causally sufficient" purposes, or even on purposes that play some motivating role but are neither causally necessary nor sufficient.[103] As it happens, I do have views about at least two of these questions. But the analysis of this Article can afford to be agnostic. However these three particular debates are resolved, it will follow, at the least, that the "objective," but-for purposes animating state action constitute a frequent sine qua non of a constitutional violation. That will be enough to support much, if not all, of the argument that follows.

### C. CONDUCT

Whereas the first two dimensions of state action that may infringe the Constitution are familiar and reasonably clear, the third dimension is certainly not familiar and is probably not yet clear either. Before attempting a definition, then, let us mark some examples.

Start, as Charles Fried has suggested, with the constitutional requirement that the President deliver a periodic address on the state of the union.[104] The constitutional command here is not quite that the President perform some action with the effect of addressing the state of the union, or even that he do so with the purpose of addressing the state of the union. Rather, the Constitution is commanding that the President engage in particular conduct: "give to the Congress information of the State of the Union." Though this particular command is positive, the Constitution also commands that the state not engage in particular conduct. To take another example from Judge Fried, Article VI prohibits the use of religious tests as qualification for public office.[105]

These examples are easily multiplied. Explicit provisions of the Constitution command the government to furnish jury trials and, in the case of felonies,

---

102. Again, Justice Scalia is the principal present defender of this distinction. *See, e.g., Church of Lukumi Babalu Aye*, 508 U.S. at 557–59 (Scalia, J., concurring). This is one way of giving content to the familiar purpose-motive distinction: Objective purposes are "purposes" and properly inquired into; actual purposes are "motives" and off-limits. *See generally* Ely, *supra* note 87, at 1217–21 (identifying this and other versions of the distinction).

103. Alexander, *Motivation*, *supra* note 99, at 936; *see also* Brest, *supra* note 73, at 130 (proposing that laws should be invalidated if an impermissible purpose "played an affirmative role in the decisionmaking process"); Regan, *supra* note 87, at 1148 (proposing a "contributed substantially" standard). Of course, there is no reason that a single standard need extend across all areas of constitutional law; motivating purposes of a particular sort may be enough to violate one constitutional provision, whereas another provision invalidates only certain but-for purposes. *Cf. id.* at 1150–51 (explaining why the standard of proof may reasonably differ when the proscribed purpose is racial discrimination as opposed to economic protectionism).

104. Fried, *supra* note 73, at 67 (citing U.S. CONST. art. II, § 3).

105. *Id.* (citing U.S. CONST. art. VI, cl. 3).

28                THE GEORGETOWN LAW JOURNAL              [Vol. 90:1

grand jury indictments,[106] and enjoin the state from imposing cruel and unusual punishment,[107] or enacting bills of attainder or ex post facto laws.[108] And Article I, Section 10 contains a short laundry list of conduct in which the states may not engage. The Supreme Court has also interpreted other, more open-ended provisions as prohibiting certain types of state conduct. The use of facial racial classifications, for instance, presumptively violates the Equal Protection Clause.[109] And, under the recent rule of *New York v. United States*[110] and *Printz v. United States*,[111] the federal government may not commandeer state officials to enact or administer a federal program. Finally, we can now add, the Constitution prohibits the state from threatening to perform an unconstitutional act, which is to say, from engaging in coercion.

All of these examples serve to bolster the claim that there exists some third dimension of constitutional violation distinct from (or, at the least, not reducible to) the first two. To describe the anticommandeering rule, for instance, solely in terms of effects or purposes, or both, would seem confused. At the same time, however, the examples demonstrate how difficult will be the task of definition. Consider Charles Fried's own description of the third category (which he labels "Acts") that he proposes as a complement to those of purpose and effects. "[T]he category of Acts," Fried explains, "has a certain primacy, being more primitive, more basic, while the other two are more sophisticated and therefore perhaps more derivative and problematic. Action is a primitive conception of human efficacy, representing the union of intention and effect."[112] Yet, this too seems inapt. For, if the anticommandeering rule is not appropriately describable in terms of purpose and effect, it seems just as mistaken to characterize it as prohibiting some sort of "primitive" or "basic" dimension of state action that is more fundamental and less "sophisticated" than are those two other dimensions. Indeed, much about state action—thickly construed to encompass any reasonable description of what government does or fails to do—that is neither effect nor purpose seems not to fit Fried's simple image.

It may be preferable, therefore, to eschew a strict definition of the conduct dimension of constitutional violation and instead to think of it negatively, as that which remains of governmental activity when the dimensions of effect and purpose are subtracted. So conceived, it is, to be sure, a potentially large and unruly residual category. Moreover, it is one with fuzzy and ·inescapably contestable boundaries. As criminal law scholars who have long struggled with

---

106. *Id.*
107. U.S. CONST. amend. VIII.
108. U.S. CONST. art. I, § 9, cl. 2; *id.* art. I, § 10.
109. *See, e.g.,* Adarand Constr. v. Pena, 515 U.S. 200 (1995). Let us bracket the interesting question of whether there is something about facial racial classifications that is constitutionally problematic beyond the racially discriminatory purpose that they manifest.
110. 505 U.S. 144 (1992).
111. 521 U.S. 898 (1997).
112. Fried, *supra* note 73, at 68.

element analysis under the Model Penal Code and its progeny know, the distinction between conduct and effects (what the Model Penal Code terms "results") is notoriously slippery.[113] But that is okay, for we need neither to naturalize this proposed trichotomy nor to deny that the conduct dimension may yet prove profitably divisible into discrete subcategories. A taxonomy is merely a tool. Its truth lies in its utility. And as we will see presently, this taxonomy has tremendous value in helping us analyze the unconstitutional conditions problem.

## IV. THE ANALYSIS IN BRIEF

We now have the major components with which to appraise the constitutionality of individual conditional governmental proposals: a mapping of the problem's contours, along with a stipulated vocabulary (from Part I); a conception of coercion that is both normatively meaningful and (in principle) determinate in application (Part II); and a concise taxonomy of the dimensions of constitutional violation within which the inquiry into coercion is situated (Part III). Although it will prove most perspicuous to elucidate the solution's many nuances as they emerge from considering (in Part V) a large number of concrete cases, it is time to demonstrate at least the rudiments of how these pieces work together.

Consider the following representative conditional offers:

*South Dakota v. Dole.*[114] The federal government gives states billions of dollars annually for highway construction, maintenance, and repair. It threatens to reduce the funds otherwise allocable to each state unless that state establishes a minimum legal drinking age of at least twenty-one. The federal government has no authority to order the states to establish particular minimum drinking ages.

*Probation.*[115] State law provides that persons convicted of various violent felonies are entitled to early probation if they agree to participate in any of several privately run anger-management programs that the state has certified for demonstrated excellence in promoting nonviolent behavior. The great majority of such programs are run by Buddhist denominations and include Buddhist meditation practices.

*Social Security.*[116] The Social Security Act provides "secondary benefits" to specified classes of dependents of covered wage earners. Such benefits paid to wage earners' disabled children terminate upon the child's marriage.

Analyzing these three cases in this order will demonstrate how a conditional

---

113. *See, e.g.,* Paul H. Robinson & Jane A. Grall, *Element Analysis in Defining Criminal Liability: The Model Penal Code and Beyond,* 35 STAN. L. REV. 681, 706–10 (1983).

114. 483 U.S. 203 (1987).

115. This is a variation on real cases that will be discussed *infra* Part V.B.2.

116. This basic scheme was upheld against constitutional challenge in *Califano v. Jobst,* 434 U.S. 47 (1977), although under the provisions there at issue secondary benefits survived a beneficiary's marriage to another statutory beneficiary. To simplify matters, this hypothetical ignores this slight wrinkle.

offer can be coercive (Part IV.A), how a conditional offer that is not coercive may nonetheless be unconstitutional because it runs afoul of particularistic constitutional doctrine on the dimensions of purpose or effect (Part IV.B), and how the systematic analysis can render a clean bill of constitutional health (Part IV.C).

## A. UNCONSTITUTIONALLY COERCIVE PROPOSALS

*Dole* arose after Congress enacted a law directing the Secretary of Transportation to withhold five percent of otherwise allocable federal highway funds from any state that permitted persons under twenty-one to buy alcohol. South Dakota, which allowed nineteen-year-olds to purchase beer, sought a declaratory judgment that the provision violated each state's allegedly plenary authority under the Twenty-First Amendment to regulate the consumption of liquor within its territory.[117] Voting seven to two, the Supreme Court upheld the condition as a valid exercise of Congress's spending power. In my view, *Dole* is arguably the single most instructive case in the unconstitutional conditions literature and, therefore, deserves our close attention.

### 1. The Supreme Court's Analysis in *South Dakota v. Dole*

Writing for the majority, Chief Justice Rehnquist began by deriving from previous decisions a four-part test to govern exercise of the spending power.[118] First, the exercise must be in pursuit of the general welfare. Second, any condition on the disbursement of federal funds must be unambiguous. Third, "conditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.' "[119] And fourth, the condition must not violate any independent constitutional bar. Additionally, in what is effectively a fifth prong, though not so denominated, the financial

---

117. *See* U.S. CONST. amend. XXI, § 2 ("The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."). Although the Twenty-First Amendment does not on its face extend such plenary power, previous decisions of the Court had strongly suggested that the Amendment should be construed to repose absolute control of the liquor trade in the states. *See, e.g.,* Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 715–16 (1984); Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 110 (1980). Relying on the plain language of Section 2, the Secretary of Transportation had argued that the Amendment "would not prevent Congress from affirmatively enacting a national minimum drinking age more restrictive than that provided by the various state laws" though it would prevent Congress from effectively lowering the minimum drinking age established by any state. *Dole,* 483 U.S. at 206. The majority did not resolve this question, but held that the condition was permissible "even if Congress may not regulate drinking ages directly." *Id.; see id.* at 212. Notice that the Court appeared to treat as equivalent the separate questions of whether Congress could enact a national minimum drinking age and whether it could command (rather than induce) each state to enact a state minimum drinking age specified by federal law. After *New York v. United States,* 505 U.S. 144 (1992), the latter question would be answered in the negative regardless of how the Twenty-First Amendment is properly interpreted.

118. *Dole,* 483 U.S. at 207–08.

119. *Id.* at 207 (quoting *Massachusetts v. United States,* 435 U.S. 444, 461 (1978) (plurality opinion)).

inducement must not amount to coercion.[120]

It should be clear that if this test is to have any real constitutional bite, it will come from the third and fifth prongs—relatedness (or "germaneness") and coercion.[121] On the actual facts of the case, however, the majority had little difficulty in concluding that neither was violated. The provision raised no problem of unrelatedness, the Court explained, because "the condition imposed by Congress is directly related to one of the main purposes for which highway funds are expended—safe interstate travel."[122] Achieving uniformity in minimum legal drinking ages would advance this goal because varying state laws had induced young people to drive to border states with lower drinking ages and because, even within a single state, the higher the minimum drinking age, the fewer the accidents per mile driven. The "relatively small percentage of certain federal highway funds" at stake rendered the inquiry into coercion equally simple.[123] Because "Congress has offered relatively mild encouragement to the States to enact higher minimum drinking ages than they would otherwise choose," the Court concluded, "the enactment of such laws remains the prerogative of the States not merely in theory but in fact."[124] There was thus no coercion.

Justice O'Connor dissented.[125] Describing her disagreement with the majority as "relatively narrow,"[126] O'Connor took issue only with "the Court's application of the requirement that the condition imposed be reasonably related to the purpose for which the funds are expended."[127] In her view, the condition

---

120. The Court in *Dole* observed that "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.' " 483 U.S. at 211 (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). This way of putting it may be thought to suggest that a condition is allowed to constitute "coercion" so long as it does not amount to "compulsion." But the remaining paragraphs of the majority's opinion are more naturally read to draw the line of prohibition between "encouragement" and "coercion," *see id.* at 211–12, which is how the case is ordinarily read, *see, e.g.*, Thomas R. McCoy & Barry Friedman, *Conditional Spending: Federalism's Trojan Horse*, 1988 SUP. CT. REV. 85, 101.

121. The first requirement is but a rubber stamp, "especially in light of the fact that 'the concept of welfare or its opposite is shaped by Congress.' " *Dole*, 483 U.S. at 208 (quoting *Helvering v. Davis*, 301 U.S. 619, 645 (1937)). The requirement of unambiguousness is only a clear-statement rule and therefore imposes no meaningful constitutional limits on these types of conditional offers. And the independent constitutional bar limitation, the Court emphasized, "is not . . . a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly. Instead, [it] stands for the unexceptionable proposition that the power may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Id.* at 210.

122. *Id.* at 208. As an indication of just how easy the question was, the Court noted that because this condition "relates directly to the purpose of the expenditure to which it is attached," the case presented no occasion to "define the outer bounds of the 'germaneness' or 'relatedness' limitation on the imposition of conditions under the spending power." *Id.* at 208 n.3.

123. *Id.* at 211.

124. *Id.* at 211–12.

125. *Id.* at 212 (O'Connor, J., dissenting). Justice Brennan also dissented in a separate and cryptic one-paragraph opinion. *Id.* at 212 (Brennan, J., dissenting).

126. *Id.* at 212 (O'Connor, J., dissenting).

127. *Id.* at 213. Before describing her disagreement with the majority, O'Connor expended close to a page in reciting her many points of agreement. *Id.* at 212–13. Perhaps revealingly, *see infra* notes

Appendix 8

that states enact specified minimum drinking ages in order to receive their full allotment of highway funds is not "reasonably related"[128] to the purpose for which those funds are expended. "When Congress appropriates money to build a highway," she explained,

> it is entitled to insist that the highway be a safe one. But it is not entitled to insist as a condition of the use of highway funds that the State impose or change regulations in other areas of the State's social and economic life because of an attenuated or tangential relationship to highway use or safety.[129]

In order to give effect to this judgment, she continued, the proper constitutional test was the one proposed by the National Conference of State Legislatures: "Congress has no power under the Spending Clause to impose requirements on a grant that go beyond specifying how the money should be spent."[130] Because the condition at issue violated this germaneness requirement, O'Connor would have held that it was not a valid exercise of the spending power but rather an impermissible attempt by Congress "to regulate the sale of liquor."[131]

So, who is right? Is the condition coercive? Is it unconstitutionally nongermane? Before continuing in our analysis of *Dole*, it will be convenient at this stage to offer a few exploratory words about what it means to have a constitutional right.

## 2. Interlude: Of Rights and Penalties

Hohfeld famously distinguished among four types of rights: rights in the strict sense (sometimes called "claim-rights"), privileges (or liberties), immunities, and powers.[132] Fortunately, a lengthy discourse on the subject is unnecessary here,[133] for as John Finnis explains, the most important distinction is between claim-rights and liberties:

> A claim-right is always either, positively, a right to be given something (or assisted in a certain way) by someone else, or, negatively, a right *not* to be interfered with or dealt with or treated in a certain way, by someone else.

---

149–53 and accompanying text, she did not include in this list the Court's resolution of the coercion question. Indeed, she does not appear to acknowledge that the ban on coercive conditions forms any part of the majority's analysis, *see Dole*, 483 U.S. at 213 (O'Connor, J., dissenting) (agreeing "that there are four separate types of limitations on the spending power"), and does not so much as mention the words "coercion" or "coercive" any place in her opinion.

128. Dole, 483 U.S. at 214 (O'Connor, J., dissenting).

129. *Id.* at 215.

130. *Id.* at 216.

131. *Id.* at 212.

132. *See* Wesley Newcomb Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 23 YALE L.J. 16 (1913).

133. The secondary literature on Hohfeld is vast. Cites to much of it, along with three new and sophisticated contributions, can be found in MATTHEW H. KRAMER ET AL., A DEBATE OVER RIGHTS: PHILOSOPHICAL ENQUIRIES (1998).

> When the subject-matter of one's claim of right is one's own act(s), forbear-
> ance(s), or omission(s), that claim cannot be to a claim-right, but can only be
> a liberty (or, in the case of juridical acts, to a power). Of course, one's liberty
> to act in the specified way may be enhanced and protected by a *further* right
> or set of rights, viz. the claim-right(s) not to be interfered with by B, C, D in
> exercising one's liberty. But a liberty thus protected by a claim-right is not a
> distinct type of Hohfeldian right; it is a conjunction of two distinct Hohfeldian
> relationships.[134]

Thus, for example, our constitutional right to free speech is usefully analyzed as
a liberty to speak conjoined with a claim-right that the state not interfere with
our exercising this liberty.[135]

The point could be made about rights other than liberties. The Fifth Amend-
ment, for instance, may be thought to confer upon individuals a claim-right to
compensation for a taking. And the Eleventh Amendment confers an immunity
from certain types of suit. Note, though, that the claim-right and the immunity
are waivable (in the former case, converting a taking, I suppose, into a giving).
In both cases, then, it is important to specify that the initial right—the claim-
right and the immunity, respectively—is conjoined to a further claim-right that
the state not interfere with the rightholder's decision to assert (rather than
waive) the right.

So it seems plausible that all types of constitutional rights—whether of a
claim-right, liberty, immunity, or power—are supported by an additional claim-
right of this sort. But of what sort, more precisely? Suppose, for instance, that *A*
has a constitutional right, in the form of a Hohfeldian liberty, to engage in
intimate relations with *B*, and that the government sends *B* (who happens to be
an astronaut) to Mars. Although it would be reasonable to say that the govern-
ment has "interfered with" *A*'s liberty (as Finnis, recall, puts it), it seems
preposterous to conclude that it has thereby violated a duty owed *A*. If this is so
then it remains to say a little more about the nature of the generic claim-right of
noninterference that is a component in the ordinary amalgam that we term a
(particular) constitutional right.

For a start, I propose, this claim-right must correlate with a government duty
not to purposely render the doing of *x* impossible (or practically impossible).
For example, if I have a constitutional right (in the sense of a liberty) to travel
abroad, the state has a duty not to purposefully prevent me from doing so by

---

134. JOHN FINNIS, NATURAL LAW AND NATURAL RIGHTS 200–01 (1980).

135. Professor Fallon is therefore misleading, I think, in opining that putative "constitutional rights"
most often operate as Hohfeldian "privileges" (i.e., "liberties"), correlating with a "no-right" on the part
of the government. Fallon, *supra* note 72, at 344 n.5. In Hohfeldian terms, that an individual, *A*, has a
privilege, with regard to the government, to do *x* entails only that the government has no right that *A* not
do *x*, which is equivalent to saying that *A* has no duty, vis-à-vis the government, not to do *x*. *See*
Hohfeld, *supra* note 132, at 32–44. This does not amount to a claim that the state operates under either
a disability or a duty that bans it from trying to compel *A* not to do *x*, which I take it is what we
ordinarily mean by asserting that *A* has a "constitutional right" to do *x*.

posting armed guards at all exit points and instructing them to physically detain me. (In our astronaut example, then, the state violates the claim-right that protects A's liberty if it sends B to Mars for the purpose—not merely with the knowledge—of preventing A and B from engaging in sexual relations.) But the claim-right must mean more than that. The state may not, upon my return, imprison me for having left. The task is to specify the principle that this homely example instantiates. Although we may be tempted to say that the state may not (absent adequate justification) punish me for exercising a right, that there already exists a substantial literature exploring the meaning of this term in the specific context of criminal punishment[136] advises a different course. After all, the state's duty not to punish me for exercising my right to travel abroad is not limited to criminal punishment (however that is ultimately construed). Surely it would count as a (presumptively) forbidden infringement were the state to greet my return by cutting off my water and electricity. Furthermore, because several rules of constitutional law already turn on whether a government-imposed disadvantage constitutes "punishment,"[137] to use that same term here would likely pick up unwanted baggage. For both of these reasons, I propose to choose a different word. Let us say that a constitutional right to $x$ entails a claim-right that the state neither purposely prevent nor penalize the assertion of the right to $x$—unless, of course, the state has adequate justification to do so.[138]

---

136. Some of the leading contributions include HART, *supra* note 30, at 4–6; J.R. LUCAS, ON JUSTICE 124–36 (1980); Anthony Flew, *The Justification of Punishment*, in THE PHILOSOPHY OF PUNISHMENT 83–87 (H.B. Acton ed., 1969); Richard Wasserstrom, *Capital Punishment as Punishment: Some Theoretical Issues and Objections*, 7 MIDWEST STUD. PHIL. 473, 475–78 (1982).

137. *See, e.g.*, United States v. Ward, 448 U.S. 242, 248–49 (1980) (in regard to the Self-Incrimination Clause of the Fifth Amendment, establishing its own two-stage test for deciding whether a civil penalty imposes criminal punishment, which includes, first, determining whether Congress intended a penalty to be either "criminal" or "civil," and then, when the intention to establish a civil penalty is discovered, asking "whether the statutory scheme was so punitive either in purpose or effect as to negate that intention"); Bell v. Wolfish, 441 U.S. 520, 536–37 (1979) (determining that "in evaluating constitutionality of conditions or restrictions of pretrial detention that implicate protection against deprivation of liberty without due process, the proper inquiry is whether those conditions amount to punishment of the detainee"); Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168–69 (1963) (offering seven criteria for determining whether a civil penalty amounts to a criminal punishment, including, among others, "whether it has historically been regarded as punishment" and "whether its operation will promote the traditional aims of punishment—retribution and deterrence"); United States v. Lovett, 328 U.S. 303, 323–24 (1946) (declaring that with respect to bills of attainder "[t]he amount of punishment is immaterial . . . . But punishment is a prerequisite"); Helvering v. Mitchell, 303 U.S. 391, 399 (1938) (holding that the Double Jeopardy Clause protects only against multiple criminal punishments and that whether a particular punishment is criminal or civil is a matter of statutory construction).

138. *Cf.* Schauer, *supra* note 75, at 430 (arguing that "the right to Ø . . . just *is* the right to demand the higher level of justification, and the right is satisfied when that higher level of justification is respected. But respecting the higher burden of justification does not entail taking that higher burden to be absolute, and thus the potential infringer respects the higher burden of justification, and so satisfies the right, even when the higher burden is actually met"). I take no position here on whether constitutional duties—as a species of duties of political morality—are ever absolute, though I readily acknowledge some duties, and corresponding rights, are so powerful that the justification necessary to override them would exist only in hypotheticals. *See* Fallon, *supra* note 76, at 84 (noting that the Court rarely interprets the Constitution to impose absolute commands). Moreover, even if there are no

So much for choice of nomenclature. It remains to define what it means to penalize some conduct, $x$. Here is a first, crude cut: $A$ penalizes $B$'s doing $x$ when the following conditions are satisfied: (1) $A$, by act or omission, causes $B$ to experience some consequence, $c$; (2) because $B$ did $x$; (3) and with a purpose that $B$ experience $c$ as disagreeable relative to some plausible alternative consequence, $d$, that $A$ would have imposed or permitted but for that purpose.

If these criteria are roughly correct—and I emphasize that some very rough accuracy is all I claim for them at present—it follows that the state penalizes the exercise of a constitutional right when it imposes (or allows to obtain) consequences upon the party exercising the right[139] that are adverse relative to the consequences that the state would impose (or allow to obtain) but for the state's purpose in having the rightholder experience the consequences as disagreeable. The state would do so, I suspect, for two principal, perhaps exhaustive, reasons: to deter future exercises of the right at issue, or to satisfy the state's interest that the rightholder suffer for transgressing some sort of norm. We may call these purposes to discourage and to punish, respectively. They are not, of course, mutually exclusive.

To summarize quickly, the preceding discussion advances two important claims: first, that a constitutional right to engage in some conduct, $x$ (including insisting that some specified state of affairs obtain), entails a duty on the part of the state not to penalize the doing of $x$, not solely a duty not to prevent or prohibit the doing of $x$; second, that penalizing has the particular meaning I have subscribed to it. In practice, it will fall to the challenger to establish that the state would have treated her more favorably were it not for a purpose of discouraging or punishing assertion of a constitutional right. And it will often be useful, I think, to approach this question in two steps. First, determine whether the state treats the challenger who has exercised her right less favorably than it would have had she not exercised it—in which event, let us stipulate, the right has been burdened. Second, examine the state's purposes for imposing the burden. Ordinarily, that is, a "penalty" exists when the state imposes a burden for the purpose of discouraging or punishing assertion of a protected right.[140]

---

absolute constitutional duties, it might still make good sense for judicial doctrine to proclaim otherwise, as a prophylactic against the tendency—as in *Korematsu*—to exaggerate the need in times of crisis. *But see infra* note 397.

139. Or upon some third party who stands in what may loosely be called a "close relation" to the party exercising the right.

140. This is a simplified, and thus imprecise, restatement of the criteria spelled out previously, which more elaborate formulation is designed to accommodate the situations in which the state penalizes the exercise of a right without (in my terms) burdening it. Because I suspect that such situations will be relatively rare, I will generally examine whether challenged governmental conduct amounts to a "penalty" by engaging in the two steps just identified in text—that is, by first inquiring into the existence of a "burden" and then, if a burden is identified, ruminating about the state's purposes. This slight simplification will make the analysis easier to follow. To understand how conduct could constitute a penalty even though it does not burden the exercise of a right imagine that the state withholds unemployment compensation from a Seventh-Day Adventist who is fired for refusing to work on Saturday and that such withholding is in fact animated by a purpose in punishing the

Appendix 8

All this said, I acknowledge that these claims are more asserted than defended.[141] (Their proof, such as it may be, will emerge from their utility in resolving unconstitutional conditions cases.) With that concession, and accepting them as true arguendo, we can return to assessing *Dole*.

### 3. Why *Dole* Was Wrongly Decided

In *Dole*, South Dakota challenged as unconstitutional a conditional proposal extended by the national government. Like (virtually) all conditional proposals, it consisted of a conditional offer (if ~$x$ then $y$) married to a conditional threat (if $x$ then ~$y$). On the facts of *Dole*, the offer promised the benefit of no reduction in highway funding if South Dakota complied with the demand that it raise its drinking age to twenty-one. The making of the proposal is coercive, recall, if carrying out the threat (doing ~$y$, or withholding some highway funds) would be unconstitutional. And withholding those funds would be unconstitutional if it amounts to a penalty. The question to explore, then, is whether the federal government's withholding of five percent of the highway funds South

---

observance of Seventh-Day Adventism. This would not burden the exercise of a right not to work on Saturday (under my stipulated definition of "burden") because the offeree would not receive the benefit even if she waived her right. *See infra* note 356.

141. Arguably, a very partial defense comes from noting the affinity between these claims and the following conclusion reached by the Supreme Court: "If a law has 'no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional.' " Shapiro v. Thompson, 394 U.S. 618, 631 (1969) (alteration in original) (quoting *United States v. Jackson*, 390 U.S. 570, 581 (1968)). But the formulation in text modifies the Court's in two principal respects.

First, although the conclusion that a law is "patently unconstitutional" if it has "no other purpose" than to chill the exercise of a right may be fair, it is also not very useful. Rarely, if ever, will the state have no other purpose than to deter exercise of a right. If nothing else, the state will wish to deter exercise of the right to advance some further purpose. In *Shapiro* itself, for instance, several states sought to justify the exclusion of residents of less than one year from receipt of state welfare benefits—the law that was found to chill the assertion of the constitutional right to migrate to another state—"as a protective device to preserve the fiscal integrity of state public assistance programs" and thereby to better "assist long-time residents." 394 U.S. at 627–28. And in *Jackson*, the federal law that chilled assertion of the right to jury trial presumably served the government's purpose in protecting public safety by reducing the number of erroneous jury acquittals. In short, the patently unconstitutional laws identified by the Court may describe a null set. Better, then, to focus on laws that have the purpose of chilling constitutional rights than on those that have such a purpose and "no other." Such laws, however, are not "patently unconstitutional," merely presumptively so.

Second, even if revised to read that a law is presumptively unconstitutional if it is adopted for the purpose (or *a* purpose) of chilling the assertion of constitutional rights by penalizing those who choose to exercise them, the Court's assertion leaves open the critical question of what it means to penalize those who exercise a right. I suggest that, in context, it must mean to raise the costs of exercising the right—relative, that is, to the costs that the rightholder would bear were it not for the state's purpose in discouraging exercise of the right in question. This leaves us with: It is presumptively unconstitutional for the state to treat one who exercises a right less well than it would otherwise for the purpose of chilling the exercise of that right. This is nearly my definition of a "penalty," which differs only in accommodating also the unusual case in which the state raises the costs to the rightsholder for the purpose simply of punishing the rightsholder for having exercised her right, even in the absence of any forward-looking purpose of deterring ("chilling") future assertions of the right, by the rightsholder in question or by others.

Appendix 8

Dakota would otherwise receive penalizes the exercise of South Dakota's right[142] to retain a minimum legal drinking age below twenty-one.

That withholding the funds burdened South Dakota's right is plain: Exercising its right caused the state to lose real money. Withholding the five percent made it more costly for South Dakota to exercise its right to permit persons under twenty-one to drink alcohol than to forego that right.[143] But did the federal government impose a penalty? That is, was it Congress's purpose in imposing the burden that South Dakota experience this consequence as disagreeable? Put another way, could it be that Congress ordered these funds withheld not despite the fact that South Dakota would surely want them, but because of it?

In fact, yes. Congress claims, and the *Dole* majority emphasizes, that the federal purpose at work is to improve highway safety. So, no doubt, it is. But that is a fairly ultimate purpose and therefore not incompatible with the proposition that the actual withholding of funds is animated by a purpose in discouraging South Dakota and other states from exercising their (supposed) constitutional rights to impose whatever minimum drinking age they see fit. Conceptually, here is how to determine whether the government's purpose in imposing a burden is to discourage exercise of a constitutional right: If (counterfactually) the government knew that granting or withholding an offered benefit would have no effect on the exercise of a particular right, and would nonetheless withhold the benefit, then it lacks a (but-for) purpose to discourage exercise of the right. If it would grant the benefit under the hypothetical assumption, then its purpose in withholding the benefit when the assumption is abandoned is indeed to deter exercise of the right, which is to say that the withholding of the benefit is a penalty, which makes the conditional threat coercive.

Needless to say, this thought experiment will not always yield confident conclusions one way or the other. In this case, however, I believe that it does. The reason to suspect that, but for a purpose in influencing the states' behavior, Congress would pay out the final five percent of highway funds regardless of the state's minimum legal drinking age (MDA) begins straightforwardly. Suppose, for ease of discussion, that, given the basic apportionment formula (which does not take into account drinking age),[144] South Dakota stands to receive $95

---

142. It is customary to refer to this capability as a right. *See, e.g.,* Baker, *supra* note 1, at 1923–24. In Hohfeldian terms, it is either a privilege or a power. Either way, I have argued above, it is protected by a claim-right that its exercise not be penalized.

143. Of course, it is implausible that the mere causing of this effect could render the government's act unconstitutional. Were the Constitution construed to impose some sort of command upon the federal government not to burden a state's exercise of its right to legislate, Congress would be left with no power of conditional spending.

144. The apportionment formula in effect when, in 1984, Congress directed the Secretary of Transportation to withhold a percentage of federal highway funds otherwise allocable from states that have MDAs below twenty-one, distributed funds principally on the basis of area and population. *See* 23 U.S.C. § 104 (1982 & Supp. III 1985).

million in federal highway funds no matter what its drinking age. This would demonstrate that Congress prefers $95 million worth of South Dakota highway construction to the $95 million itself (were the case otherwise, Congress would not make the offer), and provides prima facie reason to suppose that if Congress is willing to spend another $5 million for highway construction, its reserve price would be in the neighborhood of $5 million worth of South Dakota highway construction. So when Congress withholds that $5 million from South Dakota unless the state agrees to supply $5 million worth of highway construction *and* a drinking age of twenty-one, we start to suspect that there are strategic considerations afoot. If Congress knew that withholding the $5 million in highway funds would influence neither South Dakota nor any other state in deciding what drinking age to establish, Congress would prefer to give South Dakota the $5 million so long, of course, as the state agrees to spend it on highway construction.[145]

There is only one consideration, I think, that undermines this chain of reasoning: diminishing marginal utility. Because (beyond a certain point) each extra dollar pumped into highway construction returns a little less value, a rational Congress very possibly could determine that, after the first $95 million, the opportunity cost of the next $5 million in federal tax revenues exceeds the value of another $5 million worth of South Dakota highway construction. And were Congress to value matters thus, withholding that extra $5 million unless South Dakota both committed to $5 million in highway construction and also supplied the additional benefit of raising its MDA to twenty-one need not be a penalty. So far, so good. The problem for this argument arises when we turn our attention from South Dakota to another state, say North Dakota, that already does have an MDA of twenty-one. If, hypothetically, North Dakota mirrors South Dakota in all particulars taken into account by the basic apportionment formula—area, rural population, urban population, and the like—it would be entitled to the same $95 million in highway funds. Here is the rub: Notwithstanding that the law of diminishing marginal returns would seem to apply to North Dakota as well as to South Dakota, North Dakota would receive an additional $5 million just for promising to spend that additional $5 million on highway construction; unlike South Dakota, it need furnish no other consideration for that extra federal money. For North Dakota, in short, the marginal returns in highway construction appear not to diminish all that sharply. For North Dakota, our initial supposition that Congress's reserve price for $5 million more in highway funds would be just $5 million more in highway construction proves correct.

---

145. In speaking here of congressional preferences, I do recognize the difficulties with that notion—much the same as those which allegedly bedevil inquiries into congressional purposes. But the difficulties are easily overstated. Suffice it to say that social choice theory does not insist that no stable and coherent preference hierarchies exist among multimember bodies, but only that they do not *always* exist. *See, e.g.,* KENNETH J. ARROW, *A Difficulty in the Concept of Social Welfare, in* COLLECTED PAPERS 1, 7 (1983); Frank Easterbrook, *Statutes' Domains,* 50 U. CHI. L. REV. 533, 547 (1983).

In order, then, to make convincing its claim that denial of the last $5 million to South Dakota is not a penalty, Congress must distinguish the two Dakotas. It must, that is, explain why a full $100 million of South Dakota highway construction is worth less than $100 million of North Dakota highway construction. Even without delving into the intricacies of public finance theory, the core of the argument that may be advanced on Congress's behalf is reasonably clear. The economic return from construction of a new highway is inversely proportional, all else being equal, to the number and severity of accidents that occur on it, and the number and severity of accidents, all else again being equal, is inversely proportional to the jurisdiction's MDA. The national social welfare function of additional highway construction in states with MDAs of twenty-one or above is therefore shifted upward from that which obtains in states with MDAs below twenty-one, in which case the costs of marginal expenditures on highway construction would start to exceed their benefits at an earlier point in South Dakota than in North Dakota.

The difficulty with this argument, however, resides (as it so often will) in the requirement that all else be equal. Insofar as a new highway generates travel that otherwise would not exist at all, the argument just advanced is plausible. But a new highway also attracts existing traffic from other roads. And by shifting traffic from longer routes to shorter routes and from relatively more dangerous to relatively safer road conditions, new highways surely reduce total accidents. More to the point, the number of accidents they reduce is, again, inversely proportional to the MDA. So whether, all things considered, new highway construction is more or less economically productive in states with MDAs below twenty-one is an empirical question. And given that most states already had fairly extensive road systems by 1984, the supposition that new highways create more travel than they relocate—and, accordingly, that they produce less economic return in states with lower MDAs—can hardly be taken on faith.

In sum, although it is presumably true that highway travel is safer the higher the minimum legal drinking age (at least within the relevant range) and the greater the degree of uniformity among adjacent states, that is not quite the issue. Holding each state's minimum legal drinking age constant and correcting for the factors that the basic allocational formula already takes into account, each federal dollar spent on state highway construction is likely to return roughly the same payoff no matter what the drinking age.[146] And even if this

---

146. For simplicity of analysis, the discussion in text supposes that federal highway funds are expended on new highway construction. In fact, they are also used to improve existing highways. But if the argument hypothesized in text—namely, that marginal highway construction is less economically productive in states with MDAs below twenty-one—is unlikely, the kindred claim that marginal expenditures on highway improvement is less economically productive in such states—let alone that Congress believed this to be the case when enacting the rules challenged in *Dole*—is almost fantastic. Absent any statements remotely to this effect in the legislative history, the hypothesis that Congress threatened to withhold highway funds from states like South Dakota because it believed, say, that

40    THE GEORGETOWN LAW JOURNAL    [Vol. 90:1

turns out to be false, the fact that Congress did not address the issue anywhere in the legislative history all but clinches the matter. The straightforward explanation therefore remains the more convincing: Withholding highway funds from states, like South Dakota, that are willing to use such funds for highway construction but are unwilling to raise their drinking ages, is designed to influence state behavior and for no other purpose;[147] hence, penalizes exercise of a state's constitutional right to impose whatever MDA it sees fit.

Finally, if the withholding is a penalty, it is almost certainly an unjustified one, that is, a violation. To be sure, I take no position on precisely how stringent the federal government's duty not to penalize the exercise of a state's right to legislate (or not to legislate) should be. But whatever the appropriate magnitude, and form, of the justificatory burden, it strains credulity that Congress's interest in promoting highway safety could satisfy it in this case. Were it otherwise, the notion of an unconstitutional conditional spending offer by Congress to the states would describe a virtually null set; for, whenever Congress attaches a condition to a spending program that penalizes the exercise of a constitutional right it will do so in service of a more ultimate (usually legitimate) interest.[148] The reduction in South Dakota's highway funds is therefore unconstitutional. Consequently, the federal government's conditional proposal to give states less money if they do not raise their drinking age (or more money if they do) is coercive. It too is unconstitutional.

If what I have argued thus far is correct, two important lessons from the case can now be drawn, the first cautioning against misguided inquiry into "coercive impact," and the second concerning germaneness.

First, it is instructive that not one member of the *Dole* Court concluded, as I have, that the conditional offer at issue was unconstitutional because coercive. To some extent, of course, that is because they did not have available our particular definition of coercion. But there is a deeper reason, one reflecting an unfortunate and widespread confusion about coercion as a normative concept.

In concluding that the conditional offer was not coercive, recall, the Court emphasized the small size of the inducement. Now, this particular move has been criticized for focusing so uncritically on percentages rather than absolute

---

young intoxicated drivers are especially insensitive to marginal improvements in a highway's condition is simply not credible. This is why Professors McCoy and Friedman can so confidently conclude that "Congress would have been unwilling to risk noncompliance, and did not expect it." McCoy & Friedman, *supra* note 120, at 120.

147. That is, Congress has no *alternative* purpose. Naturally, Congress's purpose of influencing state behavior in this area is itself in service of other, more ultimate purposes. Although the no-alternative-purpose claim appears true in this case, I reiterate that I do not seek to answer whether a purpose to discourage, if it exists, must be a but-for purpose, rather than a (mere) motivating purpose to constitute a penalty. *See supra* note 103 and accompanying text.

148. *Cf.* J. Morris Clark, *Guidelines for the Free Exercise Clause*, 83 HARV. L. REV. 327, 330–31 (1969) ("The purpose of almost any law can be traced back to one or another of the fundamental concerns of government: public health and safety, public peace and order, defense, revenue.").

dollars.[149] Five percent may not sound like a lot in the abstract, but five percent of $100 million or more is nothing to sneeze at. This is a fair point. Yet, notice that nothing in my argument turns on it. Indeed, it seems that my concepts of penalty and coercion are utterly indifferent to magnitudes of effect; that is, under the foregoing analysis, the conditional proposal in *Dole* would appear to constitute coercion even if Congress had threatened to withhold, say, 0.05%, rather than five percent, of the otherwise forthcoming funds. And this does seem surprising. Although our intuitive judgments about whether something is coercive are deeply influenced by questions of degree, my conceptualizations of coercion and penalty would seem to result in a conclusion that Congress had engaged in coercion even had it threatened to withhold a mere five dollars.

That is true. But the incongruity appears only because the intuitions just appealed to concern a wholly different sense of coercion than should occupy us here.[150] In ordinary moral and legal reasoning, judgments of coercion serve two discrete functions, corresponding to the two discrete parties involved in the paradigmatic case. They serve to levy blame upon the coercer and to excuse the coercee for doing the thing the coercer demanded. The important point, in brief, is that the magnitude of coercive pressure involved is relevant to the second purpose but not the first. Suppose, for example, that I threaten to spit on your shoes unless you break my enemy's kneecaps. If you are sufficiently weak-willed (or fetishistic about your shoes) as to succumb to the threat, you are unlikely to be legally or morally excused for your act on the grounds that you were "coerced." The coercive pressure was simply too minuscule. But if moral or legal attention turns toward me, the smallness of my threat is less relevant.[151] I am still guilty of having engaged in the moral (and legal) wrong of coercion.[152] In short, coercion talk serves two distinct normative functions. In examining the coercive impact of the conditional offer, *Dole* focused on the wrong one. As we will see, this misstep frequently drives the Court to overlook instances of governmental coercion.[153]

---

149. *See, e.g.*, James V. Corbelli, Note, *Tower of Power: South Dakota v. Dole and the Strength of the Spending Power*, 49 U. PITT. L. REV. 1097, 1115–16 (1988) (noting that for a state like Texas, five percent of federal highway funds amounted to $100 million); *cf.* Nevada v. Skinner, 884 F.2d 445, 448 (9th Cir. 1989) (complaining that *Dole* left unclear whether "the relevant inquiry turn[s] on how high a percentage of the total programmatic funds is lost when federal aid is cut-off? Or . . . on what percentage of the federal share is withheld? Or on what percentage of the state's total income would be required to replace those funds? Or on the extent to which alternative private, state, or federal sources of . . . funding are available?").

150. I develop the following argument in Berman, *supra* note 39. *See also supra* note 62.

151. Of course, it may be relevant as evidence that I was not really threatening at all, but rather intended my statement to be taken in jest.

152. The same analysis applies if I threaten to spit on your shoes unless you, a fine swimmer, save a drowning child; here, though, this presumptive wrong would be justified.

153. As Kathleen Sullivan has noted, the Court has rejected most claims that conditional benefits are coercive, often by "minimiz[ing] the conditions' coercive potential as an empirical matter" or by simply asserting that the likely deterrent effect will be small. Sullivan, *supra* note 1, at 1437; *see also* Ark. Writers' Project v. Ragland, 481 U.S. 221, 237 (1987) (Scalia, J., dissenting) (arguing that a selective

Second, a brief comment about germaneness. The *Dole* majority held that the offer was neither coercive nor nongermane. Justice O'Connor, in contrast, seemingly agreed that the offer was not coercive,[154] but would have held it unconstitutional as nongermane. Under my analysis, the majority and dissent are both wrong. The offer is unconstitutional because it constitutes coercion. Furthermore, it is not yet clear whether considerations of germaneness do any work at all. Because the offer turned out to be coercive, we cannot yet know whether the Court is correct that the presence of coercion and the absence of germaneness are independently sufficient to render a conditional offer unconstitutional or whether inquiries into germaneness are wholly irrelevant to the constitutional question or whether germaneness is somehow relevant, but not in the way that the Court contends. Perhaps, finally, we do not quite know what germaneness even means. At this point, it would be premature to speculate as to the answers. It is enough to flag the issue for our continued attention.[155]

### B. UNCONSTITUTIONAL, BUT NONCOERCIVE, PROPOSALS

To see why resolving unconstitutional conditions cases requires more than the notions of coercion and penalty, it is useful now to consider the conditional offer presented in the case *Probation*.[156] Because coercion turns upon the constitutionality of the state doing as it threatens, we should proceed by imagining that an offeree, Frank the felon, rejects the condition that he participate in anger-management training and, as a consequence, that the prison authorities refuse to probate him. Note that the state's action burdens Frank's exercise of his (presumptive) constitutional right to refuse anger-management training: By standing on that right, Frank is denied early release.[157] But is carrying out the threat a penalty? That is, when the state refuses probation, does it act for the purpose either of punishing Frank's refusal or of discouraging it by vindicating the efficacy of threats? Probably not. Presumably, the state's thinking is as simple as this: With anger-management training the felon is a reasonably safe bet for release, but without it, he is not. Absent any convincing reason to suspect that the state is not acting (when carrying out the threat) to promote any of a wide range of legitimate penological purposes, this is not a penalty.[158] And there is no other apparent basis for believing the denial of probation to be

---

subsidy "does not necessarily 'infringe' a fundamental right" because it "does not, as a general rule, have any significant coercive effect"); Seidman, *supra* note 13, at 77 & n.15 (concluding, citing *Dole*, that "the Court has attempted to make distinctions concerning the extent to which the constitutionally problematic condition has a coercive *impact* on its target" (emphasis added)). For further discussion, see *infra* note 385.

154. *See supra* text accompanying notes 126–27.

155. *See infra* notes 382–87 and accompanying text.

156. *Supra* text accompanying note 115.

157. For a definition of "burden" in this context, see *supra* text accompanying note 140.

158. One of the customary penological purposes, to be sure, is to punish, but it is to punish the felon for the conduct that is criminalized (hence for which he does not enjoy a constitutional right), not for refusing to participate in anger-management training.

unconstitutional. The conditional proposal, therefore, is not coercive (in the constitutional sense). This conditional offer of probation is thus distinguished from the conditional offer of federal funds at issue in *Dole*.

Yet, the three-dimensional approach cautions that the fact that a conditional proposal is not coercive is not enough to establish that it is constitutional; the dimensions of purpose and effect must also be considered. Here the challenger's attention should turn from general principles of constitutional law—pursuant to which we examined coercion and penalty—to the specific, now asking: What purposes or effects may be prohibited by a particular constitutional provision, and are they present in this case? As present Establishment Clause jurisprudence suggests,[159] there are two conceivable bases for a successful constitutional challenge.

First, Frank may argue that the state's purpose in advancing the offer is to promote religion.[160] This will be hard to prove. The principal purpose of the offer, it would seem, is to induce felons to take steps likely to reduce the rate of recidivism without the need for incarceration and, thereby, to conserve public funds. Inasmuch as participation in certain anger-management programs outside of prison achieves greater success in reducing recidivism than do lengthier prison sentences, officials may be motivated by the additional purpose of promoting public safety. Government officials will argue that it is just happenstance that many Buddhist meditation programs, and few secular programs, have demonstrated adequate success in reducing violent conduct. But in the (perhaps unlikely) event that a court finds that the state conceived and advanced the conditional probation offer because of the offer's probable effect in promoting Buddhism, then the offer might violate the Constitution by reason of its purpose.

Even if this purpose cannot be established, it remains possible that the offer should be constitutionally worrisome because of its effects. Whatever the state's purposes, after all, it may be the case that, over time, the proposal induces many hundreds of felons to take up Buddhist meditation. It is at least open to argue that Establishment Clause principles should be understood to bar the state from

---

159. The much-derided *Lemon* test holds that a law violates the Establishment Clause if it lacks "a secular legislative purpose" or if "its principal or primary effect" either advances or inhibits religion or if it "foster[s] an excessive government entanglement with religion." Lemon v. Kurtzman, 403 U.S. 602, 612 (1971). For present purposes, we need not enter the debate over what Establishment Clause doctrine should be. The point of this illustration is simply to demonstrate the basic functioning of the three-dimensional approach. Just as I need take no position on the (hypothetically) debatable questions of what the state's purposes are and what the effects of the offer will be, I need take no position on the debatable question (of constitutional interpretation) of what the Establishment Clause prohibits.

160. Nominally, under *Lemon*, it is the absence of a secular purpose rather than the presence of a religious purpose that offends the Constitution. *See supra* note 159. But, again, the distinction is arbitrary for purposes of this illustration. The point is that the presence (but-for or otherwise) of certain types of purposes *could* be held to infringe (or violate) the Establishment Clause. Similarly, in discussing an effects challenge to the *Probation* offer, we need not feel constrained by the adjectives "principal" and "primary." The critical point is only that the conditional proposal is potentially unconstitutional on the dimension of effects.

**Appendix 8**

44          THE GEORGETOWN LAW JOURNAL          [Vol. 90:1

acting so as to produce such consequences unless so doing satisfies some sort of test of heightened justification. Whether this is the best reading of the Establishment Clause is beside the instant point. For now, it is enough that *Probation* illustrates how a conditional offer may not be coercive, yet still prove unconstitutional by reason of its effects or its purpose (or both).

### C. CONSTITUTIONALLY PERMISSIBLE PROPOSALS

Turn, lastly, to the conditional offer presented in *Social Security*.[161] When assessing *Probation*, we first examined whether the proposal was coercive, and only scrutinized the proposal on the dimensions of purpose and effect after determining that it was not. This sequence is, of course, arbitrary. Sometimes it will be more convenient to proceed in the reverse order. At this point, though, maintaining consistency will probably be most conducive to understanding.

The conditional proposal extended to disabled children of primary beneficiaries—"we will continue to provide you with benefits so long as you do not marry"—is coercive if, upon marriage, Betty the beneficiary could successfully challenge the Secretary's withdrawal of benefits. To be sure, revocation does burden her right to marry: By asserting her right, Betty is made materially worse off than if she had waived it. But this alone could hardly generate a demand for especially weighty justification, as state actions that make costly exercise of the liberties to marry, or not to marry, are virtually without number. The purpose for extending secondary benefits in the first place is to "provide persons dependent on the wage earner with protection against the hardship occasioned by his loss of earnings."[162] But that purpose implies an additional purpose of not doling out public funds to those not in need, and exists against a general background purpose of sorting possible claimants in an administratively efficient manner—such as by relying on a presumption (admittedly both over- and under-inclusive) that marriage forms a new economic unit, vitiating the beneficiary spouse's dependency on the parent whose covered wages earned the benefit. So, even if the carrying out of the government's threat will provoke some heightened judicial scrutiny just by virtue of its effects,[163] the state's interest in fiscal prudence will supply adequate justification. Importantly, this interest explains why the burden does not amount to a penalty. It is implausible in the extreme that in withdrawing Betty's benefits the government is the least bit motivated by a purpose in causing her to experience the withdrawal as disagreeable, for reasons either of punishing Betty herself or of discouraging other beneficiaries like Betty from marrying.[164] Withdrawal of Betty's benefits simply serves the government's purpose in not expending Social Security funds

---

161. *See supra* text accompanying note 116.

162. Califano v. Jobst, 434 U.S. 47, 52 (1977).

163. *See id.* at 54.

164. Consider: Assuming the Secretary had the statutory discretion to do so, would he *not* withhold the benefits had he become convinced that, for some bizarre reason, Betty did not want them?

when they are (presumably) not needed. In sum, revocation of benefits upon failure of the condition is seemingly constitutional, making the conditional proposal, as a consequence, not coercive.

If the proposal is not coercive, might it nonetheless be unconstitutional by reason of purpose or effect? What we have said thus far is probably enough to establish that it is not designed to discourage marriage. And it is hard to imagine any other even arguably improper purpose for which it might be extended. As for the proposal's effect in discouraging some marriages,[165] the effect of discouraging marriages and the effect of burdening marriages are two sides to the same coin: The innumerable state actions that may have the effect of discouraging some marriages will also have the effect of burdening those marriages not deterred. (Notice that we measure any problematic effects of the offer by reference to the state of the world given the offer's acceptance and assess the effects of the act of carrying out the threat—and thus whether the proposal constitutes coercion—against the actual or predicted state of the world given the offer's rejection.)[166] If our conclusion is correct that the latter type of effect is far too common to provoke a demand for stringent justification, then the same must be true of the former type of effect. The state's interests in separating the needy from the not-so-needy, and doing so cheaply, will supply constitutionally adequate justification in both cases. Therefore, the purposes and effects of the proposal seem as constitutionally inoffensive as the purposes and effects of carrying out the threat. The Supreme Court's unanimous conclusion in *Califano v. Jobst* is right on the money: "The general rule, terminating upon marriage the benefits payable to a secondary beneficiary, is unquestionably valid."[167]

### D. SUMMARY

Unconstitutional conditions cases are distinguished by their biconditional form: if ~x then y, if x then ~y. In normative reasoning generally, the extending of such a proposal is the type of act that could constitute the wrong of coercion. So too in constitutional law. The distinctive question for all unconstitutional conditions cases—which is to say for all cases sharing this formal structure—is whether the state engages in coercion. A proposal is coercive if the act the state threatens would be unconstitutional to carry out. To challenge an offer on grounds that it constitutes coercion is, accordingly, essentially to mount an anticipatory attack on the performing of the act that the state threatens. In other words, the fact that it is presumptively unconstitutional for the state to engage in coercion allows the recipient of a conditional proposal to challenge the proposal itself without having first to reject the offer and suffer the consequences.

When undertaking the inquiry into coercion, one would, if being systematic,

---

165. *Califano*, 434 U.S. at 54, 58.
166. *See infra* note 446.
167. *Califano*, 434 U.S. at 54.

Appendix 8

assess the act of withholding the benefit across all three dimensions of constitutional violation. We have not yet been quite so thorough. We have focused instead on the question of whether the threatened act is unconstitutional for penalizing the exercise of a constitutional right. "Penalizing," here, has a specific meaning: It is the imposition of consequences upon a rightholder that are adverse relative to the consequences that the state would impose, or allow to obtain, but for the state's purpose in having the rightholder experience the consequences as disagreeable. (The state is constitutionally free to penalize much conduct; it is not free, however, to penalize exercise of a constitutional right. That is, in large part, what it means to have a constitutional right.) In operationalizing this definition, the difficult question, as is often the case, will concern whether the state acts (or would act) with the requisite purpose (as opposed to mere knowledge) that the rightholder experience the consequences as disagreeable. Restated, in seeking to determine whether a proposal is coercive on the grounds that carrying out the threat would penalize the exercise of a constitutional right—which, ordinarily, is to say that it would burden exercise of the right for the purpose either of punishing the rightholder for having exercised her right or of deterring future exercises of constitutional right (by this or other rightholders)—the dispositive question will reduce to this: Taking as a given the offeree's refusal to do $\sim x$ (that is, the refusal to comply with the state's demand), would the state offeror better advance its legitimate and actual interests by withholding the benefit ($y$) offered or by granting it notwithstanding the offeree's (constitutionally protected) choice to do $x$?[168] And even insofar as this question employs a predictive baseline (though not *the* predictive baseline familiar to unconstitutional conditions scholarship), such reliance is only partial. The proposal threatens a penalty, and is therefore coercive, if the state could be predicted to confer the benefit taking the offeree's refusal to do $x$ as a given. But a prediction that the state would withhold the benefit even taking the offeree's refusal to do $x$ as a given does not permit a conclusion that such withholding would not be a penalty. That would tell us only that carrying out the threat would not be for the purpose of discouraging exercise of the right to $\sim x$. Yet, it could still be for the purpose of punishing exercise of a right, in which case, too, the proposal is coercive for threatening a penalty. This is a question of fact that relies upon the usual means, within and without the law, of inferring intention.

Often, as in the circumstances of *Dole*, a sound inference about the state's purpose for carrying out the threat will not be hard to draw. Other times, as we

---

168. This is not, it bears emphasis, the predictive baseline advanced by Professors Kreimer and Simons. Those scholars would ask whether the state would extend the benefit to all, if it could not discriminate between those who do and those who do not comply with the condition. *See supra* text accompanying notes 46, 54. That is too stringent a test. Recall *Social Security*. It is certainly possible that, were the government barred from discriminating between married and single secondary beneficiaries, it would prefer (what it deems) excessive generosity to excessive stinginess. But this fact (supposing it true) would not mean that, when the state *is* able to discriminate, the selective withholding of the benefit amounts to a penalty.

will see in Part V, the inference is more problematic. In any event, the state is often (though perhaps not always) permitted to penalize a constitutional right if it has adequate justification. If penalizing the exercise of the right would be justified, then carrying out the threat is constitutional, and the making of the threat is not coercive. If, on the other hand, penalizing the exercise of the right violates the right, then the conditional proposal is coercive and presumptively unconstitutional.[169]

So much for the inquiry into coercion. That is the distinctive question presented by conditional offers, but it is not the end of the constitutional analysis. Even if a given conditional offer is not unconstitutional by reason of coercion, it might yet turn out to be unconstitutional. Here we look not to principles designed specifically for the unconstitutional conditions problem, but to principles governing constitutional reasoning generally. A conditional offer, like all state action, may be unconstitutional by reason of its purposes or effects. Consider, first, purposes. Conditional offers are designed to induce certain behavior. Sometimes the state is permitted to try to encourage people to act in certain ways so long as its method is not coercive. Even though the state would infringe (and presumably violate) my constitutional rights were it to coerce me into becoming a law professor, for example, surely it is free to employ some inducements to achieve that end. Other times (think Establishment Clause, for instance) the state may be barred (absolutely or presumptively) simply from pursuing such an objective. In those cases, the offer may be unconstitutional by reason of its purposes, even though the offer really is (mere) encouragement, not coercion. Finally, even if the state's purposes might be constitutionally permissible, and its means of pursuing those purposes not coercive, the conditional offer could still prove unconstitutional if it produces constitutionally problematic effects and fails to satisfy whatever standard of heightened scrutiny contingent constitutional doctrine calls forth.

---

169. When a proposal is coercive on grounds that the act threatened would be unconstitutional by reason of penalizing the exercise of a constitutional right, I am not sure that there is any way for the state to defeat the presumption of unconstitutionality, as it seems that all likely arguments for why the infringement is not a violation will already have been considered—and necessarily rejected—when determining whether the penalizing that is threatened would be justifiable. Indeed, the very distinction between the carrying out of the act threatened and the making of the proposal is a little artificial. The proposal, after all, does not always assume the form of an explicit ex ante pronouncement. Outside of nonrepeat, two-party transactions, it may be the very act of withholding or withdrawing a benefit from *A* that operates to communicate the conditional proposal to *B* and *C*. All this suggests that it may be more precise to say that a proposal is coercive (hence presumptively wrongful) if the act threatened either is impermissible all things considered or would be impermissible but for the presence, under the circumstances, of constitutionally adequate justification for the state to discourage the conduct penalized. Under this formulation, the very same considerations that may justify imposition of a penalty would, instead of thereby preventing the proposal from constituting coercion, render the making of a coercive proposal justifiable. Although resolution of this issue is surely to be desired for conceptual and terminological clarity, it is not critical at this stage. The bottom-line conclusions of constitutionality or unconstitutionality remain the same whether or not we label a threat to impose a penalty "coercion" even if actual imposition of the penalty would be constitutionally justifiable.

Appendix 8

## V. REPRESENTATIVE APPLICATIONS

For many years, scholars of unconstitutional conditions proposed grand theories designed to make sense of all conditional benefit cases across disparate regions of constitutional law. The widespread perception that such theories have failed has ushered in a scaling down of expectations. Some scholars, we have seen, have cautioned against any form of unconstitutional conditions theorizing. Others, less skeptical, have tried to work out more localized solutions, tailored to single areas of constitutional law.[170] Bucking this trend, I claim that the three-dimensional approach thus far sketched out applies across all of constitutional law—from "structural" areas of federalism and separation of powers[171] through the entire range of individual liberties.

This may appear an extravagant claim.[172] And while it would take few, well-chosen counterexamples to demolish it—or at least to require qualification—the claim could be adequately substantiated only by running through far more areas of constitutional law, and far more individual cases, than constraints

---

170. Those favoring localized solutions have divided the constitutional terrain in two ways. *See* Baker, *supra* note 18, at 1197 & n.38. Most commentators have focused their attention on the set of unconstitutional conditions cases defined by the particular constitutional right—such as individuals' rights of free speech, religion, or abortion, or the states' rights held against the federal government—that the conditional offers implicate. A smaller number of contributions have explored a particular type of governmental offer—especially those involving public welfare benefits—even when such offers may be understood to infringe or pressure diverse constitutional rights. This Part is organized around the former approach. For examples of the latter see, in addition to Baker, Julie A. Nice, *Making Conditions Constitutional by Attaching Them to Welfare: The Dangers of Selective Contextual Ignorance of the Unconstitutional Conditions Doctrine*, 72 DENV. U. L. REV. 971 (1995); Dorothy E. Roberts, *The Only Good Poor Woman: Unconstitutional Conditions and Welfare*, 72 DENV. U. L. REV. 931 (1995); and Jonathan Rombert, *Is There a Doctrine in the House? Welfare Reform and the Unconstitutional Conditions Doctrine*, 22 FORDHAM URB. L.J. 1051 (1995).

171. Although I have just asserted that the analysis presented in this Article also resolves unconstitutional conditions cases that raise (or might be thought to raise) separation of powers concerns, I will not attempt that demonstration here. My guess is that conditional proposals in this area will rarely be coercive and, when unconstitutional, therefore, will prove offensive by reason of purpose or, most likely, effects. For a small sampling of the ways separation of powers cases can raise the unconstitutional conditions problem, see, for example, *Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252 (1991) (holding unconstitutional, as violating the principle of separation of powers, a transfer of operating control of two airports from the federal government to a regional compact, on the compact's conferral of veto power to a review board composed of nine members of Congress); and *Northern Pipeline Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 80–81 (1982) (plurality opinion) (dictum) (discussing the extent to which Congress may, consistent with Article III, condition the grant of a new substantive federal right on the adjudication of such rights in non-Article III tribunals). For one interesting discussion, see George A. Martinez, *The Res Judicata Effect of Bankruptcy Court Judgments: The Procedural and Constitutional Concerns*, 62 MO. L. REV. 9, 43–46 (1997) (exploring how giving res judicata effect to resolution of "non-core" claims by an Article I bankruptcy court raises an unconstitutional conditions problem).

172. Even scholars sympathetic to broad theorizing about unconstitutional conditions are generally skeptical that a single approach can be applied to both federalism and individual liberties cases. *See, e.g.*, Albert J. Rosenthal, *Conditional Federal Spending as a Regulatory Device*, 26 SAN DIEGO L. REV. 277, 278–81 (1989) (favoring an approach of some generality, but suggesting that federalism and rights cases may represent "two separate problem areas, with few common denominators"); Simons, *supra* note 51, at 293–94.

of time and space will permit. Accordingly, this Part will attempt to demonstrate the value of the three-dimensional analysis, and to bring out some of its many wrinkles, by applying it to only a representative sample of unconstitutional conditions cases. For ease of exposition—and without staking a position on the extent to which these categories are natural or arbitrary, revealing or obscuring[173]—the Part is divided into two sections. The first examines a range of issues arising under the rubric of federalism. The second turns attention to individual liberties.

### A. FEDERALISM

When, in the next section, we come to examine benefits conditioned upon the waiver of individual rights, it will be easy to proceed amendment by amendment, starting with the Speech and Religion Clauses of the First Amendment, and continuing through the Takings Clause of the Fifth Amendment and the Sixth Amendment right to trial. A similar clause-by-clause approach has some superficial appeal here as well. Certainly, we will be interested in, for instance, the Tenth and Eleventh Amendments and the dormant Commerce Clause. Just to mention these particular provisions, however, is to suggest some doubt about the value of a narrowly clause-bound progression. The dormant Commerce Clause, after all, is a famous misnomer, being a mere negative inference from the actual Commerce Clause. And the Tenth Amendment "states but a truism."[174] Furthermore, and most revealingly, we have just learned from *Alden v. Maine*[175] that what was known for over a century as "Eleventh Amendment jurisprudence" has nothing particularly to do with the Eleventh Amendment itself.

This is not the place to question the doctrines of constitutional law that have grown up around any of these clauses. My point is only the familiar one that proper analysis of federalism questions—much like separation of powers questions and less like those directly implicating individual liberties—relies heavily upon broad structural reasoning about appropriate relationships of governmental power. Accordingly, this section is organized around those basic dynamics rather than around discrete constitutional provisions. More precisely, this section will consider (1) conditional offers that implicate states' rights held against the federal government, (2) conditional offers by states that threaten federal interests, and (3) conditional offers by states that threaten interests held by other states. In other words, the first two subsections are concerned with the vertical division of power between the state governments and the federal government, whereas the third subsection examines the horizontal concerns implicated by exercises of power among coequal states.

---

173. *See generally* AKHIL R. AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION (1998) (arguing that the Bill of Rights was originally designed principally to serve structural objectives and was "reconstructed" to promote individual liberty by the Fourteenth Amendment).

174. United States v. Darby, 312 U.S. 100, 124 (1941).

175. 527 U.S. 706 (1999).

1. Vertical Limits on Conditional Offers Extended by the National Government

Consider three limitations on the federal government's authority over the states. First, Congress may impose no regulations on states or private entities that exceed the scope of its enumerated (nonspending) powers. Second, it may not "commandeer" the mechanisms of state governmental power in the regulation of third parties. This is, within a narrow sphere, doubly determined. Under the *New York*[176] and *Printz*[177] decisions, Congress may not compel the states to enact their own laws or to administer federal law. Moreover, even absent this rule of anticommandeering, it follows from the first limitation that when direct regulation of private conduct would exceed Congress's enumerated powers, compelling states to issue regulations in Congress's stead likewise exceeds those powers. Third, except when appropriate as an exercise of its enforcement powers under the Reconstruction Amendments, Congress may not compel the states' submission to damage remedies in suits brought by private entities in either state or federal court. Although these labels are not precise,[178] it is customary to locate the first two types of limits in the Tenth Amendment and the third in the Eleventh. For want of space, this section examines the Tenth Amendment issues only, leaving the Eleventh Amendment for treatment elsewhere.[179]

I argued in Part IV that *Dole* is the single most important unconstitutional conditions case. The core of the unconstitutional conditions puzzle resides in a state's effort to induce action through coercive means,[180] and whether coercion exists will usually turn upon the government's purpose for carrying out its conditional threat. *Dole* is invaluable for illustrating these two points. But if *Dole* is critically important conceptually, it was of little practical importance (outside its particular holding) when decided. That is because Congress has little need to employ the states as auxiliaries to further its legislative agenda so long as it can achieve its interests by directly regulating private conduct. As Professor Albert Rosenthal put it, "[i]f the front door of the commerce power is open, it may not be worth worrying whether to keep the back door of the spending power tightly closed."[181] And when *Dole* was decided in 1987, the Commerce Clause door was open widely indeed. Of course, as *Lopez*,[182] *New York*, *Printz*, and *Morrison*[183] exemplify, the door appears to be closing. Today, then, *Dole* stands as a potentially massive loophole threatening the Court's

---

176. New York v. United States, 505 U.S. 144 (1992).

177. Printz v. United States, 521 U.S. 898 (1997).

178. *See supra* text accompanying notes 172–73.

179. *See* Mitchell N. Berman, R. Anthony Reese & Ernest A. Young, *State Accountability for Violations of Intellectual Property Rights: How to "Fix"* Florida Prepaid *(And How Not To)*, 79 TEX. L. REV. 1037, 1130–72 (2001).

180. *See supra* Parts II.B, IV.A.

181. Albert J. Rosenthal, *Conditional Federal Spending and the Constitution*, 39 STAN. L. REV. 1103, 1131 (1987); *see also* Baker, *supra* note 1, at 1918–19 (quoting Rosenthal, *supra*, at 1131).

182. United States v. Lopez, 514 U.S. 549 (1995).

183. United States v. Morrison, 529 U.S. 598 (2000).

Appendix 8

recent efforts to cabin federal power vis-à-vis the states. But, I have argued, *Dole* was wrongly decided. This section explores how the unconstitutional conditions doctrine, properly conceived, works in light of *Lopez* and *Printz.*

But first a little history, for the Supreme Court's conditional federal spending jurisprudence did not begin with *Dole.* The critical moment, rather, came in 1936, when, in *United States v. Butler,*[184] the Court nominally sided with Hamilton over Madison in concluding that Congress could use its spending power to achieve ends that it could not achieve by exercising its other grants of legislative power.[185] Congress had authorized the Secretary of Agriculture to issue subsidies to farmers who agreed to certain limits on their agricultural production.[186] The Court invalidated the condition on the dubious ground that there is an "obvious difference between a statute stating the conditions upon which moneys shall be expended and one effective only upon assumption of a contractual obligation to submit to a regulation which otherwise could not be enforced."[187] Notwithstanding that the case involved an offer to private entities rather than to states and that the condition was struck down, the Court's seemingly forced ground of distinction laid the groundwork for recognizing an expansive congressional power to condition federal spending to states.

That promise was fulfilled a decade later in *Oklahoma v. United States Civil Service Commission.*[188] In 1939, Congress enacted the Hatch Act[189] to limit political activity by government employees, both federal and state. The first set of provisions, governing federal employees, was straightforward. They simply prohibited covered employees from engaging in various types of political activities. The provisions addressing political activity by state employees were more indirect. Essentially, the statute declared that no state or local governmental employee "whose principal employment is in connection with any activity which is financed in whole or in part by any Federal agency" may "take any active part in political management or in political campaigns."[190] The statute contained an enforcement mechanism providing that any agency that knew of an official's participation in specified partisan activities but did not suspend her would lose federal funding in the amount of twice that official's annual salary.[191] Cast in the terms of the unconstitutional conditions problem, the federal

---

184. 297 U.S. 1 (1936).

185. Although *Butler* said that it was siding with Hamilton over Madison, 297 U.S. at 65–66, it is frequently criticized for adopting the Madisonian view in practical effect. For an argument that neither the Court, nor its critics, has ever understood Hamilton's view of the spending power, see David E. Engdahl, *The Spending Power,* 44 DUKE L.J. 1 (1994).

186. *Butler,* 297 U.S. at 54–56.

187. *Id.* at 73. Although dubious, the distinction was not without precedent. *See infra* note 261.

188. 330 U.S. 127 (1947).

189. Pub. L. No. 76-252, 53 Stat. 1147 (1939) (codified as amended in scattered sections of 5 and 18 U.S.C. (2000)).

190. *Oklahoma,* 330 U.S. at 129 n.1 (quoting Hatch Act § 12(a), 5 U.S.C. § 118k(a) (1940) (current version at 5 U.S.C. § 1502(a) (2000))).

191. *Id.* at 133 (citing Hatch Act § 12(b), 5 U.S.C. § 118k(b) (1940) (current version at 5 U.S.C. § 1506(a) (2000))).

government was offering a sum of money equal to twice a state official's salary conditioned on the state's agreement to suspend the official in question.

In 1947, a short-handed and divided Court rejected separate challenges to both sets of provisions.[192] It upheld the restrictions on political activity by federal employees in *United Public Workers v. Mitchell*,[193] reasoning that Congress's interests in promoting "efficiency" and "good administration" justified the ban on political activities.[194] In particular, the majority explained, Congress could reasonably believe that permitting partisan activities by government employees was undesirable because it might encourage and reward partisan political activity at the expense of public-spirited official action and because it risked funneling "governmental favor . . . through political connections."[195]

In *Oklahoma*, decided the same day as *Mitchell*, the Supreme Court rejected Oklahoma's contention that the conditional offer to the states violated the Tenth Amendment. "While the United States has no power to regulate local political activities as such of state officials," the Court reasoned, "it does have power to fix the terms upon which its money allotments to states shall be disbursed."[196] Citing cases in which it had upheld conditional monetary grants from the federal government to individuals,[197] the majority simply concluded that the federal program did not violate "the State's sovereignty," for "Oklahoma adopted the 'simple expedient' of not yielding to what she urges is federal coercion."[198]

This is a common refrain. Variations on the theme preceded *Oklahoma*,[199] and as we have already seen, it reemerged later in *Dole*.[200] But the idea is quite peculiar. Coercion, after all, is a normatively freighted concept.[201] If the federal government really has employed coercion by threatening to perform an unconstitutional act, and if such coercion cannot be justified under the circumstances, then some sort of censure should flow as a matter of course. That is part of what it means to charge someone with engaging in coercion. That the victim of a coercive proposal could choose not to yield is irrelevant. Surely nobody would be so cruel, or stupid, as to suggest that the victim of the highwayman has no complaint because she could have simply not capitulated. The Court is best understood, therefore, as claiming not that the federal coercion is permissible because Oklahoma could remain steadfast, but that Oklahoma's contention that

---

192. With Justices Murphy and Jackson taking no part in either case, the Court's holdings that the provisions were constitutional were joined by only three Justices in *Mitchell* and four in *Oklahoma*.

193. 330 U.S. 75 (1947); *see also* United States Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548 (1973) (reaffirming *Mitchell*).

194. *Mitchell*, 330 U.S. at 98.

195. *Id.* at 98–100.

196. *Id.* at 143.

197. *Id.* at 144 & n.20 (citing *United States v. Bekins*, 304 U.S. 27 (1938); *Steward Machine Co. v. Davis*, 301 U.S. 548 (1937); and *Massachusetts v. Mellon*, 262 U.S. 447 (1923)).

198. *Id.* at 143–44.

199. *See Mellon*, 262 U.S. at 482.

200. *See supra* text accompanying notes 123–24.

201. *See generally* Westen, *Virtue Words*, *supra* note 53 (explaining that although "coercion" is not normatively bad by definition, it does have a strongly negative normative connotation).

there had been coercion is mistaken. But in *Oklahoma*, as is generally the case, the Court articulated no standards by which to make that determination.[202] This Article has, however, set forth such a standard.

The conditional proposal is coercive if carrying out the threat to withhold funds would, under the circumstances, be unconstitutional. The withholding of funds is unconstitutional, in turn, if it penalizes the state's exercise of its constitutional right[203] not to suspend its employee. Plainly, the federal government's withholding of funds from a state that, like Oklahoma, stands on its right imposes a consequence adverse to that which would obtain but for the state's exercise of its right. That is, the withholding of funds burdens the exercise of the state's sovereign right to employ persons as it wishes. The critical task here, just as in *Dole*, is to examine the federal government's purpose for imposing this burden. If a purpose is either to punish the state's exercise of its right or to discourage other states from exercising their constitutional rights, then the withholding of the funds penalizes the exercise of a constitutional right and is presumptively unconstitutional. If this is not a purpose for withholding funds (and if the purposes are themselves constitutionally permissible), then reducing the state agency's federal funding by twice the annual salary of the actively partisan official does not penalize a constitutional right and is presumptively constitutionally permissible.

Given that Oklahoma has chosen not to yield and that the Civil Service Commission has ruled after a hearing that the state employee had engaged in proscribed political activities, what purposes would be served by reducing funds to the State Highway Commission *if not* to punish this exercise of right or to discourage other such exercises? Perhaps, you may say, the federal government's purpose is to ensure against corrupt political use of federal funds, as though the Commission had cut off all funds that would be channeled through the potentially corrupt official. But this is not persuasive, for the sanction is not to rescind all funds that go through that official, but rather to revoke a sum of money that, from this perspective, is wholly arbitrary. The suspect official will retain whatever involvement he had previously (whether substantial or trivial) in the administration of the federal funds that remain. True, it may be impossible for the Commission to determine precisely what portion of the federal funds go through the too-political official, so the federal government must be allowed to employ some sort of reasonable proxy. But the actual act threatened—

---

202. Indeed, many lower federal courts have suggested that the Supreme Court's treatment of coercion remains standardless even after *Dole*. *See, e.g.*, Kansas v. United States, 214 F.3d 1196, 1202 (10th Cir. 2000) (rejecting a coercion claim after concluding that the "coercion theory is unclear, suspect, and has little precedent to support its applications"); Nevada v. Skinner, 884 F.2d 445, 448 (9th Cir. 1989) (observing that "[t]he coercion theory has been much discussed but infrequently applied in federal caselaw," and attributing "the federal courts' lack of enthusiasm for the theory" to "its elusiveness" and the seeming absence of "any principled definition of the word").

203. *See supra* note 140 and accompanying text. Even if not a penalty, the withholding of funds could conceivably be unconstitutional for other reasons (on dimensions of purpose, effect, or conduct), but this seems unlikely.

withholding funds amounting to twice the annual salary of the employee—is not persuasively explained as a surrogate for the degree to which the existence of potentially corrupt state officials reduce the economic return from the federal expenditures. A high-level state official may be able to redirect to partisan purposes federal funds amounting to many multiples of his annual salary;[204] a lower level employee (like the plaintiff in *Mitchell*, who was a roller at the federal mint) may have power to influence the disbursement of no federal funds at all. It is hard to avoid the conclusion, therefore, that withholding the funds at issue in *Oklahoma* served to discourage states from exercising their presumptive rights as employers, therefore constituting an unconstitutional penalty. Unless the imposition of a penalty was justified, the federal scheme was coercive and should have been invalidated.[205]

The Supreme Court did not again address a case of conditional federal spending until *South Dakota v. Dole*, forty years later. And in the dozen years since *Dole*, it has not decided another one. The Supreme Court's 1995 decision in *United States v. Lopez*,[206] however, has led many commentators to think that the next conditional spending case cannot be too far off. In *Lopez*, the Court invalidated the federal Gun-Free School Zone Act, which made it a federal offense to possess a firearm within 1000 feet of a school, as beyond Congress's commerce power. In response to the decision, President Clinton immediately proposed to condition federal education funds to each state on that state's adoption of a *state* gun-free school zone law mimicking the provisions of the invalid federal law.[207] Several commentators have opined that such a law would

---

204. I imagine the critic's scoff: Under Berman's theory, the Hatch Act was unconstitutionally coercive because the feds threatened to withhold too *little* money from the states. Not quite. My point is not that the relatively small amount of money being withheld made the threat coercive, but that it helps reveal the proposal to be coercive, as threatening a penalty.

205. Most commentators think *Oklahoma* was rightly decided. *See* Epstein, *supra* note 4, at 45 n.116 ("This particular statute should be sustained against the challenge of unconstitutional conditions because it is designed to protect the United States against abuses by recipients of federal moneys."); McCoy & Friedman, *supra* note 120, at 115; Rosenthal, *supra* note 181, at 1134–35 (concluding that there was true consent rather than coercion because the penalty imposed was so modest in magnitude). Indeed, Justice O'Connor specifically approved the holding in *Oklahoma* in her *Dole* dissent, *see* South Dakota v. Dole, 483 U.S. 203, 217 (1987) (O'Connor, J., dissenting), though, as Professor Engdahl has pointed out, Engdahl, *supra* note 185, at 56 n.231, such approval seems inconsistent with O'Connor's strict test of germaneness. Professor Jesse Choper thinks, as I do, that *Oklahoma* (like *Dole*) was wrongly decided, but he bases that conclusion on the much too extreme view that the spending power should be construed so as to "bar Congress from doing indirectly what it is forbidden to do directly." Jesse H. Choper, *The Supreme Court and Unconstitutional Conditions: Federalism and Individual Rights*, 4 CORNELL J.L. & PUB. POL'Y 460, 464 (1995).

206. 514 U.S. 549 (1995).

207. *See* Todd S. Purdum, *Clinton Seeks Way to Retain Gun Ban in School Zones*, N.Y. TIMES, Apr. 30, 1995, at A1. As it turned out, Congress decided to circumvent *Lopez* a different way, by amending the federal statute to ban the possession of only such firearms as have "moved in or otherwise affect interstate or foreign commerce." 18 U.S.C. § 922(q)(2)(A) (2000). Although I think the question exceedingly close, academic commentators seem to have concluded that this amendment satisfies the "jurisdictional element" test of *Lopez* rather easily. *See, e.g.*, Daniel J. Meltzer, Essay, *State Sovereign Immunity: Five Authors in Search of a Theory*, 75 NOTRE DAME L. REV. 1011, 1067 n.159 (2000) (citing

Appendix 8

pass the *Dole* test for conditional spending, thereby emasculating *Lopez*.[208] Something has to give.

Perhaps the most important response to the *Lopez-Dole* dilemma to date has been supplied by Professor Lynn Baker.[209] After subtly analyzing the problem, Baker proposes her own, quite straightforward, solution. The Court should start, she suggests, by presuming invalid all "offers of federal funds to the states which, if accepted, would regulate the states in ways that Congress could not directly mandate under its other Article I powers."[210] The presumption could then be rebutted only if the federal legislation constitutes "reimbursement spending"—legislation that would simply reimburse the states, in whole or in part, for the costs they would incur in pursuing the ends that federal legislation specifies.[211] Otherwise, the legislation constitutes "regulatory spending" and is unconstitutional.[212]

Professor Baker's approach is, I believe, half right. Reimbursement spending is not coercive (and is therefore presumably constitutional). As an offer of reimbursement is logically dependent upon the offeree's incurring specified expenses, withholding the offered funds on the failure of the offeree actually to incur the expenses that qualify for reimbursement betrays no impermissible purpose. It merely reflects the absence of a factual predicate without which the reason for providing the benefit disappears. But, under my account of coercion, Baker's further claim that "regulatory spending" legislation is necessarily unconstitutional is mistaken. Some instances of regulatory spending will constitute impermissible penalties; many, however, will not.

The proposed conditional spending response to *Lopez*'s specific holding provides a convenient illustration. Suppose that Congress conditioned some portion of federal education funds on states' enactment of state gun-free school zone acts. Under Baker's analysis, this would be unconstitutional regulatory spending. Under this Article's conceptions of coercion and penalty, however, the conditional offer is at least conceivably permissible. To see why, imagine that empirical findings really did show that fear of gun violence had a measurable, deleterious effect on the ability of students to learn. Perhaps the fear increases absenteeism and reduces students' levels of concentration even when present. And perhaps Congress could reasonably conclude that, under these

---

articles). Indeed, as Professor Meltzer points out, a panel of the Eighth Circuit apparently thought the matter so obvious that it deemed its opinion upholding the statute not worth publishing. United States v. Danks, 187 F.3d 643 (8th Cir. 1999) (unpublished table decision).

208. *See, e.g.,* Baker, *supra* note 1, at 1914; Ronald J. Krotoszynski, Jr., *Listening to the "Sounds of Sovereignty" but Missing the Beat: Does the New Federalism Really Matter?*, 32 IND. L. REV. 11, 13–22 (1998); Grant S. Nelson & Robert J. Pushaw, Jr., *Rethinking the Commerce Clause: Applying First Principles to Uphold Federal Commercial Regulations but Preserve State Control over Social Issues*, 85 IOWA L. REV. 1, 161 n.730 (1999).

209. Baker, *supra* note 1.

210. *Id.* at 1916; *see id.* at 1962–78.

211. *Id.* at 1916 n.16.

212. *Id.* at 1916.

circumstances, certain expensive improvements—say, smaller class size or Internet access—are not exploited sufficiently well to make them cost-justified. If all this is so, then an offer of funds for those improvements conditioned on the state undertaking satisfactory efforts to combat guns near schools should be constitutional even though not reimbursement spending.[213] In this case, the purpose for burdening a state's exercise of its sovereign right not to ban guns near schools need not be to punish or to deter, but rather to not waste federal money.[214] Under these assumptions, carrying out the threat to withhold funds is not a penalty, so the conditional proposal is not coercion.

To be sure, this example is far-fetched. In all likelihood an argument along these lines would not, and should not, be credited. Therefore, my analysis would probably yield the same conclusion as would Professor Baker's— namely, that the conditional spending legislation is unconstitutional. But the relative implausibility of its factual predicates notwithstanding, this illustration does highlight a critical flaw in Professor Baker's approach.[215] Because the efficacy of particular expenditures can depend on the presence or absence of certain (legal and factual) conditions in the world, it is perfectly reasonable for Congress to condition the offer of federal funds on the assurance that those circumstances obtain.[216] Surely, for example, Congress should be permitted to

---

213. Of course, if Congress could marshal adequate factual support for this argument, conceivably it could even resurrect (substantially for the reasons advanced by the dissents) even the federal gun-free school zone act struck down in *Lopez*. Then again, even if factual findings demonstrated that gun possession near schools did substantially affect interstate commerce, a majority of the Supreme Court might still deem a federal criminal ban unconstitutional because the activity is not "economic" (or "commercial") or because it intrudes upon areas (both education and criminal law) of traditional state concern. *See* United States v. Morrison, 529 U.S. 598, 610–18 (2000) (emphasizing both these factors as critical to the Commerce Clause test after *Lopez*). In any event, under *New York v. United States*, 505 U.S. 144 (1992), Congress could not mandate that the states enact their own gun-free school zone acts.

214. I do not mean that Congress should have to prove that the expenditure of federal money under the circumstances would be of no value at all. Rather, Congress could consider the funds "wasted" to the extent that they produce less value than they would under an alternative use.

215. In suggesting this criticism, I take myself still to be operating within the nondogmatic spirit of Professor Baker's analysis. *See* Baker, *supra* note 1, at 1989 (expressing hope "that even those who do not choose to embrace my test will nonetheless profit by being provoked to contemplate how best to solve the problem of conditional federal spending after *Lopez*").

216. This was the point of my earlier speculations regarding how Congress might conceivably defeat the inference that the conditional offer at issue in *Dole* was coercive. *See supra* pp. 38–39. The opportunity for *Dole* redux was averted in 1998 when the House narrowly rejected a highway spending bill that would have conditioned federal highway funds on state law imposing a minimum blood-alcohol-content (B.A.C.) level of no more than 0.08%. *See* James Dao, *Highway Bill Accord Rejects Tougher Standard on Alcohol*, N.Y. TIMES, May 19, 1998, at A1. In lieu of this controversial provision, Congress directed the Department of Transportation to make grants to states that adopt specified sorts of programs designed to reduce alcohol-related accidents, but on the condition that such funds "only be used by recipient states to implement and enforce such programs." 23 U.S.C. § 410(a)(1) (2000). This is merely "reimbursement spending" and, as such, is clearly constitutional. Just last year, however, Congress returned to the fray and did enact a law that conditions federal highway funds on state adoption of the 0.08% B.A.C. standard. *See* Department of Transportation and Related Agencies Appropriations Act, Pub. L. No. 106-346, § 351, 114 Stat. 1356, 1356A-34 (2000). My analysis suggests that this law is unconstitutionally coercive.

condition grants from a federal "Internet-connection" fund on states' agreement not only to use such grants to connect public schools to the Internet (reimbursement spending), but also to provide for the schools' students a certain number of computers. After all, high-capacity telecommunications connections are pointless without computers to take advantage of them. What is also true, though more easily overlooked, is that it would be reasonable for Congress to condition grants from a federal "computers-in-schools" fund on states' agreement to secure for the schools broadband Internet connections. Of course, computers without high-speed Internet access are not worthless in the way that high-speed Internet access without computers is. But so long as Congress could reasonably conclude that Internet-less computers are not worthwhile enough, the refusal to provide computers to states that exercise their undoubted right not to upgrade school buildings for Internet access cannot sensibly be deemed a penalty.

If this conclusion is correct, it serves to reinforce an earlier claim: Whether an offer of benefits, conditioned on the offeree's waiver of a constitutional right to do $x$, is coercive on the grounds that carrying out the threat would penalize the exercise of a constitutional right depends upon whether—taking the offeree's refusal to waive its right to do $x$ as a given—the state would better advance genuine and legitimate interests by withholding the benefit or by granting it notwithstanding the offeree's (constitutionally protected) choice. As indicated earlier, however, this question is often easier to ask than to answer. The remainder of this subsection offers some preliminary thoughts about two actual situations in which the answer is likely to prove particularly contentious.

Consider, first, matching grants. The argument for coercion goes like this: Naturally, the federal government may prefer that states contribute some of their own funds to the given project too. But if a state refuses, then whatever national interests explain Congress's willingness to extend the offer are still better served by the contribution than by the withholding of federal dollars. Half a loaf is better than none at all. To withhold the funds, therefore, is to penalize the state's exercise of its sovereign rights.

Though this argument has some strength, it is ultimately unconvincing, for there are at least two separate reasons to think Congress would have legitimate reasons to prefer not to spend the matching funds when they are not matched. First, the choice facing the federal government is not really between half a loaf and nothing at all, but between half a loaf and the federal dough that could still be spent for other purposes. That Congress is happy to buy $2y$ worth of some particular good for $y$ does not remotely establish that it would genuinely prefer $y$ worth of that good to whatever $y$ could buy in a different use.[217] This is not

---

217. There is no denying that to recognize this type of argument does open the door for the federal government to try to justify all conditional spending on a like rationale. If matching grants are not coercive on the assumption that Congress actually values the opportunity cost of its contribution higher than the benefit that its contribution could purchase when unmatched, who is to say that Congress does not actually believe that the opportunity cost of the $y$ offered for, say, local teacher training exceeds $y$ worth of teacher training, but does not exceed $y$ worth of teacher training *plus* an effective state ban on

58                    THE GEORGETOWN LAW JOURNAL                    [Vol. 90:1

only because Congress may treat the $y$ expended by the state as a free good (which, as a matter of both economics and sound political theory, it is not), but also out of respect for economies of scale. Second, even if the federal government would actually prefer half the loaf to its next most attractive alternative, successful realization of even that partial good is likely to require some action by state actors, and Congress might reasonably worry that state effort would prove lackadaisical and thus inadequate if the state is not itself financially committed. For both these reasons, it seems generally very plausible that Congress's purpose for carrying out the act threatened—withholding the matching funds—is to conserve funds for reasons other than to punish or to influence state behavior. Offers of matching funds, then, would not be coercive in the relevant sense.

The second type of exercise of conditional spending power arises when Congress imposes what may be called "equality conditions" on state offerees. Consider as one illustration[218] federal policy conditioning the disbursement of Medicaid funds to states on the states' agreement to provide emergency medical services to illegal immigrants.[219] The argument that such conditions are unconstitutional is straightforward: If Congress's purpose in providing the funds is to aid some primary class of beneficiaries, that purpose is served equally well whether or not the state accedes to the condition. Therefore, the purpose for withholding the benefit from the unaccommodating state is to punish or discourage. Because such purposes make the burden a penalty, the proposal can be successfully challenged as coercion without the state having first to call the federal government's bluff, as it were.

If the federal government is to rebut this reasoning, it must place heavy emphasis, I suppose, on its interests in not exacerbating inequality. That is, the federal government would have to argue that, in carrying out its threat, it actually does prefer a lesser degree of welfare for would-be beneficiaries of class $A$ to a greater degree of welfare for members of class $A$ conjoined to a

---

firearms near schools? The answer, of course, is that the courts are to say. The federal government would be free to make such an argument—and, if it is true, then the corresponding conditional offer is not coercive. But courts are not obligated to believe it. Indeed, the claim is likely to be highly implausible at least so long as Congress does not identify the specific use that would be made of the offered funds in the event they were withheld upon failure of the condition. Furthermore, given the difficulties in ascertaining purpose case by case, certain prophylactic rules and presumptions may be sensible. *See infra* Parts V.B.3–4.

218. Similar issues arise under laws conditioning federal education funds on an institution's agreement not to engage in types of discrimination that would be permitted under (judicial interpretations of) the Equal Protection Clause. *See, e.g.,* Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992); Grove City Coll. v. Bell, 465 U.S. 555 (1984); Lau v. Nichols, 414 U.S. 563 (1974). The thorny problems that arise from federal laws that condition funds on agreement by the recipient "program or activity" not to discriminate in particular ways is discussed further in Berman, Reese & Young, *supra* note 179, at 1137–42.

219. This has been uniformly upheld against state challenges. *See* Texas v. United States, 106 F.3d 661 (5th Cir. 1997); California v. United States, 104 F.3d 1086 (9th Cir. 1997); Padavan v. United States, 82 F.3d 23, 28–29 (2d Cir. 1996); New Jersey v. United States, 91 F.3d 463, 466–67 (3d Cir. 1996).

Appendix 8

greater welfare gap between classes *A* and *B*. I am inclined to think this explanation acceptable. Even if the withholding of federal funds in this case would advance social equality at the expense of economic efficiency (and this is contestable), because the Constitution commands pursuit of economic efficiency no more than it "enacts Mr. Herbert Spencer's Social Statics,"[220] there is no reason in principle why this purpose—if credible—should not be validated. But it would be naive to deny that others would view such an argument as a flimsy rationalization. Whatever the case, substantive disagreement about the truth of this account would not threaten this analysis of the unconstitutional conditions problem. It merely reinforces that the correct solution is far from an algorithmic one.[221]

## 2. Vertical Limits on Conditional Offers Extended by States

We have just seen that the tough questions of federal conditional spending turn on distinguishing coercive from noncoercive proposals and, most particularly, on determining when the federal government would have a permissible purpose for carrying out its threat to withhold funds conditionally offered. The same issue arises far less frequently in the opposite direction. States, after all, rarely offer money to the federal government. When offers by the states implicate concerns about the proper relationship of the state and federal governments, they usually arise because the state conditions an offer to private entities on their waiving rights conferred by the federal government—especially rights conferred precisely to secure federal protection from the states.

The recurring question in this realm has involved the contours of a state's power to condition the privilege of doing business within its borders. Although various types of conditions have been imposed and challenged,[222] the conditions that concern us here involved foreign corporations' nonexercise of their right to remove state court litigation to federal court. The issue arose against the background of two uniformly accepted premises: first, that a state could exclude foreign corporations entirely;[223] and second, that a state may impose conditions on the privilege of doing business "provided they are not repugnant to the Constitution or laws of the United States, or inconsistent with those rules of public law which secure the jurisdiction and authority of each state from

---

220. Lochner v. New York, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting).

221. In this, I am happy to embrace Professor Kreimer's measure of a successful analysis—that "it at least gets the easy cases right, explains why the hard cases are hard, and allows argument to center on the appropriate factual and legal issues." Kreimer, *supra* note 13, at 1301.

222. For example, state efforts to tax revenues or properties outside the state generated substantial litigation in the early part of the century. *See, e.g.*, W. Union Tel. Co. v. Foster, 247 U.S. 105 (1918); Pullman Co. v. Kansas, 216 U.S. 56 (1910); Union Transit Co. v. Kentucky, 199 U.S. 194 (1905). Because such conditions implicate interstate relationships more directly than they do dynamics between the state and the federal government, I do not discuss these cases here.

223. *See, e.g.*, Paul v. Virginia, 75 U.S. (8 Wall.) 168 (1868); LaFayette Ins. Co. v. French, 59 U.S. (18 How.) 404 (1855).

THE GEORGETOWN LAW JOURNAL

encroachment by all others."[224] The specific question confounding the Supreme Court—raised, directly or indirectly, in at least a dozen cases from 1874 through 1922—was whether this particular condition was repugnant or not.

A detailed discussion of the case law may seem of only historical interest given that the issue is no longer a live one; it is now well settled that a state may not condition the privilege of doing business on a foreign corporation's waiver of its federal right of removal. In fact, I think, close analysis of the cases is most illuminating, for the Supreme Court's tortured confrontations with this single question reveal a great deal of unconstitutional conditions thinking in micro-cosm. We see, at turns, the absolutism that the greater always includes the lesser, and the equally categorical insistence that the government may never achieve indirectly what it could not achieve directly. We see debates over purpose scrutiny and even intimations that the solution lies in the right's inalienability. Despite the great variety of approaches to the question, I will argue, coercion analysis provides the only sound explanation and justification for the rule that eventually prevailed.

The Supreme Court's first encounter with this issue came in *Home Insurance Co. v. Morse*,[225] a case concerning a Wisconsin statute that required all foreign insurance companies seeking authorization to do business within the state to agree not to remove any cases filed against it in Wisconsin state courts. The Home Insurance Company filed the requisite agreement and was certified to do business.[226] Some time thereafter, when sued on a policy, the company filed a petition to remove the suit to federal court.[227] The state trial court refused to recognize the removal because of the company's prior promise and eventually proceeded to judgment against it.[228] The Wisconsin Supreme Court affirmed.[229] A divided United States Supreme Court reversed.[230]

Although the majority concluded that the insurance company's agreement not to exercise its right of removal was void, Justice Hunt's opinion failed to make clear precisely why that should be. Plainly, the notion of inalienable rights figured prominently, as in the Court's declaration that "[a] man may not barter away his life or his freedom, or his substantial rights."[231] The problem, how-ever, was that the Court provided little basis for concluding that this particular right was inalienable if not all rights were inalienable. Justice Hunt intimated

---

224. Sec. Mut. Life Ins. Co. v. Prewitt, 202 U.S. 246, 249 (1906) ("A state has the right to prohibit a foreign corporation from doing business within its borders, unless such prohibition is so conditioned as to violate some provision of the Federal Constitution."); *id.* at 259 (Day, J., dissenting); Barron v. Burnside, 121 U.S. 186, 200 (1887); Doyle v. Cont'l Ins. Co., 94 U.S. 535, 540 (1876); Home Ins. Co. v. Morse, 87 U.S. 445, 456 (1874) (quoting *LaFayette Ins. Co.*, 59 U.S. at 407).

225. 87 U.S. (20 Wall.) 445 (1874).

226. *Id.* at 446.

227. *Id.* at 446–47.

228. *Id.* at 447.

229. *Id.*

230. *Id.* at 458.

231. *Id.* at 451.

Appendix 8

that there was something especially problematic about a purported waiver of the right to remove *en gross*, explaining that while a man

> may omit to exercise his right to remove his suit to a Federal tribunal, as often as he sees fit, in each recurring case, [h]e cannot bind himself in advance by an agreement, which may be specifically enforced, thus *to forfeit his rights at all times and on all occasions*, whenever the case may be presented.[232]

But this move presents another problem, for it would suggest that a waiver of the removal right more limited in duration or scope—say, a promise not to remove suits by policyholders for breach of contract during the first year of business—should be enforceable, whereas other language in the opinion appears to deny precisely that. After citing both English practice and Justice Story for the proposition that courts would not enforce contractual agreements to arbitrate,[233] Justice Hunt declared flatly that "[t]he law and not the contract prescribes the remedy, and parties have no more right to enter into stipulations against a resort to the courts for their remedy in a given case, than they have to provide a remedy prohibited by law."[234]

Chief Justice Chase and Justice Davis were unpersuaded. Indeed, the short dissent presented this as a straightforward case of the greater including the lesser: "The right to impose conditions upon admission follows, as a necessary consequence, from the right to exclude altogether."[235] In response, by declaring itself "not able to distinguish this agreement and this requisition, in principle, from a similar one in the case of an individual citizen [from another state]," the majority revealed that it did not appreciate the conditional benefits angle at all.[236] "A corporation has the same right to the protection of the laws as a natural citizen, and the same right to appeal to all the courts of the country," Justice Hunt asserted. "The rights of an individual are not superior in this respect to that of a corporation."[237] But this is simply mistaken. In the respect that matters, the rights of an individual *were* superior to those of a corporation, for the individual enjoyed the protection of the Privileges and Immunities Clause of Article IV, whereas the corporation did not.[238] And this, of course, is what created the conditional benefit problem in the first place—the state of Wisconsin could constitutionally prohibit corporations from other states from conducting business within its borders, while it could not similarly exclude private citizens.[239]

---

232. *Id.* (emphasis added).

233. *Id.* at 452.

234. *Id.* at 452–53.

235. *Id.* at 458–59 (Chase, C.J., dissenting).

236. *Morse*, 87 U.S. at 455.

237. *Id.*

238. Paul v. Virginia, 75 U.S. (8 Wall.) 168 (1869).

239. *See, e.g.*, Corfield v. Coryell, 6 F. Cas. 546 (C.C.E.D. Pa. 1823) (No. 3230).

Given the division on the Court and the majority's palpable failure to understand the true nature of the problem, it is not surprising that it chose to revisit the question just two Terms later in another case from Wisconsin, *Doyle v. Continental Insurance Co.*[240] Whereas the state courts in *Morse* had refused to recognize the defendant's removal, thus proceeding to judgment against it, Wisconsin responded to the company's removal in *Doyle* by revoking its authority to do business in the state.[241] After Continental Insurance brought suit in federal court to challenge the revocation as unconstitutional, Justice Hunt again issued the majority opinion for a divided Court. This time, however, it upheld the condition, embracing precisely the reasoning that had been espoused by the *Morse* dissent. "If the State has the power to cancel the license," Justice Hunt explained (seeming now to catch the point he had slighted earlier),

> it has the power to judge of the cases in which the cancellation shall be made. . . . [T]he State may compel the foreign company to abstain from the Federal courts, or to cease to do business in the State. It gives the company the option. This is justifiable, because the complainant has no constitutional right to do business in that State. . . . No right of the complainant under the laws of the Constitution of the United States, by its exclusion from the State, is infringed . . . .[242]

*Morse* was distinguished as resting on the view that a party "cannot bind himself in advance by an agreement which may be specifically enforced thus to forfeit his rights."[243]

In dissent, Justice Bradley denigrated both the majority's effort to distinguish precedent—which he claimed did "not differ a particle" from the present case[244]—and its reasoning:

> The argument . . . that the greater always includes the less, and, therefore, if the State may exclude the appellees without any cause, it may exclude them for a bad cause, is not sound. It is just as unsound as it would be for me to say, that, because I may without cause refuse to receive a man as my tenant, therefore I may make it a condition of his tenancy that he shall take the life of my enemy, or rob my neighbor of his property.[245]

The plain intimation was that the purportedly lesser action is impermissible if engaged in for a bad purpose. But having started down the path of purpose scrutiny, the dissent quickly turned in a different direction. Because modern

---

240. 94 U.S. 535 (1876).
241. *Id.* at 536.
242. *Id.* at 542.
243. *Id.* at 538.
244. *Id.* at 543 (Bradley, J., dissenting).
245. *Id.* at 543–44. Compare the "independent constitutional bar" limitation in *South Dakota v. Dole*, 483 U.S. 203, 209 (1987). *See supra* note 121.

2001]                    COERCION WITHOUT BASELINES                    63

corporations rely upon large infusions of capital, it explained, "[t]he needs of the country require that corporations—at least those of a commercial or financial character—should be able to transact business in different States."[246] And, finally, having aired this consideration of public policy, the dissent concluded on a note that left the relevance of the state's purposes wholly unclear: "The whole thing, however free from intentional disloyalty, is derogatory to that mutual comity and respect which ought to prevail between the State and general governments."[247]

Whatever relevance the dissent ultimately thought to attribute to the state's purposes, the majority would have none of it. "If the State has the power to do an act," Justice Hunt insisted,

> its intention or the reason by which it is influenced in doing it cannot be inquired into . . . . The argument that the revocation in question is made for an unconstitutional reason cannot be sustained. The suggestion confounds an act with an emotion or a mental proceeding, which is not the subject of inquiry in determining the validity of a statute. An unconstitutional reason or intention is an impracticable suggestion, which cannot be applied to the affairs of life. If the act done by the State is legal, is not in violation of the Constitution or laws of the United States, it is quite out of the power of any court to inquire what was the intention of those who enacted the law.[248]

Though the majority's disdain for scrutiny into legislative purposes could hardly be missed, much about its reasoning is unclear. First, as in academic and judicial discussions from over a century later, the passage is ambiguous regarding whether legislative purposes are constitutionally irrelevant or are simply not fit for judicial inquiry.[249] Moreover, the majority seems oddly blind to the possibility that a state's purposes may be relevant precisely because they help determine *whether* an "act done by the State is legal."[250] To be sure, one is free

---

246. *Doyle*, 94 U.S. at 544 (Bradley, J., dissenting). Perhaps so, and yet this is an explanation manifestly at odds with the dissent's earlier assertion that "[t]hough a State may have the power, if it sees fit to subject its citizens to the inconvenience, of prohibiting all foreign corporations from transacting business within its jurisdiction, it has no power to impose unconstitutional conditions upon their doing so." *Id.* at 543. This passage is notable, first, for being the Supreme Court's first reference to "unconstitutional conditions." Beyond that, it throws into question the constitutional significance of the dissent's claim about the country's commercial needs. If the Constitution should be interpreted to enable corporations to engage in interstate operations, it would seem to follow that a state would *not* have the (greater) power "of prohibiting all foreign corporations from transacting business within its jurisdiction." *Id.* at 543.

247. *Id.* at 544; *see also id.* at 543 ("Total prohibition may produce suffering, and may manifest a spirit of unfriendliness towards sister States; but prohibition, except upon conditions derogatory to the jurisdiction and sovereignty of the United States, is mischievous, and productive of hostility and disloyalty to the general government.")

248. *Doyle*, 94 U.S. at 541.

249. For just one example of such ambiguity in the unconstitutional conditions literature, see Kreimer, *supra* note 13, at 1337.

250. *Doyle*, 94 U.S. at 541.

to conclude that purposes *should* not play such a role, but the majority appears to go out of its way to pretend that they *could* not.[251] Finally, the apparent reduction of all "reasons" to undiscoverable subjective mental states—akin to "emotion"—which are off-limits, is bizarre on the facts of the case. The majority's observation that Continental "alleges" that its license "is about to be revoked, for the reason that it removed the case . . . from the State to the Federal courts"[252] is, in this respect, highly misleading. After all, the plain terms of the Wisconsin statute did not admit any doubt:

> If any insurance company . . . shall make application to . . . remove any suit or action . . . in any court of the State of Wisconsin, to the United States Circuit or District Court . . . it shall be the imperative duty of the secretary of

---

251. *Id.* ("If the act of an individual is within the terms of the law, whatever may be the reason which governs him, or whatever may be the result, it cannot be impeached. The acts of a State are subject to still less inquiry, either as to the act itself or the reason for it.") This comparison of state action to those of individuals is instructive, for whether an "act of an individual is within the terms of the law" of course often *does* depend upon the act's reasons or results. (An act is not homicide, for example, unless death results, and an act is not treason unless undertaken for the reason of giving comfort to the enemy.) All that can be said on this score is therefore a tautology: If the act of an individual is not made unlawful by virtue of its reasons or results, then it is lawful whatever may be the reasons which propel it or the results it causes. So too, then, for acts of a state.

Once we understand the error into which Justice Hunt fell, by the way, we might be better able to answer the separate but related question of whether a legislative action can be unconstitutional by virtue of its animating purpose even if those purposes are unrealized. Professor Laurence Tribe argues the negative:

> [S]etting to one side laws distributing benefits, if a government-enacted rule of conduct is constitutionally inoffensive both on its face and as applied to the particular individual challenging it, the fact that the rule would not have been promulgated (or the practice put in place) but for the enacting body's desire to achieve a constitutionally forbidden result tells us nothing more than that the government body engaged in an *unsuccessful attempt* to violate the Constitution. So too, the fact that the rule would not have been promulgated or the practice established but for the enacting body's consideration of a factor the Constitution tells it never to consider—if there are such factors—hardly suffices to render the rule of conduct promulgated, or the practice put in place, constitutionally void.

Tribe, *supra* note 101, at 23.

Though I do not think that my analyses of "coercion" and "penalty" depend upon how this issue is resolved, the case might prove otherwise. It is therefore worth noting an apparent confusion lurking in Tribe's argument. Tribe here assumes that (outside of "laws distributing benefits"), the things that are "constitutionally forbidden" are results or effects (what he calls "outputs"). But if the Constitution also forbids the state from acting so as to achieve specified proscribed purposes—which is precisely what Tribe appears to assume (arguendo) in the second sentence—then it seems wholly plausible that violation of such a command *does* make the state action void. Put another way, "the fact that the rule would not have been promulgated (or the practice put in place) but for the enacting body's desire to achieve a constitutionally forbidden result" does not tell us "that the government body engaged in an unsuccessful attempt to violate the Constitution," but that it engaged in an unsuccessful attempt *to* achieve a constitutionally proscribed result. If the Constitution proscribes legislatures from attempting to achieve certain results (just as the criminal law prohibits individuals from attempting to achieve certain results), then any such attempt, whether or not it succeeds in accomplishing its objective, does succeed (so to speak) in violating the Constitution.

252. *Doyle*, 94 U.S. at 541.

Appendix 8

State . . . to revoke and recall any authority or license to such company to do and transact business in the State of Wisconsin.[253]

In any event, the *Doyle* majority's triumph was short-lived. In *Barron v. Burnside*,[254] a unanimous Court invalidated an Iowa statute that conditioned corporate privileges on foreign corporations' agreement not to remove. The Court deemed this an easy case. Because the statute's "entire purpose . . . is to deprive the foreign corporation . . . of the right conferred upon it by the constitution and laws of the United States, to remove a suit from the state court into the federal court," it fell directly within the rule announced by *Morse*.[255] *Doyle* was distinguished on a ground that earlier decisions had not even hinted at. "The point of th[at] decision," the Court observed, "seems to have been that, as the state had granted the license, its officers would not be restrained by injunction, by a court of the United States from withdrawing it."[256] *Barron*, then, was a square vindication for the *Doyle* dissent. As against both the *Doyle* majority and the *Morse* dissent, the case firmly rejected the idea that the greater includes the lesser. As opposed to the *Morse* majority, *Barron* located the unconstitutionality of the conditional offer in the bad purposes driving the state, rather than in any supposed inalienability of the right.

Although this view found consistent approval in dicta from a series of mostly unanimous Supreme Court decisions extending over the next decade,[257] the *Doyle* Court's analysis was suddenly resurrected in the 1906 case of *Security Mutual Life Insurance Co. v. Prewitt*.[258] On facts essentially mirroring *Doyle*, a seven-member majority, per Justice Peckham, approvingly described *Doyle* as having held that "the motives of [the state's] action were not the subject of judicial inquiry,"[259] and reaffirmed the greater-includes-the-lesser logic:

> As a state has power to refuse permission to a foreign insurance company to do business at all within its confines, and as it has power to withdraw that permission when once given, without stating any reason for its action, the fact

---

253. 1870 Wis. Laws ch. 64, § 1, *quoted in Doyle*, 94 U.S. at 536–37.

254. 121 U.S. 186 (1887).

255. *Id.* at 197.

256. *Id.* at 199; *cf.* Younger v. Harris, 401 U.S. 37, 44 (1971) (referring to "Our Federalism").

257. *See* Barrow S.S. Co. v. Kane, 170 U.S. 100, 111 (1898); Blake v. McClung, 172 U.S. 239, 254–56 (1898); S. Pac. Co. v. Denton, 146 U.S. 202, 207 (1892); *see also* St. Louis & S.F. Ry. Co. v. James, 161 U.S. 545, 565 (1896) (holding that a state statute requiring foreign corporations to reincorporate in-state does not confer state citizenship for purposes of federal diversity jurisdiction); S. Ry. Co. v. Allison, 190 U.S. 326, 338 (1903) (holding, in accord with *James,* that a state statute requiring foreign railroad companies to domesticate as a condition of owning property or carrying on business in state could not confer state citizenship so as to defeat the domesticated company's federal right of removal).

258. 202 U.S. 246 (1906).

259. *Id.* at 251.

Appendix 8

that it may give what some may think a poor reason or none for a valid act is immaterial.[260]

Harking back to a distinction first proposed by Justice Hunt in *Doyle*, the Court explained that while a foreign corporation's advance promise not to remove is null and void, the state is fully entitled to withdraw the privilege of doing business within that state upon the corporation's exercise of its right to remove.[261] The Court then attempted to demonstrate that all cases subsequent to *Barron* were consistent with the distinction[262] and disavowed as "inaccurate" the *Barron* Court's alternative effort to distinguish *Morse* and *Doyle*.[263]

Justice Day, joined by Justice Harlan, devoted much of his dissent to arguing that the majority's effort to reconcile the Court's decisions was unsound in principle and unfaithful to the case law. Claiming that *Doyle* and *Barron* could not be harmonized,[264] he put his opposition to the majority's analysis in terms that could only enlarge the stakes of the debate:

> The doctrine that the surrender of rights granted or secured by the Constitution of the United States may be made a condition of the privilege of doing or continuing business with a state is at war with that instrument, and if adopted or sanctioned by all the states would nullify the supreme law of the land in some of its most essential provisions.[265]

Following a short period of unusually rapid turnover in the Court's personnel,[266] Justice Day was able to attract a unanimous Court to his position just four years later,[267] but in an opinion that barely intimated the existence of a long-running dispute[268] and failed to cite even a single one of the Court's removal precedents. That the tide had probably turned for good was signaled in *Harrison v. St. Louis & San Francisco Railroad Co.*,[269] when Chief Justice White, a member of the *Prewitt* majority, led another unanimous Court to declare flatly "that the states are, in the nature of things, without authority to

---

260. *Id.* at 257.

261. *Id.* at 253–54. And looking forward, this is a precursor to the Court's much-ridiculed claim thirty years later that "[t]here is an obvious difference between a statute stating the conditions upon which moneys shall be expended and one effective only upon assumption of a contractual obligation to submit to a regulation which otherwise could not be enforced." United States v. Butler, 297 U.S. 1, 73 (1936).

262. *Prewitt*, 202 U.S. at 255–56.

263. *Id.* at 255.

264. *Id.* at 266, 268 (Day, J., dissenting).

265. *Id.* at 262. For a similar view, see *Frost & Frost Trucking Co. v. Railroad Commission*, 271 U.S. 583, 594 (1926) ("If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guarantees embedded in the Constitution of the United States may thus be manipulated out of existence.").

266. Three new Justices joined the Court in the four years between *Prewitt* and *Herndon*.

267. Herndon v. Chi., Rock Island & Pac. Ry., 218 U.S. 135 (1910).

268. *Id.* at 158–59.

269. 232 U.S. 318 (1914).

**Appendix 8**

penalize or punish one who has sought to avail himself of the Federal right of removal."[270] The Court lamely distinguished *Prewitt* and *Doyle* as "involv[ing] state legislation as to a subject over which there was complete state authority; that is, the exclusion from the state of a corporation which was so organized that it had no authority to do anything but a purely intrastate business."[271] The Court reaffirmed *Harrison* two years later in a brief opinion concerning a successor statute to the very Wisconsin law upheld in *Doyle*.[272] Employing language reminiscent of the *Doyle* dissent, the Court struck down the statute, reasoning that it was "beyond the state's power" to "seek to prevent . . . foreign commercial corporations doing local business from exercising their constitutional right to remove suits into Federal courts."[273]

Even after this trio of unanimous decisions, the coup de grâce for *Doyle* and *Prewitt* was still six years in coming. Finally, in *Terral v. Burke Construction Co.*,[274] another unanimous Court formally overruled both earlier decisions by expressly rejecting as immaterial whether the right to remove was waived in advance by the corporation and whether the corporation's business was intrastate or interstate.[275] Seemingly troubled by the apparent purpose animating the state, *Terral* declared that the unconstitutionality of the condition

> rests on the ground that the federal Constitution confers upon citizens of one state the right to resort to federal courts in another, that state action whether legislative or executive, necessarily calculated to curtail the free exercise of the right thus secured is void because the sovereign power of a state in excluding foreign corporations, as in the exercise of all others of its sovereign powers, is subject to the limitations of the supreme fundamental law.[276]

Thus were matters finally clarified. And yet, despite the great volume of judicial ink spilled on the subject,[277] one may be excused for remaining

---

270. *Id.* at 329. This followed from the Court's view that

> [i]t may not be doubted that the judicial power of the United States . . . is a power wholly independent of state action, and which therefore the several states may not by any exertion of authority in any form, directly or indirectly, destroy, abridge, limit, or render inefficacious. The doctrine is so elementary as to require no citation of authority to sustain it.

*Id.* at 327.

271. *Id.* at 332.

272. Donald v. Phila. & Reading Coal Co., 241 U.S. 329, 332 (1916).

273. *Id.*

274. 257 U.S. 529 (1922).

275. *Id.* at 532–33.

276. *Id.*

277. The issue has attracted significant scholarly attention as well. Early treatments include GERARD C. HENDERSON, THE POSITION OF FOREIGN CORPORATIONS IN AMERICAN CONSTITUTIONAL LAW ch. 8 (1918); Harold M. Bowman, *The State's Power over Foreign Corporations*, 9 MICH. L. REV. 549 (1911); Robert Hale, *Unconstitutional Conditions and Constitutional Rights*, 35 COLUM. L. REV. 321 (1935); Maurice H. Merrill, *Unconstitutional Conditions*, 77 U. PA. L. REV. 879, 879–82 (1929); and Oppenheim, *supra* note 4.

68          THE GEORGETOWN LAW JOURNAL          [Vol. 90:1]

somewhat uncertain about why, precisely, states were constitutionally forbidden to exclude foreign corporations that removed suits to federal court. That the Court viewed the state's purposes as somehow important seemed clear. But exactly what was the unconstitutional purpose? Although the Court proclaimed that a state may not "seek to prevent" exercise of the right to remove[278] or to "deprive" corporations of that right,[279] why should the threat to withdraw corporate privileges after removal not more properly be characterized as intended (merely) to "discourage" exercise of the right? And was it really so plain that the state's purposes were critical? What, after all, did the *Harrison* Court mean when pronouncing that "the judicial power of the United States . . . is a power wholly independent of state action, and which therefore the several states may not by any exertion of authority in any form, directly or indirectly, destroy, abridge, limit, or render inefficacious"?[280] Does this not suggest that the no-removal conditions might have been unconstitutional by reason of their effects, not their purpose?[281]

Coercion analysis provides clarity. The critical task, on such analysis, is to determine what purposes the state may have for refusing corporate privileges to a foreign corporation that does not agree to waive its right of removal. If the state would confer the privilege of doing business but for a purpose in punishing this corporation or in encouraging agreement by others, the withholding of the benefit is a penalty (hence presumptively unconstitutional), and the corresponding conditional proposal is (presumptively) coercive. There is, of course, reason to suppose that it would. It is easy to imagine that, all things being equal, a state might reasonably prefer that foreign corporations not remove. It is perhaps also imaginable that a state would prefer to exclude foreign corporations entirely, or at least some types of foreign corporations. But it may seem simply incredible that whether a foreign corporation does or does not remove could make a dispositive difference in the state's assessment of whether state interests are advanced or impeded by allowing that corporation in.

Yet perhaps this is not quite so obvious after all. Recall that a great many corporations engaged in interstate business during this period were railroads and insurance companies that could be expected to be on the receiving end of a lot of litigation. Recall too that all these cases arose during the regime of *Swift v. Tyson*.[282] Removal, therefore, enabled these foreign corporations to take advantage of federal common law that might have been far friendlier to defendants than state common law was, and might reasonably have been perceived as hostile to legitimate state interests. It may no longer seem fantastic that a state

---

278. *Donald*, 241 U.S. at 332.

279. Barron v. Burnside, 121 U.S. 186, 197 (1887).

280. 232 U.S. 318 (1914).

281. *Cf.* Blake v. McClung, 172 U.S. 239, 254–55 (1897) ("Such a power [of excluding foreign corporations] cannot be exerted with the effect of defeating or impairing rights secured to citizens of the several states by the supreme law of the land.").

282. 41 U.S. (16 Pet.) 1 (1842).

could decide that it was better off without the corporations at all if disputes involving such corporations were likely to be resolved in federal court.[283] And if this is the state's genuine view, then its offer to admit foreign corporations on the condition that they agree not to remove is not coercion.

I do not mean, of course, to claim that this was the bona fide view held by states generally or that even one state actually evaluated matters in this way. My point is only that the constitutionality of the state laws conditioning the privilege of doing business on foreign corporations' waiver of their removal rights depends upon both factual and legal predicates. The *Harrison* Court's declaration "that the states are, in the nature of things, without authority to penalize or punish one who has sought to avail himself of the Federal right of removal"[284] could not have been better put; it flows (I have argued) from the very meaning of a constitutional right. But this is not quite enough to support the conclusion that the conditional offers were unconstitutional, for it remained to determine that the state's carrying out of its threat *did* penalize (or punish) exercise of the right. And that, I have tried to show, is a factual question; the nature of things cannot furnish the answer.[285] It is a question, furthermore, that courts should not

---

283. Of course, it could have avoided application of federal common law by allowing foreign corporations but codifying its preferred common-law rules. But there are many legitimate reasons why a state may not favor this option.

284. 232 U.S. at 329.

285. That a close analysis of the removal cases may be of more than academic interest is suggested by the 1931 case of *Railway Express Agency v. Virginia*, 282 U.S. 440 (1931). Railway Express, a Delaware corporation, sought to operate an intrastate "express" business in Virginia. Pursuant to a state constitutional provision, however, Virginia required Railway Express to take out a Virginia charter of incorporation as a condition of being allowed to operate the intrastate business. *Id.* at 443. Railway Express refused and sued in federal court, arguing "that the requirement of the Virginia Constitution deprives [it] of its right to sue in the federal courts and to remove suits to them on the ground of diversity of citizenship." *Id.* at 444. A unanimous Court, per Justice Holmes, disagreed.

But why? Under the authority of *Terral*, Railway's argument seemed strong. If Virginia could not condition the right to engage in in-state business on a foreign corporation's promise not to remove, surely it should not be allowed to achieve the same result by requiring the foreign corporation to reincorporate as a domestic corporation. Indeed, the parity of the two state law mechanisms had been obvious to Chief Justice Chase writing fifty years earlier in *Morse. See* Home Ins. Co. v. Morse, 87 U.S. (20 Wall.) 445, 459 (1874) (Chase, C.J., dissenting) (observing that the no-removal condition "is no more than saying that the foreign corporation must, for the purposes of all litigation growing out of the business transacted there, renounce its foreign citizenship and become *pro tanto* a citizen of that State"). Then again, the Court's earlier holdings in *James* and *Allison, see* discussion *supra* note 257, furnished the Court with a ready reply—namely, that Railway misunderstood the effect of the involuntary reincorporation. Although Virginia can condition the right to do business on reincorporation, Holmes might have said, that reincorporation would not serve to confer domestic citizenship for purposes of federal diversity jurisdiction.

Remarkably, however, Holmes said nothing of the sort. Instead of correcting Railway's understanding of the legal effect of the reincorporation condition, he agreed that compliance with the condition would have precisely the consequence Railway feared. Railway's error lay, rather, in misapprehending the condition's constitutional significance:

The appellant is not deprived of any rights. It can do all that it ever could. If it sees fit to acquire a new personality under the laws of Virginia it cannot complain that the new person has not the same rights as itself. Of course, there can be no suggestion here that the clause in the State Constitution was adopted for a sinister end. And, unless it was, the inability of the

feel they have no possible way to answer. Analysis could begin by exploring whether the costs avoided by carrying out the threat are significant enough as to make it plausible that a state would genuinely believe (not just pretextually claim to believe) that they outweigh whatever costs are thereby produced. This is essentially the inquiry that the Supreme Court undertook in *City of Boerne v. Flores*.[286] It is an appropriate (though necessarily imperfect) way to gauge actual purposes.

### 3. Horizontal Limits on Conditional Offers Extended by States

The last federalism arena to investigate concerns conditional offers by states that threaten constitutional values regarding the relationships of the states to one another. The basic constitutional principle here—read off the dormant Commerce Clause, the Equal Protection Clause, and the Privileges and Immunities Clause of Article IV—presumptively forbids discrimination against out-of-state parties and interests in favor of in-state parties. The task, accordingly, is to determine when discrimination runs afoul of constitutional values.

Start by considering the dormant Commerce Clause. At the least—and possibly at the most—it prohibits state actions undertaken for discriminatory (or "protectionist") purposes.[287] Dormant Commerce Clause jurisprudence, then, is likely to provide good opportunities for examining how to think about legislative purposes. And *Kassel v. Consolidated Freightways*[288] constitutes an excellent vehicle.

---

new State corporation to do all that the appellant could have done is only the legitimate incident of a legitimate act.

*Ry. Express Agency*, 282 U.S. at 444. *Railway Express* stands in obvious tension with *Terral. See* Note, *Unconstitutional Conditions*, 73 HARV. L. REV. 1595, 1607 n.86 (1960) (observing that *Terral* "has been somewhat vitiated" by *Railway Express*). And the hint subtly dropped—that, unlike the state law conditioning such privileges on such corporation's reincorporation, a state law conditioning in-state business privileges on a foreign corporation's agreement not to remove *is* "adopted for a sinister end"—hardly amounts to a convincing reconciliation. Perhaps a closer attention to coercion analysis can help resolve whether these cases are reconcilable, or whether one of these constitutional rules is unsound.

286. 521 U.S. 507 (1997). *City of Boerne* held that the Religious Freedom Restoration Act (RFRA) was not a valid exercise of Congress's enforcement power under the Fourteenth Amendment. "RFRA is so out of proportion to a supposed remedial or preventive object," the Court reasoned, "that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears, instead, to attempt a substantive change in constitutional protections." *Id.* at 532. This looks like pure actual-purpose review: Because the substantive effect of the law is so out of proportion to its prophylactic effect, the Court seems to say, we disbelieve the government's representation that Congress actually acted out of a prophylactic purpose. Elsewhere in the opinion, however, the Court sends a different signal, indicating that whether Congress actually had a prophylactic purpose is immaterial. On this view, the judicially perceived overinclusiveness of the congressional ban renders the statute inappropriate as an enforcement device no matter what Congress's actual motive was. *See id.* at 530 ("While preventive rules are sometimes appropriate remedial measures, there must be a congruence between the means used and the ends to be achieved. The appropriateness of remedial measures must be considered in light of the evil presented."). These two readings are nearly reconciled if a legislative "purpose" is conceived as a social construct.

287. *See generally* Regan, *supra* note 87.

288. 450 U.S. 662 (1981).

**Appendix 8**

*Kassel* arose when Consolidated, a nationwide trucking company, challenged an Iowa regulation that, with some qualifications, banned trucks longer than sixty feet from its interstate highways.[289] The statute presented a classic conditional offer: If you are driving a truck no longer than sixty feet, you may use our interstate highways; if not, you may not. The rule particularly aggrieved Consolidated because it used sixty-five-feet trucks that were permitted in all of the adjoining states.[290] It also encumbered those adjoining states because the effect of the Iowa rule was to shunt additional truck traffic to those states, imposing costs measurable in terms of additional accidents and road wear. Iowa defended the rule as serving highway safety.[291] A fractured Supreme Court affirmed lower court rulings that had held the rule unconstitutional.

Writing for a four-Justice plurality, Justice Powell concluded that the district court findings adequately established that the safety benefits were so small as to be outweighed by the burden imposed on interstate commerce.[292] Concurring in the result, Justice Brennan, joined by Justice Marshall, argued that the *Pike* balancing test was inappropriate. Because, in Brennan's view, the length limitation was maintained for discriminatory purposes, it should be subject to, and fall under, the virtually per se rule of invalidity.[293] Then-Justice Rehnquist, joined by Chief Justice Burger and Justice Stewart, dissented. Finding that the safety benefits were not illusory, Rehnquist argued that the plurality was wrong to subject them to judicial balancing.[294] And believing that Iowa's asserted purpose to promote highway safety was not "merely a pretext for discrimination against interstate commerce,"[295] he urged that the concurrence erred in applying the virtually per se rule. "Whenever a State enacts more stringent safety measures than its neighbors, in an area which affects commerce, the safety law will have the incidental effect of deflecting interstate commerce to neighboring States," Rehnquist explained.

> Indeed, the safety and protectionist motives cannot be separated: The whole purpose of safety regulation of vehicles is to protect the State from unsafe vehicles. If a neighboring State chooses not to protect its citizens from the danger discerned by the enacting State, that is its business, but the enacting State should not be penalized when the vehicles it considers unsafe travel through the neighboring State.[296]

---

289. The statute is described in *Kassel. See id.* at 665–67. The qualifications need not detain us.
290. *Id.* at 665.
291. *Id.* at 667.
292. *Id.* at 671–79.
293. *Id.* at 680–87 (Brennan, J., concurring).
294. *Id.* at 691 (Rehnquist, J., dissenting).
295. *Id.* at 692.
296. *Id.* at 705–06.

*Kassel* is a rich and fascinating case.[297] Here, though, I wish to make just one, fairly obvious point: Contrary to then-Justice Rehnquist, "safety and protectionist motives" *can* be separated. And the ability to operationalize coercion depends on knowing how to do it.

The plurality and concurrence express some doubt about whether Iowa's ban on sixty-five-foot trucks was motivated at all by safety concerns. Perhaps it was driven only by interest in shunting trucks to other states in order to save highway repair costs.[298] But put this speculation aside. Assume, with the dissent, that Iowa's true concern was to promote safety. The critical point is that this is not yet the end of the analysis; for, the fact that Iowa was motivated by safety interests is not enough to establish that the length-limit's effect "of deflecting interstate commerce to the neighboring States" is—as the dissent puts it—"incidental."

If the Iowa Legislature actually believed that trucks shorter than sixty feet are safer than trucks longer than sixty feet, then the eventual consequence of adopting the sixty-foot length limit—inducing truckers to run the longer trucks around Iowa—truly is "incidental" to realization of Iowa's safety purpose, even if the legislators knew in advance that the truckers would prefer switching routes (running sixty-five-foot trucks around Iowa) to switching trucks (running sixty-foot trucks through Iowa). But if the decisionmaker did not believe that sixty-foot trucks were safer than sixty-five-foot trucks—or did not believe that the marginally shorter trucks were so much safer as to outweigh the reduction in safety that would come from the running of a marginally greater number of trucks—then the state's supposed purpose to promote safety could be realized only by virtue of the truckers' expected decision to bypass the state. In that case, the effect of deflecting interstate commerce is not incidental, it is intentional. (This, of course, is the distinction between knowledge and purpose, as highlighted by the principle of double effect.) If the latter is true, then Iowa's refusal to allow sixty-five-foot trucks into the state is supported by a protectionist purpose, and hence unconstitutional. If conceived of as a conditional offer, therefore, the law is coercive. If conceived, instead, as a classification, it is protectionist.[299] Either way, contrary to the dissent's suggestion, the statute can be unconstitutional even if adopted to promote the state's interests in safety.

---

297. Among other things, the case contains a state action question that is only lightly touched upon, *see id.* at 704–05, insofar as the protectionist purpose Justice Brennan relies upon at most explains the Governor's 1974 decision to veto a bill that would have raised Iowa's length limit from sixty feet to sixty-five feet, and is not at all plausible in explaining Iowa's initial enactment, in 1963, of the sixty-foot limit that was then in effect in her neighboring states as well. It does seem to me that there are cases in which it is appropriate to inquire into purposes for inaction, as well as for action, and that *Kassel* is just such a case. But defending either of these claims would take us afield. *See, e.g.*, Julian N. Eule, *Laying the Dormant Commerce Clause to Rest*, 91 YALE L.J. 425, 459 (1982); Steven C. Kohl, *Recent Development*, 8 J. CORP. L. 543, 556 (1983). The discussion in text proceeds as though Iowa's sixty-foot truck limit had been newly enacted in 1974.

298. *See Kassel*, 450 U.S. at 676 n.19.

299. This parity of outcome between analyses couched in terms of conditional offers and discrimination lends comfort to the hope that we could be flexible when determining whether a case raises an unconstitutional conditions problem. *See supra* pp. 11–12.

So much for the dormant Commerce Clause. I mentioned earlier[300] that it is more propitious in the federalism context to think in structural rather than clause-specific terms. For a textbook illustration, consider *Western & Southern Life Insurance Co. v. State Board of Equalization*.[301] The case arose as a challenge to a "retaliatory tax" that California imposed on foreign insurance companies doing business in California whose home states charge higher taxes on insurers doing business there than California would charge (absent the retaliation).[302] Naturally, this would have been a clear-cut violation of dormant Commerce Clause jurisprudence, except that the Court had held much earlier that the McCarran-Ferguson Act[303] immunized discriminatory state insurance taxes from Commerce Clause scrutiny.[304] And the scheme did not violate the Privileges and Immunities Clause[305] because that clause's protection had been held not to extend to corporations.[306] The remaining question, as the Court saw it, was whether the discriminatory tax violated the Equal Protection Clause.[307] It held, seven to two, that it did not.

Justice Brennan, writing for the majority, seemed to think this an easy case. Under standard equal protection doctrine, of course, the test was whether the discrimination was rationally related to a legitimate state interest. Observing that "the principal purpose of retaliatory tax laws is to promote the interstate business of domestic insurers by deterring other States from enacting discriminatory or excessive taxes,"[308] the majority expressed "no doubt" that this was "a legitimate state purpose."[309]

Perhaps this is ultimately correct. Yet, it is hard to shake the feeling that something important is missing from the analysis. Although the majority's rudimentary equal protection reasoning had taken account of the foreign *companies'* rights to be treated equally with domestic companies (absent adequate justification for the discrimination), it completely ignored another interest deserving of constitutional solicitude—namely, other *states'* rights not to be subjected to coercion by a sister state.[310] This seems to be Justice Stevens's objection to

---

300. *See supra* p. 49.

301. 451 U.S. 648 (1981). *See generally* Note, *Taxing Out-of-State Corporations After* Western & Southern: *An Equal Protection Analysis*, 34 STAN. L. REV. 877 (1982).

302. *W. & S. Life Ins. Co.*, 451 U.S. at 650.

303. 15 U.S.C. §§ 1011–1015 (2000).

304. *See, e.g.*, Prudential Ins. Co. v. Hobbs, 328 U.S. 822 (1946) (per curiam); Prudential Ins. Co. v. Benjamin, 328 U.S. 408 (1946).

305. U.S. CONST. art. IV, § 2, cl. 1 ("The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.").

306. *See supra* note 238.

307. *W. & S. Life Ins. Co.*, 451 U.S. at 656.

308. *Id.* at 668.

309. *Id.* at 671 (citing *Parker v. Brown*, 317 U.S. 341, 363–67 (1943)).

310. Admittedly, no other state was a plaintiff in this suit; the challenge was brought by a single Ohio-based insurance company. It is worth mentioning, therefore, that sound reasons of the case-or-controversy variety may conceivably justify the narrowness of the Court's inquiry. Yet there is not the

74          THE GEORGETOWN LAW JOURNAL          [Vol. 90:1

the California statute, declaring in dissent that "[t]he practice of holding hostages to coerce another sovereign to change its policies is not . . . legitimate."[311] But if Stevens was surely correct to focus attention on this systemic concern, his repeated charge that California was trying to "coerce" other sovereigns[312] did not make his case as clearly as one may wish, for it failed adequately to operationalize the concept. As we have seen, epithetic and conclusory charges of coercion are easy enough both to levy and to ignore. What precisely did he mean when chastising California for harboring "coercive motivation"?[313]

The issue can be analyzed much more satisfactorily by recognizing at the outset that California's tax scheme takes the standard form of the unconstitutional conditions problem: If you impose no higher than a two percent tax on our insurance companies (California is proposing to other states), then we will subject your insurers to no higher than a two percent tax, too.[314] Suppose California carries out its threat (as indeed it did). Does this penalize Ohio's sovereign constitutional right to determine its own tax rate?[315] That carrying out the threat burdens Ohio's right is plain. So what is California's purpose? According to the majority, "the purpose is not to generate revenue at the expense of out-of-state insurers, but to apply pressure on other States to maintain low taxes on California insurers."[316] And so I suppose it was. But this is equivalent to saying that California's purpose is to deter states from exercising their constitutional rights to impose certain (otherwise permissible) taxes within their proper sovereign spheres. And that, I have argued, is to penalize a constitutional right—which is presumptively just what a state may not do. If my conception of what it means to have a constitutional right is correct, and if I am also correct that states must be understood to possess constitutional rights to

---

slightest hint in either the majority or dissenting opinions that a different result, and a different analysis, might properly obtain had the State of Ohio intervened in support of the Western & Southern Life Insurance Company. Consequently, I put justiciability concerns aside in the discussion that follows.

311. *W. & S. Life Ins. Co.*, 451 U.S. at 674 (Stevens, J., dissenting).

312. *Id.* at 674, 675, 677 n.7.

313. *Id.* at 675. The suspicion that Justice Stevens is not entirely sure of his ground is reinforced by his apparently favorable quotation of the United States's argument, advanced as amicus curiae, "that California has no legitimate interest in Ohio's level of taxation or fiscal structure when no discriminatory action against California citizens or corporations is involved." *Id.* at 676 n.3. Surely this is mistaken. California would be perfectly entitled, say, to pay lobbyists to encourage the Ohio Legislature to reduce its taxes on insurance companies. This illustrates the difference between purpose and coercion that Justice Stevens overlooks. Even if the conditional offer is unconstitutional by reason of coercion (and, as I proceed to argue in text, I am inclined to agree that it is), California's purpose (or motivation) *for making the offer* is still constitutionally permissible.

314. Of course, the fact that the burden threatened would be nominally imposed on a different party than the offeree is of no moment. It is uncontroversially coercive, for purposes of moral theory and criminal law, to threaten to kill someone's spouse or child unless he pays a ransom.

315. The text blithely assumes that the Constitution should be construed to protect such a "right." It seems to me that the smaller and weaker states—which succeeded, after all, in achieving equal representation in the Senate—could not fairly be assumed to have consented to anything less. But the question could be reasonably argued.

316. *W. & S. Life Ins. Co.*, 451 U.S. at 669–70.

legislate that are valid as against sister states as well as against the national government, then it would seem to follow that California's imposition of its retaliatory tax was an unconstitutional penalty and that its proposal was—just as Justice Stevens intuited—unconstitutionally coercive.[317]

At least all that is so if the majority correctly identified the purpose animating California's imposition of the retaliatory tax. Perhaps, however, California can rely on a different purpose that both justifies the discriminatory treatment and is not ruled out of bounds at this stage of coercion analysis. But what could that purpose be? It cannot be merely to raise revenue, for the Court had (properly) ruled that out as a permissible justification for discriminatory taxation decades earlier.[318] The only alternative, it would seem, would be to claim a purpose in giving domestic insurance companies a competitive advantage over their foreign competitors. States often grant subsidies to their domestic corporations to bolster their competitive positions. Can states use discriminatory taxation to realize this same end? By the time of *Western & Southern* that was an open question. It was answered in the negative three years later in *Metropolitan Life Insurance Co. v. Ward*.[319]

Per *Ward*, then, California's retaliatory scheme is coercive. And if coercive, it is almost certainly unconstitutional.[320] Therefore, if *Ward* was right that a state's

---

317. To see that this is so, imagine a variation on the actual California law. Suppose the maximum speed limit on California highways was fifty-five miles per hour, except that cars licensed from every other state must drive two miles per hour slower for every tenth of a percent by which the tax that such state imposed on the premiums of insurance companies doing business within that state exceeded two percent. (For purposes of this illustration, assume away the dormant Commerce Clause and the Privileges and Immunities Clause.) The purpose of the proposal is the same as in the actual case—to get other states to lower their taxes to no higher than two percent. According to Brennan's analysis, this would not be coercive because it is reasonably related to advance the legitimate state interest in getting other states to lower their taxes to no higher than two percent. *Cf. id.* at 672 (concluding that the discriminatory tax was reasonably related to the legitimate purpose because "it is reasonable to suppose that California's retaliatory tax will induce other States to lower the burdens on California insurers in order to spare their domestic insurers the cost of the retaliatory tax in California"). If (as I believe) this law is coercive, then, contra the majority, that the purpose animating California's proposal is legitimate cannot by itself serve to legitimate carrying out the threat.

318. *Id.* at 662–64 (discussing *Hanover Fire Insurance Co. v. Harding*, 272 U.S. 494 (1926); and *Southern Railway Co. v. Greene*, 216 U.S. 400 (1909)).

319. 470 U.S. 869 (1985). Ward involved an Alabama insurance tax scheme that imposed a 1% tax on premiums paid to Alabama insurance companies, but taxed foreign insurance companies at 3% or 4%, depending upon the type of policy. *Id.* at 871–72. (The statute also provided incentives—which we can safely ignore for simplicity sake—whereby foreign insurers could lower their rates to 2% or 3%, respectively, by investing in specified Alabama assets.) Alabama argued that this discriminatory tax did not violate equal protection because it was rationally related to a legitimate state interest in encouraging the formation of new insurance companies in Alabama. *Id.* at 873.

320. Although coercion is only presumptively unconstitutional, it is hard to imagine how it could be justified in this case. First, the Court's conclusion that it was legitimate for California to try to deter other states from taxing at certain rates does not itself entail that such an interest is sufficiently important to justify the use of coercive means. Moreover, absent some explanation for why California's interest in influencing other states' legislative choices is especially important in this particular context, to deem California's interest adequate to justify this coercion is effectively to deny that states have a constitutional right, valid against other states, to legislate as they choose. Though I am inclined to

76                    THE GEORGETOWN LAW JOURNAL                [Vol. 90:1

interest in promoting the well-being of its own domestic insurance companies is not sufficient to justify discrimination in taxation against foreign insurance companies,[321] then the retaliatory scheme adopted by California was necessarily coercive and, nearly just as certainly, not in service of an interest of sufficient importance to make it constitutionally justifiable. If *Ward* is right, then *Western & Southern* is wrong. Moreover, I now want to argue, if *Western & Southern* is right, then *Ward* is wrong.

Think of it this way: Both Alabama and California sought to promote the interests of their own insurance companies. And both employed discriminatory taxes to do so. But, as the *Ward* majority emphasized, there is this difference:

> Alabama has made no attempt, as California did, to influence the policies of other States in order to enhance its domestic companies' ability to operate interstate; rather, it has erected barriers to foreign companies who wish to do interstate business in order to improve its domestic insurers' ability to compete at home.[322]

This, the Court concluded, justified treating the two cases differently:

> In *Western & Southern*, . . . we did not hold as a general rule that promotion of domestic industry is a legitimate state purpose under equal protection

---

believe that state coercion of another state will often be justifiable where such coercion is well suited to overcome a collective action problem, that does not appear to be the case here.

321. This premise—that *Ward* was rightly decided—is admittedly doubtful. Indeed, the five-to-four decision over a vigorous dissent by Justice O'Connor (for a striking lineup consisting of herself and Justices Brennan, Marshall, and Rehnquist) has not fared well in the academic commentary. But if *Ward* was wrongly decided, it is likely for Alabama-specific reasons. As the dissent explained, Alabama's interest in the well-being of Alabama insurance companies was especially deserving of solicitude, for the state had good reasons to believe "that domestic insurance companies, on the whole, benefit the state in ways which foreign companies do not." 470 U.S. at 886 (O'Connor, J., dissenting) (quoting Brief for Appellants). Economic studies indicated that domestic insurers tended to offer products, and to serve clients, that national insurers did not. "Foreign insurers typically concentrate on affluent, high volume, urban markets and offer standardized national policies. In contrast, domestic insurers are more likely to serve Alabama's rural areas, and to write low-cost industrial and burial policies not offered by the larger national companies." *Id.* at 887; *see* Robert C. Farrell, *Successful Rational Basis Claims in the Supreme Court from the 1971 Term Through* Romer v. Evans, 32 IND. L. REV. 357, 392–93 (1999). *But cf.* Douglas Laycock, *Equal Citizens of Equal and Territorial States: The Constitutional Foundations of Choice of Law,* 92 COLUM. L. REV. 249, 266–70 (1992) (arguing that the type of discrimination at issue in *Ward* is properly subjected to searching scrutiny). Therefore, even if discriminatory taxation did serve legitimate state interests in the unusual circumstances present in Alabama, it remains doubtful that it would serve legitimate state interests in California. So while *Western & Southern* is wrong if *Ward* is right, it is very possibly wrong even if *Ward* was wrong. On the other hand, if *Ward* was wrong because it is misconceived at the outset to employ the Equal Protection Clause to scrutinize state policies that discriminate in favor of in-state insurers that (by hypothesis) the McCarran-Ferguson Act seeks to validate against dormant Commerce Clause challenge, *see, e.g.,* Regan, *supra* note 87, at 1277; William Cohen, *Federalism in Equality Clothing: A Comment on* Metropolitan Life Insurance Company v. Ward, 38 STAN. L. REV. 1 (1985), then *Western & Southern* reached the correct result despite its reasoning.

322. *Ward,* 470 U.S. at 877–78.

analysis. Rather, we held that California's purpose in enacting the retaliatory tax—to promote the interstate business of domestic insurers by deterring other States from enacting discriminatory or excessive taxes—was a legitimate one. [323]

But surely this is exactly backwards. The imposition of a discriminatory tax, by Alabama and California alike, threatens national economic well-being and therefore warrants constitutional scrutiny. But only the California scheme, and not Alabama's, threatens an additional interest in maintaining proper relationships of power between formally coequal sovereigns. That interest, too, must be given constitutional protection. Therefore, both schemes may be constitutional, or both may be unconstitutional. If one is more constitutionally problematic than the other, however, it is almost certainly the policy that would penalize the exercise of a coequal state's sovereign rights, not the policy that employs discrimination to serve its own internal interests. Interestingly, though, not one of the eight Justices[324] who sat in both *Western & Southern* and *Ward* perceived that constitutional values cut in this direction—that is, that the Alabama scheme may be permissible and the California one impermissible. Again, a careful analysis of coercion can reveal what a less systematic analysis obscures.

### B. INDIVIDUAL LIBERTIES

If federalism cases produce a large number of unconstitutional conditions questions, the variety of issues, and number of cases, implicating unconstitutional conditions in the realm of individual liberty is staggering. Space constraints, accordingly, cut here with especial bite. Although the following discussion touches on a range of individual liberties, the analysis remains more broad than deep. My goal is not to conclusively resolve any particular constitutional disputes, but only to point the way toward their resolution.

### 1. The First Amendment: Speech

Most likely, more unconstitutional conditions cases arise implicating expressive rights protected by the First Amendment than in any other single area of constitutional law. In standard analyses, these cases are quickly funneled into a complex array of doctrinal categories—public employment, government subsi-

---

323. *Id.* at 876–78. The majority later wrote:

> Unlike the retaliatory tax involved in *Western & Southern*, which only burdens residents of a State that imposes its own discriminatory tax on outsiders, the domestic preference tax gives the "home team" an advantage by burdening all foreign corporations seeking to do business within the State, no matter what they or their States do.

*Id.* at 878. Actually, the California retaliatory tax imposed discriminatory burdens on insurers from every state that imposed insurance taxes higher than those imposed by California itself; the state burdened need not discriminate. This blatant mischaracterization—which escaped comment from the dissent—may be taken to signal that, by the time of *Ward,* a majority had already become uncomfortable with *Western & Southern.*

324. Justice O'Connor joined the Court after its decision in *Western & Southern.*

78          THE GEORGETOWN LAW JOURNAL          [Vol. 90:1

dies, public forum, commercial speech, and so forth. Although this way of organizing a disorderly terrain no doubt has much to recommend it, it does have the unfortunate tendency to mask underlying concerns that cut across the categories. The following analysis therefore eschews organization by standard classifications.[325] Instead, I follow the structure suggested by the three dimensions of unconstitutionality sketched out in Part III and further developed in Part IV: examining first, how governmental offers conditioned on the recipient's waiver of interests (putatively) protected by the First Amendment may be unconstitutional because coercive; second, how they may be unconstitutional by reason of the offers' effects; and third, how they may be unconstitutional by reason of the animating governmental purpose. (Because emphasis will be on the word *how*—as distinct from *which*—we will need to consider just a few illustrations drawn from the voluminous case law.)

There is reason for this approach. The analyses in the last section focused on the presence or absence of coercion because that is the issue upon which the difficult cases in the federalism arena tend to stand or fall: If the act that government conditionally threatens is unconstitutional (usually because it would penalize exercise of a constitutional right), then the proposal is unconstitutional by reason of coercion; but if the offer is not coercive, then it is likely to face no constitutional impediment at all. Unconstitutional conditions analysis of First Amendment cases is unruly, it turns out, because coercion does not here play such a pivotal role. The fact that a given conditional offer that implicates speech rights is not coercive does not so strongly imply the offer's constitutionality. It is not surprising, therefore, that speech cases have featured so prominently in the thinking of those skeptical of unconstitutional conditions theorizing.[326] But while the skeptics are correct that proper analysis in this area relies especially on substantive and contestable interpretations of the First Amendment, any implication that general unconstitutional conditions theorizing is thereby revealed to be useless is mistaken. Rather, the free speech context is most distinctive because it is here that the necessary three-dimensionality of unconstitutional conditions analysis is thrown into sharpest relief.

*a. Coercion.*    A great many conditional offers by government run afoul of the First Amendment on the dimension of coercion, which is to say that the government violates the First Amendment when carrying out its threat.

*Perry v. Sindermann*[327] presents a classic example. Sindermann, a teacher in

---

325. I explore how best to analyze conditional offers that arise in one particular doctrinal area—commercial speech—in Mitchell N. Berman, *Commercial Speech and the Unconstitutional Conditions Doctrine: A Second Look at "the Greater Includes the Lesser,"* 55 VAND. L. REV. (forthcoming Apr. 2002).

326. *See, e.g.,* Alexander, *supra* note 19, at 1009 (opining that large portions of the unconstitutional conditions area, "and particularly large portions of conditions on free speech, cannot be theoretically rationalized"); Schauer, *supra* note 19, at 1002; Sunstein, *Anachronism, supra* note 21.

327. 408 U.S. 593 (1972).

**Appendix 8**

the Texas state college system, alleged that the state declined to renew his contract because he had issued statements critical of the Board of Regents.[328] The Supreme Court held that, if Sindermann's allegations were true, the state's action would violate the First Amendment. In a frontal assault on greater-includes-the-lesser reasoning, the Court explained

> that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.[329]

This is correct, of course, yet perhaps ambiguous just where it matters. Even conceding that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests," the question would still remain whether the state's action does infringe such interests. And the next sentence does not fully clarify matters. Presumably, the state could have refused to renew Sindermann's contract on the grounds (if true) that he used abusive language in class, even though such policy might thereby "inhibit" exercise of First Amendment freedoms. Fleshing out the Court's somewhat vague allusion to governmental reasons, it would be more precise to say that exercise of protected freedoms is penalized—hence presumptively unconstitutional—if the government denies a benefit *for the purpose* of punishing or discouraging exercise of those freedoms. If this were a purpose behind the state's decision not to renew Sindermann's contract, then the implicit corresponding offer[330]—we will employ you if you refrain from exercising your rights to criticize the regents—constitutes unconstitutional coercion.

Moving from the area of public employment to that of government subsidies, consider another easy case, *Grosjean v. American Press Co.*[331] *Grosjean* involved a challenge to a two percent license tax the State of Louisiana imposed on the gross advertising receipts of all newspapers with a weekly circulation above 20,000.[332] The evidence suggested that the tax was levied for the purpose of punishing newspapers that had been critical of Senator Huey Long. Although the actual opinion striking down the tax left its reasoning somewhat opaque, the

---

328. *Id.* at 595.

329. *Id.* at 597.

330. Of course, once we have already adjudged as a penalty some action that the state undertook without having first articulated an explicit biconditional proposal, there is ordinarily little need to imaginatively reconstruct the event as though it contained a threat to impose the penalty. *See supra* note 169 (acknowledging potential artificiality in distilling conditional offer from imposition of penalty).

331. 297 U.S. 233 (1936).

332. *Id.* at 240.

Appendix 8

Court expressed many years later that "the result in *Grosjean* may have been attributable in part to the perception on the part of the Court that the state imposed the tax with an intent to penalize a selected group of newspapers."[333] This, of course, would make the tax (in my terms) a penalty. Had there been any implicit offer to rescind the tax for a change in the large newspapers' behavior, that would have been coercion.

The question of coercion also arose in *FCC v. League of Women Voters*,[334] a 1984 decision involving a challenge to a provision of the Public Broadcasting Act that extended grants to noncommercial educational broadcasting stations on the condition that they refrain from editorializing. A closely divided Court struck down the provision, concluding that the ban on editorializing did not serve sufficiently substantial interests, or did not serve them in a sufficiently tailored manner "to justify the substantial abridgment of important journalistic freedoms."[335] Unfortunately, Justice Brennan's majority opinion gave short shrift to the fact that the condition attached to congressional *spending*, devoting only three of its thirty-five pages to the possible distinction between conditional spending and other forms of regulation.[336]

On a coercion analysis, the question is whether the government's withdrawal of subsidies from an otherwise qualifying broadcaster that refused to comply with the editorializing ban would be unconstitutional. Naturally, withdrawal of subsidies has the effect of burdening the broadcaster's exercise of its First Amendment rights. But it is hard to conclude that this effect alone provokes a constitutional demand for heightened justification without committing oneself to a host of absurdities. After all, the Pentagon's decision to buy time for armed forces recruitment commercials only during televised sporting events also burdens the exercise of First Amendment rights of a broadcaster that chooses to replace its weekly college basketball telecasts with reruns of *Murder, She Wrote*. It therefore becomes critical to determine whether the burden is a penalty.

The answer would be yes if Congress was motivated to reduce the total amount of political commentary, or to silence editorials likely to express a particular viewpoint. And the particular content of the conditional offer ("if you stop editorializing, then we will continue to fund you") at least suggests such a purpose. But that this purpose is conceivable does not make it certain. And, on reflection, it seems unlikely. Rather, as Justice Stevens explained in dissent, Congress appeared to have attached the no-editorializing condition (along with a condition, not challenged, against supporting or opposing candidates for public office) "to avoid the insidious evils of government propaganda favoring

---

333. Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue, 460 U.S. 575, 579–80 (1983) (discussing the historical background to the tax).
334. 468 U.S. 364 (1984).
335. *Id.* at 402.
336. *Id.* at 399–401.

particular points of view,"[337] for "[t]he court jester who mocks the King must choose his words with great care" and "[a]n artist is likely to paint a flattering portrait of his patron."[338] Absent any greater indication that Congress's purpose in withholding the subsidy was to discourage criticism, the Court should have concluded that the proposal was not coercive.

*b. Effects.* The suggestion that the conditional offer at issue in *League of Women Voters* was probably not coercive may be taken to imply that it was constitutional. But that is precisely the implication that the three-dimensional approach is designed to combat. Turn attention now from the government's act of carrying out the threat, which determines whether the conditional proposal is unconstitutionally coercive, to other features of the proposal itself. In particular, consider its effects. Perhaps the seduction of federal funding will be so great as to significantly reduce the amount of editorializing available to the public. Insofar as the First Amendment is construed to restrict state action that has the effect of reducing this sort of "public good," the no-editorializing condition may violate the First Amendment for reason of its effects, even if it is not coercive.[339]

Measuring the precise effects of the conditional offer at issue in *League of Women Voters* requires contestable judgments of predictive fact. But the (equally contestable) legal judgment that government action is potentially unconstitutional under the First Amendment because of its effect in reducing the total speech available to the public was made clear in *United States v. National Treasury Employees Union.*[340] That case involved a challenge to a 1989 federal law prohibiting federal employees from accepting any compensation for giving speeches or writing articles.[341] The Court upheld the challenge, but not because of concern with the government's purposes, or even (principally) out of solicitude for the rights of individual employees who faced possible discharge. The Court's focus, rather, appeared to lie elsewhere—on the "significant burden" that the broad ban on honoraria imposes "on the public's right to read and hear

---

337. *Id.* at 409 (Stevens, J., dissenting).

338. *Id.* at 408.

339. This is essentially the reasoning advanced by many commentators who have concluded that the case was correctly decided. *See, e.g.,* Fallon, *supra* note 72, at 359; Merrill, *supra* note 1, at 878 n.94. This reasoning, incidentally, does satisfactorily distinguish *League of Women Voters* from *Regan v. Taxation With Representation,* 461 U.S. 540 (1983). In *Taxation With Representation,* the availability of the option to create a section 501(c)(4) affiliate for lobbying activities ensured that the government's conditioning of the more advantageous section 501(c)(3) classification on a tax-exempt organization's decision not to engage in substantial lobbying would not significantly reduce the amount of lobbying activities. *See id.* at 544 n.6. The fullest analyses of the constitutional implications of viewing speech as a public good are presented in Daniel A. Farber, *Free Speech Without Romance: Public Choice and the First Amendment,* 105 HARV. L. REV. 554 (1991); and Richard A. Posner, *Free Speech in an Economic Perspective,* 20 SUFFOLK U. L. REV. 1 (1986). For an analysis of the unconstitutional conditions problem in speech cases that focuses on the informational interests of the audience, see Cole, *supra* note 1.

340. 513 U.S. 454 (1995).

341. *Id.* at 457.

what the employees would otherwise have written and said."[342] The conditional offer was unconstitutional, in short, by virtue of its effects.[343]

*c. Purposes.*    Consider, finally, how conditional offers may violate the First Amendment by reason of their animating purposes. Of course, *Sindermann* and *Grosjean* are themselves prime illustrations, as the purpose behind the offers in each case was (supposedly) to discourage political speech expressing a particular viewpoint. They leave open the question, however, of whether a conditional offer may be unconstitutional on the dimension of purpose despite its being constitutional on the dimension of conduct (coercion). I suggested earlier[344] that some constitutional provisions may be best understood to flatly bar the state from acting so as to achieve certain types of objectives, even if it proceeds by means of encouragement that do not amount to coercion.

The following hypothetical, adapted from Professor Kreimer,[345] illustrates the point. Suppose that a city is deciding between two routes, *A* and *B*, on which to build a new road connecting the northern suburbs to downtown. Route *A* is the more advantageous to the local newspaper because it would pass close by the newspaper's printing facility. The mayor proposes to the newspaper's publisher that he will construct the road along route *A* if and only if the newspaper tones down its criticism of his administration. Conceivably, this is not coercive. If route *B* is actually better for the city, all things considered, then the mayor would not be acting unconstitutionally when (after the newspaper declines his proposal) he carries out his threat to build on route *B*. Very possibly, though, the conditional proposal should be held to violate the First Amendment by virtue of the mayor's purpose in trying to skew media coverage in ways favorable to his administration. The offer is unconstitutional because of the government actor's animating purposes, even if it is not coercive.

The literature presents a stable of similar hypotheticals. David Cole, for example, asks whether the federal government "could create a National Endowment for Democratic Party Values, and provide grants to speakers, journalists, authors, artists, and filmmakers for propaganda supporting the Democratic

---

342. *Id.* at 470. To be sure, this conclusion follows a discussion centered on how the ban affects individual government employees. But the Court's central concern with the effect on the public at large is foreshadowed at the very start of the majority's analysis section. "Federal employees who write for publication in their spare time have made significant contributions to the marketplace of ideas," Justice Stevens began, citing "literary giants" Nathaniel Hawthorne, Herman Melville, Walt Whitman, and Bret Harte. *Id.* at 464–65.

343. For an extended argument favoring this type of analysis, see generally Merrill, *supra* note 1. As Merrill says, "[t]he public goods model would also predict that waivers of rights will be viewed more critically as the number of persons subject to the condition increases." *Id.* at 879. For a case employing this analysis, see *Shelton v. Tucker*, 364 U.S. 479 (1960) (striking down law conditioning employment as public school teacher on filing annual affidavit listing all organization to which teacher had had belonged or contributed, as creating an impermissible chilling effect).

344. *See supra* p. 47.

345. Kreimer, *supra* note 13, at 1371–72. Unlike the hypothetical in text, Professor Kreimer asks the reader to assume that the two routes serve city interests equally well.

platform."[346] The answer, of course, is that it could not. The purpose here, to promote speech of a particular partisan viewpoint, would be ruled unconstitutional. But if that is so, one might wonder, why is it constitutional for Congress to establish a National Endowment for Democracy, through which it provides grants to support propaganda favoring general democratic principles?[347] The answer is obvious: Though the two proposals share the same form, they differ in content. That it is unconstitutional for the government to act for the purpose of promoting speech favoring the Democrats (as opposed to, say, the Republicans) does not necessarily entail that it is unconstitutional for it to act (overseas only?) for the purpose of promoting speech favoring democracy (as opposed to, say, totalitarianism).[348] Whether the latter is likewise unconstitutional depends, to be sure, upon one's interpretation of the substantive content of the First Amendment, in particular "on what sorts of motivations it allows government to have."[349] And to recognize this truth does open the door for disagreement over seemingly intermediate cases—like whether it is permissible for the government to act for the purpose of promoting "decent" art.[350] But that should be expected once one recognizes that the familiar slogan that the First Amendment requires government neutrality regarding different views, however useful and important as a presumption, cannot be taken as a literal command.[351]

Furthermore, to recognize that many unconstitutional conditions cases involving the First Amendment will require contentious and contestable decisions regarding which values government may endeavor to promote—and thus will stand or fall on highly subjective judicial evaluations on the dimension of purpose—does not demonstrate that general principles of unconstitutional condi-

---

346. Cole, *supra* note 1, at 687.

347. *See* Rust v. Sullivan, 500 U.S. 173, 194 (1991).

348. Kreimer's argument that the fact that the NEA would harbor "an illegitimate purpose" were it to exclude Republican applicants for grants in oil painting, but might not violate the First Amendment in favoring pointillists over cubists, somehow demonstrates that an unconstitutional conditions methodology that turns on governmental purposes is "over-inclusive," Kreimer, *supra* note 13, at 1338–39, is, therefore, wide of the mark. To say that purposes are constitutionally relevant does not prejudge which purposes are prohibited by which constitutional provisions.

349. GEOFFREY R. STONE ET AL., CONSTITUTIONAL LAW 1765 (3d ed. 1996).

350. *See* Nat'l Endowment for the Arts v. Finley, 524 U.S. 569 (1998). In *Finley* the Court rejected a facial challenge to a federal statute that directed the NEA to "tak[e] into consideration general standards of decency" when evaluating grant applications, 20 U.S.C. § 954(d)(1) (1994), by construing the provision as essentially hortatory, *see Finley*, 524 U.S. at 580–87, thus leaving open the question whether Congress could condition eligibility for NEA grants on the applying project's not being indecent. Justices Scalia, Thomas, and Souter all read the statute, more realistically, as having real bite in the selection process, but disagreed regarding whether such viewpoint discrimination is constitutionally permissible. *Compare id.* at 590–600 (Scalia, J., concurring in the judgment, joined by Thomas, J.) (answering yes), *with id.* at 600–23 (Souter, J., dissenting) (answering no). This issue touches upon the more general question—which I raise here only to ignore—of whether, and under what circumstances, a governmental purpose to encourage $z$ is tantamount to a purpose to discourage exercise of a right to $x$, where $z$ entails $\sim x$ as a matter of either logic or practical necessity.

351. For a recent and persuasive defense of this proposition (albeit one that strikes me as unduly parsimonious in the extent to which it would recognize constitutionally legitimate restrictions on government partiality), see Abner S. Greene, *Government of the Good*, 53 VAND. L. REV. 1 (2000).

tions are illusory.[352] General principles need not, after all, deny space for substantive interpretation of particular constitutional provisions. So long as a unitary analysis of unconstitutional conditions does more than merely direct courts to ask "whether the government has a legitimate motivation for the condition that is said to be unconstitutional,"[353] we can have both a unitary theory and provision-specific analysis of legitimate governmental purposes.[354]

## 2. The First Amendment: Religion

The *Probation* hypothetical from Part IV[355] used the Establishment Clause to illustrate how a conditional proposal could be unconstitutional, even if not coercive, because of its animating purpose or actual (or probable) effects. We have just seen that the same is true of the Free Speech Clause of the First Amendment. Further consideration of the Religion Clauses reveals another unusual sort of unconstitutional condition. A conditional proposal is unconstitutionally coercive if the act threatened would be unconstitutional for any reason at all; it need not constitute a penalty. The evolution of free exercise jurisprudence furnishes an illustration.

Suppose that a state has established a scheme of unemployment compensation for persons laid off from work. The eligibility qualifications require, among other things, that claimants look actively for appropriate employment and promise not to reject any job offer on the grounds that it necessitates work on

---

352. This view is intimated in STONE ET AL., *supra* note 349, at 1764–65.

353. *Id.* at 1764.

354. Of course, a single conditional offer can be unconstitutional across more than one dimension. An intriguing example from the Supreme Court's most recent Term is *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 121 S. Ct. 1043 (2001), in which the Court invalidated a condition on federal funding to the Legal Services Corporation (LSC) that prevented LSC grantees from engaging in any legal representation involving an effort to challenge the validity of an existing welfare law. Seemingly invoking purpose scrutiny, the Court declared that, "[w]here private speech is involved, even Congress's antecedent funding decision cannot be *aimed* at the suppression of ideas thought inimical to the Government's own interest." 121 S. Ct. at 1052 (emphasis added). At the same time, the Court highlighted problems with the condition that seem largely, perhaps wholly, independent of congressional purposes—such as that it would frustrate the judiciary's policy of avoiding statutory interpretations that may raise constitutional questions, *id.* at 1050, and may shake public confidence in "the adequacy and fairness of professional representations," *id.* at 1051.

In other passages, however, Justice Kennedy's opinion for the majority waffles between purpose-based and effects-based critiques. Near the conclusion, for example, Kennedy explains that

[t]he attempted restriction is *designed* to insulate the Government's interpretation of the Constitution from judicial challenge. The Constitution does not permit the Government to confine litigants and their attorneys in this manner. We must be vigilant when Congress imposes rules and conditions which in *effect* insulate its own laws from legitimate judicial challenge.

*Id.* at 1052 (emphases added). Whether one agrees with either of these principles or not, surely the clarity of the Court's opinions would be improved were the Justices to give more explicit attention to the different dimensions or incidents of unconstitutionality. Needless to say, tangible consequences are at stake—most notably, in this case, the opinion's implication for the scope of congressional authority to restrict the federal courts' jurisdiction.

355. *See supra* text accompanying note 115 and Part IV.B.

2001]                    COERCION WITHOUT BASELINES                    85

any particular day or days of the week.[356] Call this case *Unemployment Compensation*. The conditional proposal is most likely constitutional on the dimensions of purpose and effect. The evident purpose is to ensure that indolent unemployed do not abuse the public's generosity; the most conspicuous effect is to induce people to work on days when they may otherwise not. Certainly this purpose and this effect are constitutionally permissible. Supposing just for ease of analysis that state action is not constitutionally problematic merely because it has the effect—but not a purpose—of depressing religious practice, the question remains whether the proposal is coercive.

Consider the case of Sam, a Seventh-Day Adventist, who lost his Monday-to-Friday job in a downsizing, and now, in accord with the tenets of his faith, refuses to promise to look for employment that would require him to work Saturdays. Like Betty from the case *Social Security*,[357] Sam will argue that the state's refusal to extend the sought-after benefit produces unconstitutional effects—in his case, that of raising the costs of his exercise of religion. There may seem to be a baseline problem here: Whereas Sam contends that the state's failure to provide unemployment compensation benefits in his case has the effect of making his religious practices more costly, the state could argue that its nonconferral of benefits to Sam makes him no worse off than he would be had they not offered unemployment benefits to anyone. But this notion of competing baselines is mistaken. The fact of the matter is that Sam's decision to act in accord with his religious beliefs is a but-for cause of his not receiving ben-

---

356. This hypothetical is a slight variation on the facts of *Sherbert v. Verner*, 374 U.S. 398 (1963). The actual case involved a member of the Seventh-Day Adventist Church who had been discharged by her private employer for refusing to work on Saturday (the Sabbath of Seventh-Day Adventism) and had been denied unemployment compensation benefits under a South Carolina law that was construed to make ineligible any claimants who were discharged for refusing to work on Saturdays. *Id.* at 399–401. These facts appear not to raise the unconstitutional conditions problem because the proposal does not fit the double conditional form of if *x* then ~*y*; and if ~*x* then *y*: If Ms. Sherbert had worked on Saturday, she would have kept her job and therefore still would not have received unemployment compensation! The variation in text—which, incidentally, could have arisen under the very statute at issue in *Sherbert*, *see* S.C. CODE ANN. § 66-114(3) (disqualifying claimants for failing "without good cause, to apply for available suitable work"), *quoted in Sherbert*, 374 U.S. at 401 n.3—is not subject to the same criticism. Here, the conditional offer (if you agree to look for Saturday work, you remain eligible for unemployment compensation benefits) is conjoined to a conditional threat (if you do not agree to look for Saturday work, you are not eligible for benefits).

Though I do not wish to press the point too hard, Sullivan's conclusion that the state could not be guilty of coercion in *Sherbert* because it "did not use benefits to induce the surrender of rights," Sullivan, *supra* note 1, at 1435, is questionable. The proposal there at issue is logically equivalent to the following: If you work on Saturday then (if you are fired for working on Saturday then you are eligible for unemployment benefits); if you do not work on Saturday then it is not the case that (if you are fired for working on Saturday then you are eligible for unemployment benefits). Because this statement satisfies the biconditional form if ~*x* then *y*; if *x* then ~*y* (where *y* is itself a simple conditional of the form "if *w* then *z*"), it does raise an unconstitutional conditions problem as defined in Part I. And if it is unconstitutional for the state to allow ~*y* to obtain (i.e., to allow it to be the case that the offeree is fired for not working on Saturday and is not eligible for unemployment benefits), then it appears that there was coercion on the actual facts of *Sherbert*.

357. *See supra* Part IV.c.

efits—not in the world as it could be, but in the world as it is.[358]

So there can be no reasonable dispute that the state's action in carrying out its threat does have the effect of burdening Sam's exercise of his religion, just as the government's action in carrying out its threat against Betty had the effect of burdening the exercise of her right to marry. Unfortunately for Sam, it will be difficult to prove (and is likely not to be true) that the state carries out its threat, thus burdening Sam's religious practice, for the purpose of punishing or discouraging the religious practice of Seventh-Day Adventism. So let us assume, at least provisionally, that the state's purpose is only to execute a policy (which was itself not adopted for the purpose of punishing or discouraging the exercise of Seventh-Day Adventism) in a manner that best promotes administrative convenience.

If there is a difference between *Unemployment Compensation* and *Social Security*, then, it will not be because there is a burdening effect in one and not the other (there is a burden in both) or because there is a penalty in one and not the other (there is not likely to be a penalty in either) but rather because the Free Exercise Clause should be construed to require greater justification from the government when acting so as to raise the cost of an individual's religious practice. In the actual case of *Sherbert v. Verner*,[359] the Supreme Court ruled that state action that has the effect of substantially burdening the exercise of religious freedom violates the First Amendment unless the state has no less restrictive alternative to achieve some compelling state interest.[360] Because the Court abandoned that doctrine in *Employment Division v. Smith*,[361] however, "neutral laws of general applicability" call forth no demand for heightened justification even when applied so as to burden religious practice. Consequently, if this law is held to be neutral and generally applicable,[362] then performing the act threatened was unconstitutional under *Sherbert* but constitutional under *Smith*. It follows that the conditional offer to Sam was unconstitutionally coercive under *Sherbert*, but is not today.[363]

---

358. To be sure, the state's conferral of benefits upon persons who agree to seek Saturday work is also a but-for cause of the increased cost to Sam. But that is not the act Sam is challenging. Skeptics may object that Sam cannot challenge the state action of not giving benefits to him, apart from the state action of giving benefits to others, because the two pieces form a single indivisible act. Not so. These pieces may, it is true, constitute a single indivisible *policy* in the sense contemplated by the doctrine of severability: If the condition were struck down, the state would rescind the offer. That possibility is of unquestionable relevance to whether the act threatened is a penalty, but not to whether it has the effect of burdening Sam's religious practice.

359. 374 U.S. at 398; *see also supra* note 356 (discussing *Sherbert*).

360. 374 U.S. at 406–07.

361. 494 U.S. 872 (1990).

362. That this is far from a self-defining standard is already apparent from judicial opinions. *See, e.g.*, Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 557–58 (1993) (Scalia, J., concurring); *id.* at 560–64 (Souter, J., concurring); Fraternal Order of Police v. City of Newark, 170 F.3d 359, 365–66 (3d Cir. 1999).

363. Of course, even under *Sherbert*, the offer was never coercive as applied to, say, Arthur, an atheist. That is, it was never facially coercive.

Understanding *Unemployment Compensation* facilitates understanding of a range of other cases. Consider, for instance, that the state pays for public education but not for education in private schools, including in private religious schools.[364] For many parents, the state's refusal to subsidize religious education burdens religious beliefs. (It does not burden any free exercise interests of parents who would choose even secular private education over the public school alternative.) But it is not likely to constitute a penalty. The state's chain of animating purposes for refusing to extend the subsidy presumably looks something like this: to deter parents without any particular religious scruples from removing their children from the public schools, to maintain the viability of pubic schools, to promote democratic egalitarianism, and to ensure a sound education for those who remain. The precise details of the line of reasoning are not important; the unlikelihood that state officials are motivated to punish or deter religiously motivated conduct is. And if it is not a penalty, then there remains only the burden. As we have seen, this type of burden alone no longer provokes heightened scrutiny under the Free Exercise Clause. And even were heightened scrutiny appropriate, it would remain for the state to argue that that scrutiny is satisfied for the reasons just given.[365]

Return now to real-life variations on *Probation*. The more common scenario arises when a state conditions probation or early parole for an individual criminal defendant or a certain class of offenders on participation in Alcoholics Anonymous (AA) and the offeree refuses to participate due to objections to the program's religious content. The lower federal courts have divided over whether the condition violates the Establishment Clause.[366] Either conclusion is consistent with the argument of this Article, and I express no position on which view is in better accord with either the Establishment Clause itself or existing Establishment Clause jurisprudence. The more interesting questions, however, arise if we assume that the proposal is *not* unconstitutional on dimensions of

---

364. *See generally* Michael W. McConnell, *The Selective Funding Problem: Abortions and Religious Schools*, 104 HARV. L. REV. 989 (1991).

365. Similar reasoning supports the result in *Mozert v. Hawkins County Board of Education*, 827 F.2d 1058 (6th Cir. 1987).

366. *Compare, e.g.*, Warner v. Orange County Dep't of Prob., 115 F.3d 1068 (2d Cir. 1996) (violates Establishment Clause), *and* Kerr v. Farrey, 95 F.3d 472 (7th Cir. 1996) (same), *with* Feasel v. Willis, 904 F. Supp. 582 (N.D. Tex. 1995) (no constitutional violation), *and* Stafford v. Harrison, 766 F. Supp. 1014 (D. Kan. 1991) (same). These cases have been the subject of at least one full-length article, Paul E. Salamanca, *The Role of Religion in Public Life and Official Pressure to Participate in Alcoholics Anonymous*, 65 U. CINN. L. REV. 1093 (1997), and several student commentaries, among the better of which are Rachel F. Calabro, Comment, *Correction Through Coercion: Do State Mandated Alcohol and Drug Treatment Programs in Prisons Violate the Establishment Clause?*, 47 DEPAUL L. REV. 565 (1998); Derek P. Apanovitch, Note, *Religion and Rehabilitation: The Requisition of God by the State*, 47 DUKE L.J. 785 (1998); and Michael G. Honeyman, Note, *Alcoholics Anonymous as a Condition of Drunk Driving Probation: When Does It Amount to Establishment of Religion?*, 97 COLUM. L. REV. 437 (1997).

Appendix 8

purpose or effect. As discussed earlier,[367] the claim that the proposal is unconstitutionally coercive because carrying out the threat would be a penalty is not likely to be factually supportable: When the state acts not to grant probation or parole to the offender who refuses to attend AA, it is probably animated by whatever purposes support criminalizing and punishing the underlying conduct in the first place—general and specific deterrence, incapacitation, rehabilitation, retribution, and the like. And, as just discussed above, the fact that carrying out the threat imposes a burden on nonbelievers does not presently make out a free exercise violation. If conditioning probation or parole on participation in AA does not, by virtue of purpose or effect, violate the Establishment Clause (a question that unconstitutional conditions analysis cannot illuminate), then it probably survives all constitutional challenge.

A revealing contrast is provided by the facts of *Griffin v. Coughlin.*[368] In that case, New York State conditioned an inmate's eligibility for expanded family visitation privileges on participation in the facility's alcohol and drug addiction program, a program that adopted AA's religious-oriented precepts.[369] The New York Court of Appeals upheld the inmate's challenge, holding that the program coerced religious participation in violation of the Establishment Clause.[370] Two judges dissented, arguing that the scheme was voluntary, not coercive.[371] If the concepts of coercion and penalty are properly understood, however, this is an easy case. Supposing that the Free Exercise Clause confers upon individuals a right not to participate in activities that require one to affirm the existence of a higher being (as all members of the *Griffin* court accepted that AA does), then it is clear beyond peradventure that denial of inmate Griffin's family visitation privileges upon his failure to participate in AA meetings because of his religious objections burdened his free exercise rights. It is also plain that the state had no purpose in imposing this burden other than to discourage Griffin (and others) from exercising those rights. Denial of Griffin's visitation privileges thus penalized his rights protected under the Free Exercise Clause. Therefore, unless imposition of such a penalty could be justified (not likely), the conditional threat to deny his visitation privileges unless he participated in the alcohol and drug addiction program amounted to coercion and was unconstitutional.[372]

---

367. *See supra* Part IV.B. A penalty will be easier to establish if there exist in the relevant community secular equivalents to Alcoholics Anonymous that the state does not recognize as permissible substitutes.

368. 673 N.E.2d 98 (N.Y. 1996).

369. *Id.* at 100.

370. *Id.* at 99.

371. *Id.* at 120–21 (Bellacosa, J., dissenting).

372. Here is an interesting relationship between the Establishment and Free Exercise Clauses. The analysis in text concludes that the New York program was unconstitutionally coercive in threatening to penalize Griffin's rights under the Free Exercise Clause. (Evidently Griffin did not allege a free exercise violation, relying instead solely on the Establishment Clause. *See id.* at 115.) Insofar as existing Establishment Clause jurisprudence prohibits the state from "coercing" individuals to participate in religious practices, *see, e.g.*, Lee v. Weisman, 505 U.S. 577, 604 (1992) (Blackmun, J., concurring);

Appendix 8

3. The Fifth Amendment: Takings

Application of the unconstitutional conditions doctrine to the Takings Clause is of recent vintage and modest scope. It begins with the Supreme Court's 1987 decision in *Nollan v. California Coastal Commission*,[373] followed only, thus far, by its 1994 decision in *Dolan v. City of Tigard*.[374] The relative paucity of major cases in this area, however, belies their importance. Very possibly, the Supreme Court has come closer to grasping the essential logic of coercion in its takings decisions than anywhere else.

*Nollan* arose when owners of a beachfront lot, the Nollans, sought to demolish their existing bungalow and replace it with a three-bedroom house.[375] California law required, however, that they obtain a development permit from the state coastal planning commission before proceeding with construction.[376] The Commission granted the permit but only on condition the Nollans convey a public easement across a portion of their private beach to allow beachgoers to travel between a public park a quarter-mile to the north and a public beach some comparable distance to the south.[377] The Nollans objected to the imposition of the condition as an unconstitutional taking, and the Supreme Court, five to four, agreed.

---

County of Allegheny v. ACLU, 492 U.S. 573, 659 (1989), then this free exercise violation is converted into an Establishment Clause violation as well. It is important, though, not to interpret all references to coercion as meaning the same thing. Very possibly, we should interpret references to coercion in existing Establishment Clause case law to encompass, but also to extend beyond, the precise meaning advanced in this Article. Thus, a conditional threat to penalize exercise of free exercise rights should constitute a form of coercion forbidden by both clauses, but the Establishment Clause alone should be construed to prohibit coercion in the colloquial sense of imposing pressure excessive in *degree*, even if not entailing a constitutionally wrongful threat. Put otherwise, if Justice Scalia is correct that the content of the Establishment Clause guarantee "that government may not coerce anyone to support or participate in religion or its exercise" is exhausted by the principle that the state not coerce individuals "by force of law and threat of penalty," *Lee*, 505 U.S. at 640 (Scalia, J., dissenting), then the Establishment Clause's anticoercion rule appears (depending upon what Justice Scalia means by "penalty") to add nothing to the constitutional protection already afforded by the Free Exercise Clause.

373. 483 U.S. 825 (1987).

374. 512 U.S. 374 (1994).

375. *Nollan*, 483 U.S. at 828.

376. *Id.* (citing CAL. PUB. RES. CODE §§ 30106, 30212, 30600 (West 1986)).

377. Though these facts plainly satisfy the formal requirements set forth in Part I—the state offers to grant the Nollans' application for a development permit if and only if they grant the public an easement across their property—some commentators have doubted that *Nollan* was an unconstitutional conditions case. The uncertainty arose partly from the Court's failure to recite the magic words. But doubt was also created by Justice Scalia's observation that "the right to build on one's own property—even though its exercise can be subjected to legitimate permitting requirements—cannot remotely be described as a 'governmental benefit.'" *Id.* at 834 n.2. Then this cannot be an unconstitutional conditions case, some commentators surmised, "as application of that doctrine works only if a governmental benefit is being burdened." Douglas T. Kendall & James E. Ryan, *"Paying" for the Change: Using Eminent Domain to Secure Exactions and Sidestep* Nollan *and* Dolan, 81 VA. L. REV. 1801, 1848 (1995). But this just goes to show, as discussed in Part I, that using the concept of a governmental benefit as a way to demarcate the coverage of the unconstitutional conditions doctrine is misconceived. There is no clean line separating "benefits" the state is free to withhold from "nonbenefits" it is obligated to provide. *See, e.g.*, Jed Rubenfeld, *Usings*, 102 YALE L.J. 1077, 1110 (1993).

Appendix 8

Writing for the majority, Justice Scalia concluded that the condition could not stand because it was not germane to the legitimate purposes the Commission could have for refusing the requested permit.[378] Assuming that the Commission may constitutionally deny the Nollans a permit in order to advance a legitimate state interest in, among other things, the public's visual access to the beach, Justice Scalia reasoned, the Commission could not threaten to withhold the permit in order to secure lateral access for the public to cross the beach.[379] When the "essential nexus" between the purpose of the condition and the purpose of the prohibition is eliminated, the Court explained,

> the situation becomes the same as if California law forbade shouting fire in a crowded theater, but granted dispensations to those willing to contribute $100 to the state treasury. While a ban on shouting fire can be a core exercise of the State's police power to protect the public safety, and can thus meet even our stringent standards for regulation of speech, adding the unrelated condition alters the purpose to one which, while it may be legitimate, is inadequate to sustain the ban. Therefore, even though, in a sense, requiring a $100 tax contribution in order to shout fire is a lesser restriction on speech than an outright ban, it would not pass constitutional muster. Similarly here, the lack of nexus between the condition and the original purpose of the building restrictions converts that purpose to something other than what it was. The purpose then becomes, quite simply, the obtaining of an easement to serve some valid governmental purpose, but without payment of compensation. Whatever may be the outer limits of "legitimate state interests" in the takings and land-use context, this is not one of them. In short, unless the permit-condition serves the same governmental purpose as the development ban, the building restriction is not a valid regulation of land use but an out-and-out plan of extortion.[380]

The dissenters would have held the fit between the two state interests sufficiently close to satisfy constitutional standards.[381]

*Nollan* was decided just three days after *Dole*, and the similarity in reasoning may seem obvious, for the "nexus" inquiry of *Nollan* appears to mirror the "germaneness" inquiry of *Dole*.[382] On this view, the critical difference between the two cases is that a majority of the Court found the test satisfied in the first case but not in the second.[383] In fact, the difference is more profound. The Court did not merely supply different answers in the two cases, it asked different questions.

---

378. *Nollan*, 483 U.S. at 837.

379. *See id.* at 836–42.

380. *Id.* at 837 (internal quotation marks and citation omitted).

381. *See id.* at 842–53 (Brennan, J., dissenting); *id.* at 865 (Blackmun, J., dissenting).

382. *See, e.g.*, Sullivan, *supra* note 1, at 1462–64.

383. Four members of the Court—Chief Justice Rehnquist, and Justices White, Powell, and Scalia—were in the majority in both cases.

In *Nollan* the Court examined the relationship between the state's purpose for imposing the condition (that is, for making the demand) and its purpose for denying the benefit. In *Dole*, in contrast, the Court compared the government's purpose for imposing the condition with its purpose for granting the benefit.[384] Furthermore, the two decisions advanced divergent conceptions of the function or significance of the germaneness inquiry. In Justice Scalia's hands, germaneness serves coercion: When germaneness is lacking, the proposal is coercive ("extortion").[385] For Chief Justice Rehnquist, germaneness and coercion are two necessary, yet entirely independent, tests of constitutionality.[386]

When earlier assessing *Dole*, I observed that the majority and dissent alike concluded that the proposal did not constitute coercion, and I argued that they were wrong. I withheld judgment on who was right on the question that had divided the Court—whether germaneness was satisfied.[387] Through the lens provided by *Nollan*, we can now see that the question itself was ill-posed, for both Rehnquist and O'Connor misconceived precisely what the germaneness inquiry is intended to measure. Had they compared the condition and the withholding of the benefit (as *Nollan* did), the lack of germaneness would have been evident to all. (Whether they would have understood why it matters is another question.)

Given that the Court was doubly confused in *Dole* (as to both the content and function of the germaneness inquiry), it should not be surprising that it still did not get things quite right in *Nollan*. Although Justice Scalia correctly understood which discrete things should be assessed for germaneness, and also appreciated the basic relationship between germaneness and coercion, he mistook an inferential relationship for a logical one. According to Scalia, recall, the lack of germaneness between the condition and the unconditional withholding of the benefit simply "converts" the offer into extortion.[388] But how so? To better grasp the situation, imagine this hypothetical rejoinder from the California Coastal Commission:

---

384. *Accord* New York v. United States, 505 U.S. 144, 167 (1992) (noting that, under *Dole*, conditions attached to federal spending "must (among other requirements) bear some relationship to the purpose of the federal spending").

385. There is no meaningful distinction here between "extortion" and "coercion"—as I have been using the latter term. Insofar as the Court has (misguidedly, I think) inquired into "coercion" for purposes of determining whether the offeree's choice was made under too much pressure and was therefore, in some meaningful sense, "unfree" or "involuntary," *see supra* notes 150–53 and accompanying text, then Professor Vicki Been is quite correct to present "extortion" and "coercion" as separate theories of unconstitutional conditions. *See* Vicki Been, *"Exit" as a Constraint on Land Use Exactions: Rethinking the Unconstitutional Conditions Doctrine*, 91 COLUM. L. REV. 473, 485 (1991). Difficulties with using a conception of coercion that corresponds to a worry that an offeree's acceptance of the condition may be involuntary are explored in Berman, Reese & Young, *supra* note 179, at 1152–54.

386. *See* Baker, *supra* note 1, at 1974 (noting that, in *Dole*, "the 'germaneness' and 'coercion' inquiries are completely unrelated, and apparently are to serve as their own normative justifications").

387. *See supra* text accompanying note 155.

388. Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 837 (1987).

92          THE GEORGETOWN LAW JOURNAL          [Vol. 90:1

> We care about the public's ability to see the beach. But we care about other things too—including, for example, making existing public properties on the shorefront more easily accessible. Alas, we cannot always advance both interests. In the Nollans' case, we were willing to exchange some satisfaction of the first interest to realize a gain in the second. The Nollans preferred not to make that trade. That's fine. But once they rejected our offer we remained obligated to promote the first interest by denying their permit. The fact that we were prepared to make a trade does not mean that when our offer is rejected and we proceed with our initial plan the interest asserted is a sham.

Plainly, this response is logically unassailable. The majority's implication that the conversion operates by law of nature or rule of logic is therefore quite mistaken. Put otherwise, germaneness is neither (pace *Dole*) an independent consideration nor (pace *Nollan*) a logical determinant of coercion, but is rather a heuristic device.[389] Moreover, on the facts of *Nollan*, its utility is doubtful, for the Commission's imagined response is entirely plausible. Even as a factual finding, then, the Court's assertion that "[t]he purpose" of the Commission's action in denying the Nollans a permit[390] was "quite simply, the obtaining of an easement to serve some valid governmental purpose, but without payment of compensation" is unconvincing.[391] As far as the record in *Nollan* reveals, it is more than possible that, when rejecting the Nollan's permit application, the Commission was actually motivated to "protect[] the public's

---

389. Commentators, too, have long puzzled over the significance of germaneness to unconstitutional conditions analysis. Professor Robert Hale first drew attention to germaneness, predicting in his classic study of over sixty years ago "that the Court will be influenced, in determining the validity of a conditional burden, by its views as to whether or not the condition is germane to the purpose for which the government might normally impose the burden without conditions." Hale, *supra* note 277, at 352. But Hale was perhaps less than clear about just why germaneness should matter. *See, e.g.*, Sullivan, *supra* note 1, at 1461 n.196. For her part, Dean Sullivan viewed the germaneness inquiry as an effort to ferret out illegitimate legislative processes and argued that the notion of illegitimate processes—or government "corruption"—that germaneness tests served could not be made to do real work. *See id.* at 1456–76; *see also* Fudenberg, *supra* note 13, at 415–16 (also finding germaneness theories problematic); Kendall & Ryan, *supra* note 377, at 1824 n.90 (citing Sullivan approvingly). Although Professor Baker claims that her proposed distinction between "reimbursement" spending and "regulatory" spending, *see supra* text accompanying notes 209–12, creates "an interesting relationship between the 'germaneness' and 'coercion' inquiries," Baker, *supra* note 1, at 1973, the precise nature or significance of that relationship remains obscure.

390. The Court is not entirely clear about which purpose matters—the purpose for making the proposal or for carrying out the threat. The contentious question, though, concerns the latter. There can be no dispute that the Commission's purpose in making its offer was to obtain an easement without payment.

391. *Nollan*, 483 U.S. at 837. In short, despite a formal similarity of structure, the situation actually presented is not substantively the same as if California forbade shouting fire in a crowded theater on the condition the shouter did not pay $100. In the Court's hypothetical, the inference is far stronger that the state is threatening to do something it would not actually have a legitimate motive for doing. All things being equal, we would presume that a ban on (falsely) shouting fire in a crowded theater is motivated to prevent risk of serious injury to theater patrons. That is not an interest we believe the state would trade for $100. The conditional offer, therefore, would suggest that California does not really believe shouting fire in a crowded theater creates a danger worth legislating against.

ability to see the beach, assist[] the public in overcoming the 'psychological barrier' to using the beach created by a developed beachfront, and prevent[] congestion on the public beaches"—interests that the majority concedes are legitimate.[392]

This is not yet to conclude, however, that *Nollan* reached the wrong outcome. *Nollan* is a difficult case because of the danger, identified by the majority, "that a regime in which this kind of leveraging of the police power is allowed would produce stringent land-use regulations which the State then waives to accomplish other purposes."[393] That is, even though the majority asserts, without adequate basis, that the California Coastal Commission was not really animated by legitimate purposes—in imposing the general permit restriction, attaching the condition, or refusing to grant the permit in the individual case—it is right to worry that a rule sanctioning the type of trade proposed in *Nollan* would induce states to contrive land-use regulations they would not otherwise find justifiable solely (or principally) as a chip with which to secure other interests they could not directly pursue.[394] Of course, there is reason to think the political process could be trusted generally to protect against this type of abuse and that courts could adequately discern such illegitimate purposes on a case-by-case basis.[395] But, to be sure, there is also reason to suspect otherwise, especially in light of the courts' limited ability and willingness to scrutinize avowed legislative purposes for genuineness. Therefore, it is defensible to consider enforcing the Takings Clause via a judge-made rule directing courts to invalidate conditions on land-use regulations that would serve a different purpose than would the action the state threatens.[396] In that event, however, the Court's statement that "the lack of nexus between the condition and the original purpose of the building restrictions converts that purpose to something other than what it was" must be understood as in the nature of a prophylactic rule, not a true finding of fact.[397] Put another way, *Nollan* may reflect a judgment that so many nonger-

---

392. *Id.* at 835.

393. *Id.* at 837 n.5.

394. *Cf.* Jan Z. Krasnowiecki, *Abolish Zoning*, 31 SYRACUSE L. REV. 719, 734 (1980) (describing "short zoning" as a technique by which local governments "zone all of their undeveloped land short of the level at which any significant development can occur" thereby requiring all new development to "negotiate for admission").

395. For example, Justice Kennedy has accepted analogous reasoning in the free exercise context, where he has held (1) that a facially neutral law of general applicability that has the effect of burdening or prohibiting a religious practice violates the Free Exercise Clause if it were adopted for the purpose of burdening a particular religion, *see* Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 540–42 (1993), but (2) that this does not warrant construing the Free Exercise Clause to impose any restrictions on neutral laws of general applicability not affirmatively shown to have been motivated by religious animus, *see* Employment Div. v. Smith, 494 U.S. 872, 879–80 (1990).

396. For purposes of this exposition, it is unnecessary to decide whether the facts of *Nollan* should have been found to satisfy that test of strict germaneness. *Compare Nollan*, 483 U.S. at 838–41, *with id.* at 849–53 (Brennan, J., dissenting).

397. To put things this way necessarily raises the question whether the federal judiciary has constitutional authority to create prophylactic rules. Ironically—given my effort to rehabilitate his *Nollan* opinion—Justice Scalia recently insisted that they do not have that authority, *see* Dickerson v.

Appendix 8

mane conditions on land use regulations reflect impermissible governmental purposes as to make it appropriate to set forth a categorical rule in this narrow arena even though particularized ex post determinations are more suitable for other types of allegedly unconstitutional conditions. The problem is that, by asserting unsupportably that there exists coercion as a factual matter whenever its particular germaneness test is not met, the majority avoided the need to explore whether the incidence of such coercion could be expected to be sufficiently great as to justify application of a broad prophylactic rule in lieu of case-by-case factual determinations.[398] This is a much-contested question.[399] I take no position on which side has the better of the argument. The critical point is that the Court sidestepped this difficult yet essential analysis by misconceiving the inferential relationship between germaneness and coercion as a necessary one.

Just as unfortunate, the confusion engendered in *Nollan* only increased when, in *Dolan v. City of Tigard*,[400] the Court next applied unconstitutional conditions analysis to land-use exactions. The dispute arose when Dolan applied to the City of Tigard for a development permit to expand her retail store.[401] The city, however, expressed concerns that Dolan's proposed redevelopment would, by

United States, 530 U.S. 428, 444 (2000) (Scalia, J., dissenting) (declaring that the power to impose prophylactic rules upon Congress and the states "is an immense and frightening antidemocratic power, and it does not exist"), and academics have vigorously debated the issue for years, *compare* Susan R. Klein, *Identifying and (Re)formulating Prophylactic Rules, Safe Harbors, and Incidental Rights in Constitutional Criminal Procedure*, 99 MICH. L. REV. 201 (2001) (affirming such power), *and* David A. Strauss, *The Ubiquity of Prophylactic Rules*, 55 U. CHI. L. REV. 190 (1988) (same), *with* Joseph D. Grano, *Miranda's Constitutional Difficulties: A Reply to Professor Schulhofer*, 55 U. CHI. L. REV. 174 (1988) (denying such power), *and* Thomas S. Schrock & Robert C. Welsh, *Reconsidering the Constitutional Common Law*, 91 HARV. L. REV. 1117, 1124 (1978) (same).

I propose elsewhere that the legitimacy of judge-made rules that have the practical effect of proscribing more conduct than does the Constitution itself (as judicially interpreted) may depend upon whether the rule is adopted to minimize error costs in ex post adjudication or to achieve other policy objectives. *See* Mitchell N. Berman, Substantive Rules, Decision Rules, and Prophylactic Rules: What *Dickerson* and *Garrett* Can Teach Us About Constitutional Common Law (n.d.) (unpublished manuscript, on file with author). I would reserve the label "prophylactic rule" for the latter situation, and describe the former as a species of "decision rule." However, in this Article, I follow convention by referring to all rules with prophylactic effect as "prophylactic rules."

398. In effect, the Court failed to do what it castigated Congress for not doing in *City of Boerne v. Flores*, 521 U.S. 507 (1997). *See supra* note 286.

399. *Compare* Been, *supra* note 385 (arguing that the political process can adequately police against coercion of this type), William M. Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 COLUM. L. REV. 782 (1995) (same), *and* Douglas T. Kendall, Note, *The Limits to Growth and the Limits to the Takings Clause*, 11 VA. ENVTL. L.J. 547, 558–62 (1992) (same), *with* EPSTEIN, *supra* note 15, at 184–87 (disagreeing), Fred McChesney, *Rent Extraction and Rent Creation in the Economic Theory of Regulation*, 16 J. LEG. STUD. 101 (1987) (same), *and* Stewart E. Sterk, *Competition Among Municipalities as a Constraint on Land Use Exactions*, 45 VAND. L. REV. 831, 844–53 (1992) (same). Other useful commentaries on *Nollan* include David A. Dana, *Land Use Regulations in an Age of Heightened Scrutiny*, 75 N.C. L. REV. 1243 (1997); and Nathaniel S. Lawrence, *Means, Motives and Takings: The Nexus Test of* Nollan v. California Coastal Commission, 12 HARV. ENVTL. L. REV. 231 (1988).

400. 512 U.S. 374 (1994).

401. *Id.* at 379.

increasing the impervious surface in and adjacent to the city's floodplain, escalate the risk of flooding and, by serving more customers, exacerbate traffic congestion in the central business district. Accordingly, it granted the permit application subject to the conditions that Dolan dedicate the portion of her property lying within the floodplain for improvement of a storm drainage system, and also dedicate a strip of land adjacent to the floodplain for use as a public bike path.[402] Dolan challenged the conditions as violating the nexus test of *Nollan*, and therefore as effecting an uncompensated taking of her property.

The Supreme Court, per the Chief Justice, began by deeming it "obvious" that each permit condition satisfied *Nollan*'s standards.[403] But that, the majority explained, was only the first part of the inquiry. "The second part," it continued, required a determination of "whether the degree of the exactions demanded by the city's permit conditions bear the required relationship to the projected impact of [the applicant's] proposed development."[404] After canvassing state court decisions that had examined similar questions, the Court adopted a "rough proportionality" test pursuant to which the city would have the burden of advancing "some sort of individualized determination"—not requiring "precise mathematical calculation"—"that the required dedication is related both in nature and extent to the impact of the proposed development."[405] Finding that the city could not make such a showing on the existing record, the Court remanded for further proceedings.[406]

In broad strokes, the majority was exactly right. Here, as in so many of the situations we have encountered, the decisive step is to determine what purposes would animate the government in withholding the benefit at issue. As the majority correctly concludes, straightforward application of the germaneness standard solidly supports the inference that the city's refusal to grant Dolan a redevelopment permit actually would be motivated by a desire to protect the city against increased risk of flood and increased traffic congestion.[407] I have

---

402. *Id.* at 380.

403. *Id.* at 387–88.

404. *Id.* at 388.

405. *Id.* at 391.

406. *Id.* at 396. Justice Stevens (joined by Justices Blackmun and Ginsburg) dissented on the grounds, inter alia, that proportionality was easily satisfied on the facts of the case. *Id.* at 403–05 (Stevens, J., dissenting). Justice Souter dissented separately, charging that, though the majority purported to apply its newly minted rough-proportionality test, the basic *Nollan* nexus test was actually—and improperly—doing the majority's work. *Id.* at 411–14 (Souter, J., dissenting).

407. That these are legitimate purposes is beyond dispute. *See* Agins v. City of Tiburon, 447 U.S. 255, 260 (1980) (holding that denial of a development is permissible if it would substantially advance a legitimate state interest). The range of legitimate state interests in these contexts is extremely broad. *See* Berman v. Parker, 348 U.S. 26, 32–33 (1954) (holding that in employing the police power to advance the public welfare, the state may recognize values "spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled"). For a criticism of the leniency of the Court's land-use regulation doctrine, especially as contrasted with its rather stringent exactions jurisprudence, see Lee Anne Fennell, *Hard Bargains and Real Steals: Land Use Exactions Revisited*, 86 IOWA L. REV. 1 (2000).

argued that germaneness is underinclusive as a test of constitutionality in that there may be neither penalty nor coercion even when germaneness (between condition and the act threatened) is missing.[408] In supplementing its germaneness requirement with a test sounding in proportionality, the Court in effect recognized that germaneness is (also) overinclusive: There may be penalty and coercion even when the condition demanded and the act threatened do serve the same purpose. If the exaction would serve the same purpose as denial, but to a much greater extent, then the government's steadfast refusal to confer the benefit even upon the recipient's satisfaction of a condition, less onerous to her, that would adequately ameliorate any harms that granting the permit would impose cannot serve *only* legitimate governmental interests.

The problem is that, as in *Nollan*, the Court transformed a sound intuition into an overly rigid (or otherwise somewhat misconceived) rule of constitutional law. As the immediately foregoing discussion manifests, the proper focus of any meaningful supplement to the germaneness inquiry is on the possible conditions alternative to the condition actually imposed, not on the relationship of the actual condition to the denial of the benefit. Unless the government either refused even to entertain alternatives or rejected an alternative that the offeree preferred and that would have served legitimate state interests just as well as denial of the benefit, there is precious little basis for a conclusion that withholding the benefit on failure of the actual condition constituted a penalty. This is true no matter how disproportionately the condition demanded and denial of the benefit sought would serve legitimate state interests.

This is no mere quibble. The world does not always present a finely graded continuum of options.[409] It may often be the case that denial of a permit would serve an actual and legitimate governmental interest to a relatively small degree, that the exaction demanded would serve the same interest to a relatively large degree, and that it is difficult to identify any less onerous condition that could serve the interest even as well as would outright denial. To conclude, as *Dolan*'s rough-proportionality test apparently would, that the proposal is coercive under

---

408. To recap, when it is empirically plausible, and permissible as a matter of governmental charter, for a decisionmaker to try to trade off incommensurable goods (including the avoidance of incommensurable bads), the fact that the claimed and legitimate purpose(s) for the condition are different from the claimed and legitimate purpose(s) for withholding the benefit does not alone establish that the latter would not be the decisionmaker's actual purposes.

409. For similar points in different contexts, see, for example, Harry T. Edwards & Mitchell N. Berman, *Regulating Violence on Television*, 89 Nw. U. L. REV. 1487, 1533 (1995) (explaining that the two components of narrow tailoring in First Amendment doctrine differ on just this issue); and John Q. LaFond, *The Case for Liberalizing the Use of Deadly Force in Self-Defense*, 6 U. PUGET SOUND L. REV. 237 (1983) (criticizing the traditional rules of criminal law that limit use of deadly force in self-defense to circumstances in which it is necessary to protect against death, serious bodily injury, and a few specified felonies, on the ground that it leaves effectively unprotected persons who, by reason of physical weakness, are incapable of employing the amount of permissible nondeadly force that could in theory repel an assailant).

Appendix 8

such circumstances[410] is unjustified. It is also likely to prove inefficient. After all, landowners may often prefer an exaction that flunks the majority's rough-proportionality test to outright denial of their permit applications. *Dolan* itself may well be a case in point.[411]

Though the precise rule emanating from *Dolan*, as well as the Court's application of that rule to the facts of the case, are properly criticized, a more fundamental point should not be missed. Despite the Court's failure to appreciate the constitutional logic of penalties and coercion, the takings jurisprudence that emerges from *Nollan* and *Dolan* is fundamentally consistent with that logic. To be sure, that the Court has apparently not developed—and certainly has not explicated—a very robust conceptual framework to support its exaction jurisprudence has generated some confusion about terminology[412] and produced less

---

410. The literature reflects some doubt that *Dolan* spoke to coercion at all. *See* Merrill, *supra* note 1, at 864 (claiming that the Court did not "make any attempt to suggest that the proposed deal was coerced," and concluding that "any such suggestion in the context of the facts presented would be hard to justify"). As should be clear, I have just argued that insofar as the rough-proportionality test makes any sense at all, it is as part of an inquiry into coercion. *See also* Jan G. Laitos, *Causation and the Unconstitutional Conditions Doctrine: Why the City of Tigard's Exaction Was a Taking*, 72 DENV. U. L. REV. 893, 903–04 (1995) (arguing that concerns about coercion do animate the majority opinion).

411. At least it would be a case in point were the majority correct that the exaction failed proportionality review. In fact, though, this conclusion is almost certainly wrong—largely for reasons emphasized by Justice Stevens. *See Dolan*, 512 U.S. at 403–05 (Stevens, J., dissenting). Although a full discussion of this point is unnecessary, a few words should be said about the majority's claim that the city "never said why a public greenway, as opposed to a private one, was required in the interest of flood control." *Dolan*, 512 U.S. at 393; *see also* Laitos, *supra* note 410, at 906 (arguing that "if [Ms. Dolan] kept her property in the floodplain in a natural state (which she intended to do), then the city's legitimate interest in reducing flooding would be accomplished"). This is mistaken. If Ms. Dolan were to increase the impervious surface on her property next to the floodplain, her agreement not to build on the floodplain would serve only the city's interest in ensuring that the increased risk of flooding would not do additional damage to structures on Ms. Dolan's own parcel. It would not serve (or serve only in the most attenuated degree) the city's surely greater interest in ensuring that the increased risk of flooding thereby caused would not result in additional damage to structures on other landowners' properties downstream. To satisfy that interest, the city would have to engage in other measures to mitigate the likelihood of flood. One such measure would be to build a drainage channel. Insofar as the city preferred to build that channel on that portion of Dolan's land within the floodplain, then the deed condition served the city's legitimate interest in mitigating the harm that grant of the development permit would cause in a way that a no-build condition would not. It is therefore hard to square the majority's intimations of Commission overreaching with its earlier recitation that the Commission sought dedication of that portion of Ms. Dolan's property lying within the floodplain "for improvement of a storm drainage system along Fanno Creek." *Dolan*, 512 U.S. at 380. These types of errors would be reduced, I think, were the Court to replace the *Dolan* rough-proportionality standard with an explicit inquiry into alternative conditions proposed and rejected.

412. Perhaps the most charming of which centers on whether *Dolan* even presented an unconstitutional conditions case—a question that divided the Court. *Compare* 512 U.S. at 385 (announcing that the case fell within "the well-settled doctrine of 'unconstitutional conditions' "), *with id.* at 407–09 (Stevens, J., dissenting) (terming recourse to unconstitutional conditions analysis "inadequate," "novel, and arguably incoherent"), as well as academic commentators, *compare* Laitos, *supra* note 410, at 893 (asserting that *Dolan* is not an unconstitutional conditions case), *with* Merrill, *supra* note 1, at 866 (averring that "either reading is problematic").

Part of the confusion may be attributable to the majority's characterization of the "well-settled doctrine of 'unconstitutional conditions' " as holding that

Appendix 8

than perfect doctrine. But takings law appears to be one region of unconstitutional conditions space in reasonable accord with underlying theory.

### 4. The Sixth Amendment: Plea Bargaining

Plea bargains present a classic unconstitutional conditions problem.[413] Roughly formalized, the proposal looks something like this: If you waive your right to trial, then you will receive a punishment of no more than $y$; if you exercise your right to trial, then it is not the case that you will receive a punishment of no more than $y$. (If you exercise your right and are acquitted, then you will, of course, receive no punishment; if you exercise your right and are convicted, then you will receive punishment of $y+n$.) The question is whether the proposal constitutes coercion.[414]

Many commentators think it may.[415] At least when the difference between $y$ and $y+n$ is especially pronounced, the thinking goes, the defendant cannot

the government may not require a person to give up a constitutional right—here the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government where the property sought has little or no relationship to the benefit.

*Dolan*, 512 U.S. at 385. I have argued earlier that, properly understood, the doctrine holds only that *sometimes* the government cannot grant a benefit on the condition that the recipient give up a constitutional right. *See supra* note 4 and accompanying text. Thus conceived, the doctrine is "well-settled" indeed (notwithstanding the inevitable periodic appearance of ill-considered suggestions to the contrary). Either way, of course, the principles that determine *which* conditional offers that are subject to the unconstitutional conditions doctrine are themselves "unconstitutional conditions" are far from well-settled.

413. A sampling of the large plea bargaining debate includes ALAN WERTHEIMER, COERCION ch. 7 (1987); Howard Abrams, *Systemic Coercion: Unconstitutional Conditions in the Criminal Law*, 72 J. CRIM. L. & CRIMINOLOGY 128 (1981); Albert W. Alschuler, *The Changing Plea Bargaining Debate*, 69 CAL. L. REV. 652 (1981); Thomas McCoy & Michael J. Mirra, *Plea Bargaining as Due Process in Determining Guilt*, 32 STAN. L. REV. 887 (1980); Stephen J. Schulhofer, *Due Process of Sentencing*, 128 U. PA. L. REV. 733 (1980); Robert E. Scott & William J. Stuntz, *Plea Bargaining as Contract*, 101 YALE L.J. 1909 (1992); Fred C. Zacharias, *Justice in Plea Bargaining*, 39 WM. & MARY L. REV. 1121 (1998); and *Special Issue on Plea Bargaining*, 13 L. & SOC'Y REV. 189–687 (1979). A compact recent summary is Douglas D. Guidorizzi, Comment, *Should We Really "Ban" Plea Bargaining?: The Core Concerns of Plea Bargaining Critics*, 47 EMORY L.J. 753 (1998).

414. The fuller question, to be sure, is whether plea bargaining constitutes coercion or, if it does not, whether it is unconstitutional for any other reason. I put these other considerations aside because the Supreme Court has already determined that it is constitutionally permissible for the state to act for the purpose of "persuad[ing] the defendant to forgo his right to plead not guilty." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978); *see also* Corbitt v. New Jersey, 439 U.S. 212 (1978); Brady v. United States, 397 U.S. 742 (1970). Perhaps it should be otherwise. But to think that it may be otherwise within the lifetime of anyone reading this Article is, I think, fanciful. For a detailed study of the pressures inexorably favoring plea bargaining in American legal culture, see George Fisher, *Plea Bargaining's Triumph*, 109 YALE L.J. 857 (2000); and see also *Blackledge v. Allan*, 431 U.S. 63, 71 (1977) (describing plea bargains as "important components of this country's criminal justice system"). Contrary views are expressed in Albert W. Alschuler, *Implementing the Defendant's Right to Trial: Alternatives to the Plea Bargaining System*, 50 U. CHI. L. REV. 931 (1983); and Stephen J. Schulhofer, *Is Plea Bargaining Inevitable?*, 97 HARV. L. REV. 1037 (1984).

415. *See, e.g.*, Daniel P. Blank, *Plea Bargain Waivers Reconsidered: A Legal Pragmatist's Guide to Loss, Abandonment, and Alienation*, 68 FORDHAM L. REV. 2011, 2016 (2000) (listing the charge "that the

reasonably decline the prosecutor's offer. Acceptance is therefore "coerced" or "involuntary" or "unfree."[416] There is surely some sense in which this claim is plausible. But the sense in which it may be true is not a sense in which it is constitutionally meaningful. Recall our earlier distinction between the two normative functions of coercion claims:[417] one serving to censure the actor who engages in coercion, the other serving to excuse the actor who acts in the face of coercion. The critical point is that the latter two uses of the word in the preceding sentence do not refer to the same thing. And the claim that a particular defendant (or particular class of defendants) may act under coercion in the second sense—the sense corresponding to notions of involuntariness—cannot reasonably support a conclusion that the offer is unconstitutional. Consider, for comparison, a young man who may feel "coerced" by life circumstances to join the armed forces. Surely, the existence of this type of coercion or "unfreedom" does not bar the Navy from shipping the young recruit out to sea.[418]

So the claim that the offer is coercive in the sense that it puts *too much* pressure on the defendant to accept finds little traction. It remains to determine, however, whether the offer may be coercive in the sense that it puts *wrongful* pressure on the defendant to accept. If we understand this question as provoking an inquiry into constitutionally wrongful pressure, not morally wrongful pressure, we are back in familiar territory. Our question becomes, once again, whether carrying out the threat—to impose punishment of $y+n$ on the defendant in the event he is convicted—would be constitutional.[419]

Let us be clear about how it may not be constitutional. Assume that there exists some appropriate level of punishment for the defendant, taking into account the details of his offense as well as any other relevant and constitutionally acceptable considerations. Call that level $P$. $P$ is the level of punishment that the sentencer would impose if it knew all relevant factors except for whether the defendant being sentenced pled guilty or was convicted after trial, and assuming the sentencer did not take unconstitutional considerations into account. There is, of course, a vast range within which $P$ may reasonably fall. Now, once $P$ is determined, it is perfectly acceptable for the state to offer some

---

threat of much harsher penalties after trial is impermissibly coercive upon defendants" among "[t]he most common criticisms of the practice of plea bargaining").

416. *See, e.g.*, John H. Langbein, *Torture and Plea Bargaining*, 46 U. CHI. L. REV. 3, 12 (1978) ("Th[e] sentencing differential is what makes plea bargaining coercive.").

417. *See supra* note 62 and text accompanying notes 150–53.

418. It may be objected that the state is responsible for the circumstances that exert pressure upon the criminal defendant but not those that constrain the recruit. To be sure, this distinction (assuming it to be true) may make a difference when it comes to determining whether the plea bargain is unconstitutionally coercive in the first sense—a claim we are about to investigate—but I do not see how it is relevant to determining whether the plea bargain is unconstitutional because of any coercion that may exist in the second sense.

419. Of course, if the offer proves coercive in this sense, it might also be coercive in the sense of imposing so much pressure as to make the defendant's agreement (in some respect) "unfree." But it still would be the former fact, not the latter, that makes the offer unconstitutional.

lesser sentence, say *R*, as a way of inducing guilty defendants to plead guilty, and thereby to save the state the risk of trial.[420] Imposition of the lesser sentence *R* is also justified insofar as the defendant who pleads guilty actually does accept responsibility and express remorse.[421] If all this is correct, then a plea offer is not coercive when the punishment offered (*y*) is *R*, and when the punishment threatened (*y*+*n*) is *P*. A plea offer *is* coercive, however, if *y* = *P*. In that case—sometimes called "overcharging"—imposition of the punishment threatened (*y*+*n*) would be an unconstitutional penalty because it would impose a burden (*n*) for the purpose of punishing or discouraging the defendant's exercise of his constitutional right to trial.[422]

As it happens, the Supreme Court has already addressed the constitutionality of overcharging, most prominently in *Bordenkircher v. Hayes*.[423] Hayes, a two-time felon, was indicted by a state grand jury on one count of forgery, an offense punishable by two to ten years imprisonment.[424] At plea negotiations, the prosecutor threatened to reindict Hayes under the state habitual criminal act—thereby subjecting him to a mandatory life sentence—unless he pled guilty on the forgery charge and accepted a five-year sentence.[425] When Hayes refused the offer, the state reindicted him as a career felon, the jury convicted, and Hayes was sentenced to life. The Sixth Circuit held that the reindictment constituted vindictive prosecution in violation of the Due Process Clause. The Supreme Court, five to four, reversed.

*Hayes* raises two separate questions: first, whether overcharging is constitutional; and second, if not, whether the prosecutor engaged in it. Penalty analysis answers the first question in the negative. And so would have the dissenters. Overcharging, Justice Powell concluded, is constitutionally impermissible. "Implementation of a strategy calculated solely to deter the exercise of constitu-

---

420. *See supra* note 414.

421. I am assuming that acceptance of responsibility and expression of remorse are permissible factors to take into account on either retributivist or consequentialist theories of punishment.

422. Judge Patricia Wald put this familiar point sharply:

> A sentencing judge . . . could not say, "I would have given you five years if you didn't go to trial, but since you did, I will give you seven," but he could say, "Although I might otherwise have given you seven years, I am giving you only five years because you are remorseful as shown, in part, by your willingness to plead guilty." In the first case, the judge has arrived at a benchmark sentence *he believes just in all respects*, but then added an extra increment because the defendant has burdened the system by going to trial. In the second case, the judge is according a measure of leniency by viewing the guilty plea as evidence of acceptance of responsibility and, as such, worthy of consideration.

United States v. Jones, 997 F.2d 1475, 1484 (D.C. Cir. 1993) (Wald, J., dissenting) (emphasis added); *see also* Abrams, *supra* note 413, at 133–36, 155 (elaborating upon this very distinction); Alschuler, *supra* note 413, at 658–59 & n.11 (citing authorities including the American Bar Association and the American Law Institute). Notice that this way of distinguishing penalties from discounts does not, contrary to Professor Alschuler's supposition, *see id.* at 659, require one to posit that there exists a single, objectively proper sentence for any given defendant.

423. 434 U.S. 357 (1978).

424. *Id.* at 358.

425. *Id.*

tional rights is not a constitutionally permissible exercise of discretion."[426] At first, the majority seemed to want to agree. "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort," wrote Justice Stewart for the Court, "and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.' "[427] "But," Stewart continued in a stunning non sequitur, "in the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer."[428] What accounts for this jarring conclusion, so reminiscent of the Court's odd view, frequently expressed in the conditional spending arena,[429] that a proposal is not coercive so long as the recipient is "free" to reject it? The answer comes later in the opinion when the Court reasons that "[t]o hold that the prosecutor's desire to induce a guilty plea . . . may play no part in his charging decision, would contradict the very premises that underlie the concept of plea bargaining itself."[430] If it is constitutionally permissible for prosecutors to try to induce defendants to plead guilty, so as to spare the state the uncertainty and expense of trial, the Court seems to reason, we must allow them to overcharge. But this is simply wrong. Plea bargaining is made possible so long as prosecutors are allowed to offer sentencing discounts; it is not necessary that they also be allowed to threaten a penalty.[431]

So the dissenters were right that overcharging is unconstitutional (as constituting coercion). But did the prosecutor in fact overcharge? Justice Powell thought so, deeming it fair to infer "that the prosecutor himself deemed it unreasonable and not in the public interest to put this defendant in jeopardy of life imprison-

---

426. *Id.* at 373 (Powell, J., dissenting). In a separate dissent joined by Justices Brennan and Marshall, Justice Blackmun seemed to reach the same conclusion. *See id.* at 367 (Blackmun, J., dissenting, joined by Brennan and Marshall, JJ.). Although I agree with this conclusion, Justice Powell and the precedent upon which he relies, *see id.* at 372 (Powell, J., dissenting) (quoting *Chaffin v. Stynchcombe*, 412 U.S. 17, 32 n.20 (1973)), are too grudging in implying that state action does not amount to an unconstitutional penalty so long as the state is motivated by some purpose other than punishing and deterring. It seems to me that state action that burdens a constitutional right must be deemed unconstitutional as a penalty if a but-for purpose is to punish or deter, and that it is plausibly unconstitutional so long as that is a motivating purpose. But we may leave this an open question.

427. *Hayes*, 434 U.S. at 363 (quoting *Chaffin*, 412 U.S. at 32–33 n.20) (other citations omitted). The fuller quotation from *Chaffin*—which was quoted by Powell—refers to "the only objective of a state practice." I like to think that the majority's deletion of the qualifier "only" was intentional.

428. *Id.*

429. *See supra* text accompanying notes 199–202.

430. *Hayes*, 434 U.S. at 364–65.

431. In a similar context, the federal courts of appeals have unanimously held that a sentencing judge is allowed to impose a lesser sentence on a defendant for having pled guilty, but not to impose a heavier sentence for having gone to trial. *See* United States v. Jones, 997 F.2d 1475, 1480–81 (D.C. Cir. 1993) (Mikva, C.J., dissenting) (citing cases); *id.* at 1489 (Sentelle, J., dissenting) (specifically disagreeing with Judge Mikva's contention that "it probably does not matter whether the judge was enhancing Mr. Jones' punishment or denying him leniency").

Appendix 8

ment."[432] And yet, the mere fact of reindictment cannot establish this fact. Perhaps the prosecutor, following Justice Frankfurter's advice, simply realized that "[w]isdom too often never comes, and so one ought not to reject it merely because it comes late."[433] The remaining dissenters, accordingly, seemed more ambivalent than did Justice Powell about the prosecutor's motives when recharging Hayes. Whether this prosecutor did engage in overcharging or not, Blackmun seems to suggest, it would be sensible judicial strategy to presume that he had.[434]

At this point, the similarities between plea bargains and exactions become acute. Both are common practices, the wholesale eradication of which seems impractical. And in both situations we can expect that sometimes the conditional proposal is coercive in that the refusal to grant the benefit offered (a development permit, or the lesser sentence) upon failure of condition would be motivated by the impermissible purposes of punishing or deterring the exercise of a constitutional right. Lastly, in both situations separating the coercive proposals (when carrying out of the threat would constitute a penalty) from the noncoercive proposals on a case-by-case basis is likely to prove exceedingly difficult.[435]

As we have seen, the germaneness (or "nexus") test of *Nollan* can be best understood as a prophylactic rule addressed to precisely this problem. And the rough-proportionality requirement of *Dolan* adds yet another level of prophylaxis. The Fifth Amendment right to be free from uncompensated takings is thus protected by two per se rules designed to guard against the risk that ad hoc, ex post review for unconstitutionality would produce too many false negatives. Similar reasoning recommends designing prophylactic rules to protect the Sixth Amendment right to jury trial as well.[436] *Hayes* presented the opportunity for one such rule: A threat during plea negotiations to reindict a defendant on an additional charge (when such a recharging is not based on new information) will be presumed to threaten a penalty, hence to constitute coercion.[437] A second possible rule would be to invalidate any statute or policy that provides for *automatic* downward adjustments for guilty pleas. In these situations, the risk is too great that the downwardly adjusted sentence ($y$) equals $P$, not $R$.[438] Whether

---

432. *Hayes*, 434 U.S. at 371 (Powell, J., dissenting).

433. Henslee v. Union Planters Nat'l Bank & Trust Co., 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting).

434. *See Hayes*, 434 U.S. at 368 (Blackmun, J., dissenting) (concluding that "it is far preferable to hold the prosecution to the charge it was originally content to bring and to justify in the eyes of the public").

435. *See id.* at 368 n.2.

436. *But see supra* note 397 (problematizing the notion of a "prophylactic rule").

437. This seems to have been the Sixth Circuit's reasoning. *See Hayes*, 434 U.S. at 361.

438. The U.S. Sentencing Commission was apparently influenced by reasons along these lines when it initially decided against an automatic plea discount. *See* Dan Freed & Marc Miller, *Plea Bargained Sentences, Disparity, and "Guideline Justice,"* 3 FED. SENTENCING REP. 175, 176 (1991). For a discussion of the Commission's flirtation with an automatic plea discount and the ways in which the

Appendix 8

these are sensible prophylactic rules, and furthermore, whether other prophylactic rules may be appropriate and administrable warrants sensitive consideration that cannot be undertaken here.[439] Once it is recognized that (contrary to the assumption that seemingly drove the outcome in *Hayes*) sanctioning plea bargaining need not entail sanctioning overcharging, the admitted epistemic difficulty in distinguishing coercive plea offers from noncoercive ones—which is the same distinction as lies between sentencing penalties and sentencing discounts—does not justify the near-wholesale abdication of the judicial responsibility to protect Sixth Amendment rights from state coercion.

5. Abortion

The abortion funding cases[440] provide yet another fertile ground for thinking about unconstitutional conditions.[441] They are also a good place to conclude, for

Guidelines' "Acceptance of Responsibility" provision has been applied to approximate such an automatic sentencing discount for guilty pleas, see Michael M. O'Hear, *Remorse, Cooperation, and "Acceptance of Responsibility": The Structure, Implementation, and Reform of Section 3E1.1 of the Federal Sentencing Guidelines*, 91 Nw. U. L. Rev. 1507 (1997).

Like the Sentencing Commission, the Supreme Court too has appeared hostile to automatic sentencing reductions for guilty pleas. In *United States v. Jackson*, 390 U.S. 570 (1968), it invalidated those parts of the Federal Kidnapping Act that made the death penalty unavailable when the defendant either pleads guilty or is convicted upon a bench trial, reasoning that "[w]hatever might be said of Congress's objectives, they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights." *Id.* at 582. Although the Court's holding is sensible, I think, its reasoning does not convince. After all, the Court has never subjected all government action that has the effect of chilling exercise of a constitutional right ("basic" or otherwise) to a test of necessity or narrow tailoring. Why it should in this particular context was left unexplained. The case becomes clearer, however, if we read the statute as proposing two distinct conditional proposals each offering freedom from the death penalty—the first conditioned on waiver of the defendant's right to jury, the second conditioned on waiver of the right to trial. The first proposal is plausibly unconstitutional on the dimension of purpose, namely that the state may not purposely encourage defendants to opt for trial by judge rather than jury. Of course, this rationale leaves the second proposal standing, for it *is* constitutionally permissible (so the Court has said) for the state to purposely encourage defendants to plead guilty. Here, though, a prophylactic rule makes sense. When a statute reserves the death penalty for those who are convicted upon trial rather than upon plea, the danger is too great that it is really threatening a penalty rather than offering a discount. In short, the tools proposed in this Article provide solid analytical support for the intuitions that drove the *Jackson* result.

439. Along similar lines, see *North Carolina v. Pearce*, 395 U.S. 711 (1969), in which the Court held that a trial court may not impose a more severe sentence on defendants who successfully appeal a first conviction and are then reconvicted after a new trial, except when there exists "objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." *Id.* at 726. For a succinct analysis of *Pearce* and its progeny in prophylactic terms, see Abrams, *supra* note 413, at 145 & nn. 94–101.

440. Rust v. Sullivan, 500 U.S. 173 (1991); Webster v. Reprod. Health Servs., 492 U.S. 490 (1989); Harris v. McRae, 448 U.S. 297 (1980); Williams v. Zbaraz, 448 U.S. 358 (1980); Maher v. Roe, 432 U.S. 464 (1977); Poelker v. Doe, 432 U.S. 519 (1977).

441. Worthwhile commentaries include Susan F. Appleton, *Standards for Constitutional Review of Privacy-Invading Welfare Reforms: Distinguishing the Abortion-Funding Cases and Redeeming the Undue Burden Test*, 49 Vand. L. Rev. 1 (1996); Janet Benshoof, Commentary, *The Chastity Act: Government Manipulation of Abortion Information and the First Amendment*, 101 Harv. L. Rev. 1916 (1988); Theodore C. Hirt, Commentary, *Why the Government Is Not Required to Subsidize Abortion Counseling and Referral*, 101 Harv. L. Rev. 1895 (1988); McConnell, *supra* note 364; Michael J.

they manifest both the value and the limits of general unconstitutional conditions theorizing. Close conceptual analyses of penalties and coercion, it turns out, have some payoff here. And three-dimensional thinking is essential. The lion's share of the work, however, turns on questions of fact and judgments of constitutional law, each contestable.

The core issue, raised most cleanly in *Maher v. Roe*,[442] is one of selective funding: The government provides Medicaid funding for childbirth, but not for abortions. Of course, there are many medical procedures other than abortions that the state has also chosen not to subsidize.[443] The state's refusal to subsidize abortions could plausibly be thought to raise the unconstitutional conditions problem (as defined in Part I), whereas the state's refusal to subsidize, say, tubal ligations does not, only because of the facts of nature that turn a pregnant woman's decision not to have an abortion (unsubsidized) into a decision to undergo childbirth (subsidized). Once pregnant, a woman must choose either to abort the fetus or to (try to) bring it to term.[444] A (mere) selective funding decision is thereby formalizable in the biconditional terms of a conditional proposal extended to pregnant women: If and only if you choose not to abort the fetus, we will pay (at least some portion of) the medical expenses your decision necessitates. (This is not to say that *Maher* is more faithfully rendered as a conditional proposal than as simple selective funding, but only to observe that it can be viewed in this fashion.)

Thus cast in familiar terms, the proposal is readily analyzed across the three dimensions of constitutional violation.[445] Start with effects. The likely effects of the offer will be to increase the number of childbirths relative to abortions[446] and, in theory at least, to encourage use of birth control, thereby marginally reducing the total number of pregnancies. It is hard to imagine how, without more, these effects could make government action constitutionally suspect.

---

Perry, *The Abortion Funding Cases: A Comment on the Supreme Court's Role in American Government*, 66 GEO. L.J. 1191 (1978); Michael J. Perry, *Why the Supreme Court Was Plainly Wrong in the Hyde Amendment Case*, 32 STAN. L. REV. 1113 (1980); and Laurence H. Tribe, Commentary, *The Abortion Funding Conundrum*, 99 HARV. L. REV. 330 (1985).

442. 432 U.S. 464 (1977).

443. *See McRae*, 448 U.S. at 325 n.28 (noting even a few medically necessary procedures that are not covered by Medicaid).

444. *See, e.g., id.* at 332–33 (Brennan, J., dissenting).

445. Of course, we do not need to formulate the government action as a biconditional in order to assess it across the dimensions of purpose, effect, and conduct. As Part III argues, *all* government action is properly measured for constitutionality along these three dimensions. *See supra* Part III. Indeed, adopting the conditional proposal rubric is almost certainly unnecessary here—so long as one is sensitive to the concept of an unconstitutional penalty and carefully assesses the governmental classification on the dimensions of purpose and effect.

446. Recall my proposed distinction between the effects of the proposal, and the effects of carrying out the threat. *See supra* text accompanying note 166. There is, admittedly, something artificial about this division. We could simply inquire into the effects of the selective funding policy, conceived as a single governmental act. The bifurcated approach does have the virtue, however, of helping to ensure that all potentially relevant effects are taken into account. Additionally, it distinguishes the purpose question from the penalty question. *See infra* p. 107.

Appendix 8

But the supposition that the most prominent effect of the proposal will be to encourage some women to choose not to exercise their rights to have an abortion does raise questions—both factual and legal—when we turn attention to the dimension of purpose. Was it, in fact, a purpose behind the state's issuance of this proposal (that is, of its selective funding decision) to discourage some women from choosing an abortion? And if so is that, as a matter of constitutional law, a bad purpose? Assume, as the Supreme Court did in both *Harris v. McRae* and *Maher*, that the answer to the first question is yes.[447] We have seen that some constitutional rights spawn a correlative governmental duty not to attempt to influence their exercise. Many First Amendment rights are of this variety. Presumably, it would be unconstitutional for the government to buy billboard space encouraging its citizens to "Vote Yes on Proposition Two" or to offer cash bounties for persons to attend (or not to attend) houses of worship.[448] But not all rights are of this sort. As already noted, the Supreme Court has interpreted the Sixth Amendment not to bar the state from trying to encourage criminal defendants to waive their rights to trial.[449] And presumably, municipalities could entreat landowners to convey public easements for free. In short, the question, as many commentators have observed,[450] is whether the constitutional right to choose an abortion brings with it a claim-right that the state not try to sway the decision. And the answer—at least according to the Supreme Court—is that it does not.[451] If this is correct, then selective funding of childbirth and not abortions is constitutional on the dimension of purpose even if the state acts for the purpose of encouraging the former and discouraging the latter. But whether it is correct is a matter for substantive arguments of political morality—insofar as one's theory of constitutional interpretation recognizes room for this sort of

---

447. *McRae*, 448 U.S. at 315; *Maher*, 432 U.S. at 475–76. This is not necessarily true. Even if the state believed that demand for abortions was price inelastic, a decision to subsidize childbirth, but not abortion, for poor women would be in no way incoherent. The state could be motivated by agent-relative considerations, or by concerns about the *meaning* rather than the *effect* of a decision to subsidize abortions. That is, the state could have the attitude: We do not care how many abortions are performed; we just do not want to be involved in promoting or facilitating them. Furthermore, purposefully encouraging childbirth through subsidy is not tantamount to purposefully discouraging abortion insofar as the persons sought to be influenced are contemplating pregnancy but not yet pregnant. These quibbles notwithstanding, I am willing to suppose, along with the Court, that the selective funding schemes (adopted by Connecticut in *Maher*, and by Congress in *McRae*) were significantly motivated to discourage women from exercising their rights to an abortion.

448. *See* Simons, *supra* note 51, at 296.

449. *See supra* note 414. *See generally* William J. Stuntz, *Waiving Rights in Criminal Procedure*, 75 VA. L. REV. 761 (1989). Professor Tribe's assertion that this is a "relational and systemic" right, hence "necessarily inalienable," Tribe, *supra* note 441, at 332–33, is therefore somewhat puzzling.

450. *See, e.g.*, Alexander, *supra* note 55, at 185 ("The controversy over *Maher* and *Harris* can be viewed as a controversy over whether the right to an abortion *is* a right to [government neutrality with respect to its exercise or non-exercise].["); Dorf, *supra* note 100, at 1219–32; Sunstein, *Doctrine*, *supra* note 21, at 342 (making a similar point, but drawing the erroneous conclusion that general unconstitutional conditions theorizing is therefore necessarily useless).

451. *See, e.g.*, *Maher*, 432 U.S. at 474; Beal v. Doe, 432 U.S. 438, 446 (1977). Justice Brennan intimated, if he did not explicitly pronounce, a contrary view. *See McRae*, 448 U.S. at 329–37 (Brennan, J., dissenting); *Maher*, 432 U.S. at 482–90 (Brennan, J., dissenting).

reasoning.[452] Value-neutral analysis can provide no answer.

Supposing that the effects of, and purposes behind, the extending of the conditional proposal are all constitutionally permissible, we can turn to considering whether it amounts to forbidden coercion. The question now, in other words, is whether it would be unconstitutional, on any dimension, for the state to carry out its threat not to subsidize the medical procedures necessitated by a choice to have an abortion.

Start, again, with effects. Whether or not the state were to fund childbirth, the mere fact that it does not subsidize the abortion would be unconstitutional if the Constitution were construed to require the state to ensure that every pregnant woman could effectuate a choice to terminate her pregnancy. But whatever the merits of such a position,[453] it is so far from the constitutional mainstream as to be safely ignored for our purposes. The mere refusal to subsidize poor women's abortions, it would seem, is not unconstitutional by dint of its effects. And if that is so, the question becomes how the state's concurrent subsidization of childbirth may affect the analysis. True, it converts the nonsubsidization of abortion into a "burden" in the sense (previously stipulated to)[454] of raising the costs of having an abortion relative to not having it. And this, according to Justice Brennan, is critical:

> By funding all of the expenses associated with childbirth and none of the expenses incurred in terminating pregnancy, the Government literally makes an offer that the indigent woman cannot afford to refuse. It matters not that in this instance the Government has used the carrot rather than the stick. What is critical is the realization that as a practical matter, many poverty-stricken women will choose to carry their pregnancy to term simply because the Government provides funds for the associated medical services, even though these same women would have chosen to have an abortion if the Government had also paid for that option, or indeed if the Government had stayed out of the picture altogether and had defrayed the costs of neither procedure.[455]

But this is wholly unconvincing. When confronted with an offer that the offeree "cannot afford to refuse," it makes all the difference in the world whether the offeror employs a carrot rather than a stick. Faced with the choices of sleeping late at home or showing up at the appointed date and time to mow my lawn, I have not the slightest doubt that my neighbor's son would choose the former if only I had been willing to fund both options or had been willing to pay for neither. And the fact (were it true) that I pay him well over the going rate in the neighborhood would be neither here nor there. Contrary to Justice

---

452. I made the same point about viewpoint (and quasi-viewpoint) discrimination in the First Amendment context. *See supra* notes 345–54 and accompanying text.

453. This position is forcefully argued for in Tribe, *supra* note 441.

454. *See supra* text accompanying note 140.

455. *McRae*, 448 U.S. at 333–34 (Brennan, J., dissenting).

Brennan, then, the effects that should concern us are not those that render the constitutionally protected choice to have an abortion less eligible than the constitutionally protected choice to carry the pregnancy to term, but rather those that render the choice to have an abortion more difficult than it would have been absent the particular governmental action (or inaction) challenged. This is the sense of "burden"—making abortion more costly or difficult in comparison, not to not having an abortion, but to the state's doing otherwise than it threatens—captured in the undue burden test of *Planned Parenthood v. Casey.*[456] And if this is the sense of burden that is constitutionally significant, then the policy challenged in *Maher* seems constitutionally inoffensive. If, *ex hypothesi*, the simple nonfunding of abortions does not run afoul of *Casey*, there is simply no reason to believe that nonfunding of abortions conjoined to funding of childbirth "plac[es] a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."[457]

None of this is to say, however, that the type of burden that the selective funding at issue in *Maher* does produce—increasing the opportunity cost of choosing an abortion—is entirely irrelevant. Rather, it should serve to make us watchful for the existence of a penalty.[458] We have already assumed that it is not necessarily constitutionally impermissible for the state to act for the purpose of discouraging abortion. That does not entail, however, that the state may constitutionally seek to achieve that purpose by raising the costs of its exercise. Granted, then, that the state is trying to discourage women from choosing an abortion, and that it is constitutionally permitted to do so, the critical question, conceptually, is whether it is endeavoring to do so by offering a bonus to pregnant women who choose childbirth or by imposing a burden on pregnant women who choose abortion. This is essentially the same question posed to distinguish plea discounts from overcharging. Here, as there, the former is constitutional, the second (a penalty) is not.

Also here, as there, no matter the conceptual soundness of the distinction, one may reasonably despair of being able to differentiate the two in practice. To be sure, a definitive answer is almost certainly impossible. Nonetheless, we may advance the ball a little by sketching out a way to think about the problem. And it is in this respect, I think, that recasting the issue from selective funding to a conditional proposal is most likely to aid understanding.

Imagine that an indigent pregnant woman is disposed, at time $t_1$, to terminate her pregnancy, and that the government offers, at $t_2$, to pay the medical expenses necessitated by the pregnancy if, and only if, she chooses not to exercise her right to an abortion. One possible consequence of this conditional proposal is to induce the woman to choose to carry the pregnancy to term and

---

456. 505 U.S. 833 (1992); *see supra* text accompanying note 80.

457. *Casey*, 505 U.S. at 877.

458. Although identifying a burden is helpful to the penalty analysis, it is not essential. There can be burdenless penalties. *See supra* note 140.

that, we have assumed, is an objective the state is constitutionally permitted to seek. But let us put this possibility aside, for carrying out its threat at $t_3$ is not a penalty only if, supposing it knew the woman would not change her mind, the state would nonetheless genuinely prefer not to subsidize the abortion. And the answer to this thought experiment, it seems, is likely to depend upon what the state can expect to occur at $t_3$ if it does not subsidize the abortion. Three principal possibilities suggest themselves:[459] (1) Private charitable sources subsidize a safe, legal abortion; (2) the woman herself scrapes together the necessary funds, perhaps by stinting on other necessities; or (3) the woman undergoes a cheaper, but less safe, illegal abortion, including trying to induce abortion herself.

That the state would prefer the first two outcomes to providing its own funding seems highly plausible. That it would prefer the third to providing the public funds necessary to ensure a safe legal abortion, however, seems much less likely.[460] If this is so, then whether the state is treating poor women who choose an abortion less well than it would otherwise but for its purpose in discouraging exercise of the abortion right may well depend upon the anticipated relative frequencies of the three alternative outcomes. If the third is substantially more prevalent than the first two combined, then it is arguably fair to infer that the nonsubsidy of abortions for poor women amounts to an unconstitutional penalty upon a woman's right to choose.[461]

The bottom line, I think, is that the result in *Maher* is at the least defensible, and probably right: A state can choose to fund childbirth, but not abortions. If

---

459. *See McRae*, 448 U.S. at 338 (Marshall, J., dissenting).

460. Speculation regarding this latter point could perhaps be avoided by putting the question squarely to the state's attorneys. Conceivably, political considerations could check what, for litigation purposes, would be the obvious opportunistic answer.

461. Penalty analysis, incidentally, explains why the Supreme Court majorities that rejected challenges to the selective nonfunding of abortion in all these cases were nonetheless able to speculate that "strict scrutiny might be appropriate" if a state "denied general welfare benefits to all women who had obtained abortions and who were otherwise entitled to the benefits," Maher v. Roe, 432 U.S. 464, 474 n.8 (1977); that "[a] substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion," *McRae*, 448 U.S. at 317 n.19; and that it "might" be unconstitutional "if the State barred doctors who performed abortions in private facilities from the use of public facilities for any purpose," Webster v. Reprod. Health Servs., 492 U.S. 490, 510 n.8 (1989); as well as why Professor McConnell can deem it "uncontroversial" that, even after these cases, the government would not be permitted to deprive abortion clinics of "police or fire protection or access to public highways," McConnell, *supra* note 364, at 1022.

What considerations support these observations? McConnell explains his conclusion this way: "Because the services are indispensable, a denial of access ('aid') would therefore be tantamount to destruction." *Id.* And this is probably right as far as it goes; in my terms, therefore, conditioning police or fire protection on nonperformance of abortions would be unconstitutional on dimension of effect. But—and this is the revealing point—it is much less clear that McConnell's "destruction" explanation works in the hypotheticals that engaged the Court. I doubt, for instance, that a majority of the Justices would agree that Medicaid benefits are "indispensable." The one unifying thread is that all four of these hypothetical conditional proposals would be unconstitutionally coercive for threatening a penalty.

wrong, it would most likely be because, as a matter of constitutional law, a state presumptively violates the Constitution whenever it acts (no matter in what manner) for the purpose of discouraging a woman from choosing to exercise her right to an abortion, or because, as a matter of fact, the state of Connecticut was imposing a penalty.

The post-*Maher* selective funding cases, however, are more questionable. *McRae* differed from *Maher* principally in this regard: Unlike the earlier case, here the government (now Congress) refused to fund even "medically necessary" abortions (except for those necessary to save the mother's life). Still, the analysis is much the same. Although the effect of the offer—some women foregoing abortion—is more problematic in this case than in *Maher*, this consequence does not infringe the Constitution, unless poor people generally have a constitutional right that the government ensure that their medical needs are met. And if a purpose of discouraging abortion was permissible in *Maher*, it is permissible here too.[462] Finally, withholding the benefit of public funds for medically necessary abortions is no more likely to constitute a penalty than is withholding public funds for other abortions. If *McRae* is distinguishable from *Maher*, then, it will be for the reasons supporting the fundamental rights strand of equal protection review: Although (*ex hypothesi*) the state is not constitutionally obligated to ensure access to necessary medical care, once it does provide this important benefit, it should not be permitted to discriminate in its provision without particularly weighty reasons.[463] When discrimination in the furnishing of particularly important goods or services should demand heightened justification, and whether such justification, if demanded, could be satisfied in this context, are important questions but not ones on which conceptual analysis can shed much light.

*Webster v. Reproductive Health Services*[464] involved challenges to various provisions of a Missouri statute that comprehensively regulated abortion. One provision prohibited public employees from performing or assisting abortions within the scope of their employment and also prohibited the use of public facilities—including any "physical asset owned, leased, or controlled" by the state or any of its subdivisions[465]—for abortions. The Court rejected the challenge, reasoning that

---

462. Ironically, if a purpose of discouraging abortion is deemed impermissible as a matter of constitutional law, then *McRae* actually stands on slightly stronger ground factually than does *Maher* because it is marginally more plausible in *McRae* than in *Maher* to find that the government's purpose was *not* to discourage abortion. The refusal to fund abortions will reduce their incidence in proportion to the price elasticity of demand for abortions, and legislators could expect demand to be more price inelastic for medically necessary abortions than for others.

463. This was Justice Stevens's focus in his *McRae* dissent. 448 U.S. at 349–57 (Stevens, J., dissenting); *see also id.* at 330 n.4 (Brennan, J., dissenting).

464. 492 U.S. 490 (1989).

465. *Id.* at 523 (O'Connor, J., concurring) (quoting Mo. REV. STAT. § 188.200(2) (1986)).

110          THE GEORGETOWN LAW JOURNAL          [Vol. 90:1

> [j]ust as Congress' refusal to fund abortions in *McRae* left "an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all," Missouri's refusal to allow public employees to perform abortions in public hospitals leaves a pregnant woman with the same choices as if the State had chosen not to operate any public hospitals at all.[466]

The comparison is extremely dubious. In effect, Missouri was offering medical service providers access to state property, including leases on state-owned land, on the condition that they not perform abortions on that property. For many offerees this would be an offer too good to pass up—especially for those who were already using state property and for whom a move would therefore be economically prohibitive.[467] As a result, pregnant women would find significantly fewer places to obtain an abortion than "if the State had chosen not to operate any public hospitals at all." In short, the offer at issue in *Webster* is much more likely than that in either *Maher* or *McRae* to impose an undue burden on a pregnant woman's ability to exercise her right to an abortion and is, therefore, more likely to be unconstitutional on the dimension of effect.[468]

CONCLUSION

If the analysis of this Article is on target, the unconstitutional conditions problem turns out to be much like the elephant from the parable of the blind men. Almost all theorizing about it has captured something of importance, while none has been more than partial.

Indeed, the very term, "the unconstitutional conditions doctrine," may have led one to predict that this would be so. For its meaning, I have said, is rather modest. In mediating between two competing totalizing claims—that the greater

---

466. *Webster*, 492 U.S. at 509 (quoting *McRae*, 448 U.S. at 317).

467. *See id.* at 541 n.1 (Blackmun, J., dissenting).

468. The same is true of the "abortion gag rule" upheld in *Rust v. Sullivan*, 500 U.S. 173 (1991), that barred family planning clinics that received federal funds from providing abortion counseling or referrals. Extending the comparison it had earlier made between *McRae* and *Webster*, the *Rust* Court declared that, in just the same way, "Congress' refusal to fund abortion counseling and advocacy leaves a pregnant woman with the same choices as if the Government had chosen not to fund family-planning services at all." *Id.* at 202. This is not credible. Surely government funding of family-planning services enlarges the total family-planning pie, making viable services that would not exist without the funding. But it is folly to pretend that such funding does not also seduce some family-planning programs that would exist, and offer abortion-related services, in the absence of federal funds, into changing their policies. In short, the government's offer of funds to those actual or would-be family-planning clinics that agree to abide by its abortion-referral restrictions has the effect of reducing women's ability to obtain information necessary to secure a timely abortion. Whether the effect is of sufficient magnitude to raise a constitutional problem under the undue burden standard is a further question, containing both empirical and evaluative components. To deny, however, that it has any such effect disserves candor in constitutional analysis.

includes the lesser, and that the Constitution prohibits the government from accomplishing indirectly what it may not do directly—the doctrine holds only that each position is partially correct.[469] It is not the case (says the doctrine) that the government's constitutional freedom to withhold a benefit necessarily entails that it is constitutionally entitled to withhold it on condition.

Moving next from this general, and concededly rather thin, statement of the unconstitutional conditions doctrine, the challenge has been to identify principles, rules, tests, or methods by which we can determine when the greater includes the lesser and when it does not. Again, two basic positions have contended for primacy. Very roughly, the first camp has hunted for a "unitary" solution, whereas the second has eschewed general principles in favor of close analysis tailored to individual constitutional provisions. And again, both viewpoints have contained necessary truths. I have argued that there does exist a coherent, unified approach for analyzing conditional governmental offers, but one whose operation is made expressly contingent upon the judiciary's substantive interpretations of specific constitutional provisions.

That is, to be sure, putting things rather abstractly. What (we finally want to know) does this general solution—contingent though it may be on particular constitutional doctrine—look like? The inelegant answer is that it has three dimensions and centers on coercion. All government action, I have argued, is sensibly assessed across three dimensions of possible constitutional infringement—the familiar categories of purposes and effects, along with a third somewhat nebulous category I term conduct. As a first step, then, a given conditional offer—like any type of government action—may be unconstitutional because of the state's purposes for extending the offer, or the offer's consequences, or the combination of the two.

This is true, but hardly arresting. If conditional offers raised no issues different from these, the unconstitutional conditions problem would be uninteresting indeed. The third dimension of conduct, however, reveals something more particular to the unconstitutional conditions problem. Coercion, I have argued, constitutes one type of unconstitutional conduct. And it is the type of unconstitutionality that can be an attribute only of conditional offers (or of their functional equivalents). Therefore, a conditional proposal is (at least presumptively) unconstitutional if it violates some particular constitutional principle or provision by reason of its purpose or its effects, or if it constitutes coercion. A proposal constitutes coercion, furthermore, if it contains a threat to perform an unconstitutional act.

So what happened to the parable of the elephant? In the existing literature, coercion-based theories of unconstitutional conditions compete with others. Its

---

469. Naturally, if understood in this fashion, the doctrine reflects not only "the triumph of the view that government may not do indirectly what it may not do directly over the view that the greater power to deny a benefit includes the lesser power to impose conditions on its receipt," Sullivan, *supra* note 1, at 1415, but also the converse triumph equally well.

principal (though not exclusive) competitors, it seems to me, may be found under the loose rubrics of purpose-based theories and germaneness-based theories. Do these latter types of theories have something to contribute to our understanding of unconstitutional conditions? Once again, yes. Coercion, I believe, functions as the linchpin of the unconstitutional conditions "solution." But it turns out to be a mistake to view purpose-based theories and germaneness-based theories as alternatives to an approach sounding in coercion. Rather, inquiries into governmental purposes and germaneness are, along with inquiries into effects, critical components of the coercion test.

I have just said that an offer constitutes coercion if it contains a threat to perform an unconstitutional act. Threats to imprison people for advocating communism, or to impose higher taxes on those who worship Baal, are therefore coercive. And yet such conditional proposals are rarely imagined as raising the unconstitutional conditions problem. As a matter of doctrine, that is because the problem is often restricted to cases in which the government threatens to withhold a benefit, whereas not being imprisoned and being subject to the ordinary tax code are not generally conceived of as benefits. But they could be. As a functional matter, then, limiting the unconstitutional conditions problem to cases involving threats to withhold benefits is really just a way of cabining it to those situations in which the unconstitutionality of the act government threatens is not patent.

So focus, as contributors to the debate tend to do, on situations in which the government threatens to perform an act that appears, on first or second glance, to be constitutional. Within this region of unconstitutional conditions space the act threatened is most likely to be unconstitutional, I venture, if it penalizes the exercise of a constitutional right. And an act penalizes a constitutional right, I have claimed, if it imposes a burden on exercise of that right for the purpose either of punishing the rightholder or of discouraging exercise of the right. The state's purpose for carrying out the act threatened is therefore an essential constituent of there being a penalty, which is, in turn, often a critical factor for there being coercion.

And how can we determine whether, in carrying out its threat, the government would be animated by either of these bad purposes? Here, finally, is where germaneness comes in. When the putative purpose for withholding the benefit unconditionally is not the same as the purpose for issuing the demand, then the state's withholding of the benefit upon failure of condition is likely to be a penalty. This is an inference, not a deduction. Germaneness, then, is not an alternative to coercion analysis, but rather a heuristic in service of the coercion inquiry.

There is, in short, a logic behind the unconstitutional conditions doctrine—a logic toward which much previous theorizing about unconstitutional conditions had been pointing. It is, perhaps, complex. But it is real. Careful attention to this logic can help lead us out of the morass.

<u>AMICUS APPENDIX 9</u>: *Brown v. Kendall*, 60 Mass. 292 (1850)

Brown v. Kendall, 60 Mass. 292 (1850)

6 Cush. 292

KeyCite Yellow Flag - Negative Treatment

Distinguished by Aiken v. Shell Oil Co., Or., December 30, 1959

60 Mass. 292
Supreme Judicial Court of Massachusetts.

GEORGE BROWN
v.
GEORGE K. KENDALL.

October Term, 1850.

**1 *292 The defendant, having interfered to part his dog and the plaintiff's, which were fighting, in raising his stick for that purpose, accidentally struck the plaintiff and injured him. In an action of trespass for the assault and battery, it was held, that the parting of the dogs was a lawful and proper act, which the defendant might do by the use of proper and safe means; and that if in so doing, and while using due care, and taking all proper precautions, necessary to the exigency of the case, to avoid hurt to others, the injury to the plaintiff occurred, the defendant was not liable therefor; and that the burden of proof was on the plaintiff to establish the want of due care on the part of the defendant. It was held, also, that if, at the time of the injury, both the plaintiff and defendant were not using ordinary care, the plaintiff could not recover, without showing that the damage was caused wholly by the act of the defendant, and that the plaintiff's own negligence did not contribute as an efficient cause to produce it.

THIS was an action of trespass for assault and battery, originally commenced against George K. Kendall, the defendant, who died pending the suit, and his executrix was summoned in.

It appeared in evidence, on the trial, which was before *Wells,* C. J., in the court of common pleas, that two dogs, belonging to the plaintiff and the defendant, respectively, were fighting in the presence of their masters; that the defendant took a stick about four feet long, and commenced beating the dogs in order to separate them; that the plaintiff was looking on, at the distance of about a rod, and that he advanced a step or two towards the dogs. In their struggle, the dogs approached the place where the plaintiff was standing. The defendant retreated backwards from before the dogs, striking them as he retreated; and as he approached the plaintiff, with *293 his back towards him, in raising his stick over his shoulder, in order to

strike the dogs, he accidentally hit the plaintiff in the eye, inflicting upon him a severe injury.

Whether it was necessary or proper for the defendant to interfere in the fight between the dogs; whether the interference, if called for, was in a proper manner, and what degree of care was exercised by each party on the occasion; were the subject of controversy between the parties, upon all the evidence in the case, of which the foregoing is an outline.

The defendant requested the judge to instruct the jury, that "if both the plaintiff and defendant at the time of the blow were using ordinary care, or if at that time the defendant was using ordinary care and the plaintiff was not, or if at that time both plaintiff and defendant were not using ordinary care, then the plaintiff could not recover."

The defendant further requested the judge to instruct the jury, that, "under the circumstances, if the plaintiff was using ordinary care and the defendant was not, the plaintiff could not recover, and that the burden of proof on all these propositions was on the plaintiff."

**2 The judge declined to give the instructions, as above requested, but left the case to the jury under the following instructions: "If the defendant, in beating the dogs, was doing a necessary act, or one which it was his duty under the circumstances of the case to do, and was doing it in a proper way; then he was not responsible in this action, provided he was using ordinary care at the time of the blow. If it was not a necessary act; if he was not in duty bound to attempt to part the dogs, but might with propriety interfere or not as he chose; the defendant was responsible for the consequences of the blow, unless it appeared that he was in the exercise of extraordinary care, so that the accident was inevitable, using the word inevitable not in a strict but a popular sense."

"If, however, the plaintiff, when he met with the injury, was not in the exercise of ordinary care, he cannot recover, and this rule applies, whether the interference of the defendant in the fight of the dogs was necessary or not. If the jury believe, that it was the duty of the defendant to interfere, then the *294 burden of proving negligence on the part of the defendant, and ordinary care on the part of the plaintiff, is on the plaintiff. If the jury believe, that the act of interference in the fight was unnecessary, then the burden of proving extraordinary care on the part of the defendant, or want of ordinary care on the part of the plaintiff, is on defendant."

The jury under these instructions returned a verdict for the plaintiff; whereupon the defendant alleged exceptions.

Brown v. Kendall, 60 Mass. 292 (1850)

6 Cush. 292

West Headnotes (1)

**[1]** **Abatement and Revival**◆—Actions for Personal Injuries

By express provision of Rev.St. c. 93, § 7, an action of trespass for assault and battery survives.

4 Cases that cite this headnote

**Attorneys and Law Firms**

This case was argued at the sittings in Boston, in January last, by *J. G. Abbott,* for the defendant, and by *B. F. Butler* and *A. W. Farr,* for the plaintiff.

**Opinion**

SHAW, C. J.

**\*\*3** This is an action of trespass, *vi et armis,* brought by George Brown against George K. Kendall, for an assault and battery; and the original defendant having died pending the action, his executrix has been summoned in. The rule of the common law, by which this action would abate by the death of either party, is reversed in this commonwealth by statute, which provides that actions of trespass for assault and battery shall survive. Rev. Sts. *c.* 93, § 7.

The facts set forth in the bill of exceptions preclude the supposition, that the blow, inflicted by the hand of the defendant upon the person of the plaintiff, was intentional. The whole case proceeds on the assumption, that the damage sustained by the plaintiff, from the stick held by the defendant, was inadvertent and unintentional; and the case involves the question how far, and under what qualifications, the party by whose unconscious act the damage was done is responsible for it. We use the term "unintentional" rather than involuntary, because in some of the cases, it is stated, that the act of holding and using a weapon or instrument, the movement of which is the immediate cause of hurt to another, is a voluntary act, although its particular effect in hitting and hurting another is not within the purpose or intention of the party doing the act.

It appears to us, that some of the confusion in the cases on this subject has grown out of the long-vexed question, under the rule of the common law, whether a party's remedy, where he has one, should be sought in an action of the case, or of **\*295** trespass. This is very distinguishable from the question, whether in a given case, any action will lie. The result of these cases is, that if the damage complained of is the immediate effect of the act of the defendant, trespass *vi et armis* lies; if consequential only, and not immediate, case is the proper remedy. *Leame v. Bray,* 3 East, 593; *Hugget v. Montgomery,* 2 N. R. 446, Day's Ed. and notes.

In these discussions, it is frequently stated by judges, that when one receives injury from the direct act of another, trespass will lie. But we think this is said in reference to the question, whether trespass and not case will lie, assuming that the facts are such, that some action will lie. These *dicta* are no authority, we think, for holding, that damage received by a direct act of force from another will be sufficient to maintain an action of trespass, whether the act was lawful or unlawful, and neither wilful, intentional, or careless. In the principal case cited, *Leame v. Bray,* the damage arose from the act of the defendant, in driving on the wrong side of the road, in a dark night, which was clearly negligent if not unlawful. In the course of the argument of that case, (p. 595,) Lawrence, J., said: "There certainly are cases in the books, where, the injury being direct and immediate, trespass has been holden to lie, though the injury was not intentional." The term "injury" implies something more than damage; but, independently of that consideration, the proposition may be true, because though the injury was unintentional, the act may have been unlawful or negligent, and the cases cited by him are perfectly consistent with that supposition. So the same learned judge in the same case says, (p. 597,) "No doubt trespass lies against one who drives a carriage against another, whether done wilfully or not." But he immediately adds, "Suppose one who is driving a carriage is negligently and heedlessly looking about him, without attending to the road when persons are passing, and thereby runs over a child and kills him, is it not manslaughter? and if so, it must be trespass; for every manslaughter includes trespass;" showing what he understood by a case not wilful.

**\*\*4** We think, as the result of all the authorities, the rule is correctly stated by Mr. Greenleaf, that the plaintiff must come **\*296** prepared with evidence to show either that the *intention* was unlawful, or that the defendant was *in fault;* for if the injury was unavoidable, and the conduct of the

Brown v. Kendall, 60 Mass. 292 (1850)

6 Cush. 292

defendant was free from blame, he will not be liable. 2 Greenl. Ev. §§ 85 to 92; *Wakeman v. Robinson,* 1 Bing. 213. If, in the prosecution of a lawful act, a casualty purely accidental arises, no action can be supported for an injury arising therefrom. *Davis v. Saunders,* 2 Chit. R. 639; Com. Dig. Battery, A. (Day's Ed.) and notes; *Vincent v. Stinehour,* 7 Verm. 69. In applying these rules to the present case, we can perceive no reason why the instructions asked for by the defendant ought not to have been given; to this effect, that if both plaintiff and defendant at the time of the blow were using ordinary care, or if at that time the defendant was using ordinary care, and the plaintiff was not, or if at that time, both the plaintiff and defendant were not using ordinary care, then the plaintiff could not recover.

In using this term, ordinary care, it may be proper to state, that what constitutes ordinary care will vary with the circumstances of cases. In general, it means that kind and degree of care, which prudent and cautious men would use, such as is required by the exigency of the case, and such as is necessary to guard against probable danger. A man, who should have occasion to discharge a gun, on an open and extensive marsh, or in a forest, would be required to use less circumspection and care, than if he were to do the same thing in an inhabited town, village, or city. To make an accident, or casualty, or as the law sometimes states it, inevitable accident, it must be such an accident as the defendant could not have avoided by the use of the kind and degree of care necessary to the exigency, and in the circumstances in which he was placed.

We are not aware of any circumstances in this case, requiring a distinction between acts which it was lawful and proper to do, and acts of legal duty. There are cases, undoubtedly, in which officers are bound to act under process, for the legality of which they are not responsible, and perhaps some others in which this distinction would be important. We can have no doubt that the act of the defendant in attempting to part the *297 fighting dogs, one of which was his own, and for the injurious acts of which he might be responsible, was a lawful and proper act, which he might do by proper and safe means. If, then, in doing this act, using due care and all proper precautions necessary to the exigency of the case, to avoid hurt to others, in raising his stick for that purpose, he accidentally hit the plaintiff in his eye, and wounded him, this was the result of pure accident, or was involuntary and unavoidable, and therefore the action would not lie. Or if the defendant was chargeable with some negligence, and if the plaintiff was also chargeable with negligence, we think the plaintiff cannot recover without showing that the damage was caused wholly by the act of the defendant, and that the plaintiff's own negligence did not contribute as an efficient cause to produce it.

**5 The court instructed the jury, that if it was not a necessary act, and the defendant was not in duty bound to part the dogs, but might with propriety interfere or not as he chose, the defendant was responsible for the consequences of the blow, unless it appeared that he was in the exercise of extraordinary care, so that the accident was inevitable, using the word not in a strict but a popular sense. This is to be taken in connection with the charge afterwards given, that if the jury believed, that the act of interference in the fight was unnecessary, (that is, as before explained, not a duty incumbent on the defendant,) then the burden of proving extraordinary care on the part of the defendant, or want of ordinary care on the part of plaintiff, was on the defendant.

The court are of opinion, that these directions were not conformable to law. If the act of hitting the plaintiff was unintentional, on the part of the defendant, and done in the doing of a lawful act, then the defendant was not liable, unless it was done in the want of exercise of due care adapted to the exigency of the case, and therefore such want of due care became part of the plaintiff's case, and the burden of proof was on the plaintiff to establish it. 2 Greenl. Ev. § 85; *Powers v. Russell,* 13 Pick. 69, 76; *Tourtellot v. Rosebrook,* 11 Met. 460.

Perhaps the learned judge, by the use of the term extraordinary care, in the above charge, explained as it is by the context, *298 may have intended nothing more than that increased degree of care and diligence, which the exigency of particular circumstances might require, and which men of ordinary care and prudence would use under like circumstances, to guard against danger. If such was the meaning of this part of the charge, then it does not differ from our views, as above explained. But we are of opinion, that the other part of the charge, that the burden of proof was on the defendant, was incorrect. Those facts which are essential to enable the plaintiff to recover, he takes the burden of proving. The evidence may be offered by the plaintiff or by the defendant; the question of due care, or want of care, may be essentially connected with the main facts, and arise from the same proof; but the effect of the rule, as to the burden of proof, is this, that when the proof is all in, and before the jury, from whatever side it comes, and whether directly proved, or inferred from circumstances, if it appears that the defendant was doing a lawful act, and unintentionally hit and hurt the plaintiff, then unless it also appears to the satisfaction of the jury, that the defendant is chargeable with some fault, negligence, carelessness, or want of prudence, the plaintiff fails to sustain the burden of proof, and is not entitled to recover.

*New trial ordered.*

Appendix 9

**Brown v. Kendall, 60 Mass. 292 (1850)**

6 Cush. 292

60 Mass. 292, 1850 WL 4572, 6 Cush. 292

**All Citations**

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

<u>AMICUS APPENDIX 10</u>: Dobbs, Dan B., THE LAW OF TORTS (2000)



# THE LAW OF TORTS

Dan B. Dobbs

*Hornbook Series*®

WEST
GROUP

Appendix 10

Appendix 10

*Hornbook Series*, *WESTLAW*, and the West Group symbol
are registered trademarks used herein under license.

COPYRIGHT © 2000 By WEST GROUP
                    610 Opperman Drive
                    P.O. Box 64526
                    St. Paul, MN 55164–0526
                    1–800–328–9352

All rights reserved
Printed in the United States of America
ISBN 0–314–21187–X



TEXT IS PRINTED ON 10% POST
CONSUMER RECYCLED PAPER



Appendix 10

distinction is meaningless or confusing. In any event, it has been subsumed by the intent rules: if the defendant acts on an intention to inflict a harmful or offensive bodily contact, and he succeeds, he is liable for the battery whether the harm is direct or not.

*Damages.* Once a battery is established, the defendant becomes liable for the harms resulting, including unintended ones. He may intend only an offensive touching, but he is liable for any actual harm that results. Recovery is permitted for trespassory torts without proof of pecuniary loss or actual physical harm.[13] The defendant is of course liable for physical harms resulting from the battery, but he is also liable for impermissible touchings that are not physically harmful.

*Policy.* The law of battery, an outgrowth of the old trespass writ, was originally conceived solely in terms of force and violence.[14] Like much other early law, it served to substitute a legal recovery for revenge and to discourage actual violence. Tort law today of course shares those goals; but as the rules show, it adopts more subtle ones as well. Battery today vindicates the plaintiff's rights of autonomy and self-determination, her right to decide for herself how her body will be treated by others, and to exclude their invasions as a matter of personal preference, whether physical harm is done or not.[15]

## § 29.  Harm or Offense Required to Establish Simple Battery

*The central core.* The central core of the battery rules is simple. Subject only to the most limited exception,[1] the defendant must respect the plaintiff's apparent wishes to avoid intentional bodily contact. Hostile, aggressive, or harmful touchings are batteries because the plaintiff wishes to avoid them. But the plaintiff's right to avoid unwanted intentional contact does not depend upon the defendant's hostile intent or even upon the reasonableness of the plaintiff's wishes. A person is entitled to refuse well-intentioned medical treatment[2] as well as the bumptious grapplings of an unwelcome swain.[3] In a world full of uncon-

---

13.  § 42 below.

14.  Cole v. Turner, 6 Mod.Rep. 149, 90 Eng.Rep. 958 (Nisi Prius 1704) ("the least touching of another in anger is a battery.... If any of them use violence against the other ... it is a battery").

15.  In the Interest of Baby Boy Doe, 260 Ill.App.3d 392, 198 Ill.Dec. 267, 632 N.E.2d 326 (Ill.App. 1994) (right to refuse medical treatment includes right to refuse cesarian operation that might improve chances of fetus or child); James Henderson, Why Vosburg Comes First, 1992 Wis. L. Rev. 853, 859.

§ 29

1.  See the paragraph below, *The case of social usage or conflicting rights.* In addi-

tion, there are of course affirmative defenses or privileges, such as self-defense.

2.  Rodriguez v. Pino, 634 So.2d 681 (Fla.App.1994); Gragg v. Calandra, 297 Ill. App.3d 639, 231 Ill.Dec. 711, 696 N.E.2d 1282 (1998); cf. Anderson v. St. Francis–St. George Hospital, 83 Ohio App.3d 221, 614 N.E.2d 841 (1992) (if life-saving treatment was given against the plaintiff's will, the plaintiff had a battery claim), rev'd on other grounds, 77 Ohio St.3d 82, 671 N.E.2d 225 (1996).

3.  Stockett v. Tolin, 791 F.Supp. 1536 (S.D.Fla.1992) (employer touched employee's breasts, licked her); Johnson v. Ramsey County, 424 N.W.2d 800 (Minn.Ct.App. 1988) (kissing battery); cf. R. v. Burden, 1 W.W.R. 193 (B.C. C.A.) [1982] (defendant

Appendix 10

trollable events, all persons are at least entitled to prohibit unwanted intentional touchings of any kind.

*Formulating a rule: the Restatement's "harmful or offensive" test.* How is this central policy to be formulated in a rule? The Restatement attempts to convey the policy by saying that the defendant is subject to liability for causing bodily contact that is either (a) harmful or (b) "offensive." The Restatement does not use "offense" in the sense that a person might be huffy or irritable. Rather, an offensive touching is one that infringes a reasonable sense of personal dignity.[4] More broadly put, a touching is "offensive" if it infringes upon the plaintiff's actual and apparent wishes to avoid it. Although liability may be imposed for harmful attacks, liability does not depend upon harm[5] or even upon emotional distress[6] to the plaintiff; it depends upon violating the plaintiff's right to herself.

*"Offense": plaintiff's apparent consent as the central issue.* The Restatement formula has the advantage of singling out some specific forms of battery—those that are "harmful" and those that are "offensive." But the terms may be distracting. The gist of the battery is that the plaintiff has been touched, intentionally, in a way that she has not even apparently consented to and that is not justified by some generally recognized privilege.[7] The defendant's intent to touch in a way the plaintiff has not apparently permitted is what counts: it is what makes the touching "offensive."[8] At least this is true when the plaintiff is competent to give or withhold consent.

The same idea may apply when the defendant has consent to touch but goes beyond the consent in some particular way. For instance, the surgeon who has consent to remove one organ does not necessarily have consent, even implicit consent, to remove another.[9]

sat next to plaintiff on virtually empty bus and put his hand on her thigh; this is a criminal battery).

**4.** The Restatement uses the term "personal dignity," which is again accurate but must not be understood to mean reserved bearing or social distance. It means only the right of every person to determine how her or his body is to be touched, subject perhaps to some social conventions that permit the more or less unavoidable touchings in a crowd or the like.

**5.** E.g., Whitley v. Andersen, 37 Colo. App. 486, 551 P.2d 1083 (1976), aff'd, 194 Colo. 87, 570 P.2d 525 (1977).

**6.** This is congruent with the rule for certain kinds of sexual harassment claims under some federal statutes: an abusive or hostile environment is required, but not emotional distress. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

**7.** Privileges, as affirmative defenses, are discussed in Chapter 5.

**8.** The whole course of decisions bears this out. Courts sometimes expressly recognize the point as well. See Cohen v. Smith, 269 Ill.App.3d 1087, 207 Ill.Dec. 873, 648 N.E.2d 329 (1995) ("Liability for battery emphasizes the plaintiff's lack of consent to the touching").

**9.** Mohr v. Williams, 95 Minn. 261, 104 N.W. 12 (1905) (consent to operate on right ear, actual operation on left ear, held a battery, but benefits of the operation are to be considered in fixing damages); Bommareddy v. Superior Court (Williams), 222 Cal. App.3d 1017, 272 Cal.Rptr. 246 (1990), overruled on other grounds, Central Pathology Service Med. Clinic, Inc. v. Superior Court (Hull), 3 Cal.4th 181, 832 P.2d 924, 10 Cal.Rptr.2d 208 (1992) (statute limiting punitive damages claims in medical negligence cases applied to intentional torts); see Cobbs v. Grant, 8 Cal.3d 229, 239, 502 P.2d 1, 7, 104 Cal.Rptr. 505, 511 (1972) ("Where a doctor obtains consent of the patient to perform one type of treatment and subse-

56          INTENTIONAL INTERFERENCE WITH PERSONS          Ch. 3

What counts as an apparent consent is an important topic considered later. The central point to note here is that the plaintiff's apparent consent shows that the defendant is not intending to touch in an offensive way and that no right of the plaintiff has been invaded by permitted touchings, even if it turns out to be unintentionally harmful.[10] In such a case the defendant may be responsible for negligence if he has unreasonably risked harm, but he is not liable for the intended touching to which the plaintiff apparently consented. Conversely, if it is apparent that the plaintiff is not consenting to the defendant's touching, it becomes clear that the touching is intended to be offensive at least under the substantial certainty definition of intent.

*The case of social usage and conflicting rights.* In one narrow kind of case a defendant may escape liability for an intentional touching even when he knows that the plaintiff wishes to avoid it. A plaintiff who rides the subway may implicitly consent to a certain amount of intentional jostling as other riders leave the car, and if so, the touching would not transgress the plaintiff's rights; in the Restatement's words, it would not be offensive. Suppose, however, the subway rider makes it plain to all passengers that she must not be touched by others as they attempt to exit the crowded car. Would other riders be liable for a battery if they must push through the throng to reach the exit? Presumably not. Not only are such jostlings socially accepted, they are necessary to protect the rights of others who must also live in an unpleasantly crowded world. The plaintiff's right to avoid bodily contact is important, but so is the defendant's right to take the subway and get to work. The plaintiff cannot preempt the subway space for herself alone.[11]

*The Restatement's "reasonable sense of personal dignity."* The problem of conflicting rights is a small one in the actual cases, but the Restatement gives an answer to it that may be too large. It formulates the solution by saying that the touching must be one that would offend a reasonable sense of personal dignity.[12] This formulation uses an objective standard, what people in general regard as an acceptable touching.[13] In doing so, it disregards the plaintiff's own wishes. Yet if adequately expressed, the plaintiff's wishes usually count for everything; she has a right to reject unprivileged touchings that others would find reasonable.

quently performs a substantially different treatment for which consent was not obtained, there is a clear case of battery"). In some circumstances, including genuine emergencies, an implied consent may be found. Cf. Kennedy v. Parrott, 243 N.C. 355, 90 S.E.2d 754 (1956). Distinguishable problems arise in the case of mistaken consent, uninformed consent, and conditioned consent.

10. Hellriegel v. Tholl, 69 Wash.2d 97, 417 P.2d 362 (1966).

11. Cf. McCracken v. O.B. Sloan, 40 N.C.App. 214, 252 S.E.2d 250 (1979) (plaintiff touched by smoke).

12. Restatement § 19 (1965). "Dignity," like "offense," may mislead inexperienced readers in the law. Dignity here has nothing to do with gravity, formality, or reserve. It is instead a reflection of self-respect or a sense of one's self.

13. Other objective formulations are sometimes used. See Zgraggen v. Wilsey, 200 A.D.2d 818, 606 N.Y.S.2d 444 (App.Div. 1994) (touching is offensive if it is "wrongful under all the circumstances").

§ 29    HARM OR OFFENSE    57

The real point seems to be, not that the plaintiff's wishes are to be evaluated by others, but that others are as entitled as she to ride subways. When the entitlement of others disappears, as where the subway car is not crowded, the plaintiff is free to insist that she not be touched even if many others would not object to an unnecessary jostle.

*Reasonable sense of dignity when the plaintiff lacks capacity to consent.* What is the relevance, if any, of the "reasonable sense of personal dignity"? First, when the plaintiff lacks capacity to consent or to withhold consent, an objective standard based on the objective reasonable sense of personal dignity may be desirable. For example, sexual touchings of a very small child who understands nothing of what is happening might be regarded as batteries even if they caused no identifiable harm, either because the touchings are unlawful in themselves or because they would offend an objective idea of a reasonable sense of personal dignity.

*Reasonable sense of dignity as evidence of what the plaintiff in fact permitted or prohibited.* In a second kind of case, the plaintiff has full capacity to consent or withhold consent and has not expressly prohibited the touching. The ultimate questions will be whether the touching was *in fact* against the plaintiff's apparent wishes as reasonably understood by the defendant. A touching that would not ordinarily offend a reasonable sense of personal dignity would presumably not be against the plaintiff's wishes, in the absence of some expression to the contrary. So a reasonable sense of personal dignity is also indirectly relevant in trying to decide whether the defendant had any notice that his touching would be unacceptable. It is a matter of evidence, not a rule of law. By the same token, the objective reasonable sense of dignity is irrelevant when the plaintiff has manifested a desire to avoid the contact and the defendant has no privilege (like the subway rider) that justifies the touching.

This analysis suggests that the uses of the "reasonable sense of personal dignity" test should have a quite narrow impact. The Restatement may have gone too far in suggesting that offensiveness or a reasonable sense of dignity are of general importance in determining battery liability.[14]

*Burden of proof.* In some instances, the plaintiff's consent or apparent consent is analyzed as an affirmative defense, to be proved by the defendant. However, in the case of battery, the plaintiff's burden is to show that the defendant intended to and did cause either harm or "offense," a burden that ordinarily requires the plaintiff to show that the defendant's touching was not apparently consented to. Consent or

---

14. The Restatement's illustrations are all in line with these comments. Illustrations 1 and 3 actually use the test affirmatively, as a basis for liability, not as a defense against it. In another illustration the defendant is not liable because he has held a child who is being sick in his cab. This illustration is in accord with the idea that the touching, being generally acceptable in society, would inferentially be acceptable to the particular plaintiff as well, in the absence of an expression to the contrary. Illustration 2 approximates the subway example; the defendant "deliberately but not discourteously pushes" the plaintiff to pass him in a "densely crowded street." This accords with a privilege analysis.

Appendix 10

apparent consent is certainly relevant, but not because it is an affirmative defense. Rather it is relevant on two issues that are a part of the plaintiff's case: (1) did the defendant intend an offensive touching? or (2) was there in fact an offensive touching?

## § 30.  Nature of Intent Required to Establish Simple Battery

*Intent to* ... Intent has been defined to include either a purpose to effect some result or a substantial certainty that the result will follow from the defendant's actions.[1] What *results* must the defendant intend to establish a simple battery?

*The Restatement formula.* The Restatement's formula is that the defendant must intend a "harmful or offensive contact." As already explained, an intent to touch in a way the defendant understands is not consented to is sufficient. So is an actual intent to harm. The question is whether the plaintiff shows intent by showing merely an intent to touch that turned out to be offensive or harmful, or whether she must show that the harm or offense was also intended. On this point the Restatement and some of the cases are ambiguous.[2]

*Ambiguity illustrated.* Suppose the defendant intends to touch the plaintiff but he intends the touching to be friendly and comforting, not either harmful or offensive. That is, he believes the touching is consented to. In this state of mind, he hugs the plaintiff, but the plaintiff is unexpectedly harmed by the hug or revolted by it. A little authority phrases the rule in a way that suggests the defendant will be liable.[3] Other courts seems to think that the defendant must intend not only a touching but also must intended it to be harmful or offensive.[4]

§ 30

1.  § 24.

2.  One court, for example, says that the plaintiff "must prove that there was bodily contact, that the contact was offensive, and that the defendant intended to make the contact." But of course the statement itself is ambiguous. It says that the plaintiff "must prove" the stated elements but it does not say that the plaintiff need prove *only* those elements. Laurie Marie M. v. Jeffrey T. M., 159 A.D.2d 52, 559 N.Y.S.2d 336 (1990) aff'd, 77 N.Y.2d 981, 575 N.E.2d 393, 571 N.Y.S.2d 907 (1991). In Masters v. Becker, 22 A.D.2d 118, 254 N.Y.S.2d 633 (1964), the court said that the plaintiff needed "only" to prove bodily contact, that the contact was offensive, and that the defendant intended to make the contact.

3.  Cf. White v. University of Idaho, 118 Idaho 400, 797 P.2d 108 (1990) (intent to "act" required but not either intent to harm or to offend). In *White*, a professor and piano enthusiast touched the plaintiff's back with his hands as if playing a piano.

The plaintiff was a social acquaintance and fellow enthusiast; neither harm nor offense was intended. An unexpected injury occurred. The victim sued the professor's employer, a state university, which might be held liable for an employee's negligence but not the employee's battery. The court held that the professor's act was a battery so that the university was not liable. In other words, the result of the court's expansive conception of battery in this particular case is not liability but non-liability.

4.  "A harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact, is a battery." Caudle v. Betts, 512 So.2d 389, 390 (La.1987). Many cases, some of them prosecutions for criminal battery, have emphasized the need for wrongful intent, sometimes overstating the intent required by saying that it must be an intent to harm. Other cases support the intent requirement by analyzing unintended harm as negligence, not battery. Cf. Spivey v. Battaglia, 258 So.2d 815 (Fla.1972) (friend-

protect.[11] Nevertheless, unlawfulness or some other objective standard of liability would sometimes fulfill important policies without imposing strict liability.[12]

## § 31. The Bodily Contact Required to Establish Simple Battery

*Material touching.* The size of the object that touches the plaintiff does not matter. The plaintiff is of course touched if she is struck by a bullet, but she is also touched if she drinks poison put in her cup by the defendant.[1] On the other hand, odors, smokes, or gases have been traditionally treated as intangibles, even though they do have a physical presence.[2] Whether a touching by second-hand tobacco smoke would count as a battery under some circumstances is perhaps uncertain.[3] However, several decisions have found a battery resulting from smoke, with the qualification that the defendant must have a purpose to harm or offend and is not liable merely for substantial certainty touchings.[4]

*Extended personality.* The plaintiff is also touched if the defendant touches some intimate extension of the plaintiff's person,[5] as when the

**11.** In *Vosburg* the parties were minors, and possibly the plaintiff-victim was in no position to give either an understanding consent or a legally binding one. In such a case, imposition of liability upon the defendant does not imply any loss of the plaintiff's power to decide for himself, since the plaintiff lacks that power anyway.

**12.** Sexual touchings of a small child who lacks capacity to consent and power to prohibit might be an example of an unlawful touching for which liability should be imposed even if the child was also too young to experience a sense of offense and is not harmed, and even if neither harm nor offense were intended. Given the character of such an act as one always considered wrongful, liability would not be "strict" even though the defendant lacked intent to harm or offend.

**§ 31**

**1.** Snouffer v. Snouffer, 87 Ohio App.3d 89, 621 N.E.2d 879 (1993) (administering poison is a battery).

**2.** This distinction is one of the factual bases for the traditional legal difference between trespass to land (physical, tangible entry) and nuisance (intangible invasions affecting enjoyment but not possession).

**3.** See McCracken v. O.B. Sloan, 40 N.C.App. 214, 252 S.E.2d 250 (1979) (upholding smokers' rights and refusing to find battery); see Renee Vintzel Loridas, Annotation, Secondary Smoke as Battery, 46 A.L.R.5th 813 (1997).

**4.** Richardson v. Hennly, 209 Ga.App. 868, 434 S.E.2d 772 (1993) (claim that defendant deliberately directed pipe smoke at plaintiff knowing it would cause her actual harm; pipe smoke is visible and capable of "touching" the plaintiff), rev'd on other grounds, 264 Ga. 355, 444 S.E.2d 317 (1994); Leichtman v. WLW Jacor Communications, Inc., 92 Ohio App.3d 232, 634 N.E.2d 697 (1994) (allegations that defendant repeatedly blew cigar smoke in the plaintiff's face for the very purpose of causing physical discomfort and distress). Cf. Pechan v. DynaPro, Inc., 251 Ill.App.3d 1072, 190 Ill.Dec. 698, 622 N.E.2d 108 (1993) (employer not liable for battery merely because it authorized employees to smoke in plaintiff's presence; it would be liable only if smokers themselves had a purpose to touch; substantial certainty of a touching would not suffice, semble). See, David Ezra, Smoker Battery: An Antidote to Second–Hand Smoke, 63 So.Cal.L.Rev. 1061 (1990) (canvassing theories for claims against smokers). Exposure to second-hand smoke on the job might conceivably be covered by workers' compensation if harm is caused or possibly even by anti-discrimination statutes. See Hinman v. Yakima Sch. Dist. No. 7, 69 Wash.App. 445, 850 P.2d 536 (1993) (state job-discrimination statute).

**5.** Espinoza v. Thomas, 189 Mich.App. 110, 472 N.W.2d 16 (1991) (group of strikers blocking, rocking, and beating on the car plaintiff was driving is a battery); Picard v. Barry Pontiac–Buick, Inc., 654 A.2d 690 (R.I.1995).

defendant jerks a plate from the plaintiff's hand, even if the hand itself is not touched.[6]

*Causing a touching by other objects or by other persons.* Touching is not limited to physical contact between the defendant's body and the plaintiff's. The defendant who wears gloves to slap the plaintiff is no less guilty of a battery than one who strikes the plaintiff bare-handed. More than that, the plaintiff is touched and a battery committed if the defendant intentionally pulls the chair from under the plaintiff as she sits, with the result that she falls to the ground.[7] Finally, the defendant may be responsible for a battery if he directly causes other persons to effectuate or complete the harmful or offensive bodily contact with the plaintiff.[8]

## § 32.  Battery and Other Torts: Acts and Omissions

*Acts distinguished from intent and from involuntary motion.* The Restatement structures analysis of battery and other trespassory torts by requiring an "act" of the defendant.[1] An act in the Restatement's terminology is an external manifestation of will, a voluntary contraction of muscles, nothing more.[2] Involuntary muscle spasms, convulsions, bodily movements during sleep are thus not acts. On the other hand, an instantaneous response to emergency, as where the defendant grabs the plaintiff to avoid falling, constitutes an act.[3] The term "act" has no moral content. The defendant "acts" when he strikes another even if he is prompted by insane impulses.[4]

*Act distinguished from inaction.* The term "act" is also used to emphasize a distinction between affirmative deeds on the one hand and omissions or passive behavior on the other. Battery normally results from the defendant's affirmative acts or deeds: the defendant strikes the plaintiff or spits on him or poisons his drink. Can a defendant be liable for a battery when the defendant does nothing to stop another's bodily contact with the plaintiff? Analogies from negligence law suggest that the defendant who has no special relationship with the plaintiff or her

---

**6.** Fisher v. Carrousel Motor Hotel, Inc., 424 S.W.2d 627 (Tex.1967) (plate jerked from the plaintiff's hand is a battery).

**7.** Garratt v. Dailey, 46 Wash.2d 197, 279 P.2d 1091 (1955).

**8.** Richardson v. Hennly, 209 Ga.App. 868, 434 S.E.2d 772 (1993) (it is enough that defendant sets a force in motion that touches the plaintiff, quoting PROSSER & KEETON ON TORTS § 9), rev'd on other grounds, 264 Ga. 355, 444 S.E.2d 317 (1994); Wilder v. Gardner, 39 Ga.App. 608, 147 S.E. 911 (Ga.App.1929) ("One who by advice, counsel, or command procures another to commit a wrong" is equally liable); Mock v. Polley, 116 Ind.App. 580, 66 N.E.2d 78 (1946) (one aiding and abetting or encour-

aging battery is "equally guilty" and liable in tort); Leichtman v. WLW Jacor Communications, Inc., 92 Ohio App.3d 232, 236, 634 N.E.2d 697, 699 (1994) ("one who is present and encourages or incites commission of a battery ... can be equally liable as a principal").

### § 32

**1.** E.g., Restatement § 13 (liability for harmful battery requires act, intention, and harmful contact).

**2.** Restatement § 2.

**3.** Restatement § 2, Cmt. b.

**4.** Polmatier v. Russ, 206 Conn. 229, 537 A.2d 468 (1988).

patient's autonomy interests, but if the patient is indeed incompetent, those interests have scant scope in any event and a truly neutral test that does not assume one choice to be better than another is perhaps impossible to find. These difficult cases, perhaps as much as any others, reflect something of the limits of law's ability to resolve real problems in morally acceptable ways.

## § 100.   Mistake Negating Consent

*Consent negated by mistake or misrepresentation.* The plaintiff's purported consent is ineffective to bar her claim if it is induced by misrepresentation[1] or is given under a material mistake of which the defendant is or should be aware.[2] The mistake is frequently though not always induced by the defendant's fraud or misrepresentation. Many cases decided in many settings summarize the point by saying that "fraud vitiates consent"[3] or that consent is ineffective if given as a result of fraud,[4] meaning that the plaintiff in such a case can recover.

*Relation to the manifested consent rule.* These rules are often instances of the more general principle that effectiveness of a consent is determined by appearances presented to the defendant.[5] The defendant who misrepresents the nature of the transaction, or who knows that the plaintiff is mistaken about it, knows that the plaintiff is not consenting to the defendant's acts. For instance, suppose the defendant offers the plaintiff a cup of coffee he knows to be contaminated with a poison or a deadly virus. The plaintiff takes the cup with no reason to know it is contaminated. The plaintiff's acceptance of the coffee manifests consent to take the cup and to drink coffee, but not consent to drink poison. Whether this is viewed as a mistake by the plaintiff or a misrepresentation by the defendant, the important point is that the defendant cannot believe the plaintiff is consenting to the poison.

---

Georgetown College, Inc., 118 U.S.App.D.C. 80, 331 F.2d 1000, 9 A.L.R.3d 1367 (D.C. Cir. 1964).

### § 100

1. Restatement § 892B. The term fraud is often used as well as the term misrepresentation. Fraud is a form of misrepresentation that imports intentional or knowing lies.

2. Restatement §§ 49 & 892B.

3. Neal v. Neal, 125 Idaho 617, 873 P.2d 871 (1994); Slawek v. Stroh, 62 Wis.2d 295, 215 N.W.2d 9 (1974) (consent to injections on the misrepresentation that they would not cause miscarriage is no bar to battery claim). There is a strange statement in Baugh v. CBS, Inc., 828 F.Supp. 745 (N.D.Cal.1993), that fraud does *not* affect the validity of consent; no cases are cited.

4. Janelsins v. Button, 102 Md.App. 30, 648 A.2d 1039 (1994); Micari v. Mann, 126 Misc.2d 422, 481 N.Y.S.2d 967 (1984) (acting teacher represented that students' sexual acts were needed as part of their drama training). Sometimes misrepresentation counts as a separate tort and not merely a means of dissolving the shield of consent. See John Ludington, Annotation, Medical Malpractice: Liability Based on Misrepresentation of the Nature and Hazards of Treatment, 42 A.L.R.4th 543 (1985). Misrepresentation is most commonly an economic tort, not one related to battery, see Chapter 35. So it may be more felicitous to think of the misrepresentation in the present context only as a way of negating consent.

5. § 96 supra.

Appendix 10

## Types of Mistake that Will Negate Consent

*Misrepresentations and mistakes as to collateral matters*. The plaintiff's mistake, whether induced by misrepresentation or not, must be material if it is to vitiate consent. More than that, the mistake must be about the nature of the transaction to which the plaintiff purportedly consents, not merely about some collateral matter of such as the transaction's value, cash cost, or method of payment.[6]

*Collateral mistakes*. To see a collateral mistake, suppose that a professor wishes to conduct experiments to determine whether people can distinguish between different stimuli applied to their shoulders and agrees to pay the plaintiff "the university rate." The plaintiff consents to be part of the experiment in the belief the rate is $20 an hour when in fact it is only $10. The Restatement suggests that this mistake is collateral only and not a ground for ignoring the plaintiff's consent.[7] So the professor would not be liable for battery although the plaintiff might be permitted to rescind the contract.

*Mistakes about the nature or character of the transaction*. The plaintiff is mistaken about the nature or character of the transaction when she is mistaken about a major feature of the transaction. Battery claims provide good examples. The plaintiff who professes consent to a touching is mistaken about the nature of the touching if her mistake relates to facts that make the touching harmful or offensive or prevent it from being so. For instance, the plaintiff who consents to manipulation of her body in the belief that it is for medical purposes when in fact it is only for the sexual gratification of the defendant, is mistaken about the nature of the touching, not merely about some collateral matter.[8] The same is true if the plaintiff consents to physical violence by her psychiatrist in the belief that "sluggo" treatment was therapeutic.[9] A sexual seduction induced by misrepresentation such as the defendant's assertion of an intent to marry is understandable in the same way, as a battery in which fraud has vitiated the consent.[10]

Other plaintiffs who are mistaken about the nature of the transaction include those who consent to sexual relations in the mistaken belief that the defendant is free of infection or that he cannot cause pregnancy. In such cases, if the defendant knows of the plaintiff's mistake or has induced it by a misrepresentation, he becomes liable for a battery, at

6. Restatement §§ 57 & 892, cmt. g.

7. See Restatement § 892B, Ill. 9 & Restatement § 57, Ill. 1.

8. Bartell v. State, 106 Wis. 342, 82 N.W. 142 (1900) (nude massage by "magnetic healer" ostensibly for medical purposes).

9. Rains v. Superior Court (The Center Foundation), 150 Cal.App.3d 933, 198 Cal. Rptr. 249 (1984).

10. See Piggott v. Miller, 557 S.W.2d 692 (Mo.App.1977). Jane E. Larson, "Wom-

en Understand So Little, They Call My Good Nature 'Deceit' ": A Feminist Rethinking of Seduction, 93 COLUM. L. REV. 374 (1993), proposes a much expanded liability to be imposed not only when consent is secured by misrepresentation but also when it is secured by manipulation. The original common law tort for seduction was maintainable only by the father of a minor female and was based upon loss of her services resulting from the seduction.

Appendix 10

least if disease or pregnancy actually results.[11] On the other hand, and quite apart from the plaintiff's consent, the defendant lacks the intent necessary for a battery if he neither knows nor should know that he is infected.[12]

The point is not limited to battery cases. In *Copeland v. Hubbard Broadcasting, Inc.*,[13] a homeowner consented to the entry of a woman who identified herself as a student but who in fact was there to videotape scenes for a television station. The homeowner's consent to her entrance did not bar the trespass claim. Commonly held values suggest that the transaction consented to—entrance by a student— would be viewed as radically different in nature from the transaction that actually took place—invasion by a journalist with a video camera.

*At the borders and fringes of the problem.* Some mistakes are not readily classified. Others present problems in adjudication because they become entangled with policy concerns that only happenstantially relate to mistakes.

In a very unusual Idaho case,[14] a divorcing wife sued her husband for battery, claiming that she had consented to sexual intercourse with him without knowing of his sexual relationship with another woman. She essentially claimed that her ignorance should count as a mistake and that the mistake negated her consent. The infidelity of sexual partners is traditionally a matter of great moment, so it was undoubtedly important. Quite possibly, however, its greatest importance was its bearing on other issues such as whether the marriage should continue or whether the parties should seek counseling. It seems far from clear that the wife's mistake was about the nature of acts she consented to. Nevertheless, the Idaho Court thought that it was at least a jury question whether the wife made a "mistake concerning the nature of the contact or the harm to be expected from it" and hence could recover for battery.

11. Kathleen K. v. Robert B., 150 Cal. App.3d 992, 198 Cal.Rptr. 273, 40 A.L.R.4th 1083 (1984) (contracting herpes); Barbara A. v. John G., 145 Cal.App.3d 369, 193 Cal.Rptr. 422 (1983) (lawyer telling client he could get no one pregnant); Hogan v. Tavzel, 660 So.2d 350 (Fla.App.1995) (genital warts not revealed); Crowell v. Crowell, 180 N.C. 516, 105 S.E. 206 (1920) (it was an "assault [battery] for the husband to communicate to his wife, while concealing from her the fact that he was infected therewith, a foul and loathsome disease"); De Vall v. Strunk, 96 S.W.2d 245 (Tex. Civ. App. 1936) (implicitly recognizing that consent of the plaintiff was no bar to claim that she was infected with "crabs" by intercourse with the defendant and expressly holding that participation in an illegal act of intercourse did not bar her claim); Restatement § 892B, Ill. 5; cf. Doe v. Johnson, 817 F.Supp. 1382 (W.D.Mich.1993) (suggesting substantial certainty test). Some cases lace the discussion with references to confidentiality, but the point seems simpler: the defendant caused or knew of the plaintiff's mistake about a basic characteristic of the transaction. One case treated sexual relations outside marriage as illegal and barred the plaintiff because she was an participant in the illegal act. Zysk v. Zysk, 239 Va. 32, 404 S.E.2d 721 (1990). Distinguish cases that assert negligent communication of sexual diseases, e.g., S.A.V. v. K.G.V., 708 S.W.2d 651 (Mo.1986) (spousal immunity abolished as to wife's claim against husband for negligently communicating sexual disease).

12. McPherson v. McPherson, 712 A.2d 1043 (Me.1998).

13. Copeland v. Hubbard Broadcasting, Inc., 526 N.W.2d 402 (Minn.App.1995).

14. Neal v. Neal, 125 Idaho 617, 873 P.2d 871 (1994).

At the other end of the spectrum are the cases in which a patient consents to an invasive medical procedure in ignorance of the fact that the surgeon suffers from AIDS or HIV. If the patient is actually exposed to the virus or becomes infected, she has an action based on the doctor's negligence[15] or failure to provide her with informed consent.[16] If she is not infected or exposed, however, a battery claim might be a major option.[17] She could plausibly argue that consent to an appendectomy is not consent to an appendectomy performed by an HIV infected doctor with sores on his arms, that is, that she was mistaken about the essential nature of the operation she consented to. At this writing there are few cases, most of them hobbled by a concern to avoid allowing emotional distress damages when the plaintiff has suffered no actual exposure to a toxic substance. Perhaps with this concern in mind,[18] one court has held that when the plaintiff did not actually suffer infection, the plaintiff's consent was a bar, even though she knew nothing of the doctor's infection[19] and some other courts have reached similar results.[20]

## § 101.  Consent Obtained by Duress or Coercion

*Physical and unlawful threats.* Duress includes physical coercion and threats of it, that is, force or coercive threats that are intended to and do prevent the plaintiff's free choice.[1] The defendant cannot arrest

**15.**  Cf. B.N. v. K.K., 312 Md. 135, 538 A.2d 1175 (Md. 1988) (negligence, intentional infliction of distress and fraud actions cognizable when sexual partner fails to reveal affirmatively his active case of herpes); cf. R.A.P. v. B.J.P., 428 N.W.2d 103 (Minn.App.1988) (sexual partner was negligent in engaging in sexual activity without disclosing that she had herpes); Long v. Adams, 175 Ga.App. 538, 333 S.E.2d 852 (1985) (disease communicated by sexual partner, negligence claim recognized); cf. Mussivand v. David, 45 Ohio St.3d 314, 544 N.E.2d 265 (1989) (sexual partner had duty to warn partner for benefit of her husband).

**16.**  See Faya v. Almaraz, 329 Md. 435, 620 A.2d 327 (1993) (doctor who has tested HIV positive must disclose that fact to the patient before performing an invasive procedure). Whether fear of future harm from exposure is actionable, and what counts as exposure to a disease are both difficult points considered elsewhere. See § 311.

**17.**  The difference is that a battery is actionable without proof of bodily harm or economic loss; the offensive touching is harm in itself.

**18.**  As to the problems of claims for fear of future harm and of "exposure" in toxic tort cases, see § 311. It is also true that the risk of spreading infection is extremely small if the surgeon wears gloves, in which case infection is likely to occur only if the surgeon nicks himself. However, the battery

claim, unlike some other tort claims, is based on the plaintiff's right to make for herself all decisions about her own body, not about seeking the plaintiff's best interests against her will, or accommodating the interests of the defendant and those of the plaintiff.

**19.**  K.A.C. v. Benson, 527 N.W.2d 553 (Minn.1995). The *K.A.C.* court said: "In medical malpractice claims, battery consists of touching of a substantially different nature and character from that to which the patient consented... .T.M.W. does not allege that Dr. Benson performed a different procedure from that to which she consented. Moreover, because Dr. Benson's conduct did not significantly increase the risk that T.M.W. would contract HIV, it cannot be said that Dr. Benson failed to disclose a material aspect of the nature and character of the procedure performed. Consequently, plaintiff's battery claim must fail." Id. at 560.

**20.**  Kerins v. Hartley, 27 Cal.App.4th 1062, 33 Cal.Rptr.2d 172 (1994) (policy to limit emotional harm claims based on fear of future harm is carried over to battery cases, even though surgeon ignores the limits or conditions of the plaintiff's consent).

### § 101

**1.**  Terms like free will, free choice, genuineness of consent and similar expressions

§ 101                    CONSENT OBTAINED BY DURESS                    235

the plaintiff at gunpoint and then assert that the plaintiff consented to the arrest because the plaintiff voluntarily chose confinement in preference to a bullet. Threats of physical force or confinement are commonly the basis for false imprisonment claims. That is, confinement may be achieved not only by locking the plaintiff in a room but by indicating that she will be physically halted if she attempts to leave or that she will be subjected to worse forms of imprisonment.[2] On the other hand, threats to do acts that are not themselves illegal or tortious seldom render consent ineffective.

*Economic threats to produce purely economic gains.* Economic threats that induce consent to economic transactions generally do not count as duress or improper coercion.[3] For example, transactions involving buying and selling are based on implicit or express threats. The buyer who refuses to pay more than $25,000 for an automobile is in effect threatening not to buy at all unless the seller lowers the price. If the seller consents to sell at that price even though the car is worth more, the seller cannot later recover for conversion of the chattel on the ground that his consent was produced by duress. Similarly, the employer may threaten to discharge an unproductive employee unless her job performance improves. These threats are economic on both sides—they threaten to impose economic loss in order to obtain economic gain.

*Objectively non-coercive threats without abuse of power.* The difficult cases of duress or coercion lie in the middle ground between threats of physical force or illegal action on the one hand and simple threats of economic self-interest on the other. Many of the quotidian bargains by which we arrange our relationships are grounded in implicit or explicit threats. In the Restatement's example,[4] a friend says to you, "if you are not still here when I get back, our friendship is over." You remain in confinement because you value the friendship. You cannot recover for false imprisonment on the ground that your consent was obtained by duress or coercion.

Several observations can be made about threats like this. One is that reciprocal demands are part of the give and take of life. If I cannot terminate our friendship, my own freedom is significantly diminished. If I can terminate it but cannot mention the conditions that will lead me to do so, communication between us is significantly diminished or left to murky implication. The threat in this example seems childish but it

are conventional in discussions of duress. They may not be the best terms. What is perhaps objectionable is that the plaintiff is forced to make any choice at all or the choice between the alternatives presented. See John Dalzell, Duress by Economic Pressure, Part I, 20 N.C.L.Rev. 237, 238 (1942).

2.  In Marcus v. Liebman, 59 Ill.App.3d 337, 16 Ill.Dec. 613, 375 N.E.2d 486 (1978) the plaintiff was a voluntary patient in a psychiatric facility. When she wanted to leave, the defendant threatened involuntary commitment to a state hospital if she at-

tempted to leave. This was a false imprisonment.

3.  This observation is part of the larger one that tort law generally treats economic activity differently from physical activity. However, some forms of economic duress are considered abusive or dangerous and may be important elements in some economic torts. Abuse of legal process and antitrust violations are examples.

4.  Restatement § 892B, cmt. j.

Appendix 10

represents a way of communicating about things that are important in a relationship. Although threats, express or implied, may not be gracious forms of communication, they do impart useful information and perform an important part of our social quid pro quo that permits cooperative behavior.

Two other observations about the Restatement's example are that the threat, from an objective point of view, is not coercive in any serious way and it involves no abuse of special power or position.

*Coercive threats.* As the observations above suggest, many threats or implicit threats are legitimate and others simply are not the basis for any legal response. There is a general formula for determining which threats count as sufficiently coercive to negate consent. That formula says that duress is a threat of unlawful conduct that is intended to and does prevent the plaintiff, as a person of ordinary firmness, from exercising free will or choice.[5] The formula seems almost useless in practice and most cases in fact involve contracts or avoidance of transactions rather than claims for trespassory torts like battery or trespass to land.

Aside from threats of physical harm and threats of torts or crime, most threats that negate consent or furnish an independent ground for a tort suit[6] represent serious abuses of power in some form. Some important abuses of this kind include sexual demands by employers and others in special positions of power. These are considered in the next section.

## § 102.  Consent Obtained by Abuse of Power or Position

Some threats are viewed either as inherently coercive or as an abuse of power or position or both. If the threats are coercive, the "consent" is not genuine as a matter of fact and must be given no legal effect. If the threats are an abuse of power, the profession of consent, whether genuine or not, might be denied any legal effect as a matter of policy. The possibility that consent should be disregarded for either of these reasons is not limited to any particular group of cases because that possibility turns on the facts of the individual case. This section considers the possibility that the profession of consent to sexual relations with one's employer, psychotherapist, doctor, lawyer, or religious leader is ineffective because of the abuse or potential for abuse of such a special relationship. Other relationships, such as that between student and teacher, could raise the same kind of issue.[1]

---

5.  Restatement § 871, cmt. f.

6.  If a public employee is forced by duress to resign from her job, she may have a civil rights claim for deprivation of "property" in the job without due process of law. See Angarita v. St. Louis County, 981 F.2d 1537 (8th Cir.1992). Another example is the abuse of process claim. See § 438.

§ 102

1.  Cf. Micari v. Mann, 126 Misc.2d 422, 481 N.Y.S.2d 967 (1984) (acting teacher induced students to engage in a variety of sexual acts as part of their drama training, held actionable); P.L. v. Aubert, 527 N.W.2d 142 (Minn.App.1995)(student sued the school as well as the teacher for battery and intentional infliction of distress based upon sexual touchings but the consent issue was

*Job threats and sexual harassment.* Demands for sexual favors by employers or supervisors may be implicitly threatening because of the power of employers to affect jobs and job benefits. Such threats present the employee with choices she should not be required to make. Although an employer may properly make implicit or explicit economic threats to gain economic performance, the employer may not suggest that the job or its benefits in any way depend upon the employee's agreement to sexual relations with the employer. To do so counts as quid pro quo sexual harassment under federal job discrimination statutes.[2]

Even a simple invitation by an employer or supervisor to engage in sexually related contact may imply a quid pro quo demand or threat and constitute harassment.[3] The consent professed by the employee in such cases does not bar her claim if the employer's sexual advances were in fact unwelcome.[4] So the employee proves a prima facie case by showing (a) that she was subject to unwelcome sexual conduct and (b) that her reaction to that conduct was used as a basis for decisions affecting compensation, terms, conditions or privileges of employment.[5]

*Psychotherapists and counselors.* Consent, especially consent to physical touching and sexual activity, is often induced by respect, affection, or dependence. Such a consent is of course perfectly effective and one who consents to sexual activity normally has no claim based on the activity consented to. However, in some cases the defendant owes the plaintiff a duty to avoid a potentially harmful sexual contact even if the plaintiff consents or professes consent. This is most notably the case of psychiatrists and other therapists who routinely confront troubled and vulnerable patients. Such patients often become excessively attached to their therapists and often consent to sexual contact with them. Therapists label this commonly observed phenomenon as "transference" and elaborate a theory to explain it.[6]

not even raised or discussed on appeal; the school was subject to vicarious liability).

**2.** 42 U.S.C.A. § 2000e ("Title VII"). Quid pro quo sexual harassment is a form of job discrimination that occurs when an employee's superiors either expressly or impliedly make the employee's sexual conduct a condition of job benefits. See Karibian v. Columbia University, 14 F.3d 773 (2d Cir. 1994); Hicks v. Gates Rubber Co., 833 F.2d 1406 (10th Cir.1987). A different form of sexual harassment is the hostile work environment, which does not ordinarily correspond to any of the trespassory torts but does bear some resemblance to, and may encompass, the tort of intentional infliction of emotional distress. See 1 CHARLES SULLIVAN, MICHAEL ZIMMER, & RICHARD RICHARDS. EMPLOYMENT DISCRIMINATION § 8.7 (2d ed. 1988); ALBA CONTE, SEXUAL HARASSMENT IN THE WORKPLACE: LAW AND PRACTICE §§ 3.21 & 3.22 (2d ed. 1994). On intentional infliction of distress, see § 303.

**3.** See ALBA CONTE, SEXUAL HARASSMENT IN THE WORKPLACE: LAW AND PRACTICE § 3.15 (2d ed. 1994).

**4.** Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The Supreme Court's comments are consistent with the view that a professed consent by one whose choice is so constrained is likely to be no real consent at all. Hence, "[t]he correct inquiry is whether respondent by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary." Id. 477 U.S. at 58, 106 S.Ct. at 2401.

**5.** Karibian v. Columbia University, 14 F.3d 773, 777 (2d Cir.1994).

**6.** Some therapeutic theories explain the "transference phenomenon" as a displacement of the patient's feelings about some other persons. Those feelings are then redirected at the therapist. See BARRY FURROW, MALPRACTICE IN PSYCHOTHERAPY 33 (1980).

238                    DEFENSES TO INTENTIONAL TORTS                Ch. 5

The patient's consent in such cases may be the result of diminished capacity or possibly the result of forces outside her control,[7] but even if such a consent is as real as any other, it is usually assumed and always claimed that a patient's sexual behavior with her therapist is ultimately harmful to the patient's recovery and development.[8] If that is in fact so, the therapist who engages in sexual activity with his patient is actually breaching the professional duty of care which includes a duty to avoid the risk of further emotional harm, even if the patient knowingly consents to it. For this reason, and because given the patient's vulnerability, the "consent" is highly suspect, courts[9] and legislatures[10] hold or provide that the therapist is liable in spite of the patient's professed consent.

The plaintiff in these cases often asserts the claim on a theory of negligence, no doubt because the therapist's liability insurance will cover negligence but not intended torts.[11] Some cases have suggested that the therapist is liable for breach of fiduciary duty.[12] In none of these cases is the patient's consent a bar to the claim.

*Physicians and attorneys.* Medical doctors treating patients for medical conditions ordinarily have little role in providing for the patient's mental health. A physician who engages in sexual activity with a patient

---

The legal theory is that since this is predictable, therapists should be prepared to deal with it in professional ways and that the therapist is negligent in failing to do so.

**7.** Cf. Roy v. Hartogs, 81 Misc.2d 350, 366 N.Y.S.2d 297 (1975) (allegations of consent to sexual relations obtained by "coercion by a person in a position of overpowering influence and trust" stated a good claim).

**8.** Plaintiffs always claim they have been emotionally harmed at the breach of trust, that they feel demeaned, depressive or suicidal and suffer in other ways. Although the American Psychiatric Association condemns sex-with-patients as always unethical, a few therapists have claimed that it can be useful therapy. See MICHAEL PERLIN, LAW AND MENTAL DISABILITY § 3.04 (1994).

**9.** Simmons v. United States, 805 F.2d 1363 (9th Cir.1986); cf. McNall v. Summers, 25 Cal.App.4th 1300, 30 Cal.Rptr.2d 914 (1994) (psychiatrist's sexual conduct with patient, consent might have resulted from transference phenomenon, semble, and psychiatrist might have induced patient to believe sexual relation was part of therapy); Corgan v. Muehling, 143 Ill.2d 296, 158 Ill.Dec. 489, 574 N.E.2d 602 (1991) (one holding himself out as a registered psychologist allegedly caused harmful emotional reactions in patient as a result of sexual activities together; the claim is actionable if plaintiff proves negligent handling of trans-

ference phenomenon); Bunce v. Parkside Lodge of Columbus, 73 Ohio App.3d 253, 596 N.E.2d 1106 (1991) (counselor at drug rehabilitation center and patient, liability under statute); see Linda Jorgenson, Rebecca Randles, and Larry Strasburger, The Furor over Psychotherapist-patient Sexual Contact: New Solutions to an Old Problem, 32 WM. & MARY L. REV. 645 (1991).

**10.** CAL.CIV.CODE § 43.93 (b) (patient may recover if there is therapeutic deception); ILL.COMP.STAT. 140/2 (patient may recover if the patient was emotionally dependent or the therapist practiced deception); MINN. STAT. § 148A.02 (similar); WIS. STAT. ANN. § 895.70 (patient may recover regardless of emotional dependence or deception).

**11.** See, e.g., Zipkin v. Freeman, 436 S.W.2d 753 (Mo.1968). In spite of the "negligence" theory, the therapist's decision to have sexual relations with a patient is obviously intentional. Facts and allegations recited in the cases seem to indicate that the therapist is sometimes cruel, sometimes greedy, and always abusive. So the negligence designation fails to capture the nature of the serious wrongs perpetrated by therapists in these situations.

**12.** Roy v. Hartogs, 81 Misc.2d 350, 351, 366 N.Y.S.2d 297 (1975) ("This case involves a fiduciary relationship between psychiatrist and patient and is analogous to the guardian-ward relationship ... 'Consent obtained under such circumstances is no consent, and should stand for naught' ").

§ 102          CONSENT OBTAINED BY ABUSE OF POWER          239

is thus not in the same position as a therapist. Courts have said that a medical doctor, having no duty to protect the patient from her own consent or even to avoid risk of emotional harm that can result from sexual activities, can rely on the patient's consent in the absence of fraud or duress by the physician or known incapacity on the part of the patient.[13] Lawyers are presumably in a similar position. They may find themselves disciplined for violation of ethical rules if they engage in sexual relations with clients, but the clients, not relying upon lawyers for emotional protection from themselves, are free to consent to sexual activities.[14]

The rules about lawyers and medical doctors, however, do not reflect privileges based upon status or profession. They reflect the professional roles undertaken. If a lawyer or medical doctor were to initiate sexual relations as a form of treatment,[15] or to engage in counseling or therapy, then liability would become appropriate.[16] Similarly, if these doctors or lawyers were to demand sexual favors as a condition of providing their best professional services,[17] or to exact a profession of consent by duress,[18] it seems reasonably clear that the professed consent would present no bar to the plaintiff's claim.

Analogies to the federal employment harassment cases suggest that a lawyer's demand for sexual activities with a client could carry an implicit threat that zealous professional services would depend upon compliance.[19] The analogy would also suggest that the "consent" ob-

13.  Atienza v. Taub, 194 Cal.App.3d 388, 239 Cal.Rptr. 454 (1987); Odegard v. Finne, 500 N.W.2d 140 (Minn.App.1993).

14.  Suppressed v. Suppressed, 206 Ill. App.3d 918, 151 Ill.Dec. 830, 565 N.E.2d 101, 105 (1990) (lawyer, although fiduciary, owed no duty comparable to a therapist's duty to improve patient's emotional well-being); cf. Vallinoto v. DiSandro, 688 A.2d 830 (R.I.1997) (rejecting a malpractice claim on the ground that client was not coerced and emotional harm claim on the ground that emotional harm may not have been caused by sexual relationship with attorney).

15.  See Atienza v. Taub, 194 Cal.App.3d 388, 239 Cal.Rptr. 454 (1987) (citing cases imposing liability and distinguishing them on the grounds that in those cases sexual relations were "initiated by the physician purportedly in furtherance of his treatment of the patient").

16.  Dillon v. Callaway, 609 N.E.2d 424 (Ind.App.1993) (medical doctor began providing "therapy" for patient, which turned into sadomasochistic sexual activities that eventually triggered severely harmful reactions in the patient; the patient's compensation fund was subject to liability because the doctor was acting as a therapist and the transference phenomenon theories applied).

17.  McDaniel v. Gile, 230 Cal.App.3d 363, 281 Cal.Rptr. 242 (1991) (client claimed lawyer reduced or eliminated his representation of her divorce claim when she refused to have sexual relations and that he stated or implied he would represent her zealously if she "played the game the right way"; error to give summary judgment for defendant on the claims for intentional infliction of emotional distress and malpractice); see Doe v. Roe, 756 F.Supp. 353 (N.D.Ill.1991), aff'd, 958 F.2d 763 (7th Cir.1992) (lawyer for divorce-suit plaintiff, caught in sexual situation with his client, lost ability to collect his fee from the client's husband and demanded the fee from the client; the federal racketeering claim failed, but the court noted that the plaintiff might have good state-law claims for breach of fiduciary duty).

18.  See Doe v. Roe, supra n. 17 (threats of bodily injury unless fee was paid).

19.  In divorce cases in particular, the lawyer who seeks sexual relations with a client may have a conflict of interest, first because he may consciously or unconsciously oppose his client's reconciliation with her spouse, and second because he may delay an expeditious conclusion in order to maintain the sexual status quo. Other possible con-

Appendix 10

tained as a result should be suspect as a matter of reality and ineffective as a matter of policy. But an Illinois case has in effect rejected this idea, holding also that the attorney's fiduciary duty to his client does not extend to personal relationships with the client.[20]

It is also possible that as a matter of public policy a patient's or client's consent should be given no effect when consent would give the professional a conflict of interest. In a Canadian case, *Norberg v. Wynrib*,[21] the plaintiff had become addicted to drugs. When her sources dried up, she sought prescriptions from the defendant, supposedly for her pain. The defendant prescribed drugs and also treated other complaints. Eventually he forced her to admit that she was addicted. Thereafter, he refused to prescribe drugs unless she would engage in sexual touchings. After this arrangement was broken up and the plaintiff rehabilitated, she sued the defendant. The Justices of the Supreme Court of Canada agreed that the plaintiff had a claim, but differed about the reasons for it. One group emphasized the power relationships between the parties as affecting either the reality of consent or the policy grounds for giving it legal effect. Another group thought that the doctor was liable in spite of the implied profession of consent because he acted in violation of fiduciary duty. There were other views as well.

It seems clear that at the very least the doctor in *Norberg* put himself in a position of conflict of interest. His professional duty was to heal the patient's addiction if he could, but his personal interest would have been to keep her addicted so he could continue his drug-for-sex arrangement. Even if the consent was "real," it would be very bad policy to permit professionals to deny their patients or clients the treatment they are entitled to or even to put themselves in a position of conflict of interest.

*Clergy.* Serious sexual abuse by members of the clergy has been widely reported and a number of cases have reached the courts. When pastors or priests abuse minors, courts have sometimes imposed liability,[22] although even in the child abuse cases courts have sometimes

---

flicts can be seen in Suppressed v. Suppressed, supra n. 14 (allegation that after client's husband caught lawyer in sexual situation with client, husband refused to pay attorney fees, which lawyer then demanded from client). Clouded judgment might be a significant result as well. On conflict of interest, see Margit Livingston, When Libido Subverts Credo: Regulation of Attorney–Client Sexual Relations, 62 FORDHAM L. REV. 5, 15 ff. (1993).

**20.** Suppressed v. Suppressed, supra n. 14. The opinion is much shaped by the court's view that the claim was a claim for "malpractice" with characteristics of a negligence claim rather than one for an intentional tort. It discusses the requirement that the defendant owe a "duty of care" and proof of actual damages both reflecting

negligence thinking. Barbara A. v. John G., 145 Cal.App.3d 369, 193 Cal.Rptr. 422 (1983) held that if the client could prove a "confidential relationship" on the facts of her case, the lawyer would have the burden of showing that the client's consent to sexual acts was fully informed and freely given but refused to recognize that such a relationship is always involved in lawyer-client cases.

**21.** Norberg v. Wynrib, 92 D.L.R.4th 449 (Can. 1992).

**22.** See Fontaine v. Roman Catholic Church of Archdiocese of New Orleans, 625 So.2d 548 (La.App.1993) (a priest allegedly sexually abused a 17–year old and later published photographs in a magazine and circulated video tapes; held, these allega-

invoked immunities to protect the religious organization from liability.[23] When a pastor or priest sexually exploits an adult, such as a member of the congregation or parish who seeks religious counseling, courts have sometimes insisted that the adult's consent is a bar,[24] and when the claim is based upon negligence, they have concluded that there is no tort of "clergy malpractice."[25] Such cases obviously reject the analogy to the abusive therapist,[26] even though in most instances the clergy's sexual abuse originates in counseling situations in which confidence is reposed and authority is respected by the victim. However, at this point the cases are not numerous, so they may not represent broadly held views.[27] In any event, some limited authority does support liability of clergy or their religious organization or superiors for battery or for breach of fiduciary duty.[28]

## § 103. Informed Consent: Duty to Provide Information

As already shown, the plaintiff's consent to an invasion is ineffective to bar a claim if the plaintiff is mistaken about the nature of the invasion and the defendant knows it.[1] In some cases, however, the plaintiff is not so much mistaken about the nature of the proposed

tions state a privacy invasion claim); Mrozka v. Archdiocese of St. Paul & Minneapolis, 482 N.W.2d 806 (Minn.App.1992).

23. See Schultz v. Roman Catholic Archdiocese of Newark, 95 N.J. 530, 472 A.2d 531 (1984) (forcible sexual acts against a member of priest's Boy Scout group, resulting in boy's suicide; held, the Archdiocese is a charity and immunity from tort liability for its negligence in failing to prevent such things); cf. Foreign Mission Board of the Southern Baptist Convention v. Wade, 242 Va. 234, 409 S.E.2d 144 (1991) (controlling employer of missionary had no duty to protect children from molestation by their missionary-father, even though employer knew of the sexual abuses).

24. Schieffer v. Catholic Archdiocese of Omaha, 244 Neb. 715, 718, 508 N.W.2d 907, 911 (1993): ("What is involved in this case is conduct between consenting adults. There is no allegation that the defendant used force or fraud to accomplish his sexual relations"); but cf. F.G. v. MacDonell, 150 N.J. 550, 696 A.2d 697 (1997) (clergy sexual abuse of counseling situation is breach of fiduciary duty; "troubled parishioners should be able to seek pastoral counseling free from the fear that the counselors will sexually abuse them. Our decision does no more than extend to the defenseless the same protection that the dissent would extend to infants and incompetents"). When the adult is not in counseling with the minister, the consenting adults rule is clearly applicable. See Bladen v. First Presbyte-

rian Church of Sallisaw, 857 P.2d 789 (Okla.1993).

25. See § 258.

26. See Hertel v. Sullivan, 261 Ill. App.3d 156, 160, 198 Ill.Dec. 574, 633 N.E.2d 36, 39 (1994) ("We reject plaintiff's suggestion that the duties of a priest to his parishioner or of a minister to his congregation should be equated with the duties of a psychologist to his patient. A priest or minister is not required to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably well-qualified psychologist").

27. See John Wagner, Jr., Annotation, Cause of Action for Clergy Malpractice, 75 A.L.R.4th 750 (1990).

28. See Moses v. Diocese of Colorado, 863 P.2d 310 (Colo.1993) (no separate tort of clergy malpractice but church might be liable for negligent hiring, negligent supervision, and breach of fiducial duty when it neither sought to prevent nor to ameliorate the effects of priestly sexual behavior with vulnerable parishioners); Destefano v. Grabrian, 763 P.2d 275 (Colo.1988) (clergyperson giving marriage counseling to husband and wife and having sexual intercourse with one of them); F.G. v. MacDonell, 150 N.J. 550, 696 A.2d 697 (1997) (fiduciary duty).

§ 103

1. § 100 supra.

invasion as ignorant about its potential risks or consequences. In such a case, the mistake rules would not vitiate the plaintiff's consent.

Medical operations and procedures often involve this point. At one time it was thought that when a surgeon operated upon a plaintiff who did not know and had not been informed of the risks of the operation, the plaintiff might have a claim for battery because the consent would be ineffective. Such a claim would be a good one no matter how well the operation was performed or what benefits it conferred. It is clearly right to treat the operation as unconsented to if the plaintiff was mistaken about the nature of the operation and the defendant knew it. But the plaintiff's ignorance of the risks does not necessarily mean the plaintiff was mistaken about the nature of the operation.

Why is it that the plaintiff who is ignorant of the risks of a medical procedure may not be mistaken about its nature? First, the patient is not mistaken at all if she knows that operations have risks and knows also that she does not know what they are. Mistake is a state of mind not in accord with the facts. A person who knows she does not know a fact is not mistaken about that fact at all.[2] Second, the plaintiff might erroneously believe she knows the risks when she does not; in that case, she is indeed mistaken, but not necessarily about the nature of the operation. The risks of a procedure and safer alternatives might not go to the nature of the operation, only to collateral matters of value. These points indicate some of the reasons why ignorance is not always the equivalent of a mistake that will vitiate consent.

Even if the plaintiff is not mistaken, however, her consent to a medical procedure might be ineffective to bar her suit for other reasons. Courts can impose upon the surgeon or physician a duty to use reasonable care to inform the plaintiff of the important or material risks or at least of risks that other doctors would explain to a patient. That is what courts have come to hold under the rules of negligence law and under the specific rubric of informed consent.[3]

The result is that in most courts, battery claims against the surgeon would be entertained only if the surgeon has exceeded the consent by performing an operation not consented to at all[4] or by operating with knowledge that the plaintiff was mistaken (not merely ignorant) about the nature of the operation. If the surgeon's fault is that he failed to provide information that should have been provided, the plaintiff's consent holds good to bar the battery claim. In that case, the surgeon's liability, if any, must be based on a showing that he was negligent, either in failing to disclose material facts or in performing the operation itself. These claims are discussed in the context of medical malpractice claims generally.[5]

2. See 2 DAN B. DOBBS, LAW OF REMEDIES § 11.2 (2d ed. 1993).

3. See §§ 250 & 251 below.

4. E.g., Gerety v. Demers, 92 N.M. 396, 589 P.2d 180 (1978).

5. See Chapter 14.

The distinction between the plaintiff's ignorance of risks and her mistake about the nature of the operation is slippery. The difficulty is now compounded because courts in recent years have begun to use the term "informed consent" both in discussing (a) the doctor's obligation to provide information (the claim usually treated as a negligence claim) and (b) his obligation to operate within the limits of the plaintiff's consent (the claim usually treated as a battery claim).[6] This difficulty requires careful reading of the cases, some of which say the plaintiff did not give informed consent but appear to mean that she did not give any consent at all to the operation or procedure that was performed.

## § 104.   Scope and Termination of Consent

Consent does not bar the plaintiff's claim (a) for any tortious conduct that is outside the scope of the consent or apparent consent nor (b) for any tortious conduct occurring after consent has been effectively revoked and the defendant has an opportunity reasonably to avoid that conduct.

### Scope of Consent

*Liability for exceeding the consent.* The plaintiff may limit her consent as she likes, consenting to one act but not another, or to acts at one time but not another, or to acts under some conditions but not others.[1] The scope of the defendant's protection is the scope of the consent. If his conduct would be tortious except for consent and his conduct goes beyond the consent or its conditions, he is subject to liability.[2]

*Determining the scope.* The scope of the consent may itself be subject to dispute because its scope, like its existence, depends heavily upon implications and the interpretation of circumstances. Consent to shoot rabbits in the landowner's woods is almost certainly not consent to shoot them in the landowner's front yard.[3] Possibly also a consent to operate on the right ear is not consent to operate upon the left one,[4] but it is not impossible to believe that a patient about to undergo an operation consents by implication to extensions of the operation that become

---

6. For instance, Fox v. Smith, 594 So.2d 596 (Miss.1992) speaks repeatedly of informed consent but appears not to involve a failure to provide information but a medical procedure that simply was not even professedly consented to. Moure v. Raeuchle, 529 Pa. 394, 604 A.2d 1003 (1992) likewise speaks throughout of informed consent, but a major illustration in the opinion suggests the court has in mind, not a failure to provide information, so much as a scope of consent issue. The illustration is Mohr v. Williams, 95 Minn. 261, 104 N.W. 12 (1905), § 130 below—a case involving an operation different from the one consented to.

### § 104

1. See Restatement § 892A (3).

2. E.g., Karl J. Pizzalotto, M.D. v. Wilson, 437 So.2d 859 (La.1983).

3. But in Florida Publishing Co. v. Fletcher, 340 So.2d 914 (Fla.1976) the court ignored the difference between consent-by-custom to enter land and consent for a stranger to enter a dwelling place in the owner's absence.

4. Mohr v. Williams, 95 Minn. 261, 104 N.W. 12 (1905), overruled in part, Genzel v. Halvorson, 248 Minn. 527, 80 N.W.2d 854 (1957).

Appendix 10

5. *Damages when a negligence claim is established*. When the plaintiff succeeds in establishing a negligence claim against the defendant, courts award damages for a wide range of injuries, including damages for emotional harm and financial loss. At first glance, this statement seems to contradict those in the immediately preceding paragraph. But there is no contradiction. The preceding paragraph indicated that there is seldom a tort claim for stand-alone emotional or financial harm based on simple negligence. But once a negligence claim is established by showing that the defendant negligently caused property damage or bodily injury, the victim can recover all damages that are reasonably foreseeable, including damages for such intangibles as pain, a sense of lost enjoyment of life, and emotional distress. Financial loss resulting from injury or property damage, such as lost wages or the costs of medical attention, is likewise recoverable, as are all proven future losses.

## § 111. Negligence: The Common Law Background

*Strict liability for trespassory torts?* In the law of torts, the word negligence is old but its current content is relatively new. Although the concept of fault was important in the old action on the case, negligence did not appear as a somewhat general system for resolving personal injury and property damage claims until the 19th century, mostly after the American Civil War. The English common law of tort as it stood in the 14th century was very largely the law of trespassory torts.[1] The traditional view is that strict liability was imposed when the writ of Trespass could be used.[2] That included cases of direct and immediate harm from the unauthorized use of physical force. Under this view, the defendant might be liable for an accidental shooting, even if the defendant was not negligent.[3]

*Action on the case for indirect harms*. By the direct harm test in Trespass cases, an ordinary vehicular collision might result in strict liability. But if that was the logic of the old Trespass action, it was never applied to such facts in America. Instead, negligence law developed from the action on the Case.[4] The action on the Case was proper (a) when the defendant inflicted injury that was not immediate and direct,[5] (b) when

### § 111

1. See S.F.C. Milsom, Historical Foundations of the Common Law 305 (2d ed 1981).

2. See § 14. Some scholars have challenged this view. See Gary Schwartz, Tort Law and the Economy in Nineteenth-Century America: A Reinterpretation, 9 Yale L.J. 1717 (1981); Gary Schwartz, The Character of Early American Tort Law, 26 U.C.L.A. L. Rev. 641 (1989); Stephen Young, Reconceptualizing Accountability in the Early Nineteenth Century: How the Tort of Negligence Appeared, 21 Conn. L. Rev. 197 (1989).

3. Weaver v. Ward, Hob. 134, 80 Eng. Rep. 284 (K.B. 1616).

4. See S.F.C. Milsom, Historical Foundations of the Common Law 283 (2d ed 1981).

5. The classic and much quoted example of the distinction between Trespass and Case: if you throw a log and strike the plaintiff, he has an action in Trespass, but if you leave a log in the road and the plaintiff falls over it in the dark, the plaintiff has an action on the Case. Reynolds v. Clarke, 1 Str. 634, 93 Eng.Rep. 747 (K.B. 1726). The direct-indirect test for distinguishing Trespass and Case is consistent with earlier decisions, but the explicit for-

Appendix 10

injury arose out of consented-to invasions that were carried out badly, as where a veterinarian undertakes to cure the plaintiff's horse and fails as a result of his negligence or neglect;[6] and (c) when the defendant's fault lay in his failure to act rather than in some affirmative misconduct.[7] In the action on the Case, the plaintiff was required to prove both the defendant's fault and actual harm. Those requirements apply to the negligence action today.

*Relationship of parties in actions on the Case.* The action on the Case originally involved parties who had a relationship with each other by contract or status.[8] That setting differed from that found in the action of Trespass, which in contrast often involved strangers whose duties did not depend upon a relationship between the parties. In Case, for example, the defendant would be an innkeeper,[9] the plaintiff a guest; or the defendant a surgeon, the plaintiff a patient.[10]

*Significance of parties' relationship.* The contract or relationship of the parties was doubly important in such cases. *First*, the relationship of the parties is important because that relationship may require the defendant to take affirmative steps to avoid harm to the plaintiff; hence the word neglect (the root for negligence) appears in these cases in the sense that the defendant should be liable for a failure to act.

*Second*, the standard of care or duty owed by the defendant was implicitly set by accepted community practices and expectations as incorporated in the contract itself; the defendant who holds himself out as an artificer of any kind implicitly says he will follow the standards of such artificers. The defendant who undertakes to move casks of brandy safely will be liable for spilling the brandy because that is a failure to perform as promised.[11] Equally, the parties' explicit or implicit expecta-

---

mulation of the test does is not found until around 1700. See M.J. PRICHARD, *Scott v. Shepherd* (1773) AND THE EMERGENCE OF THE TORT OF NEGLIGENCE 5, 13 ff. (1976).

**6.** Waldon v. Marshall, Y.B. Mich. 43 Ed. 3, f. 33, pl. 38 (1370), *printed and translated in* C.H.S. FIFOOT, HISTORY AND SOURCES OF THE COMMON LAW: TORT AND CONTRACT 81 (1949).

**7.** C.H.S. FIFOOT, HISTORY AND SOURCES OF THE COMMON LAW: TORT AND CONTRACT 66 (1949). See Steinson v. Heath, 3 Lev. 400, 83 Eng. Rep. 750 (K.B. 1694) ("case lies for non-feasance, against my shepherd for negligent keeping my sheep, against my carter for negligent keeping my horses, and for not repairing a bridge by which I am to pass.... against a chaplain, for not reading prayers, against an innkeeper, who refuses to lodge me ..."). One writer went so far as to say that the "primary meaning" of negligence in the early American cases was "nonfeasance," that is, neglect of some positive duty imposed by law. MORTON HORWITZ, THE TRANSFORMATION OF AMERICAN LAW, 1780–1860 86 (1977). A late example of this asso-

ciation of Case and nonfeasance or nonaction was Ogle v. Barnes, 8 T.R. 188, 101 Eng.Rep. 1338 (K.B. 1799).

**8.** See S.F.C. MILSOM, HISTORICAL FOUNDATIONS OF THE COMMON LAW 393 (2d ed. 1981); Percy Winfield, The History of Negligence in the Law of Torts, 42 L. Q. REV. 184 (1926).

**9.** The Innkeeper's Case, Y.B. Easter 42 Ed. 3, f. 11, pl. 13 (1369), *printed and translated in* C.H.S. FIFOOT, HISTORY AND SOURCES OF THE COMMON LAW: TORT AND CONTRACT (1949); Burgess v. Clements, 4 M. & S. 306, 105 Eng.Rep. 848 (K.B. 1815).

**10.** Dr. Groenvelt's Case, 1 Ld. Raym. 213, 91 Eng. Rep. 1038 (1697) (dictum that case would lie against a surgeon for "mala praxis," "his ill practice upon the body of J.S.").

**11.** Coggs v. Bernard, 2 Ld. Raym. 909, 92 Eng.Rep. 107 (1703) (a case actually pleaded as an action on the case with the language of "assumpsit" or undertaking, which was also the language of a contract claim).

Appendix 10

tions may relieve the defendant of liability; the guest may undertake to protect his own property and thus relieve the innkeeper of liability when it is stolen.[12]

*Particularization of duties in action on the Case.* Given that duties in Case tended to find their source in community custom and conduct of the parties, courts naturally did not impose any universal principles of responsibility. They imposed liabilities they thought proportioned to the parties' own contract or expectation. Doctors were to use the care of doctors, farriers the care of farriers and so on. Bailees who without charge accepted temporary custody of the plaintiff's property owed a duty to care for that property that was considerably different from the duty owed by a bailee who was paid to care for the property.[13] In some categories, the duty could be strict at times. Common carriers and innkeepers might be charged with loss of the guest's property even if the innkeeper was not at fault.[14] So defendants might argue that they were not in any recognized category such as a common carrier and hence that they owed no duty of care at all.[15]

*Stranger cases.* But things were changing by 1700. Defendants who are not in a contractual relation with the plaintiff—strangers they are called—are beginning to cause serious harms. The stranger who causes a collision on the road is still liable in trespass in 1700 and for a long time afterwards,[16] but plaintiffs are beginning to bring suit in Case against strangers who cause indirect or mediate harms.[17] Because the parties are

---

12. In Burgess v. Clements, 4 M. & S. 306, 105 Eng.Rep. 848 (K.B. 1815), the innkeeper set up the guest in a special show room, giving him a key. The guest left his sample case in the room without locking the door. Lord Ellenborough wanted to bar the guest in part because the property was lost through the guest's own fault. But LeBlanc, J. had a different reason for barring the plaintiff. He thought the parties prescribed their own terms by their conduct, and that in accepting the key, the plaintiff discharged the innkeeper of responsibility. See also Sanders v. Spencer, Dyer 226, 73 Eng. Rep. 591 (K.B. 1556).

13. See THOMAS M. COOLEY, THE LAW OF TORTS 628–633 (1879). Cooley repeated the supposed rule requiring extreme care, ordinary care, or slight care, depending upon whether the bailment was for the benefit of the bailee, mutual benefit, or the benefit of the bailor only, but he also attempts to fit this to the general formula of ordinary care by treating the benefit issue as part of the circumstances, and he recognizes, too, that the understanding of the parties is what ultimately governs.

14. See Calye's Case, 8 Co.Rep. 32a, 77 Eng.Rep. 520 (K.B. 1584) (if the guest's goods are stolen, the innkeeper is liable).

15. Lovett v. Hobbs, 2 Show. 127, 89 Eng.Rep. 836 (K.B. 1680). The actual words

were "the action lay not," against a coachman who damaged or lost goods because the coachman was not a common carrier. The argument was rejected because the coachman was like a waterman who carries men and goods as a common carrier.

16. Leame v. Bray, 2 East. 593, 102 Eng.Rep. 724 (K.B. 1803).

17. A master improvidently sends his servant to train ungovernable horses in a crowded place; they cause injury to the plaintiff, who successfully brings an action on the Case. (Harm was considered indirect when the defendant acted through an agent or servant.) Michael v. Alestree, 2 Lev. 172, 83 Eng.Rep. 504 (1676). The classic log-in-the-road example of the distinction between Trespass and Case also envisions a stranger case. See Reynolds v. Clarke, 1 Str. 634, 93 Eng.Rep. 747 (K.B. 1726). Or the defendant leaves a pile of lime in the street; the wind blows the lime, which startles the horse, which breaks the chaise in its frightened dash. Lord Mansfield tells the jury to decide whether the defendant was guilty of "blameable negligence." Flower v. Adam, 2 Taunt. 314, 127 Eng.Rep. 1098 (C.P. 1810). When the parties were neighbors, courts might derive a duty of reasonable care from the maxim that you must enjoy your property in such a way as not to injure others,

Appendix 10

strangers, not in a contractual relationship, the defendant's negligence is understood in a general, or at least undefined sense. By the 1800s, there is nothing unusual about suing a stranger in Case rather than Trespass and the negligence standard necessarily ceases to arise from the parties' relationship. At some point, too, the plaintiff is given an option: he can sue in Case even if injury is direct, so long as he can actually prove negligence and actual harm.[18] The net result is that by 1800, plaintiffs sue in Case for road accident injuries. The older connection of Case (and negligence) to particular occupations and particular duties is no longer required. So negligence is already becoming a general idea even though its standards have not been articulated.

*Coming to America.* A great deal of the common law of tort migrated to America with colonization. Even as the American revolution was being launched, English judges were still debating tort cases by debating the direct vs. indirect distinction.[19] After Independence, the Constitution allocated Admiralty jurisdiction,[20] with its potential for covering maritime torts, to the federal government. Otherwise, tort law was the province of the States, which usually[21] made formal provision for reception of the English common law as the basis of their own legal systems.[22] The sparse American authority on torts in the generation or so after adoption of the Constitution seems to indicate that courts were routinely thinking primarily in terms of fault or negligence.[23] Nevertheless, in the

---

see Vaughan v. Menlove, 3 Bing. (N.C.) 468, 132 Eng.Rep. 490 (C.P. 1837), which is also used in nuisance cases. See M.J. PRICHARD, *Scott v. Shepherd* (1773) AND THE EMERGENCE OF THE TORT OF NEGLIGENCE 15 ff. (1976) (noting a few "straws in the wind" from earlier times but identifying the late 17th century as the beginning of "non-relationship" negligence cases).

**18.** Williams v. Holland, 10 Bing. 112, 131 Eng. Rep. 848 (C.P. 1833). This view was also followed in America. Dalton v. Favour, 3 N.H. 465 (1826). See E.F. Roberts, Negligence: Blackstone to Shaw To ? An Intellectual Escapade in a Tort Vein, 50 CORNELL L. REV. 191, 201 (1965).

**19.** Scott v. Shepard, 2 Wm. Bl. 892, 96 Eng.Rep. 525 (1773) (Blackstone, J. dissenting at the court's allowance of Trespass against a defendant tossed a lighted squib at A, who batted it away towards B, who batted it towards the plaintiff, who lost sight of an eye as a result). If, however, the plaintiff showed both fault and actual harm, at least when harm was not intended, courts sustained the action on the case. Slater v. Baker, 2 Wils. 359, 95 Eng.Rep. 860 (K.B. 1767) (surgeon's treatment of broken leg, plaintiff not required to sue vi et armis).

**20.** 1 THOMAS SCHOENBAUM, ADMIRALTY AND MARITIME LAW §§ 1–6 & 3–1 (2d ed. 1994).

**21.** Later, Florida, Louisiana, California and some Southwestern States were brought into the union with varying degrees of Spanish, or Spanish–French civil rather than common law background. See LAWRENCE FRIEDMAN, A HISTORY OF AMERICAN LAW 169, 171–76, 364–65 (2d ed. 1985).

**22.** E.g., COLO. REV. STATS. ANN. §§ 2–4–211; 5 ILCS 50/1. See LAWRENCE FRIEDMAN, A HISTORY OF AMERICAN LAW 107 ff. (2d ed. 1985). Less obviously but more importantly, what the states really adopted, at least over time, was the common law process, not merely rules of particular cases. The common law process contemplates continued development. See, e.g., Wright v. Grove Sun Newspaper Co., Inc., 873 P.2d 983 (Okla. 1994).

**23.** See Gary Schwartz, Tort Law and the Economy in Nineteenth-Century America: A Reinterpretation, 9 YALE L.J. 1717 (1981). Many of the early cases seemed to involve indirect injury, so their discussion of negligence is no surprise. E.g., Colt v. M'Mechen, 6 Johns. 160 (N.Y.Sup.Ct.1810) (common carrier's liability for loss of goods except for act of God or the public enemy, considering whether loss resulted from negligence as opposed to Act of God); Foot and Reynolds v. Wiswall, 14 Johns. 304 (N.Y. 1817) (the plaintiff's sloop was damaged by a steamboat on the Hudson River on a dark

Appendix 10

early 1800s, negligence seems not to have become a widespread or general system of adjudication.

## § 112. Negligence: Adopting a General Principle of Liability for Fault

*Growing into modern tort law.* The older tort law, based on a distinction between Trespass with its direct invasion and Case with its indirect invasion, differed from modern tort law in three important ways. *First*, in contrast to contemporary law, strict liability was or may have been imposed in the Trespass/direct harm cases. *Second*, the liabilities imposed in Case, although based on fault of some kind, were not originally adjudicated under a general fault standard applicable to everyone but under standards set by the particular profession or calling of the defendant. *Third*, the lineaments of negligence itself had not been drawn clearly; what would count as fault in any general system of fault was undetermined. All three of these things began to be altered significantly in the 19th century, mostly after 1850.

*(1) Eliminating or limiting the role of strict liability.* If strict liability was imposed for direct injuries, such liability was limited or eliminated in favor of a fault-based system. By around 1800 lawyers began arguing that a distinction existed between intentional or wilful torts on the one hand and merely negligent torts on the other.[1] The distinction was not immediately developed, but in another generation we find courts beginning to distinguish negligence from intent[2] or at least to show a

night in 1812, a jury charge in terms of negligence with the burden upon the defendant to exonerate himself by proving freedom from fault was seemingly accepted by the parties). In Vincent v. Stinehour, 7 Vt. 62 (1835), the plaintiff alleged what might have been considered a direct and forcible injury except that it may have involved the intervening reaction of an animal: the defendant ran over the plaintiff with a carriage. The court refused to charge on liability without fault and required negligence to sustain a claim. The jury found for the defendant. The Vermont Supreme Court upheld a judgment for the defendant on the ground that "no one can be made responsible, in an action of trespass, for consequences, where he could not have prevented those consequences by prudence and care." For this broad statement, the court relied on cases in which the defendant had done no act at all with reference to the plaintiff, as where his horse simply ran away with him. In some other cases the setting involved indirect injury but the facts might have been thought to suggest strict liability in a later generation; yet liability was limited by the fault principle. In Livingston v. Adams, 8 Cow. 175 (N.Y. 1828) an upper

riparian owner's dam broke, leading to damages of the lower owner's property. The court considered the case in terms of negligence, not strict liability. The case may be distinguishable from Rylands v. Fletcher, L.R. 3 H.L. 330 (1868) where strict liability was imposed when a pond's waters flooded the plaintiff's coal mine, but it would not have been bizarre to suggest strict liability in Livingston. In Panton v. Holland, 17 Johns. 92 (N.Y.1819) the defendant excavated his own land, with the result that the plaintiff's nearby house partially collapsed from lack of support. The court held that liability turned solely on negligence, although here again strict liability for removal of lateral or subjacent support would not be inconceivable. See Restatement § 817.

### § 112

1. Ogle v. Barnes, 8 T.R. 188, 101 Eng. Rep. 1338 (K.B. 1799); E.F. Roberts, Negligence: Blackstone to Shaw to ? An Intellectual Escapade in a Tory Vein, 50 CORNELL L. Q. 191, 199 (1965).

2. E.F. Roberts, Negligence: Blackstone to Shaw to ? An Intellectual Escapade in a Tory Vein, 50 CORNELL L. REV. 191, 200 (1965).

<u>AMICUS APPENDIX 11</u>: Epstein, Richard A., *Foreword: Unconstitutional Conditions, State Power, and the Limits of Consent*, 102 HARV. L. REV. 5, 7 (1988-1989)

University of Chicago Law School

## Chicago Unbound

Journal Articles                                        Faculty Scholarship

1988

# Foreword: Unconstitutional Conditions, State Power, and the Limits of Consent

Richard A. Epstein

Follow this and additional works at: https://chicagounbound.uchicago.edu/journal_articles

 Part of the Law Commons

Recommended Citation

Richard A. Epstein, "Foreword: Unconstitutional Conditions, State Power, and the Limits of Consent," 102 Harvard Law Review 4 (1988).

This Article is brought to you for free and open access by the Faculty Scholarship at Chicago Unbound. It has been accepted for inclusion in Journal Articles by an authorized administrator of Chicago Unbound. For more information, please contact unbound@law.uchicago.edu.

Appendix 11

# THE SUPREME COURT
## 1987 TERM

## FOREWORD: UNCONSTITUTIONAL CONDITIONS, STATE POWER, AND THE LIMITS OF CONSENT

*Richard A. Epstein*

## TABLE OF CONTENTS

|  | PAGE |
|---|---|
| I. INTRODUCTION | 5 |
| A. A Ubiquitous Problem | 5 |
| B. The Plan of Action | 14 |
| II. THE CONCEPTUAL FRAMEWORK | 15 |
| A. Private Transactions | 16 |
| 1. Perfect Competition | 16 |
| 2. Monopoly | 16 |
| 3. Collective Action Problems | 19 |
| 4. Externalities | 21 |
| B. The Political Context | 21 |
| C. Citizen Misconduct | 25 |
| D. Judicial Implementation of the Unconstitutional Conditions Doctrine | 26 |
| 1. First Principles | 26 |
| 2. Second Best | 28 |
| III. THE STATE INCORPORATION POWER | 28 |
| A. Nineteenth-Century Special Charters | 28 |
| B. Foreign Incorporation | 31 |
| C. Overriding the Nondiscrimination Rule | 38 |
| IV. TAXING, SPENDING, AND FEDERALISM | 40 |
| V. PUBLIC ROADS AND HIGHWAYS | 47 |
| A. Economic Regulation and Frost Trucking | 47 |
| B. Freedom of Speech and the Highways: Lakewood | 54 |
| VI. THE POLICE POWER | 58 |
| A. Land Use | 60 |
| B. Commercial Speech and the Morals Head of the Police Power | 64 |
| VII. EMPLOYMENT CASES | 67 |
| VIII. GOVERNMENT BENEFITS | 73 |
| A. Tax Exemptions and Freedom of Speech | 74 |
| B. The Religion Cases | 79 |
| C. Medicaid Benefits and Abortions | 89 |
| D. Tax Exemptions, Free Exercise, and the Antidiscrimination Principle | 94 |
| E. Food Stamps | 96 |
| IX. CONCLUSION | 102 |

4

Appendix 11

Page 185 of 293

# UNCONSTITUTIONAL CONDITIONS, STATE POWER, AND THE LIMITS OF CONSENT

*Richard A. Epstein*[*]

## I. INTRODUCTION

### A. A Ubiquitous Problem

The Supreme Court's decision in *Lyng v. International Union, UAW*,[1] decided during the 1987 Term, looks like a creature of the modern activist state. *Lyng* asked the Court to resolve the constitutional tension between the Food Stamp Program and the National Labor Relations Act (NLRA). Before the New Deal, the issues presented by the case would not, and probably could not, have arisen. Politically, Congress did not have the will to pass either of these programs. If passed, each would likely have been found to fall outside Congress' commerce power.[2] It was also unresolved whether the Food Stamp Program could have been sustained under Congress' spending

---

[*] James Parker Hall Distinguished Service Professor of Law, University of Chicago. I would like to thank Larry Alexander, Albert Alschuler, Douglas Baird, Gerhard Casper, David Currie, Frank Easterbrook, Larry Kramer, Jonathan Macey, Michael McConnell, Frank Michelman, Charles Smith, David Strauss, and Cass Sunstein for their exhaustive and informative comments on portions of an earlier draft. I have tried to incorporate their insights and answer their objections as best I could. Richard Craswell, David Friedman, Stephen Shiffrin, and Alan Schwartz gave me valuable advice in working through some of the lines of argument developed in this Foreword. I also benefitted from comments at the University of Chicago Work in Progress Workshop, and from comments that I received in presenting the earlier draft at a luncheon workshop of the clerks and staff of the Seventh Circuit. The errors that remain in this Foreword are of my own invention.

[1] 108 S. Ct. 1184 (1988). For further discussion of the case, see pp. 96–102 below.

[2] *See, e.g.*, Schechter Poultry Corp. v. United States, 295 U.S. 495, 548–49 (1935) (holding that regulation of time and hours does not fall within Congress' commerce clause power); Carter v. Carter Coal Co., 298 U.S. 238, 308–09 (1936) (same); United States v. E.C. Knight Co., 156 U.S. 1, 12 (1895) (holding that regulation of manufacturing monopolies does not fall within Congress' commerce clause power). The NLRA had indeed been held unconstitutional in the three unanimous circuit court decisions to pass on the question. *See* Fruehauf Trailer Co. v. NLRB, 85 F.2d 391 (6th Cir. 1936), *rev'd*, 301 U.S. 49 (1937); NLRB v. Friedman-Harry Marks Clothing Co., 85 F.2d 1 (2d Cir. 1936), *rev'd*, 301 U.S. 58 (1937); NLRB v. Jones & Laughlin Steel Corp., 83 F.2d 998 (5th Cir. 1936), *rev'd*, 301 U.S. 1 (1937). For my defense of *E.C. Knight*, see Epstein, *The Proper Scope of the Commerce Power*, 73 VA. L. REV. 1387, 1432–54 (1987). There had been some erosion of *Knight* in the pre-1937 period, but none that went nearly as far as *Jones & Laughlin*. For example, the Railway Labor Act of 1926, 45 U.S.C. §§ 151–188 (1982), was found to fall within the scope of the commerce power in Texas & New Orleans Railroad v. Brotherhood of Railway Clerks, 281 U.S. 548, 570 (1930), but that statute was consciously limited to the instruments of interstate transportation, a proper subject of the federal commerce power since Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1 (1824).

Appendix 11

Page 186 of 293

*HARVARD LAW REVIEW*    [Vol. 102:1

power.[3] For good measure, the NLRA might well have been held to work an impermissible infringement of the liberty of contract of both employer and employee.[4]

The New Deal transformation and its aftermath have placed both statutes beyond political controversy, just as they have immunized the statutes from direct constitutional attack. When a 1981 amendment to the Food Stamp Program provided that food stamps would not be distributed to workers who go out on strike in a labor dispute other than an employer lockout,[5] however, the stage was set to examine what first and fourteenth amendment principles apply to the interaction of these two complex statutory systems. The respondent union claimed that the statutory change "coerced" workers into sacrificing their first amendment right to freedom of association in order to obtain the food stamps that Congress provided to persons generally in need, and even to nonstriking workers who had quit their jobs.[6] Its equal protection claim covered much the same ground: although the Congress need not have provided any food stamp benefits at all, once it embarked upon such a program, it could not discriminate between striking workers and other needy recipients.

Cast in this form, the respondent's case is a curious blend of old and new. While its setting may be novel, *Lyng* raises the basic structural issue that for over a hundred years has bedeviled courts and commentators alike under the mysterious title of "unconstitutional conditions."[7] In its canonical form, this doctrine holds that even if a

---

[3] The spending power authorizes Congress "to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. Madison read the clause to authorize Congress to spend only for those purposes that fell within the other enumerated powers of article I, section 8. *See* United States v. Butler, 297 U.S. 1, 65 (1936). *Butler*, however, rejected the Madisonian view in favor of Hamilton's and Story's construction, which allowed any expenditure that advanced the "general welfare of the United States" without limitation to the enumerated powers. *See id.* at 65–66. The food stamp program could not have survived if Madison's view had been adopted. The fate of a food stamp program under Hamilton and Story's position is uncertain. The legislation is "general" in the sense that it applies uniformly across the country, but it is not general in the sense of providing a public good shared by all citizens alike. With the 1937 expansion of the commerce clause, the system of enumerated powers collapsed and with it any concern over the contours of the spending power. For a defense of the Madisonian view, see Currie, *The Constitution in the Supreme Court: The New Deal, 1931-1940*, 54 U. CHI. L. REV. 504, 529–36 (1987). For a discussion of that view in connection with unconstitutional conditions, see pp. 40–44 below.

[4] *See, e.g.*, Coppage v. Kansas, 236 U.S. 1 (1915); Adair v. United States, 208 U.S. 161 (1908). The Court in 1929 distinguished these cases in the context of the Railway Labor Act. *See Texas & N.O.R.R.*, 281 U.S. at 570–71.

[5] Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, § 109, 95 Stat. 361 (1981) (codified at 7 U.S.C. § 2015(d)(3) (1982)).

[6] The statute provides that when a worker has voluntarily quit his employment, the period of disqualification is only 90 days, and then only if the quitter is the head of a household as defined under the statute. *See* 7 U.S.C. § 2015(d)(1) (1982).

[7] The phrase, for example, appears in Justice Bradley's dissent in Doyle v. Continental

Appendix 11

Page 187 of 293

state has absolute discretion to grant or deny a privilege or benefit, it cannot grant the privilege subject to conditions that improperly "coerce," "pressure," or "induce" the waiver of constitutional rights. Thus, in the context of individual rights, the doctrine provides that on at least some occasions receipt of a benefit to which someone has no constitutional entitlement does not justify making that person abandon some right guaranteed under the Constitution.[8] In other instances, the doctrine prevents the government from asking the individual to surrender by agreement rights that the government could not take by direct action. Thus, although a state may absolutely forbid foreign corporations from doing business within its borders, it cannot allow them in on condition that they waive their right to federal diversity jurisdiction, any more than it could divest them of this right by statute.[9] In still other instances, the doctrine closely resembles equal protection, barring the state from making certain privileges available to individuals only if they consent to terms more onerous than those demanded when the same privileges are made available to others. Again, the state may prevent foreign corporations from doing business in the state altogether, but it may not allow them to do business only on condition that they pay higher taxes than their local competitors.

The problem of unconstitutional conditions arises whenever a government seeks to achieve its desired result by obtaining bargained-for *consent* of the party whose conduct is to be restricted. There is, for example, an ordinary first amendment issue when the government seeks to impose prior restraints on publication. That question is transformed into an unconstitutional conditions issue when a government benefit is conditioned upon acceptance of prior restraint. Similarly, there is only a traditional equal protection claim when the government imposes heavier criminal penalties on blacks than it does

---

Insurance Co., 94 U.S. 535 (1876): "Though a State may have the power, if it sees fit to subject its citizens to the inconvenience, of prohibiting all foreign corporations from transacting business within its jurisdiction, it has no power to impose unconstitutional conditions upon their doing so." *Id.* at 543 (Bradley, J., dissenting). An earlier hint of the doctrine is found in Lafayette Insurance Co. v. French, 59 U.S. (18 How.) 404 (1856): "This consent [to do business as a foreign corporation] may be accompanied by such conditions as Ohio may think fit to impose; . . . provided they are not repugnant to the Constitution or laws of the United States . . . ." *Id.* at 407. The condition involved in *French*, to accept service of process in order to do business in the state, was sustained.

[8] *See generally* Van Alstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law*, 81 HARV. L. REV. 1439, 1445–49 (1968).

[9] At the time of *Doyle*, states were allowed to impose such conditions. *Doyle* was significantly restricted, however, by Barron v. Burnside, 121 U.S. 186 (1887), which returned to the earlier position of Home Insurance Co. v. Morse, 87 U.S. (20 Wall.) 445 (1874), by striking down a similar condition. *Doyle* was definitively overruled, and the position of *Morse* and *Barron* reaffirmed, in Terral v. Burke Construction Co., 257 U.S. 529, 533 (1922). *See infra* p. 38.

Appendix 11

on whites or vice versa. The unconstitutional conditions overlay comes into play only when the government sells goods or services to blacks on more onerous contract terms and conditions than those it offers to whites.

There is a special conceptual problem with the doctrine of unconstitutional conditions, however, that does not arise in connection with ordinary constitutional limits on government powers. Why does the doctrine exist at all? Why should there be any limitation at all on a system of government power that rests on the actual consent of the individuals whose rights are thereby abridged? To be sure, even the system of free markets recognizes some limitations upon the principle of consent in ordinary contracts between private individuals. Duress, force, misrepresentation, undue influence, and incompetence may be used to set aside contracts that otherwise meet the normal requirements of offer, acceptance, consideration, and consent. But none of these conventional grounds accounts for the doctrine of unconstitutional conditions, which comes into play only after all these conventional hurdles to consensual union have been overcome.

The analogies to ordinary contract law thus give rise to a persistent puzzle that can be formulated in both conceptual and practical terms. To revert to the foreign corporation cases, if a state can exclude a foreign corporation, why can it not admit the corporation subject to whatever conditions it wishes to impose?[10] Sometimes the puzzle is stated in terms of a greater and a lesser power. The greater power to exclude might be said to include the lesser power to admit on condition.[11]

The objection to the doctrine of unconstitutional conditions can also be stated in functional terms. How can striking workers complain that they have not received benefits to which they have no absolute entitlement? The state has made an offer that any worker may choose to accept or reject. There has been no use or threat of force. As long as individuals know what is best for themselves, they can enter into only those bargains that leave them better off after than before. Some

---

[10] Justice Holmes dismissed the entire doctrine of unconstitutional conditions as a logical and conceptual error: "Even in the law whole generally includes its parts. If the State may prohibit, it may prohibit with the privilege of avoiding the prohibition in a certain way." Western Union Tel. Co. v. Kansas, 216 U.S. 1, 53 (Holmes, J., dissenting).

[11] *Cf.* Posadas de Puerto Rico Assocs. v. Tourism Co., 478 U.S. 328, 345–47 (1986) (holding that "greater" power to ban gambling includes "lesser" power to ban advertising promoting gambling). The formulation is somewhat misleading, however, because greater/lesser problems can arise even when the issue of consent or the form of a conditional grant is far removed from a case. For example, any case of selective enforcement of criminal or civil sanctions might be said to give rise to a greater/lesser problem: if the state has the greater power to punish both blacks and whites, then it has the lesser power to punish only blacks or only whites. Although such cases do not give rise to an unconstitutional conditions problem as that term is used here, the greater/lesser language is still applicable.

**Appendix 11**

Page 189 of 293

workers have taken the bargain and others have cast it aside. All workers are free to make whatever decisions they choose, but must live with the consequences of their decisions once made.[12] The same point could be made about the case of race. Blacks cannot complain, because they are better off with the bargains they made than they were before the state contracted with either blacks or whites.

These examples appear to justify the doctrine of unconstitutional conditions as a half-conscious adaptation of the classical Pareto superiority test used in modern welfare economics to evaluate alternative social states. As originally developed, the Pareto criterion attempted to make social judgments about alternative states of the world without resorting to problematic interpersonal comparisons of utility. It avoided the necessity and awkwardness of such comparisons by prescribing a test that allowed each person to compare his own private welfare before and after the legal change. Thus if no person in state $A$ is worse off than he was in state $B$, and at least one person is better off in state $A$ than he was in state $B$, then state $A$ must be judged as superior to state $B$. The criterion of judgment is social in the sense that the welfare of every individual is taken into account, yet the stringent condition that no person be worse off in state $A$ than in state $B$ obviates the need for any comparison of welfare across separate persons.

The Pareto formula has often been attacked for being too restrictive of the type of social changes that it allows.[13] Nonetheless, where the relevant universe involves only two self-interested parties, any voluntary agreement or grant satisfies the test, for the agreement is formed only if it makes both sides better off than before, given that each is the best judge of his own welfare. The use of this Pareto formula presupposes that the status quo ante is the baseline against which shifts in individual welfare are measured. Thus when people reject a bargain or grant offered by the state, they are no worse off than they were before. When they accept the bargain or grant on condition, they are better off. Either way, they are not in a position to complain. The state for its part is treated (and this assumption will become controversial) as though it were a single person that knows its own preferences, measured against the same baseline of the status quo ante. If its bargain or grant is rejected, then it will be no worse off than before; if that grant or condition is accepted, then it will be better off. Either way the stringent Pareto conditions are

---

[12] For a celebration of this bargain theory, see Merrill, *Unconstitutional Conditions*, 77 U. PA. L. REV. 879 (1929).

There are shades of the same position in the dissenting opinion of Justice Rehnquist in First National Bank of Boston v. Bellotti, 435 U.S. 765, 823–27 (1978) (Rehnquist, J., dissenting).

[13] *See, e.g.*, Coleman, *Efficiency, Utility, and Wealth Maximization*, 8 HOFSTRA L. REV. 509 (1980).

Appendix 11

Page 190 of 293

satisfied so that there is no reason to worry about the terms and conditions that the government attaches to its bargain or grant. No matter what its outcome, the proposed transaction appears unassailable.

The implications of this reasoning for *Lyng* are clear: if Congress could grant or withhold food stamps at will, then it can do so on condition. Before the 1981 Amendments to the Food Stamp Program, Congress could have repealed the statute in its entirety, much the way a settlor can take back at will the property that he has placed in a revocable inter vivos trust. The baseline against which the conduct of individual union members must be measured, therefore, is not one in which they are entitled to food stamps as of right. Relative to the proper baseline, no worker can complain. A worker who bargains away his right to strike for food stamps does so because he values the latter more than the former; a worker who rejects that offer is no worse off than he would have been in the baseline situation. The situation is thus radically distinct from one in which the state uses force against any individual, for in that case one person is left worse off because of the application of state power and, at the very least, has a strong case to demand that the state justify its action.

At first blush, then, a categorical rejection of the doctrine of unconstitutional conditions seems to square with both traditional conceptions of sovereign power and modern tests of social welfare. A position with so strong an apparent pedigree should be hard to dislodge on any ground. Yet the doctrine of unconstitutional conditions tenaciously endures, notwithstanding charges by figures no less distinguished than Justice Holmes that it is both logically incoherent and corrosive of sovereign power.[14] Originating in the nineteenth century, the doctrine of unconstitutional conditions is no new judicial concoction in the post-New Deal welfare state. Nor is the doctrine anchored to any single clause of the Constitution. Like the police power, it is a creature of judicial implication. It roams about constitutional law

---

[14] Holmes' most famous statement of his position is found in McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 29 N.E. 517 (1892):

> The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman. There are few employments for hire in which the servant does not agree to suspend his constitutional right of free speech, as well as of idleness, by the implied terms of his contract. The servant cannot complain, as he takes the employment on the terms which are offered him.

*Id.* at 220, 29 N.E. at 517–18.

A similar freedom of contract rationale is found in some of Holmes' tort opinions. *See, e.g.,* Lamson v. American Axe & Tool Co., 177 Mass. 144, 145, 58 N.E. 585, 585–86 (1900) ("[The workman] complained, and was notified that he could go if he would not face the chance. He stayed, and took the risk. He did so none the less that the fear of losing his place was one of his motives." (citations omitted)). Justice Holmes reiterated these principles in the context of unconstitutional conditions in *Western Union Telephone. See supra* note 10.

**Appendix 11**

Page 191 of 293

like Banquo's ghost, invoked in some cases, but not in others. It has been used as an aid in construing the scope of Congress' spending power[15] and of the states' police power.[16] It has been engrafted onto substantive protections afforded to speech,[17] religion,[18] and property.[19] It also has found expression in decisions under the equal protection[20] and due process[21] clauses. About a dozen cases in the past two terms testify eloquently to the diverse and thorny issues that the doctrine raises.

The importance of the unconstitutional conditions doctrine has brought forth an extensive array of academic literature to explain and justify it.[22] The received writing sensibly recognizes the essential place that the doctrine occupies in modern constitutional law, but it makes far less sense when it attempts to explain how the doctrine arises or what it does. In part, the difficulties arise from the persistent efforts to make unconstitutional conditions cases resemble duress or coercion cases,[23] as is made evident by the discussion of differences between "penalties" or "fines" on the one hand, and "subsidies" or "benefits" on the other.[24] Yet if common law duress were present in these cases, the recipient of the grant would be able to attack the offending condition without resorting to any special doctrine of unconstitutional conditions. As long as the condition is obtained by coercion or duress, it can be set aside as a matter of right, regardless of its content. In contrast, the doctrine of unconstitutional conditions

---

[15] *See* Child Labor Tax Case, 259 U.S. 20 (1922); South Dakota v. Dole, 107 S. Ct. 2793 (1987); *infra* pp. 40–47.

[16] *See* Nollan v. California Coastal Comm'n, 107 S. Ct. 3141 (1987); Posadas de Puerto Rico Assocs. v. Tourism Co., 478 U.S. 328 (1986); *infra* pp. 58–67.

[17] *See, e.g.,* City of Lakewood v. Plain Dealer Publishing Co., 108 S. Ct. 2138 (1988); Arkansas Writers' Project, Inc. v. Ragland, 107 S. Ct. 1722 (1987). For discussions of these cases, see pp. 55–58 and pp. 76–77 below, respectively.

[18] *See, e.g.,* Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136 (1987); Thomas v. Review Bd. of the Ind. Employment Sec. Div., 450 U.S. 707 (1981); Sherbert v. Verner, 374 U.S. 398 (1963); *see also infra* pp. 79–89.

[19] *See, e.g., Nollan,* 107 S. Ct. 3141; *infra* pp. 60–64.

[20] *See, e.g.,* Southern Ry. Co. v. Greene, 216 U.S. 400 (1910); *see also infra* note 65.

[21] *See* Frost & Frost Trucking Co. v. Railroad Comm'n, 271 U.S. 583 (1926); Western Union Tel. Co. v. Kansas, 216 U.S. 1 (1910); *infra* pp. 47–54.

[22] *See, e.g.,* Kreimer, *Allocational Sanctions: The Problem of Negative Rights in a Positive State,* 132 U. PA. L. REV. 1293 (1984); Shiffrin, *Government Speech,* 27 UCLA L. REV. 565 (1980); Van Alstyne, *Cracks in "The New Property": Adjudicative Due Process in the Administrative State,* 62 CORNELL L. REV. 445 (1977); Van Alstyne, *supra* note 8, at 1445–49.

[23] *See, e.g.,* Child Labor Tax Case, 259 U.S. 20, 36–37 (1922); Van Alstyne, *supra* note 8, at 1445–49.

[24] *See infra* pp. 41–44 (discussing the *Child Labor Tax Case); infra* pp. 79–87 (discussing Sherbert v. Verner, 374 U.S. 398 (1963)); *infra* pp. 94–96 (discussing Bob Jones Univ. v. United States, 461 U.S. 574 (1983)); *infra* pp. 96–102 (discussing Lyng v. International Union, UAW, 108 S. Ct. 1184 (1988)).

Appendix 11

is directed toward the substance of various conditions, regardless of the course of negotiations between the individual recipient and the state.

The balancing tests commonly suggested by commentators show that the doctrine of unconstitutional conditions cannot be explained by analogy to common law coercion.[25] This balancing is not evidentiary, as courts are not asked to weigh different sorts of evidence that might indicate whether a certain gesture is an implied threat of the use of force. Rather, its close involvement with the substantive terms and conditions of the statute — for example, whether the use of state highways is conditioned upon agreeing to service of process in all cases, or only in those arising out of use of the highways — distances us from the process-oriented issues that dominate ordinary duress cases. But without a strong substantive theory that explains both the use and the limits of individual consent, the use of balancing tests in this context leaves far too much room to the legal imagination. Balancing must be in service of a general theory. It cannot be a substitute for one.

Efforts to explain the doctrine on the basis of "dignitary" interests[26] are also unsatisfactory, running into the same difficulties in this context that they do in all others. First, it is unclear how individual dignity is advanced when restrictions are placed upon the individual right to contract. Can one respect the dignity of the individual, and at the same time hold that a person, although of full age and competence, cannot make the decisions of greatest importance to his or her life prospects? How does one enhance dignity by restricting choice? Theories of dignity are often used to support notions of individual autonomy, yet here they are invoked to limit the ability of the individual to enter into desired agreements with the state. Second, the dignitary theories are undermined by their exclusive focus on the individual upon whom the condition is imposed. As far back as Hohfeld, if not before, it has been understood that the creation and recognition of a right or privilege in one person will impose correlative obligations on others.[27] The art (or science) of government is to develop some social criterion, such as the Pareto test, that helps decide which interests, including dignitary interests, should be protected, and which not. In this inquiry, of course, it is useful from the individual's perspective to identify the benefits of having certain conditions removed from state bargains or grants. But the analysis is incomplete

---

[25] *See* Kreimer, *supra* note 22, at 1349–51 (criticizing attempts by Van Alstyne and others to defend this balancing approach).

[26] *See, e.g.,* Mashaw, *Administrative Due Process: The Quest for a Dignitary Theory*, 61 B.U.L. REV. 885 (1981).

[27] *See* Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 23 YALE L.J. 16 (1913).

Appendix 11

Page 193 of 293

unless the correlative costs to other persons of their removal are taken into account as well. So long as resources are scarce, individual rights, even constitutional rights, must have some correlative duties. Thus, any complete analysis must take both sides of the same problem into account, but dignitary theories generally fail to do so.

The most ambitious effort to organize the unruly law of unconstitutional conditions is that of Professor Kreimer, who recognizes that standard notions of coercion are unable to account for the doctrine.[28] In Professor Kreimer's view, the greatest difficulty with the coercion question is to identify the appropriate baseline against which the possibly coercive effects of government action may be evaluated. When the baseline gives a right to the government, government may condition the benefits that it imposes. When it gives the right to the individual, then the government's extraction of a concession amounts to impermissible coercion.[29] Kreimer proposes three baselines against which the constitutionality of any government bargain can be measured: history, equality, and prediction.[30] Although an account of baselines is essential to any general analysis of unconstitutional conditions, Kreimer's inability to offer a single baseline for assessing conditional government benefits renders his account problematic. For example, the historical baseline may allow the states selectively to grant access to the public highways in a way that the equality norm prohibits. Consistent and determinate baselines can be generated only with aid of a theory that links the substantive guarantees provided under the Constitution to the set of government practices and processes that can undermine them. The theory, moreover, has to be functional, not intuitive: it must explain how some social improvement

---

[28] Kreimer has also pointed out the limitations of simple contract models that focus exclusively on force and fraud. *See* Kreimer, *supra* note 22, at 1318 ("While there is a contemporary philosophical school that attaches unique status to rights of bodily integrity and freedom from physical force, it is hard to imagine any modern constitutional theorist taking the position that only a direct threat of violence would violate constitutional rights."). He attributes this model to Robert Nozick, Charles Fried, and me. *See id.* at 1318 n.77. In part, this Foreword is my effort to go beyond the simple libertarian model in the context of state grants and bargains. For my own concerns with the libertarian model, published after Kreimer's observation, see R. Epstein, Takings, 334–38 (1985), and Epstein, *The Classical Legal Tradition*, 73 Cornell L. Rev. 292, 298–99 (1988).

[29] *See*, Kreimer, *supra* note 22, at 1352 ("My conclusion is that the distinction between liberty-expanding offers and liberty-reducing threats turns on the establishment of an acceptable baseline against which to measure a person's position after the imposition of an allocation.").

[30] *See id.* at 1359–74. History refers to the use of tradition and the status quo ante as a baseline, so that coercion occurs when a previously enjoyed benefit is lost. *See id.* at 1359–63. Equality refers to equal treatment under the law, and invokes equal protection ideals generally. *See id.* at 1363–71. Prediction is the hardest baseline of all to grasp because it requires a counterfactual judgment of what a government would have done had it been asked to adopt a policy without reference to the constitutional rights that it is asking the individual citizen to waive. *See id.* at 1371–74.

**Appendix 11**

Page 194 of 293

is obtained by striking down the condition in question. So much at least is demanded by any theory that treats the substance of bargains, not the process of their formation, as its subject matter. What is needed is a more systematic examination of the overall consequences of certain bargaining strategies undertaken by government.

## B. The Plan of Action

In this Foreword, I hope to explain why the divisions and confusions in judicial and academic opinion on the subject of unconstitutional conditions do not rest upon simple error or naïve misconception of the legal doctrine, but upon deep structural problems associated with both constitutional theory and the larger questions of proper political governance. There are no shortcuts to this form of analysis. In order to understand unconstitutional conditions, it is first necessary to understand the function and limitations of consent, and the bargaining processes by which it comes about.

Part II of this Foreword develops such a conceptual framework. Its inquiry is overtly functional and utilitarian. Bargains are interactions thought to advance some overall measure of social welfare. They are not regarded as absolutes in themselves. Essentially, we want to enforce bargains when and only when they satisfy two criteria. First, does the bargain create joint gains for the contracting parties? Second, does the bargain respect the interests of third persons who are not parties to the bargain? Within a libertarian framework, the first criterion is satisfied by refusing to enforce bargains induced by force and fraud. Similarly, the second criterion is met by refusing to enforce bargains that contemplate the use or threat of coercion or fraud against third parties. As stated, these criteria account for many of the necessary limitations on the common law regime of contractual freedom. Although this model addresses some of the possible externalities that are created by contractual agreements, it ignores monopoly and collective action problems, which also induce individuals to take actions that benefit their private, but not the social interest.[31] Each of these phenomena offers compelling reasons why certain private bargains are not enforced. The problems each pose arise with equal or greater intensity in the context of state bargains. The reasons that lead us not to enforce some private bargains can thus explain why certain bargains between the government and the individual are not enforced. Once those reasons are explicated, we can provide a

---

[31] The closest example of the general approach I am proposing is found in Easterbrook, *Insider Trading, Secret Agents, Evidentiary Privileges, and the Production of Information*, 1981 SUP. CT. REV. 309, 349. Judge Easterbrook presents a view of the doctrine of unconstitutional conditions as part of an elaborate effort "to control cases of externalities and monopoly." *See id.*

more systematic consequentialist argument for why the doctrine of unconstitutional conditions limits the ability of individuals to consent to the surrender of constitutional rights.

With this framework in view, the remainder of the Foreword shows how the doctrine of unconstitutional conditions does, and should, function in a variety of contexts as a check against the political perils of monopoly, collective action problems, and externalities. In principle there are two ways to organize the discussion. The first is to examine how the doctrine works with respect to its distinct limitations upon the "prices" people have to pay in order to obtain benefits from the government. Thus there could be a discussion of the first amendment protections of speech and religion, the takings clause, the due process clause, and the like. I have chosen not to follow that course, at least not fully. Instead, I have adopted an approach that first identifies the different heads of government power and then shows how the doctrine of unconstitutional conditions plays itself out with respect to their exercise. By beginning with the powers and not the limitations, it is easier, I think, to follow both the doctrine's historical development and its institutional framework.

Given this orientation, I begin with those areas in which the preservation of competitive markets has been regarded as an important social function. Part III thus concerns the use of the doctrine of unconstitutional conditions in the area of its birth, the nineteenth-century cases in which states sought to impose discriminatory taxes or regulations upon out-of-state corporations that sought to do business within their borders. Part IV pursues a question of federalism of great importance in the pre-1937 cases: how the doctrine of unconstitutional conditions might be used to ensure that the United States does not invade the area of powers reserved to the states. Part V then examines the role of the doctrine in limiting the power of the state to control access to public roads and highways. Part VI addresses the relationship between the doctrine of unconstitutional conditions and the police power, as it relates to the regulation of both property and commercial speech. Part VII then discusses the use of the doctrine in modern areas of tax benefits and welfare rights. It covers the receipt of conditioned exemptions for real estate and sales taxes, and the receipt of unemployment benefits, medical benefits, or, as was the case in *Lyng*, food stamp benefits for striking union workers. A brief conclusion follows.

## II. The Conceptual Framework

In order to understand the limitations on bargaining, it is best first to sketch how bargains can lead to optimal social results. I thus begin with a brief discussion of perfect competition, and then move on to discuss monopoly, collective action, and externality problems as they

occur in private law contexts. Thereafter I shall show how these problems arise in the context of state power.

## A. Private Transactions

*1. Perfect Competition.* — We begin with an idealized spot market that contains many buyers and many sellers. Fraud and duress are rendered illegal, as is the power of either sellers or buyers to contract among themselves over output or price. In this type of market an optimal social equilibrium emerges in the sense that all the possible gains from trade are exhausted by voluntary exchanges. Within the ideal competitive equilibrium, there will be a unique price at which all goods will be traded, and that price will be set equal to the marginal cost of the marginal producer.[32] Accordingly, no seller and no buyer have any discretion over price. The seller who tries to raise his price above the market will find no takers. The seller who tries to lower his price below the market will find that he cannot make a profit on the sales that are concluded. A system of perfect economic freedom yields a set of rules in which no player finds it to his advantage to engage in any bargaining tactics at all. The ideal competitive market yields a situation in which all the gains from bargains are captured at zero bargaining costs.

*2. Monopoly.* — The polar opposite to perfect competition is monopoly.[33] Here the market has a single seller who can set terms for sale that maximize his own profits. In general the monopolist will seek to maximize his own profits by selling a smaller quantity of goods at a higher price than is found in the competitive market. This private strategy yields lower total social output than is achievable under pure competition. The social losses in question arise from three distinct sources. First, when the monopolist raises his price, he prevents some mutually beneficial exchanges. Thus, if the competitive price of a good is eight and the monopoly price is ten, any consumer who values that good at more than eight units but less than ten will no longer purchase it. The benefits of that foregone exchange are thus one form of loss created by monopoly.

---

[32] In real markets, nonprice terms introduce additional complexity that must be taken into account. These terms — such as warranties and delivery provisions — usually are accounted for by adjustments in the price term. Also, in practice, firms seek supracompetitive returns by finding new "niches" for their products that, in the short run at least, give them some discretion over prices. The resulting monopoly gains are typically subject to erosion in the long run by new entry, a phenomenon generally inapplicable to political markets.

[33] For an excellent general discussion of the differences between competitive and noncompetitive markets, see D. FRIEDMAN, PRICE THEORY 215–61 (1986).

Appendix 11

There is a second source of loss as well. With respect to transactions that do occur, the price increase of two units seems to result in a pure transfer of wealth from consumers to producers without any attendant social loss. Nonetheless, this transfer itself is not costless to achieve. Monopolies do not come down from heaven, but are acquired by purposive and costly human action. The prospect of obtaining increased prices is a private gain for which any prospective monopolist will pay. The costs of acquiring a monopoly, whether by buying out a competitor or obtaining government protection from competition, are real costs incurred to obtain simple wealth transfers. The result is that some fraction, and perhaps all, of the potential social gain from the transaction is always wiped out, creating a second form of loss.

Finally, there is a third source of loss associated with monopolies. Outside a regime of pure competition, there is no unique price at which goods can be bought and sold. The advent of a bargaining range — a series of prices at which both buyer and seller are willing to transact — gives rise to a problem of "strategic bargaining," or more generally, "strategic behavior." Parties now have a tendency to "act strategically," to conceal preferences, to lie, to haggle, to holdout, to dicker, to build coalitions, and to price discriminate, all of which cost money but which produce no real gain.

The losses that arise from strategic behavior can perhaps best be seen if we take an extreme situation, the bilateral monopoly, in which there is a single buyer and single seller. The buyer might be willing to pay 200 units to purchase, and the seller to accept 100 units to sell. A costless bargain at any price in the interval generates 100 units of total gain. If the price is 150, each side obtains 50 units of that gain. But 150 does not offer a stable resting point. The seller, for example, may be to tempted to spend, say, 10, to sell at 170, while the buyer may be tempted to spend 10 to purchase at 130. Both strategies cannot be successful. If each side's efforts cancel each other out, then the sale is still at 150, but bargaining behavior reduces the total gain by 20 units, or 10 per person. Nor is the overall result changed by any shift in the contract price from the even division at 150. The total gain is still reduced by the level of bargaining costs, which could exhaust much of the 100 units of potential gain. Therefore, any set of institutions that could reduce the bargaining costs without defeating the bargain would generate important social benefits that could be shared by both parties to the transaction.

The dangers of monopoly have led to powerful legal restraints against freedom of contract. Thus, an aggrieved consumer may bring a private antitrust monopoly action. Such a consumer is better off having made a purchase from a monopolist than he would have been if he had done without the good. In the example above, he might

Appendix 11

have valued at eleven units a good for which the monopolist charged ten, but for which the competitive price was eight. Nonetheless the antitrust damage action for two units (ignoring trebling of damages) is permitted, notwithstanding the consumer's consent to pay ten. The baseline norm is not the state of affairs before any contract, but the achievable state of affairs under the competitive equilibrium that is the social optimum. In effect, the plaintiff is regarded as a suitable private attorney general and can sue, notwithstanding his position as a willing party to the contract. Yet by the same token, the purchaser is not free of all obligations under the contract. He must, for example, treat goods with proper maintenance in order to maintain an action for breach of express warranty, just as he would in the competitive situation.

Similar limitations on consent are often found in cases of bilateral monopoly. A good illustration of the process is the common law response to private necessity, as it relates to the law of both tort and contract. For example, when a ship is caught in a storm and the crew can save itself only by docking at a single dock, there is a powerful bilateral monopoly problem that invites the use of strategic bargaining. The dockowner may be able to make a gain if he allows the use of his dock for any sum greater than 10 units, while the ship's crew may be willing and able to pay 1000 just for the temporary use of the dock. If the matter were resolved by a voluntary bargain, the price settled upon might be anywhere within the total range of 10 to 1000, leaving both sides better off. Worse still there might be no bargain at all, if the dockowner, who has so little to lose by holding out for a high price, refuses to accept a more reasonable offer.

The doctrines of "conditional privilege," developed at common law, are a response to bargaining problems created by the necessity situation.[34] In essence they allow the shipowner to use the dock upon payment of compensation equal to the rental value of the dock, plus damages for any loss inflicted during the storm. The right to exclude, a normal incident of property, is suspended under conditions of necessity.

Modifications of the law of contract parallel those in the law of property. For example, it has long been the law in admiralty that a salvor is not allowed to take advantage of the position of a ship in distress at sea by driving a hard bargain. Even if such a bargain has

---

[34] *See* Ploof v. Putnam, 81 Vt. 471, 71 A. 188 (1908) (recognizing a privilege to enter the land of another when acting under private necessity); Vincent v. Lake Erie Transp. Co., 109 Minn. 456, 124 N.W. 221 (1910) (requiring compensation to be paid for damage caused when using another's property under conditions of necessity). *See generally* Bohlen, *Incomplete Privilege to Inflict Intentional Invasions of Interests of Property and Personality*, 39 HARV. L. REV. 307 (1926).

Appendix 11

Page 199 of 293

already been concluded, it will not be enforced, and compensation will be set in accordance with a formula that takes into account both the risk to the salvor and the gain to the rescued ship[35] — a principle easily extended to contracts made in the dock case. What goes for price terms applies equally to conditions that might otherwise be set. Thus a contract that said, "I will rescue you only if you agree not to enter into competition with me in the real estate market and to vote Republican" would not be enforced either.

These limitations on contractual freedom could not be justified if the only reason to invalidate contracts were to counteract force and fraud, both of which are absent in the situations just described. Rather, the rules are a judicial effort to maximize the overall value of the dock or of salvage activities by preventing the gameplaying that parties might otherwise engage in, given the large bargaining range. The rules impose a single price at which the dock must be rented, or ships salvaged, which is set roughly to allow the rescuer a competitive return on his costs, while preserving the remainder of the cooperative surplus for the party subject to the external necessity. The legal rules are set in a way that best imitates the outcome that a competitive market would generate. The moment the crisis is over, the ordinary rules of property and contract are restored. The dock can be used by the shipowner only with the owner's consent; the salvage crew keeps full control over its equipment. Calm seas and safe journeys bring with them a return to the ordinary property rights regime.[36] Monopoly and necessity thus offer powerful reasons for limiting a regime of private freedom of contract.

*3. Collective Action Problems.* — The problem of monopoly is closely associated with the so-called collective action problem that has now been studied in many private law areas. A bankruptcy situation

---

[35] The Supreme Court has stated the rule as follows:

Courts of admiralty will enforce contracts made for salvage service and salvage compensation, where the salvor has not taken advantage of his power to make an unreasonable bargain; but they will not tolerate the doctrine that a salvor can take the advantage of his situation, and avail himself of the calamities of others to drive a bargain; nor will they permit the performance of a public duty to be turned into a traffic of profit. The general interests of commerce will be much better promoted by requiring the salvor to trust for compensation to the liberal recompense usually awarded by courts for such services.

Post v. Jones, 60 U.S. (19 How.) 150, 160 (1856) (citations omitted). For the determinants of salvage price, see Landes & Posner, *Salvors, Finders, Good Samaritans, and Other Rescuers: An Economic Study of Law and Altruism,* 7 J. LEGAL STUD. 83 (1978).

[36] In Calabresi's terms, the necessity situation reduces the dockowner's protection to that afforded by "liability rules" — a damage action against loss. "Property protection" means that control over the asset can only be lost by consent, the normal situation. *See* Calabresi & Melamed, *Property Rules, Liability Rules and Inalienability: One View of the Cathedral,* 85 HARV. L. REV. 1089, 1105–06 (1972).

Appendix 11

Page 200 of 293

illustrates the problem as well as any other.[37]  Suppose that there is
a single common debtor with a large number of independent general
creditors.  Assume further that the debtor's business has a positive
"going concern" value that could not be captured if its assets were
sold off piecemeal in order to satisfy creditors' claims.  If the business
should become insolvent, the way to maximize the total return to the
creditors would be to keep the business intact, and to provide each
creditor with a portion of the earnings it generates prorated to his
share of the debt.  Nonetheless, any debtor has powerful incentives
to take individual action that would defeat this ideal collective solu-
tion.  Thus, creditor *A* may prod the debtor for full payment of his
obligation by threatening suit.  To stave off disaster, the debtor may
agree to make this payment, even at the cost of the piecemeal sale of
assets.  Once any given creditor takes this course of action, other
creditors will also move to protect their assets.  Each creditor will
therefore race for early payment and seek a "preference" from the
debtor.  The debtor, who might have survived if the creditors stayed
their hand, can be brought down by the onslaught.  Acting individ-
ually, the creditors will manage to destroy the going concern value of
the business, probably ensuring that many creditors will receive only
partial payment, and some none at all.  Moreover, all of the jockeying
consumes enormous resources, which could be spared if the creditors
acted as a unit from the outset.

The difficulties of this collective action problem have long been
understood to require some form of legal modification of the simple
common law rules of property, contract, and tort.  Because the debt-
or's property is a common pool asset, certain individual contracts or
transfers between any single creditor and the debtor can be set aside
to preserve the value of the whole.  In essence, therefore, much of
the bankruptcy law is designed to force otherwise independent actors
to act together in a cooperative manner.  Groups do not act in their
collective interests in quite the same way that individuals act in their
individual interests.  The so-called problem of the prisoner's dilemma
is a standard example of the problem of collective choice.[38]  The legal

---

[37] *See, e.g.,* D. BAIRD & T. JACKSON, CASES, PROBLEMS AND MATERIALS ON BANKRUPTCY
31–35 (1985); T. JACKSON, THE LOGIC AND LIMITS OF BANKRUPTCY LAW 10–13 (1986).

[38] The prisoner's dilemma arises when each of two prisoners acting alone finds himself driven
to confess, even though both prisoners would be better off if they could coordinate their efforts
and remain silent.  To see how this situation might arise, assume the following sentences await
each prisoner: if both confess, each gets a five-year sentence; if prisoner *A* confesses but prisoner
*B* does not, *A* gets a one-year sentence and *B* gets a ten-year sentence; if *B* confesses but *A*
does not, *B* gets the one-year sentence and *A* gets the ten-year sentence; if neither prisoner
confesses, each gets a two-year sentence.  If *A* and *B* could coordinate their behavior, both
would remain silent, and each would escape with a light two-year sentence.  Acting separately,
however, each will confess and therefore receive a five-year sentence.  Consider *A*'s situation.
If *B* confesses, *A* should confess in order to receive a five-year sentence instead of a ten-year

Appendix 11

Page 201 of 293

doctrines addressing this problem provide yet another powerful limitation on consent even in the absence of force and fraud that cannot be ignored in the constitutional context.

*4. Externalities.*[39] — The last of the social problems that lead to limitations on freedom of contract is the need to protect strangers to the agreement. It is here that the libertarian prohibition against the use of force shows its greatest strength. Assume that *A* is not entitled to take the property of *B* without *B*'s consent. Any contract between *A* and *C* that allowed *A* to take *B*'s property would not be enforced, at least as against *B*. The prohibition is necessary in order to forestall destructive behavior that would otherwise undermine any stable system of social organization. If *A* and *C* could bargain away the rights of *B*, why would *B* and *D* not bargain away the rights of *A*? And so on ad infinitum. An unending series of costly bargains could be used to secure the transfer of wealth, but little would be done to secure the creation of wealth in the first instance. The legal rule allowing persons to exchange only those resources that they own creates powerful incentives for the creation of wealth, and with it the satisfaction of human desires. The rule that allows them to buy, sell, or consume resources owned by others only leads to the dissipation of wealth. Private law must therefore protect all individuals against the contractual machinations of strangers. The rights that *A* and *B* each have against *C* cannot be enlarged by an agreement between *A* and *B* alone. The temptations for strategic contracting would be too great.

## B. The Political Context

The dangers inherent in a system of private contracting often carry over into the political arena. Thus, despite the traditional Hobbesian

---

sentence. If *B* remains silent, *A* should confess in order to receive a one-year sentence instead of a two-year sentence. No matter what *B* does, therefore, *A* is better off confessing. Parallel arguments apply to *B*, so both *A* and *B* confess. A chart of the payoffs looks as follows, where the first entry in each box is *A*'s expected sentence, and the second entry is *B*'s:

|   |  | *B* | |
|---|---|---|---|
|   |  | confess | keep silent |
| *A* | Confess | 5,5 | 1,10 |
|   | Keep Silent | 10,1 | 2,2 |

The prisoner's dilemma set out here is one that seems socially beneficial because it tends to forestall crime. But sometimes, as in the bankruptcy case, each creditor finds himself in a prisoner's dilemma game with his co-creditors that leads to a negative social outcome, namely the destruction of the going-concern value of the business. For various articles discussing the prisoner's dilemma, see RATIONAL CHOICE 34–107 (J. Elster ed. 1986).

[39] The seminal discussion of this issue is found in Coase, *The Problem of Social Cost,* 3 J.L. & ECON. 1 (1960). I have stated my own views more fully in Epstein, *Causation — In Context: An Afterword,* 63 CHI.-KENT L. REV. 653, 653–57 (1987).

insistence that the state must exercise a monopoly of force within its jurisdiction in order to prevent the war of all against all, the creation of that monopoly power in the hands of a few public officials itself poses a great danger of abuse. The major task of constitutionalism, therefore, has been to forge a system in which these government excesses are curtailed while leaving the state sufficient power to discharge the necessary tasks of governance. A system of unrestrained political power does a poor job in setting the right balance. In some markets the government has a high degree of monopoly power. It may be the only party that can operate the public roads, issue building permits, or allow firms to do business in corporate form. Unlike the private monopolist, its power cannot be eroded by the entry of new firms, but is perpetuated by a legal prohibition against entry by new rivals. The risks of resource misallocation identified in private transactions carry over to the political area as well. There is an obvious need for limitations on the direct use of coercion. By the same token, if the monopoly and necessity cases are any guide, there are obvious reasons to limit the capacity of the government to bargain with its individual citizens. Just as the dockowner in the private necessity case is limited to a fixed rate of return when the dock is used by others and forbidden from imposing collateral or unrelated conditions on that use, so too the state, when it provides resources of which it is the sole supplier, should be limited both in the concessions that it may exact from private owners and in the conditions it may impose on them.

Similarly, government action often creates the risk of collective action problems. As a single unified entity, the state may be able to make offers to widely dispersed individuals who find themselves faced with a prisoner's dilemma game. Each person acting alone may think it in his interest to waive some constitutional right, even though a group, if it could act collectively, would reach the opposite conclusion. By barring some waivers of constitutional rights, the doctrine of unconstitutional conditions allows disorganized citizens to escape from what would otherwise be a socially destructive prisoner's dilemma game.

Finally, the problem of externalities as it arises from majority rule must be taken into account. The state is an association of a large number of individuals with diverse interests and inconsistent desires. Yet it must make decisions that bind them all. In principle it would be ideal if all collective decisions could be made by unanimous consent, which would forestall the problem of the majority exploiting the minority. But any unanimous consent requirement would lead to government paralysis, because any single individual would be in a position to bargain strategically by holding out for a lion's share of the gain from social action. For better or for worse, some system of

majority rule is a necessary evil, and one that forces us to confront explicitly the expropriation problem in the political context.

Left unregulated by constitutional limitations, a majority could use a system of taxation and transfers to secure systematic expropriation of property. Taxes could be used to purchase property, which could then be conveyed to some preferred groups·via "bargain sales," at a fraction of its true value. There would be no exploitation of the happy buyer, but there would be a risk that the state as trustee would have abused its power in relation to the other citizens it represents, all of whom received less than fair value in exchange for the property transferred. This pattern of abuse would result not only in a systematic deprivation of the interests of some citizens but also in an overall efficiency loss, as the controlling group will not only expend resources to obtain the transfer, but will be willing to acquire the property even when they value it less than the state did.[40] The legal system tries to combat this problem through the use of the public trust doctrine.[41] Standing alone, the problem is not one of unconstitutional conditions because there is no effort to take advantage of the happy parties who prosper from doing business with the state.

Externalities, however, become entwined with the problem of unconstitutional conditions when the state seeks to grant benefits or make contracts subject to conditions that some individuals find far more onerous than others. To be sure, conditions will not be imposed if everyone is hurt equally by them, but they may become part of a system of contracts or grants if they work to the benefit of a dominant

---

[40] To take a simple case, assume that there are five persons in the society at large, and that a majority faction of three arranges to buy a public asset worth $500 for $300. In a static analysis, the wealth of each of the two minority shareholders decreases by $40 (one-fifth of the state's $200 loss in the transaction), assuming that the asset has equal value for all concerned. The wealth of each of the three dominant shareholders, ignoring assets not involved in the transaction, increases from $200 before the transaction ($100 in cash, plus $100 for his interest in the public asset) to $227 after the transaction ($60, or one-fifth of the publicly held cash, plus $167, or one-third of the $500 asset). As a first approximation there is only a redistribution, not substantially different from that of an ordinary takings case. In dynamic terms, however, there will be not only a simple shift of wealth, but a total reduction as well. Not only are transaction costs incurred in making the shift, but the winning coalition may be able to profit from the public sale if they value the asset at more than $300, even if they value it at less than $500. Hence there is a systematic divergence between private and social costs, analogous to the one found in the monopoly case. The winning coalition forces the transaction even when the property is worth *less* in private hands than it was in public hands. The insistence that full value be paid for any transfer of property from the state is necessary to stop this problem. *See* Epstein, *The Public Trust Doctrine*, 7 Cato J. 411 (1987).

[41] *See* Illinois Cent. Ry. Co. v. Illinois, 146 U.S. 387 (1892). *Illinois Central* does not locate the public trust doctrine in any particular clause of the Constitution. On the public trust generally, see Rose, *The Comedy of the Commons: Custom, Commerce, and Inherently Public Property*, 53 U. Chi. L. Rev. 711 (1986), and Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471 (1970).

faction and against the interests of others. Assume, for example, that before the introduction of a government benefit program — say, the construction of a public highway — each of two factions has a welfare of 50 units. Construction of the highway can improve the position of each group from 50 units to 100, and thus advance aggregate welfare from 100 to 200. Thus far it seems that going forward with the project is entirely unproblematic.

Once use of the highway may be conditioned, however, the analysis becomes far more complicated. Consider two polar scenarios. Under the first, building the highway and conditioning its use advances total utility from 100 to 250 units, while that of each faction increases from 50 to 125. Here both sides are unambiguously better off with the imposition of the condition than they were without it, so that courts should accept the condition even if they could not compel its adoption.

The second scenario, however, is far more problematic. Suppose that the total welfare involved increases from 100 to 175 units, but that the position of the dominant faction moves from 50 to 120, while that of the weaker faction moves only from 50 to 55. In essence the imposition of the condition is designed to secure factional gains, which are costly to obtain, shrinking the total size of the pie even while the size of the slice enjoyed by the dominant faction increases. A third scenario is possible, but unlikely: a one-sided condition might advance the welfare of one group from 50 to 110 units, and that of the other from 50 to 120. In this case, the only inquiry is whether it is worthwhile to equalize the expanded gains from benevolent collective action.

The first two scenarios, then, are the ones that require closer attention. The doctrine of unconstitutional conditions is necessary to prevent the second alternative (unequal shares and smaller total gain) from prevailing over the first. Thus if the dominant faction cannot be prevented from conditioning use of the highway in the second scenario, other citizens will take the bitter with the sweet, and consent to the total package. Clearly, the world with the project and the condition is better than the world without any project at all. But, to use Kreimer's language, we have selected the wrong baseline, for the world of the project without the condition is better than either of these two alternatives. In the case given, there is social loss in that the total size of the surplus produced by government action is reduced from 200 units, if the latter condition is not allowed, to 175 units, if the condition is allowed. If the legal system focuses only on the consent of the individual citizen, it will not distinguish between these very different kinds of conditions and their very different allocative effects. The doctrine of unconstitutional conditions offers a way to pierce the consent by using as the baseline, not the status quo ante, but an achievable state of affairs in which the program is put forward without the conditions attached.

Appendix 11

At this point, it becomes difficult to use a simple Pareto test to make the applicable distinction, for the dominant faction is left worse off when the condition is rejected than when the condition is imposed. Now the object of the inquiry is to maximize the total cooperative surplus from the government action. Some effort must be made to compare the size of the gains obtained by each of the rival groups, and for this task one convenient approach is to accept only conditions that tend to advance the welfare of all groups pro rata, as opposed to those having a differential effect.

Given this complex inquiry, the trick is to fashion a test that can distinguish good conditions from bad ones. A rule that all persons on the highway must agree to answer for their torts seems to be the benevolent kind of condition.[42] In imposing it the state acts as a mutual agent of all citizens in a way that advances their ex ante welfare. Alternatively, a condition stipulating that all commercial haulers who use the highway must agree to accept the restrictions of common carriers looks like the type of condition that reduces the total size of the social surplus, by allowing it to be redistributed through factional intrigue.[43] A strong unconstitutional conditions doctrine, which like a strong equal protection argument insists that all parties be treated equally, is one effective way to control this public abuse and to ensure full preservation of the social surplus created from the use of highways.

In dealing with unconstitutional conditions, the stakes are not limited only to dollars and cents, or even to property and economic liberties. Conditions might impinge upon individuals' political and religious liberties as well. It is therefore necessary carefully to examine the soundness of conditions for which consent has been obtained. Doing so once again requires the doctrine of unconstitutional conditions.

### · C. Citizen Misconduct

Thus far, all attention has been directed toward potential misconduct by government officials. But there is no reason to assume that government officials are any more self-interested than are the citizens with whom they do business. Thus the risk of strategic behavior is *bilateral*. In private dealings, any party to a complex transaction can engage in strategic behavior, and so too in the area of political action. Just as the government may seek to exploit the individual, so too a citizen may try to exploit the government. The flip-side, therefore, to the doctrine of unconstitutional conditions is the idea of "compelling

---

[42] *See infra* note 138 and accompanying text.

[43] *See infra* pp. 47–54 (discussing Frost & Frost Trucking Co. v. Railroad Comm'n, 271 U.S. 583 (1926)).

state interest," which appears throughout all constitutional analysis. Typically the doctrine of unconstitutional conditions does not interfere with government bargains designed to prevent individual exploitation of some common pool assets. To revert to the above example, a user of the public highways can be required to abide by the rules of the road as a condition of entry. The control of public nuisance is an end that the government can seek not only by direct regulation of private property, but as a condition on the use of public property as well.

### D. *Judicial Implementation of the Unconstitutional Conditions Doctrine*

*1. First Principles.* — The analysis of any unconstitutional conditions problem requires an assessment of the relative strength of the three risks of abuse that can arise when the state bargains with its citizens. But even after the relevant factors are set out, several pieces of the puzzle must still be put in place.

The first piece concerns the extent to which the Supreme Court will undertake this review of government behavior. Here, as in other contexts, the answer is heavily dependent upon its attitude toward the behavior of government officials. The private law response to monopoly, collective action problems, and externalities reflects the assumption that individuals will seek to maximize their own private returns, given the external constraints under which they labor. Its legal rules therefore have been set to minimize the likelihood that they will be able to achieve some private gain at some net social cost. To be sure these assumptions are overdrawn. There are many individuals who will come to the aid of those who are in trouble, without so much as the thought of payment to themselves. Many people would never think of abusing their partnership control to cheat their partners. These cases are important for any overall assessment of human nature, but they are not the cases against which the legal rules are directed. Honest and honorable people do behave well regardless of the legal framework in which they act. The law must be directed against that fraction of the total population for whom self-interest is the sole beacon of conduct. For such people, the assumptions of the law fit all too well with the behavior that the law seeks to control.

The question what to make of human nature carries over to the constitutional context with equal significance. If it is assumed that government officials and the private parties who influence them are prone to the corrosive influence of self-interest, then the legal rules should strictly scrutinize whatever behavior they undertake. If the direct use of government coercion is subject to serious constitutional scrutiny, then government bargains should be subject to a similar level of scrutiny. The doctrine of unconstitutional conditions thus becomes an inseparable part of constitutional law, attendant to any

and all exercises of government power. Alternatively, if government officials are assumed to act with benevolent motives when they regulate, then they should be assumed to act with similar motives when they contract. The low level of scrutiny found under rational basis review would carry over from regulation to bargains, and the doctrine of unconstitutional conditions would play only a marginal role in our legal firmament.

There are today many competing general constitutional visions, which bear on the question of how courts should regard government figures. Some theories stress the virtues of republican self-government;[44] others the satisfaction of "dignitary" interests;[45] still others the protection of economic liberty or the niceties of utilitarian calculation. Other constitutional theories rest upon the sanctity of private property and the fear of the democratic excesses of the populist masses.[46] For present purposes, the correctness of the basic orientations is not the critical point. The various theories only direct attention to those areas in which the political process is viewed with distrust. It is precisely in those areas that the doctrine of unconstitutional conditions will take root and flourish.

In this connection, the constitutional fault line of the post-1937 period poses the same problem for the doctrine of unconstitutional conditions that it does for direct forms of government regulation. The weak protection of property and contract is juxtaposed with a strong suspicion of government regulation of preferred freedoms, such as speech and religion, and the government use of suspect classifications, such as those based upon religious and political views. Today there remains, to a lesser degree than before, an erratic fear of political aggrandizement by one state at the expense of another, or of the states at the expense of the federal government.

This hierarchy of legal rights makes the doctrine of unconstitutional conditions especially difficult to apply to complex modern statutory schemes that implement explicit or implicit transfers of wealth for purposes now regarded as unquestionably legitimate — for example, to regulate land use, or to help the needy or unemployed. Yet these programs, whether by regulation or taxation, often effect such transfers along forbidden lines, such as political or religious affiliation. Frequently, the question arises how to disentangle these two distinct strands of a single statutory scheme, subjecting each to its appropriate

---

[44] See, e.g., Michelman, The Supreme Court, 1985 Term — Foreword: Traces of Self-Government, 100 HARV. L. REV. 4 (1986). For a more recent discussion, see Symposium: Republican Civic Tradition, 97 YALE L.J. (forthcoming 1988).

[45] See, e.g., Mashaw, supra note 26.

[46] The Framers' concerns in this regard are set out in McConnell, Contract Rights and Property Rights: A Case Study in the Relationship Between Individual Liberties and Constitutional Structure, 76 CALIF. L. REV. 267, 270–71 (1988).

Appendix 11

Page 208 of 293

level of review — minimal scrutiny for ordinary rights, strict scrutiny for fundamental rights and suspect classifications. The coerced transfer of property from *A* to *B* may be allowed today in general economic areas, but it will not be tolerated along (say) religious or political lines. Where the state seeks those forbidden objectives through contracting, its actions will be met with the same hostility as when it proceeds through direct regulation or taxation. In such contexts, we find the continued, indeed expanded, vitality of the doctrine of unconstitutional conditions in modern times.

2. *Second Best.* — The doctrine of unconstitutional conditions is also beset with the serious problem of being a "second best" approach to controlling government discretion. In many cases, the Supreme Court has held that Congress or the states have absolute discretion with regard to matters such as allowing foreign corporations to do business within the state or allowing commercial vehicles to use public highways. This discretion increases the risks associated with monopoly, collective action problems, and externalities in a wide variety of bargaining contexts. In some cases, the doctrine of unconstitutional conditions is used to "take back" some of the power which had been conferred upon government officials in the first instance. In principle, the doctrine's application would be unnecessary if the Court had restricted the scope of the government power in the first instance.

Often the unsatisfactory nature of the doctrine of unconstitutional conditions arises from its status as a mop-up doctrine where other forms of constitutional restraint have been abandoned. Within these contexts, it is often very difficult to decide whether the doctrine does more harm than good. When the government is told that it cannot bargain with individuals, the empirical question arises whether government will deny them a useful benefit altogether, or grant them the benefit without the obnoxious condition.

## III. THE STATE INCORPORATION POWER

### A. Nineteenth-Century Special Charters

One of the most important powers of the state is to grant charters to those firms that wish to be incorporated within the state. Often since Chief Justice Marshall's pronouncements in *Trustees of Dartmouth College v. Woodward,*[47] the corporation has been said, somewhat misleadingly, to be an "artifical being" that owes its existence to the state. But behind the corporate form lie the desires of ordinary

---

[47] 17 U.S. (4 Wheat.) 518, 636 (1819) ("A corporation is an artifical being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence.").

Appendix 11

human beings. Who receives the certificate, and on what terms, can raise all the potential for abuse associated with government discretion.

Consider what happens in a regime in which the state has complete discretion in awarding charters. First, state legislators will be able to extract enormous payments (including bribes) from the private parties who wish to obtain the benefits of incorporation. Second, granting a certificate of incorporation to one firm while denying one to its competitors creates enormous externalities. The public at large is denied the benefits of competitive product markets, while the rival firms are relegated to doing business in the inferior partnership form, with unlimited liability for members.

These two concerns are not simply hypothetical. One of the major political issues in the nineteenth century revolved around the once common practice of issuing individual, special charters of incorporation, the abuses of which have been well documented.[48] The situation was corrected largely through competition between states in the chartering market, rather than through application of any constitutional principle. The result was a regime of general incorporation that essentially allows any group of individuals the benefit of the corporate form as long as they can meet certain minimum requirements designed to protect the public at large from abuse: minimum assets or insurance to protect tort creditors, and a willingness to accept service of process in the corporate name.[49]

Although not prompted by application of the doctrine of unconstitutional conditions, the shift in the method of chartering corpora-

---

[48] For a judicial account, see Louis K. Liggett Co. v. Lee, 288 U.S. 517, 557–64 (1933) (Brandeis, J., dissenting). For an explicit public choice analysis of the abuses under the special charter system, see Butler, *Nineteenth-Century Jurisdictional Competition in the Granting of Corporate Privileges*, 14 J. LEGAL STUD. 129, 138–52 (1985).

[49] Even within this framework there are opportunities for abuse. Thus, in First National Bank of Boston v. Bellotti, 435 U.S. 765 (1978), the Supreme Court struck down a Massachusetts criminal statute that prohibited corporations from making contributions or expenditures "for the purpose of . . . influencing or affecting the vote on any question submitted to the voters, other than one materially affecting any of the property, business or assets of the corporation." MASS. GEN. LAWS ANN. ch. 55, § 8 (West Supp. 1977). The statute also provided that matters concerning the general taxation of income or property shall be "deemed" not to affect the corporation. Here the restriction was struck down on first amendment grounds over the dissent of Justice Rehnquist, who argued, relying on *Dartmouth College*, that because the corporation is a creation of state law, the state can legitimately withhold from the corporation those liberties not "incidental" to the corporation's state-defined purpose. *See* 435 U.S. at 822–28 (Rehnquist, J., dissenting).

In a sense this restriction applies evenhandedly to all corporations. But it is selective among business entities as a larger class, exacting an implicit tax on speech by corporations that reduces the gains from incorporation that private parties otherwise would obtain. The statute is not designed to prevent any abuse of the corporate form. In my view it could be struck down not only on first amendment grounds, but as a differential tax that violates the takings clause. *See* R. EPSTEIN, *supra* note 28, at 283–305. The first amendment analysis in *Bellotti* is similar to that applicable in the highway cases, discussed below at pp. 47–58.

Appendix 11

tions shows the social utility of limiting the state's discretion. It does make sense to say that the state may choose not to grant any individuals a charter of incorporation, or may choose to grant it to all comers on equal terms, but cannot use the ostensibly lesser power of picking and choosing among applicants. To see the point, consider a very simple and stylized example. Assume two firms — firm $A$ and firm $B$ — desire corporate charters. If neither firm $A$ nor firm $B$ gets a charter, then each will have a value of $100. If firm $A$ gets a charter and firm $B$ does not, then $A$ will have a value of $120 and $B$ a value of $90. If firm $B$ gets a charter and firm $A$ does not, then $B$ will have the value of $120 and $A$ the value of $90. If both firms get the charter, then each will have a value of $115. These values do not reflect the costs of getting a charter. The payoffs of the various alternatives are put in tabular form in the notes.[50]

In a regime of selective incorporation firm $A$ and firm $B$ will both bid for a charter, and each would be prepared to pay up to $20 to the legislators to obtain an exclusive charter. If either party starts down this road then the other will have to respond because one rival's incorporation reduces its competitor's net worth from $100 to $90. There will be a complex political struggle, the outcome of which is quite unclear. What is clear is that these bargaining costs reduce the total gains from incorporation, both for the firms and the society at large, even if the fourth outcome is achieved. In an extreme case, dual incorporation with bargaining costs taken into account could leave both firms with a value of only $100. Political intrigue can wipe out the efficiency gains of incorporation for firm members, suppliers, and customers.

We can now see the value of a rule rejecting the argument that the greater power (to keep all firms from incorporating) includes the lesser power (to keep some firms from incorporating). If the state is forced to grant charters of incorporation to every firm if it grants a charter to any, then the second and third possibilities are eliminated. The state is forced to choose between scenarios one and four. The

---

[50]

| Structure | Value | | |
|---|---|---|---|
| | $A$ | $B$ | Total |
| 1. No incorporation | $100 | $100 | $200 |
| 2. $A$ only | $120 | $90 | $210 |
| 3. $B$ only | $90 | $120 | $210 |
| 4. Both $A$ and $B$ | $115 | $115 | $230 |

This chart underestimates the value of alternative 4 because it does not include the gains that the public achieves from general incorporation, including greater technical innovation and more competition in product markets. This point does not affect the analysis; if anything, these gains tend to show the greater social preference for alternative 4.

**Appendix 11**

**Page 211 of 293**

two firms will no longer be in a position to compete with each other for charters, so the level of intrigue will be diminished. In addition, political dynamics will tend to force the outcome to scenario four, as the legislators will be very hard-pressed to resist an outcome that benefits both firms and the public at large. The upshot is that the power of *selective* incorporation is the greater power, while the all-or-nothing choice is the lesser power.[51] Whatever the formal appearances, selective incorporation gives political actors a greater opportunity to extract economic rents.[52] The rule forcing the state to incorporate all firms or none is, as a first approximation, a better protection against individual and public abuse.

There is still one piece to the puzzle missing, for some conditions can and should be uniformly imposed upon all firms seeking incorporation, for example those requiring insurance or minimum capitalization to protect tort creditors, and those requiring firms to accept service of process. These requirements can be stated in a general form, however, so that public protection is possible without conferring enormous discretion upon state authorities.[53] Within the context of local incorporation, then, rejecting the greater/lesser dogma prevents political abuse and advances the overall competitive situation.

### B. Foreign Incorporation

Although the battle over general incorporation laws during the middle of the nineteenth century showed the dangers of government discretion, it did not squarely raise the question of unconstitutional conditions. Rather, it was the conflict over whether a foreign corporation had a right to do business in a state under the same terms and conditions as a domestic corporation that gave birth to unconstitutional conditions doctrine. A state's power to exclude foreign corporations creates a monopoly situation, for no matter where a firm is incorporated, each state has the sole right to decide whether it can do business within its territory. The opportunities for political maneuvering should be evident. Firms will compete to gain entrance for themselves and to exclude rivals, just as they did when special charters for incorporation within the home state were the general rule.

The best way to combat this problem is through a strong, categorical rule granting foreign corporations the same right to do business

---

[51] Kreimer makes this point explicitly: "Often it is only by ripping a problem from its historical context that selective denial can be viewed as a lesser power. In reality, selective deprivation may be the less controlled and hence the more dangerous power." Kreimer, *supra* note 22, at 1313 (footnote omitted).

[52] *See* McChesney, *Rent Extraction and Rent Creation in the Economic Theory of Regulation*, 16 J. LEGAL STUD. 101 (1987).

[53] The conditions imposed in *Bellotti* do not address either of these concerns. *See supra* note 49.

in another state *on the same terms and conditions* available to its local corporations. In effect, the power to select between domestic and foreign corporations could be eliminated as long as no state would be prepared to disenfranchise its local firms in order to keep out foreign rivals. By forcing states to select between the first and fourth alternatives stated above, the doctrine of unconstitutional conditions, applied in this interstate context, again would result in the state choosing the fourth alternative.

The obvious — and correct — constitutional vehicle for reaching this position is the privileges and immunities clause, which provides that "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."[54] That line of attack, however, was decisively foreclosed in *Paul v. Virginia*,[55] which held that corporations were not "citizens" within the meaning of that clause. The position so adopted necessarily conferred a broad range of discretion upon the state, which *Paul* set out with extraordinary clarity:

> Now a grant of corporate existence is a grant of special privileges to the corporators, enabling them to act for certain designated purposes as a single individual, and exempting them (unless otherwise specially provided) from individual liability. The corporation being the mere creation of local law, can have no legal existence beyond the limits of the sovereignty where created. As said by this court in *Bank of Augusta v. Earle*, "It must dwell in the place of its creation, and cannot migrate to another sovereignty." The recognition of its existence even by other States, and the enforcement of its contracts made therein, depend purely upon the comity of those States — a comity which is never extended where the existence of the corporation or the exercise of its powers are prejudicial to their interests or repugnant to their policy. Having no absolute right of recognition in other States, but depending for such recognition and the enforcement of its contracts upon their assent, it follows, as a matter of course, that such assent may be granted upon such terms and conditions as those States may think proper to impose. They may exclude the foreign corporation entirely; they may restrict its business to particular localities, or, they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interest. The whole matter rests in their discretion.[56]

The Court thus took a very relaxed attitude toward the question of governmental abuse. The implicit repudiation of any form of judicial scrutiny in *Paul* carried forward the original argument in *Dartmouth College* that corporate privileges are the subject of legislative grace, and exposed the Achilles heel of that earlier decision which, in

---

[54] U.S. CONST. art. IV, § 7.

[55] 75 U.S. (8 Wall.) 168 (1869).

[56] *Id.* at 181.

Appendix 11

Page 213 of 293

protecting existing charters, expanded the power of the state to regulate business affairs of new corporations.[57]

*Dartmouth College* necessarily rejected the theory that the welfare of a corporation is simply the welfare of its individual shareholders, all of whom are collectively prejudiced by the inability to do business in other states.[58] The sharp disjunction between the right of individual traders to enter foreign states on equal terms with local citizens and the inability of foreign corporations to do the same constitutes a fundamental weakness in *Paul* that was not lost on the leading commentators of the time, all of whom reverted to aggregate theories of the corporation to conclude, in the words of Victor Morawetz:

> [T]he rights and duties of an incorporated association are in reality the rights and duties of the persons who compose it, and not of an imaginary being.
>
> . . . .
> . . . [T]here is no reason of immediate justice to others, why a number of individuals should not be permitted to form a corporation of their own free will, and without first obtaining permission from the legislature, just as they may form a partnership or enter into ordinary contracts with each other.[59]

Even if a corporation is not a "citizen," its shareholders surely are, and it is they who are denied legal protection against selective exclusion.

Although *Paul* prevented the privileges and immunities clause from ensuring nondiscrimination, other constitutional avenues that could have constrained the level of state discretion conferred by *Paul* soon opened up.[60] Most notably, the term "person" as used in the due

---

[57] The effects still linger. *See* CTS Corp. v. Dynamics Corp. of Am., 107 S. Ct. 1637, 1649–50 (1987) (upholding state regulation of anti-takeover legislation, in part because corporations are the creature of state regulation). For a brief discussion of the point, see Comment, *The Personification of the Business Corporation in American Law*, 54 U. CHI. L. REV. 1441, 1442 n.3 (1988). It is also worth mentioning that one of the most horrible of the Supreme Court decisions on race relations, Berea College v. Kentucky, 211 U.S. 45 (1908), which allowed states to prohibit any incorporated educational institution from teaching black and white students together, rested in large measure upon the fact that corporations are creatures of the state. *See id.; see also supra* note 49 (discussing this analysis as applied in *Bellotti*).

[58] The implication of *Dartmouth College* was made explicit in Bank of Augusta v. Earle, 38 U.S. (13 Pet.) 519 (1839), which held that the power of a corporation to act, within or beyond its home state, is limited by the provisions of its charter.

[59] V. MORAWETZ, A TREATISE ON THE LAW OF PRIVATE CORPORATIONS OTHER THAN CHARITABLE § 1, at 2 (1882); *id.* § 29, at 24. The development is outlined in Comment, cited above in note 57, at 1457–58. Note the use of natural right rhetoric to support market structures that can be justified on consequentialist grounds.

[60] The contract clause line of argument had already been foreclosed, with Chief Justice Marshall and Justice Story dissenting, by the earlier decision in Ogden v. Saunders, 25 U.S. (12 Wheat.) 213 (1827), which denied the clause any effect with respect to future contracts. I have defended the prospective view of the contract clause in Epstein, *Toward a Revitalization of the Contract Clause*, 51 U. CHI. L. REV. 703 (1984).

Appendix 11

process clause had been construed to cover the same corporations deemed not to be "citizens" under the privileges and immunities clause.[61] By the 1890's it had been held that the words "without due process of law" were to be construed in some contexts to mean at least "without just compensation,"[62] so that takings jurisprudence, which often uses a disproportionate impact test to determine whether just compensation has been provided,[63] now applied to the states. The disproportionate impact of a discriminatory tax seems clear enough. If the tax is a taking, then its discriminatory impact is clear evidence that the party so taxed has not received just compensation for the moneys paid to the state. The same kind of argument could be made in principle with respect to the equal protection clause. If foreign shareholders are entitled to the same rights as domestic ones, then any discrimination between them must be justified by the extra costs that foreign corporations impose on local governments, of which there seem to be none. Any sensible use of either due process or equal protection doctrine would have resulted in an end run around *Paul*, without recourse to the doctrine of unconstitutional conditions. Under this "strong rights" thesis, the state would not have the power *either* to exclude foreign corporations from doing business within its borders *or* to tax foreign corporations differently from local firms. The outsider comes in on equal terms, and nothing more need be said.

Because this position did not take hold in the late nineteenth or early twentieth century, however, the stage was set for the Court's use of the doctrine of unconstitutional conditions, under both the due process[64] and equal protection[65] clauses of the fourteenth

---

[61] *See* Santa Clara County v. Southern Pac. R.R. Co., 118 U.S. 394, 396 (1886). Note that Congress could not have limited state discretion during this period, because *Paul* had also held that local insurance contracts were matters of local commerce (or more decisively that they were not commercial transactions at all) and thus beyond the reach of the commerce clause. *See* 75 U.S. (8 Wall.) 168, at 182–85 (1869).

[62] *See* Chicago, Burlington, & Quincy R.R. Co. v. Chicago, 166 U.S. 226, 235–41 (1897).

[63] *See* R. EPSTEIN, *supra* note 28, at 204–09.

[64] *See* Pullman Co. v. Kansas, 216 U.S. 56 (1910); Western Union Tel. Co. v. Kansas, 216 U.S. 1 (1910).

[65] *See* Southern Ry. Co. v. Greene, 216 U.S. 400 (1910). *Southern Railway* acknowledged that the equal protection analysis follows a path similar to the earlier due process analysis. *See id.* at 413–18. There is good reason for the parallelism. Both the equal protection and due process clauses essentially follow the same path as the takings clause, as it applies to general taxation and regulation. In essence, it is virtually impossible to measure whether the benefits of taxation exceed the costs of the tax imposed. Hence unequal treatment or disproportionate impact should become the proxy by which to judge whether there is an illicit transfer of wealth between groups. *Cf.* Armstrong v. United States, 364 U.S. 40, 49 (1960) (holding that the takings clause was intended to prevent placing a disproportionate share of burdens on a few). For an extensive discussion, see R. EPSTEIN, *supra* note 28, at 195–215. The equal protection clause emphasizes equal treatment; the due process clause emphasizes the loss of property without compensation. In essence, they both look at different ends of the same set of issues.

Appendix 11

amendment[66] as a "second best" means of controlling government discretion. In *Western Union Telegraph Co. v. Kansas*,[67] for example, the Court struck down a discriminatory tax Kansas sought to impose upon Western Union, a New York corporation. The tax itself was based on the corporation's entire capital stock, not only on its local assets, and thus had a strong extra-territorial effect. Clearly, the due process clause would have struck down the tax if the firm had done no business in Kansas. The issue of unconstitutional conditions arose because the state conditioned its willingness to allow Western Union to engage in *local* commerce on its willingness to pay the discriminatory tax.[68] Without the doctrine of unconstitutional conditions, the consent of the firm would have cured the defects in extraterritorial treatment; with the doctrine in place, however, consent of the corporation did not prevent it from challenging the disputed condition.

Important consequences flow from the choice of legal regimes. The key difference between the unconstitutional conditions argument and the strong rights argument set out above goes to the set of the choices left to the state. Under unconstitutional conditions doctrine, the state may choose either to exclude the foreign corporation altogether or to let it in on equal terms with the local corporations. By rejecting the greater/lesser analysis championed by Justice Holmes,[69] the Court thus barred the state from allowing consenting foreign corporations to do business subject to a countless array of taxes or other burdens that did not apply to domestic corporations,[70] although it did not prevent the state from exercising the "greater" power of excluding foreign corporations altogether.

The question arises how the state will behave under these two legal regimes. In order to answer that question, it is necessary to undertake a rough interest group analysis that takes into account three disparate sets of interests: local consumers, local businesses, and foreign corporations. When the state has complete power to admit, exclude, or admit subject to conditions, it is highly likely that the state will often choose the third path, which Kansas adopted in *Western Union*, even though it enjoys an absolute right to exclude under *Paul*.

Start with local consumers. These individuals both gain and lose from the admission of foreign corporations subject to the discrimina-

---

[66] *See* Merrill, *supra* note 12, at 879–80; Oppenheim, *Unconstitutional Conditions and State Powers*, 26 MICH. L. REV. 176, 176 (1927).

[67] 216 U.S. 1 (1910).

[68] *See id.* at 4–8. The statutory decision excluding purely local business probably reflected the judgment that Western Union was indispensable for the interstate business, but not for the local markets, where other firms could compete. It fits in well with a public choice model of regulation.

[69] *See supra* notes 10 & 14.

[70] *See supra* pp. 34–35; *infra* pp. 37–38.

Appendix 11

Page 216 of 293

tory tax, when measured against the alternative of admitting them subject only to normal taxes. On the positive side of the ledger, more taxes might be collected from the out-of-state firms, thus reducing the local tax burden. (Either alternative is preferable on this measure to exclusion, which would result in no tax revenue.) On the negative side, the discriminatory tax imposes burdens on local consumers who are forced to pay higher prices for some goods and services, and to forego the benefits of other bargains the higher tax renders uneconomical — the so-called excess burden imposed by the discriminatory tax.[71] (Again, either alternative is preferable to exclusion, which would result in no consumers' surplus from business with foreign corporations.) For local consumers as a group, it seems plausible that these effects will tend to offset each other. Local competitors for their part have far less ambivalence. They gain revenue and competitive advantages from the discriminatory tax and should support it strongly. While some might want total exclusion, the loss of both tax revenue and the opportunities to do business with foreign suppliers and customers make this an unlikely outcome. Given that political compromise is always possible on the level of discrimination embedded in the tax, discriminatory taxes such as found in *Western Union* should emerge.

This calculus changes radically when the doctrine of unconstitutional conditions puts the state to an all-or-nothing choice. Now local consumers must be asked to support a total exclusion of out-of-state firms. Under this rule, these citizens receive no revenue offset from the foreign tax, and they lose in addition the possibility of doing business with efficient out-of-state firms who are able to overcome the tax disadvantage. Consumer losses become very large, with no obvious offsetting gains. We should thus expect that they would strongly support a repeal of the special tax when the doctrine of unconstitutional conditions puts them to the choice of nondiscriminatory entry or total exclusion of foreign firms.

For their part, rival sellers of goods and services may well like the total exclusion, at least for their direct rivals, but they would not desire a similar exclusion for out-of-state firms that supply inputs that these firms purchase, or for firms that purchase their products. On balance, therefore, it will likely be difficult to assemble a broad instate coalition of producers who will find it in their own self-interest to keep the outsiders out permanently, or even to impose taxes so high that most of them choose to stay out. The net result would be the

---

[71] The term "excess burden" is applied to any tax in which the amount received from the taxing authority is less than the private parties so taxed lose. The deadweight loss associated with such excess burdens is analogous to that which occurs when the price set by a private monopolist exceeds the competitive price. *See generally* J. GWARTNEY & R. STROUP, ECONOMICS: PRIVATE AND PUBLIC CHOICE 110–11 (4th ed. 1987).

Appendix 11

Page 217 of 293

desired one: out-of-state firms would be allowed to compete on even terms.

Still to be considered are the interests of the out-of-state firms. In principle they would always prefer the nondiscriminatory taxes to the other two choices. But the prospect of supracompetitive profits may induce them to pay a discriminatory tax for the privilege of doing business. Thus the legal regime of *Paul,* before its demise in *United States v. South-Eastern Underwriters Association,*[72] created an extensive bargaining range between local governments and outside firms, with ample opportunities for strategic behavior on both sides. If the guess about local politics is correct, the use of unconstitutional conditions in this context would force the states to the proper social alternative — letting outsiders in on an equal basis — by precluding the use of discriminatory taxes. The doctrine cuts out all intermediate positions, leaving the state only the all-or-nothing alternatives of total exclusion or nondiscriminatory admission. Forced to either of the two edges of the bargaining range, the local interests are better off allowing out-of-state firms in on equal terms than excluding them entirely.[73] The total exclusion option sanctioned by *Paul* is preserved, but as an empirical matter factional intrigue is forestalled, and the correct outcome of the ensuing political game is in most cases ensured. The subsequent histories of the decisions in both *Western Union Telephone Co. v. Kansas*[74] and *Southern Railway Co. v. Greene,*[75] both of which struck down discriminatory taxes, bear out this hypothesis, insofar as the modern versions of both statutes now apply nondiscriminatory rules to foreign corporations.[76] It was simply not viable to exclude either foreign railroad or foreign telegraph companies from doing any portion of their business within any state.

This analysis applies not only to taxation of foreign corporations, but also to other kinds of regulation as well. Consider the common provisions that sought to restrict the ability of foreign corporations to

---

[72] 322 U.S. 533, 543–49 (1944). *South-Eastern Underwriters* held that fire insurance companies were subject to prosecution under the Sherman Act, *see id.* at 553–62, and explicitly rejected any argument that the business of insurance was not commerce, *see id.* at 539–43. Congress responded to the decision by passing the McCarran-Ferguson Act, Pub. L. No. § 79-15, 59 Stat. 33 (1945) (codified as amended at 15 U.S.C. §§ 1011–1015 (1982 & Supp I 1983)), which returned regulation of the insurance industry to state control. The local patterns of discrimination against foreign corporations are discussed in connection with Western & Southern Life Insurance Co. v. Board of Equalization, 451 U.S. 648 (1981). *See infra* pp. 38–40.

[73] *See supra* notes 71–72.

[74] 216 U.S. 1 (1910).

[75] 216 U.S. 400 (1910).

[76] In the aftermath of *Southern Railway,* Alabama law provides that foreign corporations are subject to the same "duties, restrictions, penalties, liabilities now or hereinafter imposed upon a domestic corporation of like character." ALA. CODE § 10-2A-227 (1987). Kansas, in the aftermath of *Western Union,* subjects domestic and foreign corporations to an identical franchise tax. *See* KAN. STAT. ANN. §§ 17-7503(c), 17-7505(c) (Supp. 1987).

Appendix 11

Page 218 of 293

avail themselves of the federal courts' diversity jurisdiction. *Terral v. Burke Construction Co.*[77] overruled several earlier cases[78] by holding that:

> a State may not, in imposing conditions upon the privilege of a foreign corporation's doing business in the State, exact from it a waiver of the exercise of its constitutional right to resort to the federal courts, or thereafter withdraw the privilege of doing business because of its exercise of such right, whether waived in advance or not.[79]

The justification for this result is identical to that in the tax cases. Foreign corporations presumably want access to federal courts to escape the local bias of state courts. To prevent them from exercising this option is to subject them to a disguised differential tax equal to their estimated additional burdens of litigating in a hostile forum. If forced to choose between exclusion and admission on equal terms, the states do the latter, as happened after *Terral*,[80] which is as it should be. As with taxes, the doctrine serves in this context as an effective constraint on arbitrary power found in the absolute authority to exclude foreign corporations.[81] Again the proposition is not a necessary truth. The success of the doctrine rests solely on the empirical judgment that a state, when faced with the all-or-nothing choice, will choose to allow the outsider in on equal terms.

### C. Overriding the Nondiscrimination Rule

Although use of the doctrine of unconstitutional conditions in state taxation cases is now well established, its success depends on the steadfastness with which it is applied. That level of resolve in turn depends upon what justifications are found appropriate to displace its underlying principle — an issue not raised in the earlier cases. In this regard, the recent taxation cases are unsatisfactory.[82] In *Western*

---

[77] 257 U.S. 529 (1922).

[78] *See, e.g.,* Security Mutual Life Ins. Co. v. Prewitt, 202 U.S. 246 (1906); Doyle v. Continental Ins. Co., 94 U.S. 535 (1876).

[79] 257 U.S. at 532.

[80] *See* ARK. CODE ANN. § 4-27-102 (1987). This statute, which corresponds to the Act of May 13, 1907, No. 313, sec. 1, 1907 Ark. Acts 744, is identical to the 1907 Act, save for the elimination of the clause condemned in *Terral.*

[81] The result in the case has also been supported on the ground that it protects the jurisdiction of the federal courts from state encroachment, an argument invoked, but not explored at length, in *Terral, see* 257 U.S. at 532–33, and endorsed in Merrill, cited above in note 12, at 892. It was perhaps on this ground that Justice Holmes joined the decision notwithstanding his earlier dissents in *Western Union,* 216 U.S. at 52 (Holmes, J., dissenting), and *Southern Railway,* 216 U.S. at 418 (Holmes, J., dissenting).

[82] *See, e.g.,* Commonwealth Edison Co. v. Montana, 453 U.S. 609 (1981) (holding a severance tax on the coal production to be nondiscriminatory even though 90% of the coal was shipped under contracts shifting the tax burden to out-of-state utility companies). *But see* Epstein, *Taxation, Regulation and Confiscation,* 20 OSGOODE HALL L.J. 433, 445–49 (1982) (criticizing the result in *Commonwealth Edison*).

Appendix 11

Page 219 of 293

*& Southern Life Insurance Co. v. Board of Equalization*,[83] California imposed an overtly discriminatory tax on some out-of-state insurance companies. The tax was not a simple discriminatory tax like the one invalidated in *Western Union*. Rather, it was styled as a "retaliatory" tax that was imposed only when the state of incorporation of the foreign company, here Ohio, charged California companies higher tax rates for doing business in Ohio than the California companies paid in California. Ohio did not impose any discriminatory tax on California life insurance companies (which it could not do under *Western Union*).[84] But Ohio did tax all insurance companies doing business in Ohio a premium tax at a higher rate (2.5%) than California charged for its local companies (2.35%). Thus, California's retaliation provision, in effect, imposed a 2.5% premium tax on the California revenues of Ohio corporations. The differential tax was justified as a way to pressure Ohio corporations to use their influence to lower the general premium tax in Ohio to California levels.

Despite the explicit discrimination revealed by these facts, Justice Brennan upheld the tax. He first made clear his unwillingness to reverse *Paul*'s interpretation of the term "citizen" in the privileges and immunities clause. But he did accept — heartily, though without explanation — the unconstitutional conditions gloss used to mitigate the absolutism of that decision.[85] The shift from the privilege and immunities analysis to an equal protection analysis, however, allowed Justice Brennan to place an elastic "rational basis" construction on the doctrine of unconstitutional conditions, as permissive as the rational basis review he had applied directly in equal protection cases.[86]

Applying this standard, he found that California's tax was justified as a device to induce other states to reduce the amount of taxes imposed on California businesses, and that the life insurance industry itself had supported the tax in question. In so doing, he left ajar the door to politics that had been shut more tightly by the earlier and more categorical versions of unconstitutional conditions doctrine. As Justice Stevens' dissent pointed out, the decision allows California politicians to seek influence over the general level of taxes in Ohio.[87] It is worth adding that the differential tax might be supported by

---

[83] 451 U.S. 648 (1981).

[84] *See id.* at 675 (Stevens, J., dissenting); OHIO REV. CODE ANN. § 5729.03 (Anderson 1973).

[85] *See* 451 U.S. at 656–68, (endorsing the doctrine after reviewing the long line of confused precedent in the area).

[86] *See, e.g.,* Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456 (1981) (allowing the state to ban use of plastic milk containers). I have criticized that decision strongly in TAKINGS, cited above in note 28, at 143–44. Justice Brennan did not originate this line of analysis, which had reached its present form in earlier decisions. *See, e.g.,* Ferguson v. Skrupa, 372 U.S. 726 (1963); Williamson v. Lee Optical Co., 348 U.S. 483 (1955).

[87] *See* 451 U.S. at 677–78 n.7 (Stevens, J., dissenting).

Appendix 11

Page 220 of 293

insurance companies because of their determination to monopolize local markets. California's retaliatory statute is hauntingly reminiscent of New Jersey's effort, struck down in *Gibbons v. Ogden*,[88] to get even with New York's restrictive steamboat monopoly. Its motivation also seems similar to the clearly protectionist sentiment underlying the system of retaliation in the trade legislation that Congress has just enacted.[89] Ohio still keeps its old tax rate,[90] so that the Supreme Court's decision allows discrimination to flourish across states in a short-run that lengthens as the shadows of the evening. As elsewhere, the rational basis test leads only to constitutional confusion and to the release of political forces far better kept in check. It is often said that the Constitution does not impose categorical restrictions upon inefficient or sneaky practices. But in hard cases, we can only make sense of the substantive provisions that it does contain in light of the social consequences generated by alternative interpretations of those provisions. We know that the creation of one national economic market was a major goal of the Framers, and it remains a goal worthy of our support. The per se rule of *Western Union* and *Southern Railroad* is superior to its watered-down modern alternatives.

## IV. TAXING, SPENDING, AND FEDERALISM

The unconstitutional conditions doctrine also limits the scope of government discretion under the federal taxing and spending power. As is well known, taxation is an effective way for governments to secure implicit transfers of both wealth and power. These transfers can be implemented by imposing higher rates on some persons, granting exemptions to others, or by imposing conditions on the collection of taxes or on the grants of exemptions. The potential abuses in the taxing power are well captured by Chief Justice Marshall's famous dictum that the "power to tax involves the power to destroy."[91] If this tendency had been countered by a broad reading of the takings clause, then all selective taxes, exemptions, preferences, and conditions would be struck down as impermissible redistributions, unless supported by a narrow police power justification.[92] But even before the 1937 constitutional watershed, the Court had always taken a far more relaxed view on matters of selective taxation than Chief Justice

---

[88] 22 U.S. (9 Wheat.) 1 (1824).

[89] *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (1988).

[90] *See* OHIO REV. CODE ANN. § 5725.18(B) (Anderson 1986).

[91] McCulloch v. Maryland, 17 U.S. (4 Wheat) 316, 427 (1819).

[92] *See generally* R. EPSTEIN, *supra* note 28, at 283–305 (applying takings analysis to taxation).

Appendix 11

Marshall's dictum might suggest is appropriate.[93]  Only when taxation has been intimately tied, not to individual rights, but to the distribution of power within the federal system has this pattern of judicial deference been broken.  In the context of federalism, the inquiry takes much the same form as it did with foreign corporations: does the doctrine of unconstitutional conditions operate as an effective "second-best" backstop to enforce constitutional limitations on congressional power?  I shall address the use of the doctrine to limit Congress' power to regulate the states under the taxing and spending powers, both as they existed before 1937 and, in far less important form, today.  I shall postpone a discussion of unconstitutional conditions and tax policy in the areas of individual liberties until Part VIII.

In the *Child Labor Tax Case*,[94] Congress imposed a tax equal to ten percent of the profits of any firm that employed child labor in certain specified businesses.[95]  The tax imposed in this case raises the paradox of unconstitutional conditions in the following fashion:  Congress has the power to impose a general income tax equal to ten percent of the profits of any business; why, then, does this greater power not entail the lesser power to forgive that tax to anyone who chooses not to employ certain forms of child labor?

The answer lies in concern over the distribution of power between the state and federal governments.  Before 1937, the commerce clause was understood not to confer upon Congress the power to regulate the "internal affairs" of the states.  *Hammer v. Dagenhart*[96] had struck down a federal statute that forbade the shipment of goods in interstate commerce from any plant that had used prohibited forms of child labor, whether or not the labor was used on the goods so shipped.  *Hammer* treated the regulation as invading the reserved powers of the states as delineated under the tenth amendment to the Constitution:[97]  "The powers not delegated to the United States by the Constitution,

---

[93] *See, e.g.*, McCray v. United States, 195 U.S. 27 (1904) (upholding a tax that discriminated against yellow margarine in favor of white margarine); Alaska Fish Salting & By-Products Co. v. Smith, 255 U.S. 44 (1921) (upholding a tax on fish produce that discriminated against the use of herrings); A. Magnano Co. v. Hamilton, 292 U.S. 40 (1934) (upholding a tax on butter substitutes alleged to discriminate against the oleo industry).  The tendency continues apace today.  *See* United States v. Ptasynski, 462 U.S. 74 (1983) (sustaining a windfall profit tax on crude oil that contained a geographically defined exemption for certain Alaskan producers).

[94] 259 U.S. 20 (1922).

[95] Persons under the age of 16 were not to be employed in mines and quarries.  Persons under 14 were not to be employed in mills, canneries, workshops, factories, or manufacturing establishments.  Persons between 14 and 16 could be employed in such outfits only if they worked less than a prescribed number of hours.  The statute also provided protections to employers who hired underaged workers in good faith.  *See* Title XII, Revenue Act of 1918, ch. 18, Pub. L. No. 65-254, 40 Stat. 1138, 1138–39 (1919).

[96] 247 U.S. 251 (1918).

[97] *See id.* at 274–76.

nor prohibited by it to the States, are reserved to the States respectively, or to the people."[98]

Although *Hammer* was explicitly overruled in *United States v. Darby*,[99] I believe that *Hammer* was correctly decided,[100] for reasons that rest on the doctrine of unconstitutional conditions.[101] The ability to regulate the shipment of goods in interstate commerce is tantamount to holding vast monopoly power over all the means of transportation — highways, rails, sea, and, today, air. The analogy to the private necessity cases[102] is thus compelling. In essence the federal government in *Hammer* tried to use its monopoly power to extract concessions from private firms to conduct their manufacture and mining operations in accordance with standards set by Congress, at a time when it was conceded that Congress could not set standards for local employment by direct regulation.[103] The ability to close down all modes of interstate transportation threatened to work an enormous redistribution of wealth from firms that were unwilling to comply with the restrictions to firms that were not. The statute in *Hammer* certainly had nothing to do with covering the costs of operating the interstate transportation system. If a robust form of either the takings or public trust doctrine had been applied to highways, this restriction itself would have been found invalid, wholly without regard to the commerce clause, because of its disparate impact on the rights of individual citizens: some would have gained enormously from the use of public roads, while others would have had huge portions of their gains stripped from them. But these individual rights arguments would have failed even in 1918, because the prevailing account of the police power gave broad latitude to the states to impose child labor laws.[104]

Nonetheless, because concerns of federalism were very much alive at the time of *Hammer*, a transfer of power from the state to the federal government *was* subject to far greater scrutiny. The effect of the child-labor restriction on the interstate shipment of goods, a subject admittedly within the scope of the federal commerce power, was to induce all private firms to abide by the federal regulation. The

---

[98] U.S. Const. amend. x.

[99] 312 U.S. 100, 116–17 (1941).

[100] *See generally* Epstein, *supra* note 2, at 1427–32.

[101] *See id.* at 1423–24 & 1429 n.109.

[102] *See supra* notes 34–36 and accompanying text.

[103] For another case concerned with the balance of state and federal power, see United States v. E.C. Knight Co., 156 U.S. 1 (1895). I have defended that decision in Epstein, cited above in note 2, at 1432–35.

[104] *Cf.* New York Cent. R.R. Co. v. White, 243 U.S. 188, 207 (1917) (recognizing state authority under the police power to enact workmen's compensation laws). All states did have child labor laws in 1917, so that the issue in *Hammer* was whether the more stringent federal standard was preferable to the lower state standard applicable in North Carolina. *See* Epstein, *supra* note 2, at 1430–33.

Appendix 11

Page 223 of 293

gains that any firm achieved from the interstate sale of its goods were far greater than the gains it could hope to achieve by hiring child labor in violation of the federal statute, especially in light of the applicable state restrictions. To enforce the statute, then, was necessarily to bring about a "voluntary" acceptance of federal power. The doctrine of unconstitutional conditions is the necessary counterweight to the federal government's exercise of its monopoly power. Congress has the greater power to regulate interstate commerce and indeed to prohibit certain items from passing in interstate commerce at all.[105] But in this instance, the greater power should not include the power to admit goods into interstate commerce subject to conditions that drastically shift the distribution of power within the federal system. *Hammer* reached the right result in striking down this statute while leaving the federal government the power to regulate the instrumentalities of interstate commerce with regard to matters pertaining directly to their use: the weight of certain shipments and the like, which are designed to prevent abuse of common assets by private users.[106]

The *Child Labor Tax Case*[107] raises the identical federalism issue as did *Hammer*, as Chief Justice Taft well understood. The only difference is that in the *Child Labor Tax Case* the federal government sought to condition its coercive powers to tax instead of its coercive power to regulate interstate commerce. The offer made was one that no firm could refuse, given that the marginal gains from using child labor in violation of the federal norm were no doubt far smaller than the ten percent tax on profits imposed by the statute. If this tax could have been applied, then similar taxes, with higher rates if necessary, could have been used repeatedly, thus obliterating any limitation on federal power. Chief Justice Taft tried to capture these concerns in the proposition that the federal government had the power to impose "taxes" but not "penalties" upon activities within the states.[108] The language of penalty is troublesome, however, because taxes are as coercive as penalties, given that both are backed by the use of force. The effort to distinguish between them is designed to cast the case back into the familiar libertarian mode in which only force and fraud can set aside bargains, a model that is inadequate because it does not

---

[105] *See, e.g.*, Champion v. Ames, 188 U.S. 321 (1903) (lottery tickets); Hipolite Egg Co. v. United States, 220 U.S. 45 (1911) (adulterated foods). It seems clear that the power to regulate under the commerce clause allows Congress to prohibit the transfer of certain goods in interstate commerce, such as infected foods that threaten interstate commerce itself. But it is far more doubtful, even in these cases, that Congress can either regulate or prohibit the shipment of goods in interstate commerce in an indirect effort to seize the police power within any given state. *See* Epstein, *supra* note 2, at 1422–25.

[106] *Cf. infra* pp. 51–52 (describing conditions intended to minimize abuse of public highways).

[107] *See* 259 U.S. 20 (1922).

[108] *See id.* at 38–39.

Appendix 11

take into account all of the risks associated with government discretion. An account of the line between penalties and taxes might delve into matters of motive — was the exaction designed to raise revenue, or to discourage primary activity, or to do both? Generally, one may conclude that a tax has some ulterior motive if its expected revenues are zero, as was the case with the child labor tax. But whether we call this exaction a tax or a penalty is quite beside the point. The federal power to tax can be used to the same end as its monopoly position over the public highways: to frame offers that extract a disproportionate share of the gain from some firms engaged in interstate commerce. Because this was the case with the child labor tax, it should have been struck down, even if someone could have argued that the penalty characterization was somehow mistaken.[109] The greater power to impose a ten percent tax on all profits does not threaten the system of enumerated powers the way the "lesser" power to tax selectively does.

Today, with the passing of *Hammer*, the issue in both child labor cases is moot. Since 1937, Congress has been acknowledged to have plenary powers of regulation over all aspects of the economy. Thus, what Congress was barred from achieving by indirection in *Hammer* and the *Child Labor Tax Case*, it can now achieve through direct regulation without constitutional impediment.

One exception to Congress' plenary economic regulatory power, however, concerns the powers given to the states under the twenty-first amendment, which provides: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."[110] On the plausible assumption that this amendment reserves to the states the exclusive power over the transportation and shipment of intoxicating liquors within their borders, there would remain, even after the revolution of 1937, an area of commerce within the exclusive power of the state.

Nonetheless, *South Dakota v. Dole*[111] held, by a 7–2 vote, that Congress could work a statutory end run around the twenty-first amendment. At issue in the case was title 23, section 158 of the United States Code, which allowed the Secretary of Transportation

---

[109] The decision to strike down this tax lends support to Madison's construction of the "spending power." *See supra* note 3. In the *Child Labor Tax Case* the government could have argued that the power to tax for the "general welfare of the United States" covered more territory than the commerce clause, and could certainly include the protection of young workers across the United States. The failure of this argument makes sense only if the general welfare is limited to the other enumerated powers, which must have been Chief Justice Taft's assumption when he linked this case so closely with *Hammer*.

[110] U.S. CONST. amend. XXI, § 2.

[111] 107 S. Ct. 2793 (1987).

Appendix 11

Page 225 of 293

to withhold up to five percent of the otherwise allocable federal funds for highway construction from states "in which the purchase or public possession . . . of any alcoholic beverage by a person who is less than twenty-one years of age is lawful."[112] South Dakota's law allowed 19-year-olds to purchase 3.2% beer. Upholding the federal provision, Chief Justice Rehnquist, speaking for the Court, held that even if the twenty-first amendment prohibited Congress from directly regulating the age of beer drinking, Congress could do so indirectly through the use of its spending power.[113]

Chief Justice Rehnquist's opinion is unsatisfying. The Court noted the many occasions on which Congress had been able to attach conditions to the receipt of federal funds.[114] Where such conditions do not involve any efforts by Congress to expand its effective power, however, these provisions are easily distinguishable.[115] Where the conditions involve powers reserved to the states under the tenth amendment, the Court has traditionally required that the federal government show a sufficiently compelling interest to override the state interest.[116] The danger that Congress will leverage its broad spending

---

[112] 23 U.S.C. § 158(a)(1) (Supp. III 1985). The five percent restriction was for fiscal year 1986. For succeeding years the figure was ten percent. *See id.* § 158(a)(2).

[113] *See* 107 S. Ct. at 2796. Chief Justice Rehnquist then set out the rules determining the scope of Congress' spending power: that its "exercise be in pursuit of 'the general welfare,'" (although courts should defer to Congress' determinations of what expenditures promote the general welfare); that the federal government give fair notice to the state of conditions attached to receipt of federal grants; and that such conditions not be "'unrelated to the federal interest in particular national projects or programs.'" 107 S. Ct. at 2796 (quoting Massachusetts v. United States, 435 U.S. 444, 461 (1978) (plurality opinion)). The first condition has been rendered trivial by the present broad construction of the "general welfare." *See supra* note 3. Nor is there any reason to give discretion to Congress in defining the scope of its own powers. The notice requirement is trivial because statutes can be made clear, although individual statutes may fall far short of the clarity required. *See, e.g.,* Pennhurst State School & Hosp. v. Halderman, 451 U.S. 1 (1981) (holding that a grant of federal funds to state facilities for the disabled was not conditioned on the state's willingness to upgrade facilities). In this case, everything turns on the validity of the condition. All the other points are preliminary asides.

[114] *See* 107 S. Ct. at 2796.

[115] *See, e.g.,* Fullilove v. Klutznick, 448 U.S. 448 (1980) (upholding against an equal protection challenge a requirement that recipients of federal contracting grants set aside a certain portion of those grants for minority-owned subcontracting companies); Lau v. Nichols, 414 U.S. 563 (1974) (holding that a school system is required under the 1964 Civil Rights Act to offer remedial help to Chinese students who do not speak English as a condition to receipt of federal assistance).

[116] *See, e.g.,* Oklahoma v. Civil Serv. Comm'n, 330 U.S. 127, 143 (1947). The applicable statute there provided that:

> [N]o officer or employee of any State or local agency whose principal employment is in connection with any activity which is financed in whole or in part by loans or grants made by the United States or by any Federal agency shall . . . take any active part in political management or in political campaigns.

The Hatch Act ch. 410, 53 Stat. 1147 (1939), *amended by* Ch. 640, 54 Stat. 767 (1940). The Supreme Court, relying on the broad reading given the commerce power in United States v.

Appendix 11

Page 226 of 293

powers to subvert the twenty-first amendment is as great as the danger that it will leverage its power to subvert the tenth amendment, and should be met with the same judicial response. The state, in its effort to decide whether or not to accept the condition, has to decide whether it values the loss in federal revenues more than it values its own independence in setting the minimum age for liquor consumption. In principle, if Congress has the power to reduce highway revenues to the states by five or ten percent, there is no reason why it could not exclude any state from participation in the program by cutting off its revenues entirely. The power of discretion therefore allows the federal government to redistribute revenues, raised by taxes across the nation, from those states that wish to assert their independence under the twenty-first amendment to those states that do not.

Chief Justice Rehnquist conceded in effect that the doctrine of unconstitutional conditions had to apply to the spending power when he noted that:

> [A] grant of federal funds conditioned on invidiously discriminatory state action or the infliction of cruel and unusual punishment would be an illegitimate exercise of the Congress' broad spending power. But no such claim can be or is made here. Were South Dakota to succumb to the blandishments offered by Congress and raise its drinking age to 21, the State's action in so doing would not violate the constitutional rights of anyone.[117]

His defense, however, misses the essential point, because the doctrine of unconstitutional conditions is not limited to the protection of individual rights against encroachment by government power. So long as the twenty-first amendment identifies structural limitations upon federal power, the doctrine of unconstitutional conditions should ensure that these limitations as well are not overridden by the vast discretionary power of the federal government over the distribution of its general revenues. The need to control federal power is not limited to cases of common law coercion, given the risks of strategic behavior so evident in *Dole*. As with the *Child Labor Tax Case*, the relevant

---

Darby, 312 U.S. 100, 124 (1941), sustained the statute on the ground that the tenth amendment is a truism. *See* 330 U.S. at 143. The case is far harder if the tenth amendment is construed as an effective limitation on federal power. This particular statute should be sustained against the challenge of unconstitutional conditions because it is designed to protect the United States against abuses by recipients of federal moneys. It is therefore parallel to a rule preventing private parties from obstructing public highways. The case would be quite different, however, if the statute provided that all state officials had to abide by this restriction if any state program received federal moneys. Then the overreaching by the federal government would become the greater abuse. This "relatedness" requirement as a limitation on the scope of conditions that the federal government may impose also crops up in the police power cases, *see infra* pp. 63–64, and the employment cases, *see infra* pp. 69–70.

[117] 107 S. Ct. at 2798.

Appendix 11

Page 227 of 293

question is not the desirability of regulations the federal government seeks indirectly to impose. It is rather the proper demarcation of the division of powers between separate sovereigns.

## V. Public Roads and Highways

If the federal government has always had an effective legal monopoly over the instrumentalities of interstate transportation, then similarly state governments have long enjoyed a powerful local monopoly over public highways and roads. It should come as no surprise, therefore, that the doctrine of unconstitutional conditions also emerged in cases where the state demanded the release of constitutional rights as the price of access to public highways. *Frost & Frost Trucking Co. v. Railroad Commission*[118] shows the halting and ineffective development of the doctrine in the context of classic state economic regulation. *City of Lakewood v. Plain Dealer Publishing Co.*,[119] decided this past Term, raises parallel issues in a first amendment context, thus resulting in a more forceful application of the doctrine. The framework of analysis is similar in the two areas, even if the protected constitutional rights differ. The first inquiry is to determine the extent of the government's monopoly power in its control of public highways. The second inquiry is to determine the extent to which the conditions imposed upon entry or use are designed to upset the competitive balance between rival users. The third inquiry, which is the flip side of the second, is to determine whether the restrictions in question are designed to control against opportunistic behavior by individual citizens in their use of the common pool asset, the public roads.

### A. *Economic Regulation and* Frost Trucking

In 1917 the California Railroad Commission received the power to regulate the rates and charges of the common carriers who used California public highways.[120] A common carrier — one who carried the goods of all comers over public highways for a fee — could gain access to the public highways only after first obtaining a permit from the Commission certifying that its business was for the "public convenience and necessity."[121] In 1919 the Commission's statutory powers were extended to cover transportation companies that were not common carriers.[122] Frost Trucking, which had a private contract to

---

[118] 271 U.S. 583 (1926).
[119] 108 S. Ct. 2138 (1988).
[120] *See* Act of May 10, 1917 § 3, 1917 Cal. Stat. 331.
[121] *Id.* § 5, 1917 Cal. Stat. 333.
[122] *See* Act of May 13, 1919 § 2, 1919 Cal. Stat. 458.

transport citrus fruit for a single supplier, fell into this last category, but it refused to apply for the required permit and was then ordered by the Commission to suspend its operations.[123] The Commission's decision was upheld by the California Supreme Court. Justice Sutherland wrote:

> That court, while saying that the state was without power, by mere legislative fiat or even by constitutional enactment, to transmute a private carrier into a public carrier, declared that the state had the power to grant or altogether withhold from its citizens the privilege of using its public highways for the purpose of transacting businesses thereon; and that, therefore, the legislature might grant the right on such conditions as it saw fit to impose.[124]

In Justice Sutherland's words, the California court was willing to allow private carriers access to public roads only if they dedicated their property to the "quasi-public use of public transportation."[125]

The stage was set for the familiar unconstitutional conditions argument. Justice Sutherland assumed arguendo that the state could admit or exclude persons at will from the use of public highways. Then, however, by analogy to the foreign corporation cases, he held "that it may not impose conditions which require the relinquishment of constitutional rights"[126] — in this instance the right of a private carrier not to be compelled to assume the duties and burdens of a common carrier against its will.[127] So stated, the argument proceeds at a very high level of abstraction and is subject to the standard objections based upon the "greater and lesser power" theory that lay at the root of Justice Holmes' general opposition to the doctrine,[128] and to his dissenting opinion in this case.[129] If an individual values his constitutional rights less than he does the privilege that the state is offering, then why not allow the bargain to go forward? Persons have a constitutional right to keep property, yet they surrender it all the time in order to obtain alternative goods that they value more highly. Why not here?

The proper analysis of the case begins with its historical context. The initial problem is the now familiar one of the adequacy of "second-best" response to government discretion. The doctrine of unconstitutional conditions becomes necessary only after it is settled that a state has the absolute right to exclude private firms from use of the high-

---

[123] *See* 271 U.S. at 590.
[124] 271 U.S. at 591.
[125] *Id.*
[126] *Id.* at 594.
[127] *See id.* at 593.
[128] *See supra* notes 10 & 14.
[129] *See* 271 U.S. at 601 (Holmes, J., dissenting).

Appendix 11

way. That conclusion was dictated by *Buck v. Kuykendall*,[130] a precedent established one year before *Frost* was decided. *Buck* had invalidated, under a dormant commerce clause analysis, regulatory restrictions upon interstate service between Seattle and Portland.[131] Nonetheless, this part of *Buck* did not apply to *Frost*, which concerned purely intrastate movement (as the words were understood before 1937) on state highways, and was therefore beyond the scope of the commerce power. Without the element of interstate commerce, *Buck* gave the states unfettered discretion to deny common carriers access to the highways:

> The right to travel interstate by auto vehicle upon the public highways may be a privilege or immunity of the citizens of the United States. A citizen may have, under the Fourteenth Amendment, the right to travel and transport his property upon them by auto vehicle. But he has no right to make the highways his place of business by using them as a common carrier for hire. Such use is a privilege which may be granted or withheld by the State in its discretion, without violating either the due process clause or the equal protection clause. The highways belong to the State. It may make provision appropriate for securing the safety and convenience of the public in the use of them.[132]

The phrase "a privilege which may be granted or withheld by the State in its discretion" recalls the assertion of state power over foreign corporations justified by the Court in *Paul v. Virginia*.[133] So too does the short shrift given to the privileges and immunities clause. The bald conclusion that "the highways belong to the State" does not begin to address the question of how their use should be allocated among the various members of the public. Yet it is just that question that the doctrine of unconstitutional conditions must address. To allow the state the power to exclude or admit at will from public highways raises the problems of externalities and strategic bargaining with

---

[130] 267 U.S. 307 (1925).

[131] Justice Brandeis' reasoning in *Buck* was cryptic. *See id.* at 324 ("The federal-aid legislation is of significance not because of the aid given by the United States for the construction of particular highways, but because those acts make clear the purpose of Congress that the state shall be open to interstate commerce."). Nonetheless, the result was correct, for the alternative opens up enormous potential for strategic behavior by the states, which would be able to prevent all out-of-state common carriers from using any in-state road built without federal support. Had *Buck* gone the other way, then, short of congressional intervention, interstate business would be subject to all the intrigue and retaliation that surrounded the legislation at issue in Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 4–5 (1824), and that finds expression today in the politics of landing rights in international aviation. *Buck* and its companion case, Bush Co. v. Maloy, 267 U.S. 317 (1925), which held that states could not exclude interstate commerce even from roads constructed solely with state funds, are thus uncelebrated but critical decisions that preserved a unified national market after the coming of automotive transportation.

[132] 267 U.S. at 314 (citations omitted).

[133] 75 U.S. (8 Wall.) 168 (1869); *see supra* p. 32.

Appendix 11

Page 230 of 293

which the doctrine is concerned. Those whose entry is subject to selective conditions are at a competitive disadvantage to their rivals, while the bargaining range for use of the roads between the state and any individual citizen is very broad. Political discretion over licenses can only encourage the dissipation of valuable resources to achieve partisan advantage. The same numerical illustrations presented in discussing the foreign corporation cases apply without change in this context.[134]

The object of a sound highway system is to maximize the gains that are attainable from use of the public roads. That goal is attainable only if the selective power of admission to the roads is curtailed — an equal protection concern — and if the state revenues from the highways are limited to its costs of running the system — a takings or due process objective. What should be flatly prohibited is the covert redistribution of wealth between private parties in the funding and utilization of public roads by imposing unequal exactions for equal benefits. These rules are hardly novel, even at the constitutional level, for they found expression in the special assessment cases for funding local improvements, including roads and sewers, that routinely came before the Supreme Court under the due process clause between the end of the Civil War and the beginning of World War I.[135]

Although the proper doctrinal rules here would deny the state the absolute power to admit traffic to or exclude it from the public road, Justice Brandeis' dictum in *Buck* set the stage for Justice Sutherland in *Frost* to use the doctrine of unconstitutional conditions as the next-best alternative. To his great credit, Justice Sutherland recognized the importance of market structure even in this context and accepted the dominance of the competitive equilibrium as a constitutional principle, despite the state's monopolistic control over the roads:

> It is very clear that the act, as thus applied, is in no real sense a regulation of the use of the public highways. It is regulation of the

---

[134] *See supra* note 50 and accompanying text.

[135] *See* Diamond, *The Death and Transfiguration of Benefit Taxation: Special Assessments in Nineteenth-Century America*, 12 J. LEGAL STUD. 201 (1983). I address this subject, within the generalized eminent domain framework utilized here, in TAKINGS, cited above in note 28, at 286–89.

These cases held that the due process clause imposed some limitations on the funding devices that the state could use to finance local improvements, including local roads. In each case the total sum to be raised by taxes was limited to the cost of building the road in question: excess moneys could not be siphoned off into general revenues. The difficult question was finding the right formula to match costs with benefits once redistribution was in principle ruled out of bounds. Individualized (plot by plot) assessments of benefits were costly to make, and unreliable to boot. Yet automatic rules — such as assessment by front footage — could be unreliable because they missed large pockets of subjective gain in individual cases. In large measure this choice between rival benefit rules asks which set of errors is more debilitating, so that the state has some discretion in the choice of benefit formula as long as a consistent formula is used throughout.

Appendix 11

business of those who are engaged in using them. Its primary purpose evidently is to protect the business of those who are common carriers in fact by controlling competitive conditions. Protection or conservation of the highways is not involved.[136]

Justice Sutherland therefore struck down the condition that the state tried to attach to the use of the roads. California could exclude Frost from the use of the highways altogether, but it could not condition its entry upon the company's willingness to assume the burdens of a common carrier. Here the right in question might have one of two sources. First, the right to enter into ordinary contracts for the carriage of goods could be regarded as a form of property protected by the takings clause. Alternatively, the right protected could be regarded as falling within the fourteenth amendment right to engage "in the common occupations of the community."[137] The doctrine is of broader scope in the first instance than it is in the second, but both apply to the instant case. The effort to condition entry to the highways on the sacrifice of the right to remain a private carrier imposed a disproportionate burden on Frost, and would have worked an implicit transfer to the common carriers with which it was in competition.

The decision in *Frost* gives some indication of the type of conditions the state might be able legitimately to impose upon highway use. The clue comes from Justice Sutherland's reference to the "protection and conservation of the highways," and builds upon concerns about externalities and strategic behavior. Thus, the state can impose taxes and rules that are designed to promote the smooth flow of traffic, to prevent accidents, to resolve tort actions, and to ensure that individuals have to answer for their wrongs. These rules are necessary to prevent the exploitation of a common pool resource by its users. To be sure, these rules condition access to the roads upon the consent of the users, but the consent is for conditions that are *justified* by the need to curtail opportunistic behavior by the road users.[138] Similarly

---

[136] 271 U.S. 583, 591 (1926).

[137] *See, e.g.*, Truax v. Raich, 239 U.S. 33, 41 (1915) ("It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure.").

[138] *Cf.* Hess v. Pawloski, 274 U.S. 352 (1927). The statute at issue in *Hess* allowed out-of-state individuals to be sued for accidents that they caused within the state.

> Under the statute the implied consent is limited to proceedings growing out of accidents or collisions on a highway in which the non-resident may be involved. . . . It makes no hostile discrimination against non-residents but tends to put them on the same footing as residents. Literal and precise equality in respect of this matter is not attainable; it is not required.

*Id.* at 356. The case is an easy one, given the user exploitation that the statute seeks to curtail. However, the opposite result would be required if users of the state's roads were required to submit to the jurisdiction of the state's courts in *any* case brought by the state's residents.

Appendix 11

the state should be able to impose a system of weight restrictions (to control wear and tear), or tolls (to alleviate congestion). These are the kinds of conditions that would be imposed by the private owner of a road for his own benefit and for that of his customers. Such conditions closely parallel the incorporation rules on service of process and capitalization.[139]

It still remains to inquire how successful Justice Sutherland's invocation of the doctrine of unconstitutional conditions proved in controlling abuses of the state's power to control public highways. In order to answer that question, it is necessary to distinguish between two sets of cases. The first class involves situations like *Frost*, in which the state seeks to limit access to the system of public roads through general economic regulation. The second involves the potential release of certain constitutional rights, such as the right to vote, to speak, to practice one's religion, to resist unreasonable search and seizures, and (perhaps) even to hold property without fear of confiscation.

On the economic issues, the unconstitutional conditions doctrine of *Frost*, in sharp distinction to the foreign taxation cases, has had little favorable effect in practice. Initially, Justice Sutherland regarded *Frost* as a kind of takings case (for a quasi-public use), because private carriers were subject to the regulation thought appropriate to common carriers.[140] But even as he applied the doctrine, he gutted its power. Justice Sutherland allowed the possibility that private carriers should themselves be "subject to regulations appropriate to that kind of carrier,"[141] without indicating what they might be or what ends they might serve. It hardly seems worth the fuss to invoke the doctrine at all if private carriers can be regulated by independent commissions and forced to endure conditions and restrictions so onerous that they cannot compete with common carriers.

---

[139] *See supra* p. 29.

[140] *See* 271 U.S. at 591.

[141] *Id.* at 592. Today private carriers, called "contract carriers," are regulated in much the same fashion as common carriers. They are, for example, subject to regulation on maximum and minimum rates, *see, e.g.,* CAL. PUB. UTIL. CODE §§ 3501–3800 (West 1975 & Supp. 1988), and to strict licensing requirements, *see, e.g., id.* § 3571.

The standard for obtaining a permit in California is no longer based on public convenience and necessity, but upon a showing of financial responsibility satisfactory to the public utilities board. Moreover, "[t]he commission may attach to the permit such terms and conditions as, in its judgment, are required to assure protection to persons utilitizing the operations." *Id.* § 3572. In practice *Frost* seems to have been read so narrowly as to have no practical effect on the course of the process of regulation. One California court, for example, declared: "It is obvious that the interests of the general public, as well as those of the trucking industry, are promoted by the establishment of fair and uniform rates which tend to give stability to the industry, and to protect operators against unfair and destructive competition." Orlinoff v. Campbell, 91 Cal. App. 2d 382, 387, 205 P.2d 67, 70 (1949). The case then quoted from the California decision in *Frost*, without referring to the Supreme Court case that reversed it.

Appendix 11

Page 233 of 293

If this regulatory option remains, then the state will not respond to the all-or-nothing requirement by choosing all, as it would in the foreign incorporation cases. Local political considerations are such that total exclusion of many potential commercial users of the highway often will prevail. We need think only of the airport transportation monopolies that are jealously protected by state regulations, or of private buslines and jitneys that have routinely been kept off city streets.[142] The power of state selection within classes of carriers and between classes of carriers was hardly curtailed at all by *Frost*. The right expression of the unconstitutional conditions doctrine would be far more restrictive: the state is under no duty to build public highways, just as it is under no duty to charter corporations; if it does build public highways, however, then all persons should have equal access to them, and the state powers of regulation and taxation should be directed to the *sole* end of preventing particular users from externalizing the costs of their own operations upon the other users of the system. *Frost* provided a weak imitation of the desired rule, because it did not attack head-on, under either a takings or public trust rationale, the state's claim of absolute ownership of the highway.

Nonetheless, *Frost* created a valuable legacy in the second class of cases, which involve the kinds of suspect classifications and fundamental rights that are now closely scrutinized under the footnote-four rule of *Carolene Products v. United States*.[143] In principle the state could bargain for any number of ends. Justice Sutherland recognized that each person acting by himself would have a strong incentive to sacrifice other protected rights in order to get the greater short-term benefit of being able to use the roads. He thus invoked in *Frost* earlier language from *Western Union Telegraph Co. v. Foster*,[144] to the effect that a state could not use its control over public streets to regulate the messages that telegraph companies wished to send.[145] He also worried about the parade of horribles that might arise if the state could use its power to:

> impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the

---

[142] *See* Eckert & Hilton, *The Jitneys*, 15 J.L. & ECON. 293 (1972); Pashigan, *Consequences and Causes of Public Ownership of Urban Transit Facilities*, 84 J. POL. ECON. 1239 (1976).

[143] 304 U.S. 144 (1938). *See generally* Ackerman, *Beyond Carolene Products*, 98 HARV. L. REV. 713 (1985) (dissecting the naïve interest-group politics behind footnote four); Miller, *The True Story of Carolene Products*, 1987 SUP. CT. REV. 397 (giving the unhappy special interest history of the actual restrictions on filled milk upheld by the Court).

[144] 247 U.S. 105 (1918).

[145] *See id.* at 114.

Appendix 11

Page 234 of 293

Constitution of the United States may thus be manipulated out of existence.[146]

Justice Sutherland's concern is proper, even though his use of the term "compel" obscures the difference between the state's bargaining strategies and the state's outright use of force. The real danger is not coercion, but a collective action problem, hinted at by the word "manipulated." Voting rights, for example, may be of little value to any given individual, who would surrender them gladly for a right to do business on public highways. If many individuals did so, the combined effect would be to ensure a structural tyranny and the loss of many other liberties. State officials who push this deal are not selling things that they own. They are selling "things" — for example, access to roads — that belong to the public at large. Their success may be aided by the classical prisoner's dilemma, in which many unorganized users of the public highways find themselves. If all users could contract in advance, none would release his right to vote. The imposition of a rule that prevents the state from making certain bargains limits the power of the dominant coalition or faction within the state to engage in strategic threats to capture the private surplus from the use of the public highways. Although public officials may still act in breach of trust, they cannot obtain as much for their pains, because they possess fewer credible threats against citizens. Once the state cannot impose restrictions on fundamental rights upon those who want to gain access to the highways, then, in this context at least, it cannot impose them at all, for any such restrictions imposed directly would fall before particular constitutional commands. It makes no difference whether we talk about the state's threats to remove access to the roads ("coercion") or its promises to grant access to them ("benefit"). Whatever the nominal baseline, the strategic games are always destructive of the social fabric. The potentially catastrophic holdout problems of treating the state as the absolute owner of the public highways are dramatically moderated even by a restricted doctrine of unconstitutional conditions.

## B. *Freedom of Speech and the Highways:* Lakewood

The doctrine of unconstitutional conditions as generalized in *Frost* involved access to public highways for economic uses. *Frost* was decided when the Court still afforded moderately strong constitutional protection of economic liberties, as shown by its willingness to probe into the state's asserted police power justification. With the waning of judicial concern with economic affairs, the regulatory issues raised in *Frost* dropped out of later cases. At the same time, *Carolene*

---

[146] 271 U.S. at 594.

Appendix 11

Page 235 of 293

*Products* and its progeny dictated a higher level of scrutiny for legislation impinging upon fundamental rights or employing suspect classifications. The doctrine of unconstitutional conditions migrated with the flow, and thus became entwined with modern issues of religion, speech, and equal protection.

The public highway cases were thus transformed into the "public forum" cases,[147] and the renewed level of higher scrutiny once again proceeded from a presumption of distrust of legislative and executive behavior. Before this new orientation was adopted, there was some judicial support, again voiced by Justice Holmes, for the categorical position that the state owns the highway or park and therefore can exclude speakers at will.[148] But this absolutist position quickly fell when it was decided that state title to the public highways did not allow it to bar the distribution of literature, or to subject it to any special prior restrictions, license tax, or permits.[149] The end run tolerated in the context of economic regulation would not be allowed here.

This welcome retreat from the principle of absolute public ownership limits the need for the doctrine of unconstitutional conditions, but does not render it entirely unnecessary. There is often a capacity limitation — if not for lonely leafleteers on public roads and streets, then surely on public fairgrounds — that becomes critical as the demands on public space rise.[150] Someone has to decide who will gain access and who will not. Given the level of scrutiny applied to such decisions, the issue of unconstitutional conditions should have been expected to reappear in the modern context of the public forum, and it did, in last Term's decision in *City of Lakewood v. Plain Dealer Publishing Co.*[151]

Lakewood's ordinance gave the town mayor the discretion to decide which newspaper companies would receive annual, nonassign-

---

[147] *See generally* Kalven, *The Concept of the Public Forum*: Cox v. Louisiana, 1965 SUP. CT. REV. 1; Stone, *Fora Americana: Speech in Public Places*, 1974 SUP. CT. REV. 233.

[148] While still on the Massachusetts Supreme Judicial Court, Justice Holmes stated:

> For the legislature absolutely or conditionally to forbid public speaking in a highway or public park is no more an infringment of the rights of a member of the public than for the owner of a private house to forbid it in his house. When no proprietary right interferes, the legislature may end the right of the public to enter upon the public place by putting an end to the dedication to public uses. So it may take the lesser step of limiting the public use to certain purposes.

Commonwealth v. Davis, 162 Mass. 510, 511, 39 N.E. 113, 113 (1895), *aff'd*, 167 U.S. 43 (1897).

[149] *See* Lovell v. Griffin, 303 U.S. 444 (1938). Marsh v. Alabama, 326 U.S. 501 (1946), took the far more controversial step of applying a similar analysis to privately owned company towns.

[150] *See, e.g.*, Heffron v. International Soc'y for Krishna Consciousness, Inc., 452 U.S. 640 (1981) (allowing the state to impose on Krishna groups the same time, place, and manner restrictions applicable to all others at a state fair).

[151] 108 S. Ct. 2138 (1988).

Appendix 11

Page 236 of 293

able permits to place its newsracks on public property. The decision was to be made after considering a range of factors, including the approval of the rack's design by the Architectural Board of Review, the willingness of the permittee to obtain insurance that would hold the city harmless for all liability arising from the use of the newsrack, and "such other terms and conditions deemed necessary and desirable by the Mayor."[152] The issue of unconstitutional conditions arose when it was urged that the City was under no obligation to allow any newsracks at all on public streets, and could therefore make the right to place racks on public roads subject to whatever conditions the City wished to impose.

*Lakewood* differs from *Frost* in two ways. First, in this context city ownership of the public streets gives government far less monopoly power than was involved in *Frost*. While the public roads are the only available means of transportation, newspapers can be sold by subscription or in stores. The government power therefore is somewhat attenuated. Yet by the same token, it is by no means trivial, especially because some papers (such as those distributed without charge) rely heavily upon newsrack distributions. The scope of government power, although not absolute, is still large enough to give it substantial monopoly power. There is reason therefore to invoke the doctrine of unconstitutional conditions. Second, unlike the statute in *Frost*, Lakewood's ordinance contained no explicit requirement that the newspaper waive any constitutional right. It was not asked to agree to mayoral censorship as a condition for placing its racks on the public streets. Nonetheless, the wide level of discretion conferred upon the mayor raised the possibility that he would seek to impose a condition that would require the waiver of first amendment rights, such as softening opposition to one of the mayor's pet projects. The possibility that some papers might consent to this *sub rosa* condition could induce others to follow suit. The power to select who shall stay and who shall go made it possible for the mayor to prefer newspapers that supported his policies and to deny permits to those that opposed them, and the prospect of such mischievous behavior was far more troubling than a simple rule totally banning newspaper racks from the public street.[153]

---

[152] LAKEWOOD, OH., CODIFIED ORDINANCES § 901.181 (1984) (cited and quoted in *Lakewood*, 108 S. Ct. at 2142 n.2).

[153] *Cf.* Police Dep't v. Mosley, 408 U.S. 92 (1972) (invalidating a city's ban on all forms of picketing except those regarding a labor dispute). The case did not explicitly rest on the doctrine of unconstitutional conditions, and indeed the Court attached little weight to the fact that the Mosley's picketing took place on the public highways. Instead the Court undertook a combined first amendment and equal protection analysis which attacked the ordinance because it distinguished among different types of speech by subject matter. *See id.* at 95–96. The subject matter distinctions gave the state officials more discretion than the simple all-or-nothing ban on picketing, but far less than that contemplated by Lakewood's statutory scheme. *Mosley* thus

Appendix 11

Page 237 of 293

The sound first amendment limitations on discretion do not, however, answer all the questions of what newsracks, if any, must be placed upon public property. Surely the first amendment does not require that any newspaper company be allowed to place its racks on public property at will, without paying any fee at all. Public streets and roads are still a form of commons, and one risk associated with the maintenance of any commons is its overexploitation by private users who do not fully take into account the costs that their own behavior imposes upon other members of the public. Strategic behavior by the mayor is only one form of abuse; excessive use by the newspaper companies must be reckoned with as well, which is why decisions preventing excessive noise and other similar nuisances have survived to the present day, under the rule that allows for appropriate "time, place and manner" restrictions.[154]

Because of this dual hazard, there is surely some reason to allow the City to restrict the number of newsracks on public property, and perhaps even to confine them to certain locations within the town. *Lakewood* did not pass, for example, on whether a total ban on newsracks in residential areas would be constitutional. There is, of course, the risk that restrictions on the locations and number of newsracks could also be more severe than appropriate. Such a restriction might be attacked in extreme cases — for example, if the ordinance restricted all newsracks in order to punish one particular newspaper. Yet a facial attack on such a statute is surely out of place; some concrete evidence of official misconduct should be required. More generally, there comes a point at which the capacity to control government abuse diminishes, while the gains from controlling that abuse are small. Then it is time to quit, under the first amendment just like anywhere else. The simple rule that the town can determine the number and location of newsracks, but must allocate them by some nondiscretionary means goes a very long way toward controlling the most obvious forms of abuse.

It is instructive to note that the first amendment principles applicable in this case are drawn from those developed in connection with the economic liberties cases. The concern with conditional admission to the roads that animated *Frost* had to do with implicit redistribution

---

represents the hard intermediate case. The strongest argument for sustaining the Court's position is that there is so little that can be offered to justify the ban. *See generally* Stone, *Restrictions of Speech Because of Its Content: The Peculiar Case of Subject-Matter Restrictions*, 46 U. CHI. L. REV. 81 (1978) (exploring the relationship between subject-matter based and viewpoint-neutral regulation of speech). Note that *Mosley* becomes an unconstitutional conditions case if the use of the public road is conditioned on the willingness not to picket in nonlabor cases. Similar issues arise in the veterans' exemption context. *See infra* pp. 77–79 (discussing Regan v. Taxation with Representation, 461 U.S. 540 (1983)).

[154] *See, e.g.*, Kovacs v. Cooper, 336 U.S. 77 (1949) (plurality opinion).

Appendix 11

Page 238 of 293

of wealth among separate common carriers, and across different sectors of the trucking business. The restrictions against excessive weight and the like were routinely allowed in order to control against the exploitation of a common resource by a single user. If that economic model had applied, *Lakewood* would have come out the same way even without resort to first amendment principles. Indeed under the economic liberties framework, it would not be enough to guard against the possibility of favoritism to firms within the class of newspapers. It would also be necessary to worry about a reciprocal risk: whether newspapers as a class received a subsidy from the rest of the public at large in the form of below-market rents of public space. That additional constraint would be very hard to administer because there is no strong economic theory that determines the optimal level of newsracks to be allowed on public property. The theory would, however, suggest that once the number of spaces was determined by political means, their allocation to individual newspaper companies would have to take place by bid, just as in the common carrier case. Within the first amendment framework, the bid system seems clearly acceptable. But now other systems may be allowed as well. A lottery may not guarantee the most efficient use of public space, but it does eliminate (ex ante) redistribution among newspapers. A system that takes the total number of spaces and divides it by the number of applicants does the same thing, but may give a boost to papers with smaller circulations that a bidding system would not. The critical point is that the first amendment analysis of highway use generally, and the unconstitutional conditions analysis more concretely, proceed on identical terms as the previous analysis of *Frost*. The demise of economic liberties means in essence that we have to worry about only one form of error, the imposition of undue restrictions, but can ignore implicit subsidies to the newspaper companies. Government misconduct probably has far greater impact in the context of road regulation than it does in the context of speech. But whatever the Court's shortcomings in its protection for economic liberties, *Lakewood* itself is a welcome and correctly decided case.

## VI. THE POLICE POWER

Skirmishes over the doctrine of unconstitutional conditions have recently arisen in connection with the state police power, most notably in *Posadas de Puerto Rico Associates v. Tourism Co.*[155] and *Nollan v. California Coastal Commission.*[156] In order to set the stage for its

---

[155] 478 U.S. 328 (1986).

[156] 107 S. Ct. 3141 (1987). *Nollan* has generated an enormous amount of controversy. For a more extended account of my views, see Epstein, *Takings: Descent and Resurrection,* 1987 SUP. CT. REV. 1, 31–44. *See also The Jurisprudence of Takings,* 88 COLUM. L. REV. (forthcoming 1988).

Appendix 11

use in this context, it is necessary first to give some brief account of the police power generally.[157] The police power addresses the set of justifications that the state must put forward in order to override any of the substantive protections of the Constitution. Some recognition of the police power justification seems to be necessary if we are to make any sense of the Constitution at all. It is difficult to conceive of a defense of private property so absolute that ownership of a handgun allows its owner to kill or maim at will, or a defense of freedom of speech so pure as to countenance securities fraud or perjury. One possible account of the police power therefore allows the state to override explicit constitutional guarantees when necessary to protect other persons from the threat or use of force or fraud. The relevant restrictions are often prospective in application, like a ban on the sale of firearms or the ban on printing a false prospectus. Typically, the states and their subdivisions have a monopoly over the use of the police power, creating a risk that exercise of this power will go beyond its stated purpose, and will be used to cloak protectionist efforts to raise the cost of entry of firms and individuals into what would otherwise be competitive markets. The effort to sort out appropriate police power measures from inappropriate ones typically requires an analysis of the "fit" between the ends to be served and the means to be used. The effective scope of the state power depends heavily, therefore, on the applicable level of scrutiny. So long as the perils of both overregulation and underregulation are about the same level of magnitude, some "intermediate" level of scrutiny seems appropriate.[158] This analysis is perfectly general, and explains why in practice limitations on the police power must arise from the property, speech, contract, religion, and equal protection guarantees of the Constitution.

Under current doctrine, the police power is typically afforded a construction that covers far more than the suppression of force and fraud, especially in land use cases, and, to a lesser extent, in commercial speech cases. In essence, the state is allowed to regulate in ways that are thought generally to advance the public good, and a very low level of scrutiny is applied both to the ends sought and to the connection between means and ends. In land use cases, the police power was extended far beyond the nuisance control rationale at least as early as *Euclid v. Ambler Realty Co.*[159] Today, it has been broadened still further to allow states to regulate levels of population growth, to force towns to provide some minimum percentage of low-

---

[157] For a longer discussion, see R. EPSTEIN, cited above in note 28, at 107–45.

[158] *See id.* at 128–29. A need to take a closer look at the police power arises whenever there is any fear of factional abuse. *See generally* Sunstein, *Naked Preferences and the Constitution*, 84 COLUM. L. REV. 1689, 1723–27 (1984).

[159] 272 U.S. 365 (1926).

Appendix 11

Page 240 of 293

income housing, to set rents, or to pursue aesthetic ends.[160] Yet even
this broad construction of the police power does not give the state
ordinary ownership rights over the property that it may restrict or
regulate. Even today, the state could not pass a statute making it the
owner of all development rights in property, which it could then turn
around and sell for cash. But even subject to this important caveat,
the use of the relaxed, rational basis standard of review necessarily
increases the scope of government discretion, and thus opens the door
to the perils associated with government monopolies. As before, the
question arises whether the doctrine of unconstitutional conditions can
control the risks of so expansive an account of government power.
We turn first to land use, and then to commercial speech.

## A. Land Use

*Nollan v. California Coastal Commission*[161] illustrates how the
generous contours of the police power in the land use context usher
in a discussion of unconstitutional conditions as a second-best mea-
sure. The Nollans owned a small, dilapidated beach house that they
wished to tear down and replace with a larger home. Under the
prevailing construction of the police power, the Court assumed, the
state could have prevented the construction of the new house abso-
lutely, in order to preserve the public's "viewing access" over the
Nollans' land from the public highways to the waterfront.[162] The
Commission announced that it was prepared to grant the Nollans the
right to build on their land, and consequently the right to obstruct
that view, if the Nollans would surrender a lateral, beachfront ease-
ment over their land for the benefit of the public at large. If the
Nollans had accepted the deal, then the state would have gotten the
easement without having to buy it for cash. However, it was also
settled that this easement would have had to be purchased if taken
by the government in a separate transaction.[163] Similarly, it seems
clear that the Coastal Commission, having only limited powers, could
not have simply declared itself the owner of the development rights
over the Nollans' land solely to sell it back to them for cash.

Within these contours, the question raised in *Nollan* was whether
the state could force the Nollans to choose between their construction
permit and their lateral easement. Justice Brennan argued that it
could, resting his dissent on the model of the private bargain and

---

[160] *See, e.g.*, Agins v. City of Tiburon, 447 U.S. 255 (1980) (holding that a zoning ordinance
restricting development of land to open space or low-density residential use is a valid exercise
of police power).

[161] 107 S. Ct. 3141 (1987).

[162] *See id.* at 3147.

[163] *See id.* at 3145.

Appendix 11

implicit rejection of the unconstitutional conditions doctrine.[164] If the state could ban construction of the new house entirely, then it could grant permission to construct on condition that the lateral easement be deeded over to the state.[165] Justice Scalia, writing for the majority, invoked (in all but name) the doctrine of unconstitutional conditions to hold that this particular bargain between the state and two of its citizens was impermissible because the condition imposed — surrender of the easement — was "unrelated" to the legitimate interest used by the state to justify its actions — preserving the view.[166] The question is who is right, and why.

One way to avoid the problem is to recognize that the scope of the police power gives the state far too much discretion even when it does not wish to bargain with citizens. Restrictions on height and bulk are unrelated to the prevention of any ordinary, common law nuisance, and can be obtained by neighbors (many of whom have built for themselves the very type of structures that they are trying to prevent others from building) only if they are able to purchase a restrictive covenant. There seems no reason why the state should be able to take for the public at large the same type of property interest that neighbors must buy. If so, then *Nollan* need not even reach the unconstitutional conditions question. The state cannot force a citizen who owns two plots of land to choose which one to keep and which to surrender to the state, for imposing such a choice amounts to taking property without just compensation. The issue is no different when the landowner is put to the choice of encumbering his land with a restrictive covenant or a lateral easement. The choice the state puts to the citizen is no better than one which an uncommonly fastidious gunman puts by allowing his victim the choice between his watch and his wallet. Any sound delineation of property rights thus would vindicate the Nollans before even reaching the unconstitutional conditions question.

Once this first line of defense has been overcome, why the doctrine of unconstitutional conditions? Here its use is best explained by re-

---

[164] Justice Brennan argued that:

> The Coastal Commission, if it had so chosen, could have denied the Nollans' request for a development permit, since the property would have remained economically viable without the requested new development. Instead, the State sought to accommodate the Nollans' desire for new development, on the condition that the development not diminish the overall amount of public access to the coastline.

*Id.* at 3152 (Brennan, J., dissenting) (footnote omitted). The clear implication is that the greater power of preventing development altogether includes the lesser power of allowing development subject to surrender of the demanded easement. Note, however, that Justice Brennan accepts the unconstitutional conditions doctrine in the speech and religion contexts. *See infra* pp. 75–76 (discussing Speiser v. Randall, 357 U.S. 513 (1958)); pp. 80–86 (discussing Sherbert v. Verner, 374 U.S. 398 (1963)).

[165] *See* 107 S. Ct. at 3152 (Brennan, J., dissenting).

[166] *See* 107 S. Ct. at 3148.

Appendix 11

Page 242 of 293

verting to the basic social purpose behind the takings clause: to ensure that an interest in private property will pass into government hands only if it is worth more to the government, as representative of the public, than its market value in private hands.[167] If the state has to purchase the lateral easement, this purpose is satisfied, because public officials have to raise the money to make the purchase. The protection so afforded is imperfect, however, because there is always the risk that one group (beach users) will be able to purchase the easement with money raised by taxes imposed upon the public generally. While the takings prohibition (unless extended to taxation)[168] does not stop this particular form of political externality, it does at least ensure that a separate constraint against resource misallocation is observed. Making the payment requires an imperfect set of political institutions to take into account the very large losses that the single owner will suffer, losses that can be downplayed or ignored when payment is not required.

These institutional constraints against misbehavior tend, however, to break down if the state can link the fate of the lateral easement to the issue of visual access, as the Coastal Commission tried to do. The threat to impose development restrictions on the landowner does not require any budget appropriation by either California or the local municipality. If the losses that state regulation could inflict upon the owner are (as seems probable) far greater to the owner than the loss of a lateral easement, then there seems little prospect that the state's offer will be declined. Landowners will sacrifice an interest worth $1000 in order to preserve development rights that are worth a hundred times as much.[169] Once this sequence runs its course, therefore, all we know are the relative values that the landowner attaches to his two separate interests. We do not know whether the value of the lateral easement to the state is greater than its value to the owner, because no accountable political party has been forced to make that explicit judgment. One central allocative function of the eminent domain clause is effectively bypassed by allowing the state to couple the lateral easement with the construction permit.

In this context, the doctrine of unconstitutional conditions limits the abuse of government discretion by severing the denial of the

---

[167] Ideally, the state should be required to pay not the market value, but the subjective value that the individual attaches to the property. Because the latter is difficult to determine, courts have moved to the market value standard. *See, e.g.,* United States v. 546.54 Acres of Land, 441 U.S. 506, 511 (1979). The argument in the text, however, does not depend on which standard of private valuation is used.

[168] *See* R. EPSTEIN, *supra* note 28, at 283–305.

[169] The point is not one of idle speculation, for the Nollans were the only parties to fight the Commission, while 43 other landowners had capitulated. *See* 107 S. Ct. at 3158 n.9 (Brennan, J. dissenting). The number would have been 44 if this constitutional challenge had not appeared viable.

Appendix 11

Page 243 of 293

construction permit from the taking of the lateral easement. This course of action is not without its dangers. It is quite possible that the easement will be purchased for cash (which is appropriate if the compensation levels are rightly set, although they often are not when severance damages are involved). It is also possible that the permit would be denied outright, so that people like the Nollans would be left worse off than they were when they could bargain away their rights. But in this case the empirical guess is that the government, as in the foreign incorporation cases,[170] will choose not to exercise its greater power. Imposing the building restrictions necessarily deprives the community of the increased taxes generated by his new residence, which probably will not increase the demands on public facilities by the same amount. The groups who are interested in lateral access may be far less interested in visual access, so that the coalition pressuring for visual access will disintegrate when the two issues are separated. Chances seem good that the "public" at large would not want this permit restriction in and of itself. The severance therefore calls the bluff of the Coastal Commission by preventing it from parlaying a threat of something that interest groups do not want into the acquisition of something they do want — for free. The "relatedness" requirement imposed by Justice Scalia thus has powerful functional roots, for it narrows the size of the bargaining range and hence reduces the state's ability to extract concessions from individual owners by coordinating separate types of government initiatives.

The necessary prerequisite for undertaking this inquiry is that the takings clause limits the permissible level of redistribution between the public at large and landowners. Under the traditional rational basis test, that concern is so weak that state power (including the power to bargain) would remain unbridled. It is therefore no accident that Justice Scalia's implicit invocation of the doctrine followed a more general assertion that the deferential rational basis review does not carry over from equal protection to takings cases.[171] Even within Justice Scalia's formulation of the problem, the government's broad discretion over the nature and type of height, square footage, and exterior design regulations introduces various opportunites for abuse that a more rigorous account of the police power would preclude. But within very rough limits this invocation of unconstitutional conditions does have bite. With *Nollan* in place, the state cannot insist that the landowner deed over an easement in order to get an electrical hook-up for his house. In a cautious second-best sense, *Nollan* is a fit case for using the doctrine. But it is a far cry from the best

---

[170] *See supra* pp. 35–38.

[171] *See* 107 S. Ct. at 3147 n.3 (contesting Justice Brennan's advocacy of a rational basis test).

*HARVARD LAW REVIEW* [Vol. 102:1

solution, which is a return of the police power to its traditional confines.

## B. Commercial Speech and the Morals Head of the Police Power

A similar police power problem can arise in the first amendment context. In *Posadas de Puerto Rico Associates v. Tourism Co.*,[172] Puerto Rico wished to encourage tourists to come to Puerto Rico to gamble. It did not make gambling illegal for local citizens, but it did prevent any local advertisement of gambling on the island proper, leaving Posadas, a Holiday Inn franchisee, free to advertise its gambling facilities on the mainland. It was conceded that the control of gambling fell within the traditional "morals" head of the police power of the state, so that the state could have made gambling illegal had it so chosen. In upholding the statute, Justice Rehnquist implicitly rejected the doctrine of unconstitutional conditions when he argued that Puerto Rico's plenary power to ban gambling itself gave it the lesser power to license gambling, subject to the condition that the licensee accept a ban on local advertisement[173] — itself a limitation on a first amendment right. Do first amendment principles require that such advertisements be tolerated, given the decision to allow the gambling itself? Where the advertising was neither misleading nor fraudulent, the canonical version of the constitutional inquiry is that "the speech may be restricted only if the government's interest in doing so is substantial, the restrictions directly advance the government's asserted interest, and the restrictions are no more extensive than necessary to serve that interest."[174] Justice Rehnquist's deferential exploration of these issues upheld the restrictions, which Justice Brennan, who championed the greater/lesser logic in his *Nollan* dissent, would have struck down.[175]

For our purposes, the central question is whether the doctrine of unconstitutional conditions, as applied in this context, effectively checks government misbehavior. The picture is decidedly murky. In one sense it does. The Puerto Rican policy is cynical: gambling has terrible consequences for the social fabric, so Puerto Rico attempted

---

[172] 478 U.S. 328 (1986).

[173] *See id.* at 346.

[174] *Id.* at 340 (citing Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 566 (1980)).

[175] *See id.* at 350 (Brennan, J., dissenting). Although he employed a high level of scrutiny, Justice Brennan claimed that he would have struck down the law even under the Court's more permissive standard. *See id.* at 350–51. For a spirited denunciation of Justice Rehnquist's opinion for its application of low-level scrutiny, see Kurland, *Posadas de Puerto Rico v. Tourism Company: "Twas Strange, 'Twas Passing Strange; 'Twas Pitiful, 'Twas Wondrous Pitiful."*, 1986 SUP. CT. REV. 1.

Appendix 11

Page 245 of 293

to externalize its costs by taking the money of tourists, who will take their social and pyschological problems home with their other belongings. The possible interests of other states, which cannot prevent their citizens from gambling outside their borders, are not registered in the local political calculus, and in all likelihood are of faint importance in the Congressional politics over Puerto Rico's status and preferences. On the domestic front, the ban on casino gambling does not extend to such noble pastimes as horse racing, cockfights, and the Puerto Rican lottery.[176] In essence this exercise of the police power has a clearly anticompetitive component, for as Justice Brennan, writing in the spirit of a public choice economist, suggested, "it is surely not far-fetched to suppose that the legislature chose to restrict casino advertising not because of the 'evils' of casino gambling, but because it preferred that Puerto Ricans spend their gambling dollars on the Puerto Rico lottery"[177] — which, it might be added, tourists are not very likely to play.

*Posadas* is extremely difficult to make sense of because the statute, as applied to both Puerto Ricans and to visitors, can plausibly be characterized either as a traditional exercise of the police power or as an attempt by Puerto Rico to exploit those within its borders. The unconstitutional conditions inquiry in *Posadas* is in a sense the opposite of the one in *Nollan*: should the Court require the bundling of the two issues — casino gambling and casino advertising — in order to forestall the political abuse that threatens commercial speech?

Perhaps it should. One advantage of the bundling is that the advertising ban, permissible only if gambling itself is banned, is of no consequence: who would advertise what he could not sell? This means that governments and citizens would not become comfortable with large bureaucracies whose sole function is to suppress or regulate speech. Yet in another sense this linkage is very hard to sustain. One reason to legalize gambling is simply damage control. It is better that people not gamble, not only for their own personal character, but also for the corrosive effect gambling has on family and business obligations. Nonetheless, it is just too costly to try to control gambling by criminal sanctions. Better therefore to legalize the "disfavored" activity, which can then be taxed to keep participation within reason. Disfavored activities, moreover, need not be treated like all other business activities. Advertisement stimulates business, so it might be proper for a state to decide that, while it should not ban gambling, it should nonetheless moderate its growth by banning advertising. Surely if the issue were the legalization of marijuana and other drugs, a respectable argument could be made to allow their sale, subject to

---

[176] *See* 478 U.S. at 342.
[177] *Id.* at 353–54 (Brennan, J., dissenting).

Appendix 11

*HARVARD LAW REVIEW*                    [Vol. 102:1

a general tax and to prohibitions or restrictions on advertising, which, because of advertising's public visibility, should be reasonably easy to enforce. In effect we have adopted such a strategy with respect to cigarettes, which are sold, heavily taxed, and subject to advertisement restrictions, at least on television and radio.[178] Given the absence of any coherent social attitude toward gambling (or toward drugs, alcohol, tobacco, or prostitution), courts should exercise some deference to state restrictions on such activities, which fall within the traditional "morals" head of the police power as it relates to *both* property and speech.

Nonetheless there are reasons to doubt that the regulation at issue in *Posadas* meets that test. The social disruptions of gambling, if real, should be manifest in all its forms. When the state seeks to divide markets — with local customers directed toward the state's own lottery, and well-heeled out-of-state customers toward its posh casinos — it looks as if the anticompetitive motives dominate the protective motives. Forcing an all-or-nothing choice between banning all advertisement or banning none allows the state to pursue its legitimate police power objectives without running the risk of rigging local markets. If total bans are thought to be too damaging to the pocketbook, then it is still possible to have a rule that allows all forms of gambling to use print, but not media advertising, or perhaps the reverse. Perhaps the state should be able to disengage the decision to allow gambling from its decision to ban its advertisement, but some very powerful justification must be offered to show why different forms of gambling should operate under different regulatory regimes. Justice Rehnquist might have been correct in insisting that the doctrine of unconstitutional conditions is inapplicable to the connection between gambling and advertising. But the explicit discrimination between government-run and privately run gambling raises the prospect of abuse that calls for a stronger use of unconstitutional conditions in its equal protection guise.

There is a second element of *Posadas* that is still more disturbing. Present law freely allows general economic regulation of all sorts and descriptions.[179] Under Justice Rehnquist's logic, the power to ban an activity implies the power to ban its advertisement. It follows, therefore, that first amendment protections afforded commercial speech can be no greater than the meager protections given to economic liberties. In order to provide adequate protection for speech, then, it becomes necessary to build a Maginot line between the relaxed attitude toward

---

[178] In my view, the justification for these restrictions should rest on the externalities these activities impose on third parties.

[179] *See, e.g.*, City of New Orleans v. Dukes, 427 U.S. 297 (1976); Ferguson v. Skrupa, 372 U.S. 726 (1963); Williamson v. Lee Optical Co., 348 U.S. 483 (1955); Kurland, *supra* note 175, at 13.

Appendix 11

Page 247 of 293

economic liberties and the stricter scrutiny on matters of speech. The doctrine of unconstitutional conditions again serves as a second-best tool to limit the ominous implications of the modern economic liberties cases. But this larger problem, and the horribles it suggests, would disappear if we returned to the older cases on occupational freedom, requiring the state to show a strong justification before banning any ordinary commercial activity.[180]

Even if we do not take that hard line, it is still possible to limit *Posadas*, which should be understood not as an ordinary commercial speech case, but as a police power morals case. Constitutionally, it should be a close question whether gambling may be banned, and hence a close case whether advertising of gambling can be banned, even if the gambling is allowed. The difficulty of these questions thus weakens the constitutional protection for gambling and its advertising alike. But these substantive doubts do not eliminate the equal protection dimension of the case. It is still imperative that the state treat all forms of any suspect activity such as gambling under the same standard unless some powerful justification for differential treatment can be demonstrated. By this logic, *Posadas* should stand only for the proposition that constitutional protection of speech is at its lowest ebb in the morals cases. It need not overrun the constitutional protection of commercial speech generally.

## VII. EMPLOYMENT CASES

The doctrine of unconstitutional conditions can also be applied to contracts of employment between the state and private individuals. In this context, application of the doctrine should generally be restricted. The doctrine of unconstitutional conditions is most imperative when the risk of government abuse is greatest, and least attractive when the risk of citizen abuse is greatest. If the state were to condition employment on the willingness of an employee to contribute a portion of his salary to the dominant political party, that condition would be struck down because of the systematic distortion that it would work upon the political process. The case is scarcely different from a direct transfer of public funds into party coffers. The worker may be better off with the job subject to the condition, but, as in the standard monopoly case, additional social gains are obtainable if the job is offered without the condition.

Fortunately, such extreme abuses of government power are relatively infrequent, so that today unconstitutional conditions issues tend to be raised with respect to restrictions relatively germane to the work at hand: the terms and conditions of individual employment contracts.

---

[180] *See, e.g.,* Truax v. Raich, 239 U.S. 33, 41 (1915).

**Appendix 11**

Page 248 of 293

The very statement of the doctrine suggests that most cases in this area satisfy the "relatedness" requirement that Justice Scalia spelled out in *Nollan*. Nonetheless, it is important to ask in each individual case whether the restriction in question represents a strategic gambit by the state, or whether it is designed to counter a parallel gambit by the individual worker. In order to decide which form of opportunism is dominant, a ready test is at hand: a court can simply ask whether the kinds of restrictions that the government seeks to impose on its own employees are similar to those that private firms in competitive labor markets impose on employees engaged in similar activities. Perhaps some positions in government are so unique that no private analogue applies, but even in this context, the large number of government employers may help to create a competitive labor market.[181] For the general range of office workers, executives, policymakers, and bureaucrats the connections are very close indeed. It is very hard to create monopolies in labor markets without explicit government intervention to block free entry. It follows therefore that the law should find fewer occasions to invoke the unconstitutional conditions doctrine in the context of government employment than in other contexts, and it does.

In *Snepp v. United States*,[182] the Supreme Court held that the United States could hold Snepp, a CIA agent, to the terms of an employment contract in which he agreed, first, that he would "'not . . . publish . . . any information or material relating to the Agency, its activities or intelligence activities generally, either during or after the term of [his] employment, without specific prior approval by the Agency,'" and second, that he would not "'disclose any classified information relating to the Agency without proper authorization.'"[183] Snepp published his book without the contractually required clearance, and the book may or may not have contained classified information — an issue that the CIA had a strong incentive to keep out of court. But wholly apart from the disclosures contained in the book, there was an evident breach of contract, assuming that the state could impose the contract condition consistent with the free speech clause. The case thus raises again the question of unconstitutional conditions, for the issue becomes whether the greater power not to hire at all includes the lesser power to hire subject to this condition on publication.[184]

---

[181] This theme is developed in Williams, *Liberty and Property: The Problem of Government Benefits*, 12 J. LEGAL STUD. 3, 27–31 (1983).

[182] 444 U.S. 507 (1980). The analysis given here is similar to that provided in Easterbrook, cited above in note 31, at 339–52.

[183] 444 U.S. at 507–08 (quoting Appeal to Petition for Certiorari at 58a–59a, *Snepp* (No. 78-1871)).

[184] *See generally* Easterbrook, *supra* note 31, at 349 (arguing against the Court's use of unconstitutional conditions doctrine in *Snepp*).

Appendix 11

Page 249 of 293

Why shouldn't it?  Any breach of the system of prior clearances creates the risk of improper disclosure, which can only undermine the ability of the CIA to obtain needed information from sources that rely on the review process for their protection.  Thus the relatedness requirement seems met.  More generally, the operation of any government agency requires the sharing of restricted information, which will be inhibited if personnel can obtain information for one purpose only to turn around and use it for another.[185]  The restriction in question is no doubt similar to ones private employers impose upon employees entrusted with sensitive information, and it is difficult to see how the public is ill-served by ensuring the confidentiality of its intelligence agents.  Should the government through pre-publication review seek to stifle political criticism of the agency that does not rest upon classified information, then the problem can be handled on a case-by-case basis, by in camera hearings if necessary, without disturbing the basic structure of the statute.  As in the highway cases, one must worry about abuse not only by the government, but also by parties doing business with it.  The bargain here does not seem to be a cloak for any hidden government abuse, and it thus should be sustained, as the Court held, absent some specific showing of misbehavior.[186]

Other cases reveal the same pattern.  In *Connick v. Myers*,[187] the plaintiff, an assistant district attorney in New Orleans, protested her transfer to another division and circulated questionnaires inside the office concerning office morale, the need for grievance committees, and the alleged misconduct of her supervisors.  She was then dismissed

---

[185] This same concern explains why the Supreme Court was also correct not to apply the doctrine of unconstitutional conditions in Seattle Times Co. v. Rhinehart, 467 U.S. 20 (1984), in which the Court held that parties able to obtain discovery of sensitive documents under the Washington Superior Court Rules (identical to the Federal Rules of Civil Procedure) did not have a first amendment right to disclose those documents to the public at large.  In essence the limited use imposed upon the discovery recognizes that there are powerful reasons to limit the dissemination of information by protective orders, as provided for in rule 26(c).  As elsewhere, doctrines of unconstitutional conditions have to be sensitive to strategic behavior by private parties as well as by government.  The prospect of filing a weak lawsuit in order to obtain documents for publication should not be dismissed in this age of high-stakes litigation.  If the information obtained in discovery is relevant to the case at hand, it can be introduced at trial, where its dissemination can be assured.  Note too that the party resisting the discovery has no obvious manipulative strategy at its disposal, so that the law should work to control the behavior of the party seeking discovery, which has all the discretion.

[186] *See* 444 U.S. at 509 n.3.  There is the further issue of damages.  The Court imposed a constructive trust and required Snepp to disgorge his full profits from the book.  *See id.* at 515–16.  The remedy is probably excessive if looked at from the point of view of the harm to the CIA in the individual case, but it has the desired institutional feature of ensuring compliance with the government procedures in cases where damage remedies calculated on actual loss from a given disclosure will not deter agents whose gain from publishing confidential information exceeds the actual loss they cause the Agency.

[187] 461 U.S. 138 (1983).

Appendix 11

Page 250 of 293

for leading a "'mini-insurrection'" in the office.[188] Here the question
is whether the first amendment allows limitations on speech about
office management. The government does not have anything like a
monopoly position over the district attorneys it employs, for both local
governments and private firms hire criminal lawyers. These condi-
tions are similar to those private firms impose on the protests that
their employees can make. As in *Snepp*, the need to control employ-
ees' abuse must be weighed against the need to control official abuse.
As long as the district attorney's office remains subject to external
scrutiny and criticism, including criticism from Myers after her dis-
missal, the normal rules of employment contracts should apply, as the
Court held.

In a more current vein, the issue of drug testing raises the question
whether the government can require persons to "waive" their fourth
amendment rights against unreasonable searches and seizures as a
condition of employment. Here the risks that prompt application of
the unconstitutional conditions doctrine do not seem to apply. The
use of drugs is related to performance on the job, and private firms
that have to operate within competitive labor markets insist on similar
conditions. The conditions imposed do not seek to constrain private
practices and relations of employees that are unrelated to their em-
ployment. Nor do these cases involve the hypothetical danger of the
government using taxpayer money generally to pay people to release
their fourth amendment rights in general. That practice could not be
tolerated precisely because, under the guise of multiple, separate pri-
vate contracts, it would work a fundamental change in overall gov-
ernment structure.[189] But the close connection between employment
and testing seems to preclude any system-wide loss. The doctrine of
unconstitutional conditions has no obvious role to play in the context
of drug-testing.

The doctrine of unconstitutional conditions might also be invoked
in the employment context to protect procedural rights. Assume that
the government has offered an individual an at-will employment con-
tract which by design provides the employee with no procedural pro-
tections against government dismissal. The question is whether this

---

[188] *See id.* at 141.

[189] Taken to the limit, moreover, no cash compensation would be paid to any person in
society. If the government pays $100 to each person to waive his fourth amendment rights, it
must raise those revenues from general taxes of an equal amount. Thus, what one person
receives in direct payment has already been lost in taxes. Once the cross-payments are netted
out, the compensation that is received is strictly in-kind. In exchange for the release of my
fourth amendment rights, you hereby agree to release your fourth amendment rights. It is not
clear that one person should regard the release of fourth amendment rights by others as a benefit
to him, given its tendency to increase government powers. Clearly, if some system-wide shift
is to be taken with search and seizures, an explicit amendment to the Constitution and not
covert transfers should be required.

Appendix 11

form of contract infringes the constitutional guarantee that no person shall be deprived of property without due process of law. In an early foray into the issue, Justice Rehnquist in *Arnett v. Kennedy*[190] adopted a view containing strong freedom-of-contract strains: "where the grant of a substantive right is inextricably intertwined with the limitations of the procedures which are to be employed in determining that right, a litigant in the position of appellee must take the bitter with the sweet."[191] In one sense this statement is surely too broad, for the government is surely not in the position of an employer under a contract at-will. If it is clear that the government cannot condition its offers of employment on the willingness of workers to support one political party or the other, then surely it cannot invoke those same reasons when it decides to fire. In both cases, the random use of power does not tend to distort or skew the political process in favor of entrenched interests, but appointments or dismissals with political (or religious) conditions attached will have just that impact. Nonetheless, despite the many sustained attacks on this position,[192] Justice Rehnquist's contractual logic is far stronger once cases involving forbidden motives are put aside. *Arnett* itself involved the most attractive facts for the dismissed employee, insofar as he was fired for allegedly defaming the very government official who was supposed to render an initial judgment on his case. Justice Rehnquist deliberately sidestepped the thorny constitutional question whether some independent party would be required to make the initial hearing determination.[193]

Whatever the right result in cases of this sort, the basic logic of *Arnett* seems unassailable. The government here hires workers in an intensely competitive environment, which is why its own rules and procedures do in fact contain fairly extensive procedural protections for them, including the possibility of back-pay awards after an evidentiary trial-type hearing on appeal.[194] Given the wide range of possible employment opportunities outside the government, there is little danger of state monopoly power in this context, but considerable concern with substandard government service by lax, incompetent, or dishonest employees. The decision to steer clear of constitutional

---

[190] 416 U.S. 134 (1974) (plurality opinion).

[191] *Id.* at 153–54. *Arnett* is one of many cases that raise this issue. *See, e.g.,* Bishop v. Wood, 426 U.S. 341 (1976); Board of Regents v. Roth, 408 U.S. 564 (1972).

[192] *See, e.g.,* Michelman, *Formal and Associational Aims in Procedural Due Process,* in DUE PROCESS, NOMOS, XVIII, at 126 (J. Pennock & J. Chapman eds. 1977); Van Alstyne, *supra* note 22, at 462–66. *But see* Williams, *supra* note 181, at 27.

[193] *See* 416 U.S. at 155 n.21. The issue is difficult because the presence of bias could, but need not, coincide with dismissal for the class of reasons prohibited to government officials.

[194] *See id.* at 145–47. Because the plaintiff in *Arnett* chose not to participate in the hearing process at all because of his objections to the initial proceeding, it is unclear whether the procedural safeguards that the statute did contain could protect against abuse.

Appendix 11

entanglements in the employment area removes a host of thorny issues from the judicial agenda, freeing the Court from having to determine what kind of hearing is required and when it should be offered. There are quite enough political pressures to turn government employment into a civil service sinecure without the Court placing its own unsteady thumb on the scales.

The sound logic of *Arnett*, of course, has been soundly repudiated by the subsequent decision in *Cleveland Board of Education v. Loudermill*.[195] Loudermill, a security guard who had been dismissed from his job on charges that he had dishonestly filled out his employment application, challenged the constitutional adequacy of the city's procedures. His claim was sustained, 8 to 1, with only Justice Rehnquist dissenting.

Speaking through Justice White, the Court first noted that no one disputed that Loudermill's contract created the necessary "property right," because all state employees were allowed to retain their position "during good behavior and efficient service."[196] Justice White then concluded that the procedures necessary to protect this substantive right could not be determined solely by the Ohio statute, but had to be tested against constitutional requirements. He curtly rejected Justice Rehnquist's "bitter with the sweet" rationale:

> The point is straightforward: the Due Process Clause provides that certain substantive rights — life, liberty and property — cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty.[197]

Justice White's argument may capture the state of current doctrine,[198] but it misses the point. The reason why life and liberty are not "defined by procedures" is that they are not, in any system of limited government, acquired by grant from the state. Property, to the extent that it is acquired by first possession or private purchase, should stand in exactly the same position as life or liberty. Because

---

[195] 470 U.S. 532 (1985).

[196] OHIO REV. CODE ANN. § 124.34 (Anderson 1984). The statute in fact provided for a review procedure under which grievances could be filed with the state personnel board of review. The board could appoint a trial board to hold a hearing, from which appeals could be taken to the State Court of Common Pleas. The statute did not provide for a pretermination hearing.

[197] 470 U.S. at 541.

[198] *See, e.g.,* Logan v. Zimmerman Brush Co., 455 U.S. 422, 430–32 (1982) (holding that state law defines "property" interests, whereas the Constitution defines applicable procedural guarantees); Vitek v. Jones, 445 U.S. 480, 488–90 (1980) (holding that due process guarantees attach to "liberty interests" created by the states).

Appendix 11

Page 253 of 293

none is a grant from the state, ordinary procedural guarantees must be met before any may be taken away. In this context, it is imperative that the state not be allowed to "redefine" the private interest so as to remove constitutional protections. But contracts for public employment do have their origins in transactions with government. So long as private contracts can specify both the terms of employment and the terms of their dismissal, public contracts should be able to do the same, absent the threat of abuse of government monopoly power. In this context, substance is not separate from procedure. Both are part of a complex package of contractual benefits that an employee receives in exchange for services rendered.

The doctrine of unconstitutional conditions should not apply solely because the attached condition is important, or because it is good policy for the state to keep an employee on the job until the charges against him are fully resolved,[199] or because dismissal will impose some measure of hardship upon the worker.[200] Nor does the validity of the condition turn upon some effort to advance individual dignity.[201] The state does not need judicial oversight to make its own prudential judgment whether it is riskier to keep workers suspected of improper conduct on the job pending hearings, taking into account the costs of hiring substitutes or training replacements. Likewise, individual employees are capable of deciding whether procedural benefits are more important than the wage and other benefits provided by the job. Unconstitutional conditions doctrine should be invoked only when there are structural concerns relating to monopoly power, collective action problems, and externalities suggesting that individual consent will generally be an insufficient check against systematic government misbehavior. *Loudermill* therefore is a case in which freedom of contract should have prevailed.

## VIII. GOVERNMENT BENEFITS

Each of the previous five Parts has examined the doctrine of unconstitutional conditions in connection with those types of government action routinely undertaken by the traditional minimal state. The New Deal has vastly expanded the catalogue of permissible government functions. As if to celebrate that development, Professor Charles Reich, writing in 1964, spoke of the new role that government had taken, not only in protecting traditional interests in contract and

---

[199] *See* 470 U.S. at 543. The same theme is echoed in Justice Marshall's partial concurrence. *See id.* at 549 (Marshall, J., concurring in part and concurring in the judgment). Justice Marshall would have required a full-dress evidentiary hearing before any stopping of an employee's wages. *See id.* at 548.

[200] *See* 470 U.S. at 544.

[201] For an attempt to develop such a dignitary theory, see Mashaw, cited above in note 26.

property, but also in creating various kinds of government "largess" in the form of "money, benefits, services, contracts, franchises, and licenses."[202] That increase in state power translates into an increase in official discretion, which in turn expands the scope of the principle of unconstitutional conditions. This Part traces that development in five celebrated areas of government benefits. The first section discusses the use of tax exemptions conditioned on the content or subject matter of speech. The second section addresses the connection between unemployment benefits and the constitutional guarantees under the religion clauses. The third section examines the relation between welfare benefits for medical services and the prohibition against use of public funds for abortions — an issue with heavy religious overtones. The fourth section turns to the intersection of tax policy and religious liberty, and asks the extent to which Congress can condition tax-exempt charitable status on the willingness of private universities to adhere to the commands of the antidiscrimination laws. The last section returns to the issue with which this Foreword began, the relationship between the food stamp program and the labor strikes under the National Labor Relations Act. Throughout these cases it becomes necessary to analyze in close detail the claim that the refusal to provide some government benefit is tantamount to imposing a "fine" or "penalty" that the government could not impose by direct action.

### A. Tax Exemptions and Freedom of Speech

One way for the government to influence the pattern of private activities is through the imposition of selective taxes. People are less willing to engage in those activities that are taxed than in those that are not. The flip side of this power is the provision of tax exemptions, which have the reverse effect upon the pattern of activities. People are more likely to engage in activities that are exempt from taxes than in those that are not. The incentive effects of tax rules are evident across the entire spectrum of economic activities, although they normally receive almost no constitutional examination under the prevailing rational basis test. If direct regulation proceeds largely without constitutional interference, then there is no reason to subject taxation to any higher level of review. The situation is quite the opposite when speech is affected. Here taxation and exemptions have the same effect as they do in other contexts, and are subject to the same high levels

---

[202] Reich, *The New Property*, 73 YALE L.J. 733, 733 (1964); *see also id.* ("Increasingly, Americans live on government largess — allocated by government on its own terms, and held by recipients subject to conditions which express 'the public interest.'"). Reich's category of largess includes many of the traditional functions of government, such as licensure and regulation of highways, along with their modern counterparts in the welfare state. In this Part the greater emphasis is upon a subclass of the new property that is tied to the welfare state.

Appendix 11

of scrutiny imposed on direct regulations generally. What is true of taxes is also true of exemptions.

*Speiser v. Randall*[203] is an early manifestation of the problem, and it shows how the conditions attached to a tax exemption can properly be struck down on first amendment grounds. The California Constitution provided that World War II veterans were entitled to property tax exemptions only if they signed an oath stating that they did not advocate the overthrow of the governments of the United States or California by force or violence, or aid of hostile foreign states in time of war.[204] The state argued that it could give its "privilege" or "bounty" to whomever it saw fit.[205] On this view, the exemption would withstand constitutional challenge even if a statute that sought to punish the same conduct by fine or imprisonment did not. Justice Brennan characterized the statute as though it was tantamount to a "fine,"[206] and struck it down accordingly, for the want of the proper procedural protections.[207] The doctrine of unconstitutional conditions is implicated because the benefit conferred by the exemption is conditioned on the willingness of individual taxpayers to adhere to certain political views. The selective tax exemption, no less than a selective tax, necessarily results in a redistribution of wealth and political influence from those who are unwilling to sign the oath to those who are. It may well be that the general property tax exemption for veterans is proper,[208] but redistribution on grounds of political belief generally is not. Coercive tax burdens cannot be waived selectively for those whose views conform to the dominant political position, any more than additional taxes can be imposed on those whose views do not. State gifts work as much of an illicit redistribution of wealth and power as state fines.

The California Supreme Court recognized the point when it held that the exemption could be denied only for speech or advocacy that could be punished directly, thereby mooting the objection that the State was punishing indirectly what it could not punish directly. But

---

[203] 357 U.S. 513 (1958).

[204] The full oath read: "I do not advocate the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means, nor advocate the support of a foreign government against the United States in event of hostilities." *Id.* at 515.

[205] *See id.* at 518.

[206] *See id.*

[207] *See id.* at 520–29.

[208] *Cf.* Regan v. Taxation with Representation, 461 U.S. 540 (1983) (upholding against first amendment and equal protection challenges a statute that exempted from taxation charitable contributions to support lobbying by veterans groups but not to support lobbying by other groups); Personnel Adm'r v. Feeney, 442 U.S. 256 (1979) (holding that a statute giving preference to veterans in awarding civil service jobs does not discriminate against women in violation of the equal protection clause).

Appendix 11

once the statutory exemption received that construction, it was then fair to ask whether the statute afforded the same procedural protections as an ordinary criminal trial, which it did not. Hence the statute was rendered vulnerable to attacks on procedural due process grounds, as Justice Brennan's opinion demonstrates.[209] *Speiser* involved excessive reliance upon an unexplicated idea of fines or coercion.[210] But its result is correct when tested against a theory of unconstitutional conditions designed to thwart the abuses arising from unchecked government discretion.

The question of tax exemptions came up in a somewhat more difficult form in the recent case of *Arkansas Writers' Project, Inc. v. Ragland*,[211] a case decided in the 1986 Term. Here the statutory structure was more complicated. Arkansas exempted from its general sales tax the "[g]ross receipts or gross proceeds derived from the sale of newspapers" and from certain types of magazines, including "religious, professional, trade and sports journals and/or publications printed and published in this State."[212] The plaintiff's general-purpose magazine fell into neither of these two categories, and hence had to pay the tax.

*Arkansas Writers' Project* again raises the problem of unconstitutional conditions because Arkansas did not have to give any publication an exemption. Thus, the sole issue was whether the state could condition the exemption on the willingness of a magazine to publish material of a particular subject matter. The statute would have been a manifest violation of the first amendment if it had tied the exemption to the adoption of any particular viewpoint, which it did not. Nonetheless, the statute did single out certain types of publications for benefits that other types of magazines were denied. By changing the relative costs of producing various kinds of magazines, the statute in effect brought about a mix of publications different from the one that would have arisen under either a tax-free world or one with a uniform tax on all types of publications. As a matter of marketplace economics, these distortions deviate from the competitive ideal, and could be condemned on those grounds alone. But with the waning of economic liberties as a constitutional doctrine, this argument can be directed

---

[209] *See* 357 U.S. at 520–29.

[210] *See id.* at 518 ("To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech.").

[211] 107 S. Ct. 1722 (1987).

[212] ARK. STAT. ANN. § 84-1904(f), (j) (1947), *quoted in* 107 S. Ct. at 1724–25. This statute seems unconstitutional in its explicit discrimination against out-of-state newspapers. The issue, however, is more complicated, because it now seems that states may provide differential subsidies for local firms, but not impose differential taxes. *See* New Energy Co. of Ind. v. Limbach, 108 S. Ct. 1803 (1988) (disallowing a discriminatory tax while appearing to tolerate discriminatory subsidies).

Appendix 11

*THE SUPREME COURT — FOREWORD*

only to the legislature, not to the courts. Indeed, Justice Scalia would have upheld the tax because he regarded *Arkansas Writers' Project* as an economic regulation case,[213] scarcely distinguishable from other cases of selective exemption that have thus far survived constitutional attack.[214]

Nonetheless, the evident connection between the exemption and speech makes this clearly a first amendment case. In this context, it is hard to demonstrate how any economic misallocation leads to an unwanted distortion in the marketplace of ideas, especially one that could be seized upon by political actors to advance their own interests. Still, the Court was correct to strike the statute down because there was so little to be said on its behalf. A uniform system of exemptions could end all objection to the statute without requiring a detailed analysis of its content, while still allowing the state to advance newspapers and magazines as against other activities. In the unlikely event that a uniform exemption created a budget shortfall, the state could adopt a *partial* uniform exemption as necessary to meet its revenue requirements. Finding the condition attached to the exemption unconstitutional thus achieves the right result, even in a case that seems to·present only limited opportunities for government abuse.

The same analysis yields different results in the earlier case of *Regan v. Taxation with Representation*[215] (*TWR*), in which a system of charitable exemptions was challenged on the ground that it could not be applied to moneys raised for lobbying activities. The taxpayer in *TWR* was a political organization that attacked two provisions of the Internal Revenue Code that failed to grant it tax-exempt status, and that failed to grant deductions to its contributors.[216] The unconstitutional conditions challenge came in two parts. The first was that it was impermissible to attach any limitations restricting the ability of otherwise exempt organizations to participate in lobbying. The second

---

[213] *See* 107 S. Ct. at 1730 (Scalia, J., dissenting).

[214] Thus, Justice Scalia pointed out the special mail rates given to religious, educational, scientific, philanthropic, agricultural, labor, veterans', and fraternal organizations. *See id.* at 1732. These classifications are broader than those involved in *Arkansas Writers' Project*, and thus they probably would, and should, survive challenge.

[215] 461 U.S. 540 (1983).

[216] The two provisions involved were § 501(c)(3) and § 501(c)(4) of the Internal Revenue Code. Both provide tax-exempt status for various kinds of charitable organizations. The Court specified two principal differences between organizations receiving § 501(c)(3) status and those receiving § 501(c)(4) status:

> Taxpayers who contribute to § 501(c)(3) organizations are permitted by § 170(c)(2) to deduct the amount of their contributions on their federal income tax returns, while contributions to § 501(c)(4) organizations are not deductible. Section 501(c)(4) organizations, but not § 501(c)(3) organizations, are permitted to engage in substantial lobbying to advance their exempt purposes.

461 U.S. at 543.

Appendix 11

part was that it was impermissible to permit veterans' organizations to operate free of the restrictions made applicable to other political groups.

Justice Rehnquist, speaking for the majority, rejected both challenges, relying heavily upon the norm of "broad discretion" in taxing matters.[217] "This Court has never held that Congress must grant a benefit such as TWR claims here to a person who wishes to exercise a constitutional right."[218] But this account suppresses the equal protection component of the argument. The objection is not to the failure to grant the subsidy, as such, but to granting the subsidy to charitable organizations while denying it to lobbying organizations.

Properly formulated, the critical question is whether this broad type of condition creates any distortion in the political process. It is doubtful that it does, even when the statute is tested against the more demanding first amendment standards of scrutiny. The religious, political, and educational activities exempted under the statute cover the full range of activities without subject matter or viewpoint discrimination, and the ban on lobbying is imposed at the same high level of generality. The differences in tax treatment may well induce some moneys to go into, say, academic work that would otherwise go into direct lobbying, but it is hard to see what political groups, if any, would gain systematic advantage from this effect. Here, unlike the tax exemption situation posed by *Arkansas Writers'*, there seems to be a powerful government counterweight on the other side. One great peril in political life today is that the broad discretion of federal and state government over economic affairs increases the potential gains to partisan activities, of which lobbying is only the most visible. Why that conduct must be subsidized, even if charitable organizations are subsidized, is therefore something of a mystery. The doctrine of unconstitutional conditions should be invoked precisely when the conditions attached to government action increase the risk of political polarization, the opposite of the case when lobbying efforts proceed without tax dollars. The distinction between lobbying and charitable activities thus survives even a higher level of constitutional scrutiny.[219]

The standard of review becomes far more important on the second question: whether veterans' organizations alone should receive preferred tax status for their lobbying activities. Justice Rehnquist, still employing a degree of judicial deference, simply noted that all veterans organizations qualified regardless of their views.[220] If veterans

---

[217] *Id.* at 547.

[218] *Id.* at 545.

[219] It is therefore unnecessary to adopt Justice Blackmun's position. Justice Blackmun, using a high level of scrutiny, allowed the denial of exemptions for lobbying organizations under § 501(c)(3), but only because of the ability of affiliate organizations to use tax-exempt funds to lobby under § 501(c)(4). *See id.* at 552–53 (Blackmun, J., concurring).

[220] *See* 461 U.S. at 548.

Appendix 11

Page 259 of 293

groups only had disagreements among themselves on issues of no concern to others, a tax subsidy to them might not affect the denial of a parallel subsidy to other organizations. But although these groups may differ among themselves on some issues, they must surely act in concert on others, where they operate in direct competition with unsubsidized lobbying groups. In these cases the differential tax treatment does distort the outcome of the political process in ways that the first amendment and the equal protection clause should preclude. It appears therefore that Congress at least should be put to the all-or-nothing choice of granting exemptions to all lobbying organizations or to none.

I reach that conclusion with a fair bit of trepidation, lest Congress take the bait and extend the tax benefit to all lobbying groups, including the vast number that are totally unconcerned with veterans' activities. The unconstitutional conditions doctrine again achieves only a second-best goal. The grant of universal tax exemptions to lobbying organizations subsidizes all special-interest groups at the expense of the general public, introducing yet another set of tax distortions. There is a prisoner's dilemma game here, in which all persons can be made better off if no lobbying group receives a tax subsidy. Perhaps the proper response is to treat *all* tax subsidies of political lobbying as beyond the power of Congress to grant, in order to control not only tax distortions between lobbying groups, but tax distortions between lobbying and socially productive activities.[221] Lobbying may well be a protected constitutional right,[222] but in a system of limited government it is not one that is either deserving of or entitled to a political subsidy.

## B. The Religion Cases

Unemployment compensation programs typically limit their benefits to people who are unemployed through no fault of their own and remain available for work. One question is whether the state can deny these benefits to people who will not work because the only jobs available require them to violate their religious beliefs. Can the state refuse to provide unemployment benefits to persons unwilling to take these jobs? The current answer is no. The major decision was *Sherbert v. Verner*,[223] which was followed in the 1980 Term by *Thomas*

---

[221] It would of course be irresponsible for the Court to take such an extreme step in any case where veterans' organizations did not have a chance to present their side of the argument. Indeed the best justification for *Regan* is prudential: the Court did not want to resolve the various difficult issues that would have arisen if the veterans' tax exemption had been found unjustifiable.

[222] *See, e.g.*, Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 138 (1961) ("The right of petition is one of the freedoms protected by the Bill of Rights.").

[223] 374 U.S. 398 (1963).

Appendix 11

*v. Review Board of the Indiana Employment Security Division*,[224] and in the 1986 Term by *Hobbie v. Unemployment Appeals Commission*.[225]

*Sherbert* illustrates the basic pattern in all these cases. Mrs. Sherbert, a Seventh-Day Adventist, was dismissed from her job because she refused to work on Saturday, in conflict with her religious convictions. The state system of unemployment compensation restricted payments to persons who were unable to work through no fault of their own.[226] The state employment board decided that Mrs. Sherbert had quit for personal reasons, and that jobs were "available" to her within the region. Accordingly her claim for compensation was denied.[227] The Supreme Court was then forced to decide whether the refusal of the state to pay her benefits constituted a limitation on the free exercise of religion, or, alternatively, whether the decision to pay unemployment compensation would be a de facto establishment of religion. The case raised an unconstitutional conditions question because it had been settled both that a state need not have any system of unemployment compensation at all and that any government system of unemployment compensation is unquestionably constitutional, at least since *Carmichael v. Southern Coal & Coke Co.*,[228] which permitted redistributive policies aimed at promoting the "common good."

*Sherbert v. Verner* brings to a head the tension between the religion clauses in the Bill of Rights on the one hand and one common form of "new property" on the other. In a world of limited government, each of the two religion clauses operates within a relatively self-defined sphere. The free exercise clause guarantees that the government cannot interfere with the "negative liberties" of the citizen with respect to religious practices. It cannot prohibit religious worship, and it cannot fine, license, tax, or punish religious practices in any way. The obligation of the state is to leave people alone. The establishment clause governs the other side of the line, prohibiting the state from going into the business of religion. Certainly it cannot support one religion to the exclusion of the others. In the modern view, neither can it give aid to all religions equally, if nonreligious groups are excluded.[229] In a world of limited state and federal power, the pressures on each of the religion clauses is tolerably small, and the possibility of their collision reduced, being limited primarily to cases in

---

[224] 450 U.S. 707 (1981).

[225] 480 U.S. 136 (1987).

[226] *See* 374 U.S. at 400–01.

[227] *See id.* at 401.

[228] 301 U.S. 495 (1937). For my criticisms of that decision, see R. EPSTEIN, cited above in note 28, at 309–12.

[229] *See, e.g.*, Everson v. Board of Educ., 330 U.S. 1, 15–16 (1947).

Appendix 11

Page 261 of 293

which the government is forced to reconcile the religious interests of its employees with the requirements of public service.[230]

The situation becomes far more difficult once the government goes beyond its role as an enforcer of private rights to create and administer a system of positive welfare rights. The greater scope of government action necessarily makes it easier for the state to offend either or both of the religion clauses. Moreover, as long as the government remains in the business of managing all phases of the economy, a simple line that requires government "nonfeasance" in certain areas or a "strict separation" between the state and religion becomes indefensible. Some more sophisticated test to distinguish among government actions is needed. In 1961 Professor Kurland proposed the following standard:

> [T]he thesis proposed here as the proper construction of the religion clauses of the first amendment is that the freedom and separation clauses should be read as a single precept that government cannot utilize religion as a standard for action or inaction because these clauses prohibit classification in terms of religion either to confer a benefit or to impose a burden.[231]

Reduced to a single catchword, "neutrality" becomes the guiding principle in religion cases.

In *Sherbert* no Justice was able to give a satisfactory account of the clash between the religion clauses and the unemployment benefit programs. The Court, speaking through Justice Brennan, recognized that the state did not seek to impose "criminal sanctions,"[232] but held in essence that the elimination of the unemployment benefits was a form of coercion:

> Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of

---

[230] *See, e.g.*, Goldman v. Weinberger, 475 U.S. 503 (1986) (upholding a military regulation barring the use of religious headgear).

[231] Kurland, *Of Church and State and the Supreme Court*, 29 U. CHI. L. REV. 1, 5–6 (1961); *see also* Katz, *Freedom of Religion and State Neutrality*, 20 U. CHI. L. REV. 426, 429 (1953) (noting the tension between the two clauses "where the state takes over the ordering of the lives of groups of citizens, as in the armed forces, in prisons, and in institutions to which delinquent or dependent children are committed. Here the effect of strict separation would be seriously to limit the religious freedom of the citizens concerned."). For a more modern treatment of the same issue, see McConnell, *Neutrality Under the Religion Clauses*, 81 Nw. U.L. REV. 146 (1986).

[232] 374 U.S. at 403.

burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

> Nor may the South Carolina court's construction of the statute be saved from constitutional infirmity on the ground that unemployment compensation benefits are not appellant's "right" but merely a "privilege." It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing conditions upon a benefit or privilege.[233]

Thus the doctrine of unconstitutional conditions surfaced to fill the void in Mrs. Sherbert's case. It is clear that the state need not provide any benefits at all. The "fine" becomes a measure of relative deprivation: if the government chooses to provide those benefits at all, it cannot condition them upon the willingness of people to work in ways that contravene their religious beliefs.

Justice Stewart's concurrence shows that Justice Brennan's "fine" analogy is far from dispositive. In Justice Stewart's view, any effort to apply the free exercise clause to these facts would conflict with the court's own establishment clause jurisprudence:

> If the appellant's refusal to work on Saturdays were based on indolence, or on a compulsive desire to watch the Saturday television programs, no one would say that South Carolina could not hold that she was not "available for work" within the meaning of its statute. That being so, the Establishment Clause as construed by this Court not only *permits* but affirmatively *requires* South Carolina equally to deny the appellant's claim for unemployment compensation when her refusal to work on Saturdays is based upon her religious creed. . . . [T]he Establishment Clause forbids the "financial support of government" to be "placed behind a particular religious belief."[234]

In this passage, Justice Stewart treats the unemployment program as a subsidy to religion because people who do not work on Saturday for religious reasons obtain a benefit that other non-Saturday workers do not receive. Justice Brennan finds a penalty by comparing the claimant to other persons who actively seek work but cannot find it, while Justice Stewart identifies a subsidy by looking to the universe of persons who do not seek work on Saturdays. Justice Brennan's "penalty" suggests free exercise difficulties in upholding the statute as applied, while Justice Stewart's "subsidy" suggests establishment clause difficulties in striking it down. The neutrality principle could

---

[233] *Id.* at 404 (footnote omitted).

[234] *Id.* at 414–15 (Stewart, J., concurring in the result) (quoting Engel v. Vitale, 370 U.S. 421, 431 (1962)). Justice Stewart concurred in the Court's result because he thought that "the Court's mechanistic concept of the Establishment Clause is historically unsound and constitutionally wrong." *Id.* at 415. His concurrence reflects his treatment of the free exercise clause as the dominant member of the partnership, *see id.* at 415–16; Braunfeld v. Brown, 366 U.S. 599, 616 (1961) (Stewart, J., dissenting), a view that makes *Sherbert* a relatively easy case.

Appendix 11

be invoked to support both positions or neither. Clearly something
has to give. What?

It is necessary again to return to fundamentals. Notwithstanding
their differences, Justice Brennan and Justice Stewart share two prem-
ises. Both start from the assumption that the unemployment compen-
sation programs are constitutionally sound, for otherwise the uncon-
stitutional conditions issue could never arise. Both then explore the
limitations that the state might place upon receipt of the benefit.
While they disagree about the proper analysis in *Sherbert*, neither
Justice would tolerate a program that provided public unemployment
compensation programs only to those who agreed to practice Judaism
or Christianity, or only to those who agreed not to observe one of
those faiths. They thus agree on the vital issue. They both reject the
now familiar argument that because the state need not establish an
unemployment compensation program at all, it can therefore choose
the objects of its affections, for such selection confers too much power
on the state. Thus the doctrine of unconstitutional conditions is not
a point of contention between the two Justices. It is in fact their
second common premise.

The question arises, however, as to its scope. Here *Carmichael*'s
acceptance of redistribution through employment compensation is im-
portant because it marks a clear break from *Frost*, whose imperfect
efforts to preserve competition had an explicitly antiredistributive bias.
Once general takings and public trust arguments are no longer suffi-
cient to forestall any form of covert redistribution between $A$ and $B$,
then additional pressure is placed upon the religion clauses to forbid
redistribution both from or to religion. Within this framework, I
believe that the idea of neutrality can now be usefully reformulated
into its more precise economic analogue: the government cannot en-
gage in activities that either penalize or subsidize the practice of
religion. Judicial scrutiny is high, for whether the government pro-
gram is sustained or struck down, there is a substantial risk of con-
stitutional error.[235] This test is more stringent than that found in the

---

[235] For a further discussion of the same point, see McConnell & Posner, *Neutrality Toward
Religion: An Economic Approach*, 56 U. CHI. L. REV. (forthcoming 1989). Once this refor-
mulation is made, it no longer follows that Kurland's test, *see supra* note 231 and accompanying
text, is the best way to eliminate subsidies in either direction. There is always the risk that
formally neutral rules will have powerfully disparate effects — for example, a rule that all
soldiers must eat standard army rations, regardless of their religious dietary restrictions. It may
well be possible to introduce explicitly religious distinctions into the law in ways that benefit
both religious and nonreligious people, by a practice of "accommodation," which allows religious
people to take certain types of employment, as long as they bear the additional costs that their
religious practices impose on the system at large. In effect there may be deviations from a
strictly neutral (or separationist) baseline that improve the welfare of all concerned, as in
Goldman v. Weinberger, 475 U.S. 503 (1986). For a general discussion of the relationship
between neutrality and accommodation, see McConnell, *Accommodation of Religion*, 1985 SUP.
CT. REV. 1.

*HARVARD LAW REVIEW* [Vol. 102:1

speech area, where only restrictions that burden private speech are suspect, while those that subsidize it are not.[236] In contrast, *every* form of error in the religious context is subject to constitutional scrutiny, for to avoid the perils of free exercise may be to land in the thicket of establishment, and vice versa. The question of subsidy or penalty then requires the selection of the right baseline, but that in turn is possible only after careful treatment of the insurance and funding issues in *Sherbert*.

This approach allows us to go beyond the metaphor of the "fine" that appealed to Justice Brennan. The state does not take Mrs. Sherbert's money when she quits work. It refuses to pay her "its" money. Therein lies the rub. The state is not a person, but a complex network of arrangements among people, of which only some are voluntary. As with public highways and foreign taxation, the state does not spend its own money. It spends money that it raises from private individuals, including this plaintiff. To make the analysis tractable, assume that all the funds to the unemployment system are collected from a tax imposed directly or indirectly on the workers and the firm. Assume further that random redistributions of wealth between, say, plumbers and pipefitters, are permitted under *Carmichael*. Divide the world now into two classes of people, those who might quit jobs for religious reasons and those who would not. The question that the religion clauses ask is whether there is an implicit redistribution of wealth across those two classes — *either way*. If the redistribution runs from religious persons to nonreligious persons, then we have a free exercise clause violation. If it runs in the opposite direction, then we have an establishment clause violation. Which is it?

At first blush, the argument seems to be that there is an implicit subsidy conferred upon Mrs. Sherbert, and hence an establishment clause violation. She is entitled to recover for all the normal cases of unemployment specified in the statute, plus one additional type of case: not working because of religious conflict. If she pays the same premium as everyone else, but receives more extensive insurance coverage in exchange, then she looks like the net recipient of a forbidden state subsidy.

This argument, however, is wrong, or at least incomplete. The proper insurance inquiry is whether Mrs. Sherbert is, other things equal, in the same risk classification as other people within the state. Thus, suppose it could be shown that people with religious beliefs have steadier work habits and therefore quit jobs far less frequently than those whose work habits are inferior in part because they are

---

[236] The case of government-sponsored speech is far more difficult, because it requires taking into account the roles of political leaders, program officers, and ordinary employees. The exact contours of this problem are beyond the scope of this Foreword. *See generally* M. YUDOF, WHEN GOVERNMENT SPEAKS (1983); Shiffrin, *supra* note 22.

Appendix 11

not anchored in religious beliefs. If Mrs. Sherbert is denied benefits, then she is forced to subsidize nonreligious workers. Indeed, even after she is allowed to obtain coverage when she refuses to work on Saturdays, it remains unclear whether that subsidy is fully reversed. It could be that the additional coverage afforded her is quite negligible,[237] given her other personal characteristics, so that on balance she contributes far more to the unemployment fund than her expected payout from it. Alternatively, it may well be that the coverage for her refusal to work on the Sabbath gives her a better than expected deal from the fund. If one considers the religious benefit in isolation, then it looks as though there is an establishment clause violation. If one considers that benefit in the context of the entire program, then (combining effects) the outcome is unclear. It may well be that the plan is skewed against Seventh-Day Adventists. The only way to find out is to check the collections for and payments from the fund. Justice Stewart's establishment clause view is more defensible on the view that each item of coverage should be considered in isolation. Justice Brennan's is more defensible on the aggregate view. The problem simply could not arise if all premiums paid to any state unemployment compensation system reflected the risk of each covered worker accurately, for then any elements of systematic redistribution already would have been squeezed out of the system.

What should be done when, as is now the law, one form of redistribution (between or within occupational groups) is allowed while another form of redistribution (between religious classes) is prohibited? The simple solution would be to create two separate risk pools at the outset.[238] But how? One possibility is that individuals who want to have coverage against Sabbath layoffs can pay an additional premium with respect to that risk. The insurance should be viable because they can still be required to conduct a search for other employment. And they will be able to escape the terrible dilemma that Justice Brennan described, of having to choose between economic welfare and their religious beliefs. The small extra premium to cover this second class of risk can be imposed only upon those workers who think it important to get it, and the economic biases otherwise built into the system can continue apace.[239]

---

[237] The Court noted that of the 150 Seventh-Day Adventists in Spartanburg only two were unable to find non-Saturday employment. *See* 374 U.S. at 399 n.2.

[238] This approach was implicitly rejected in United States v. Lee, 455 U.S. 252 (1982), in which the Amish were required to contribute to the social security system, with its separate funding, despite a free exercise claim that any payment to or receipt of benefit from the system violated their religious beliefs. For a further discussion of *Lee*, see pp. 87–89 below.

[239] Another possibility is to place all such workers in a separate risk pool, with their own insurance premiums. This prospect is far more radical, and it might well result in a radical revision of premium payments for workers in both classes. There would still be some redistri-

Appendix 11

This system of separate charges costs money, if only to administer the proper "pass-throughs" to individual employees. With modern actuarial and payroll techniques the costs should be small, but the cost of setting and collecting the premium might still exceed the premium itself, if that too is small. Even private insurance markets do not have perfect calibration of risk groups, because the costs involved in separating them are too high. If that situation exists, we are forced to decide which distortion, Justice Brennan's on the decision frontier, or Justice Stewart's on the equalization of covered events, appears the more serious. Justice Brennan's conclusion seems to be correct. The amount of redistribution from a failure to subdivide this risk pool is small, given the infrequency of unemployment payments necessitated by a recipient's religious beliefs. On the other hand, the ex post dilemma of religious people — who are forced to participate in this system against their will in the first place — seems palpable. Where some imperfection must be tolerated, better to choose the smaller, as Justice Brennan did.

Even if it were feasible to charge Sabbatarians separate premiums for religious layoffs, or even to place them in their own separate risk group, one problem would remain. Suppose a worker takes a job when she has no religious convictions; she then acquires religious convictions only to be dismissed promptly because she will not work on Saturday. Does this case differ in any degree from *Sherbert*? The Supreme Court in *Hobbie*, following its earlier decision in *Thomas*, held that this new circumstance was immaterial. Justice Brennan's opinion is perfectly conclusory: "The First Amendment protects the free exercise rights of employees who adopt religious beliefs or convert from one faith to another after they are hired. The timing of Hobbie's conversion is immaterial to our determination that her free exercise rights have been burdened . . . ."[240]

From an insurance point of view, however, the difference between the two cases is critical. In a world in which conversions are random, it may make *more* sense to allow unemployment compensation benefits to people who convert after they were hired. If, when employment was undertaken, all persons had an equal chance of converting, then there would be no redistribution ex ante. In contrast, the redistribution problem in *Sherbert* arose precisely because the risk of Sabbath employment was *known* before employment had begun, when the separate premium could have been collected. Still, *Hobbie* is problematic. Allowing the benefits may not work a redistribution across members of the nonreligious pool, but it will necessarily work a redistribution from nonreligious people (who pay into the system) to

bution within each class on nonreligious grounds, but the total level of residual redistribution would probably be far smaller than it is under the present program.

[240] 107 S. Ct. 1046, 1051 (1987) (footnote omitted).

Appendix 11

Page 267 of 293

religious people (the only ones who collect) in the way the establishment clause prohibits. One way to solve that problem is to have the premium that covers this case paid for by persons who have signed up for the additional religious coverage, for now there will be redistribution across employees (which is allowed) but not across religions (which is prohibited).

Admittedly, this approach to interpreting the religion clauses quickly becomes very technical, and it may seem odd that resolving particular religion clause cases should turn on the fine points of insurance contracting as applied to unemployment compensation or social security benefits. But this conclusion is really inescapable. Together the religion clauses function to prohibit redistribution, in either direction, between religious and nonreligious persons. Skewed insurance contracts and massive welfare systems offer almost unlimited opportunities for implicit redistribution, which must be policed if both clauses are to be given their full effect. In the days of limited government action, the somewhat stricter separation of religious and government activities reduced the possibilities of redistribution. Now with the pooling of resources through government ventures, combatting redistribution on religious lines is far more difficult, for the benefits and burdens to both groups must be both identified and measured. Even so, with the major normative premise set by the religion clauses, the rest is economic technique, for which a knowledge of insurance contracts and plans is indispensable. The simpler rhetoric of freedom, fines, and coercion must be replaced with a closer analysis of whether this state system of forced contribution and disbursal works implicit transfers along religious lines.

This way of construing the religion clauses suggests that the Court made a serious mistake in *United States v. Lee*.[241] In *Lee*, the appellee, a member of the Old Order Amish, refused to file the appropriate social security returns or to withhold social security payments from his employees' paychecks. His argument, not contested, was that the Amish religion requires its followers to look after their own elderly and sick and considers it sinful either to pay any funds into, or to receive any benefits out of, the social security system. The statute is thus a more massive infringement on religious liberty than the unemployment statute in *Sherbert* because the social security tax means that the Amish can hire workers, and remain in business, only if they are prepared to violate their religious beliefs.

The entire case for the statute therefore turns on the strength of the government interest in the social security system. The traditional requirement calls for the state to demonstrate an "overriding governmental interest,"[242] but no reader of *Lee* can escape the impression

---

[241] 455 U.S. 252 (1982).
[242] *See id.* at 257–58.

Appendix 11

Page 268 of 293

that the Court applied this ostensibly rigorous standard in a very relaxed fashion. The Court was content to quote a congressional report to the effect that mandatory participation was "indispensable" and that the social security system would collapse if participation were made "voluntary."[243] Its argument, however, is woefully weak in this context.

First, the concern with a voluntary social security system rests upon the obvious conclusion that younger workers (among others) will abandon a system in which the present value of their contributions is greater than the present value of their expected receipts. If everyone did this, the system would collapse, leaving the federal government unable to pay off benefits to present and future recipients without resorting to general taxation. But even if the Amish could opt out of the system as a group on religious grounds, all persons whose religious beliefs were not affronted would remain. The massive amounts of redistribution within the social security system could continue apace, without making the Amish be part of it. Indeed it is unclear whether the system would be stronger or weaker unless some detailed accounting were made to determine whether the Amish as a group were net payors or recipients. (Because of their refusal to accept the money to which they are entitled, they are at present clearly net contributors to the system.)

To be sure, the case would be different if the Amish wanted the benefit of the social security system without having to bear any of its costs.[244] A religious belief that it is blessed to receive but sinful to pay need not be funded by those who disagree. Similarly, the Amish claim would be suspect if some Amish opted into the system while others did not. But there is no hint of any selective participation designed to wring dollars from the system. Indeed, all self-employed Amish are already out of the system by virtue of a specific statutory exemption from Congress.[245] Because the benefits received under social security are all separable, this issue is sharply distinguishable from the hypothetical cases put by the Court, in which tax funds are used to purchase public goods, such as defense and public order,[246]

---

[243] *See id.* at 258.

[244] *Lee* is thus distinguishable from Bowen v. Roy, 476 U.S. 693 (1986), in which two applicants for welfare benefits claimed that their religious beliefs prevented them from having their two-year-old daughter's social security number used in processing their claims. That free exercise claim was rightly rejected. The applicants in *Roy* were seeking the benefits of the system without assuming its burdens, which in this instance were designed to prevent fraud. In *Lee*, the Amish made no effort to capture the sweet without the bitter.

[245] *See* 26 U.S.C. § 1402(g) (1982). The Court in *Lee* refused to reach the question whether the free exercise clause compels this exemption, or whether the establishment clause forbids it. *See* 455 U.S. at 260 n.11.

[246] *See* 455 U.S. at 260 ("If, for example, a religious adherent believes war is a sin, and if a certain percentage of the federal budget can be identified as devoted to war-related activities,

Appendix 11

Page 269 of 293

from which the Amish benefit whether they contribute or not. By contrast, there is no free-rider problem in *Lee* at all.

In sum, the Amish's case regarding social security is compelling because as a group they are willing to disaffirm both the benefits and the burdens of the social security system. The analysis of *Sherbert* showed that the best way to fend off both establishment clause and free exercise claims is to adopt a set of rules whereby religious groups neither receive a net subsidy nor suffer a net tax from participation in collective financing plans. In *Lee*, it was possible to *guarantee* that result by having a complete separation between social security and the Amish system of self-help for their own elderly. Why the Court should have found any overriding governmental interest in preventing this arrangement remains a mystery.

### C. Medicaid Benefits and Abortions

The Medicaid program established by the Social Security Act in 1965 is generally designed to provide medical benefits for needy persons.[247] Since 1976 the Hyde Amendment to the statute has provided, subject to narrow exceptions, that Medicaid benefits could not be used to reimburse otherwise eligible women for the costs of obtaining abortions,[248] which had become constitutionally protected by the Court's 1973 decision in *Roe v. Wade*.[249] The Hyde Amendment was spurred on by the widespread opposition to *Roe*, and represented an undisguised legislative effort to limit *Roe*'s impact by changing the rules for funding medical care. *Roe* manifestly prohibits any explicit fines or penalties to be placed upon a woman's right to have an abortion.

---

such exemptions would have a similarly valid claim to be exempt from paying that percentage of the income tax.").

[247] Social Security Act, Pub. L. No. 89-97, tit. I, § 121(a), 79 Stat. 343, 343 (1965) (codified as amended at 42 U.S.C. § 1396 (1982 & Supp. IV 1986)).

[248] The amendment provides that:

[N]one of the funds provided by this joint resolution shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest when such rape or incest has been reported promptly to a law enforcement agency or public health service . . . .

Joint Resolution of Nov. 20, 1979, Pub. L. No. 96-123, § 109, 93 Stat. 923, 926 (1979); *see also* Joint Resolution of Dec. 21, 1982, Pub. L. No. 97-377, § 204, 96 Stat. 1830, 1894 (1982) (providing that appropriated funds can be spent on abortions only when the mother's life is endangered).

[249] 410 U.S. 113 (1973). For the record I should note that I view *Roe* as incorrect largely for the reasons that I set out in 1973. *See* Epstein, *Substantive Due Process by Any Other Name: The Abortion Cases*, 1973 SUP. CT. REV. 159. The literature on *Roe* of course continues to be produced at a fever pitch, but I do not wish to reargue any of the merits here. Instead the material that follows assumes that *Roe* is rightly decided and only asks about its implications for the abortion funding cases insofar as they depend upon the doctrine of unconstitutional conditions.

Appendix 11

The Hyde Amendment sidesteps the obvious by offering the indigent woman a clear financial inducement to carry the fetus to term.

The constitutional challenge to the Hyde Amendment, rejected in *Harris v. McRae*,[250] presents the issue of unconstitutional conditions in yet another guise. The greater power is that the state can decide to have no Medicaid program at all, as was the case before 1965. The lesser power is that the state can exclude certain procedures — abortions — from coverage under the program. The question is whether, once Congress decides to commit itself to a Medicaid program, it must also commit itself to the funding of abortions. If one treats the state, as the Court did, like a private person, then the case becomes easy — too easy: there is no "coercion" in the form of either force or fraud. Those women who want to get an abortion can still do so, even if they do not receive the "subsidy" from the state. Those who now think that the provision of external benefits makes bearing a child worthwhile have their opportunities expanded, not contracted. While their choices may be shifted, as a group they are better off because they have received options that previously they had been denied; so too are the fetuses that survive. The fact that the public at large has to bear the costs of running a medicare system remains beyond constitutional scrutiny, given the explicit constitutional approval of redistributing income and wealth to improve the health of the public at large.

The hurdle faced by the dissenters is to show that the special powers of the state present prospects of illicit behavior sufficient to displace this simple model of the socially useful bargain. In his dissent Justice Brennan in effect relied upon two familiar strands of the unconstitutional conditions doctrine: *Frost*[251] and *Sherbert*.[252] *Harris* is critically different from both cases, however.

In *Frost*, the unique power of the state lay in its ability to exclude everyone from the public highways, instrumentalities of commerce for which there are no clear substitutes — arguably no substitutes at all. The unconstitutional conditions doctrine was used, albeit ineffectively, to constrain that substantial monopoly power. But there is no monopoly in the abortion market, for *Roe* in effect established a rule of free entry that ensures that indigent women, like all others, can receive abortions at a competitive price. The only pull the Hyde Amendment gives the state over the Medicaid recipient is its ability to withhold funds for an otherwise readily available abortion. The cost of an abortion, moreover, is relatively low, at least in comparison with

---

[250] 448 U.S. 297 (1980).

[251] *See id.* at 336–37 (Brennan, J., dissenting). I do not discuss the dissents of Justices Marshall, Blackmun, and Stevens because they do not expressly address the unconstitutional conditions aspect of the case.

[252] *See id.* at 334–36.

**Appendix 11**

aggressive neonatal care, and there is nothing to prevent other private individuals or charitable organizations from making up the shortfall, and doing so in today's world with an implicit tax subsidy. We are far removed from a world in which private charity would have to construct an entire rival highway system in order to escape the clutches of the state monopoly.

*Sherbert* poses the much closer challenge, for it too involved the provision of state financial benefits without the powerful monopolistic structure of the state. Read in one sense, *Sherbert* treats the *differential* benefits between what one gets if she is willing to work on the Sabbath and what she gets if she is not as though it were a "fine." Analogously in *Harris*, the failure to provide medical payments for abortions also could be regarded as a "fine," bringing the case within the general prohibition of *Roe*, insofar as the state will pay in full for the alternative medical procedures.

Yet the differences are also critical. *Sherbert* was decided within an extraordinarily strict constitutional framework, where the free exercise and the establishment clauses worked as powerful pincers to constrain government action. The full analysis of *Sherbert* showed the weakness of the "fine" metaphor and required that one take into account both the incentive effects and the insurance consequences of the unemployment compensation system. That same analysis should be brought to bear here, where it points, cautiously but clearly, against the case for invalidation.

Start with the problem of differential incentives. The winning argument in *Sherbert* was that the promise of unemployment benefits induced the applicant to behave in a manner that necessarily violated her religious convictions. The right to an abortion may be subject to constitutional protection, but having an abortion is not a religious or moral *obligation*. The state may have given the woman an incentive to do what she would otherwise not choose to do. But it has not forced her to sacrifice religious scruples in order to retain financial benefits, as happened in *Sherbert*. Can the two choices be regarded as the same?

The answer, if at all, must come from what we think of as the constitutional status of the woman's choice to the abortion. It is here that the counterargument gains strength. Justice Brennan correctly insisted that *Roe* does more than just decriminalize abortion. Rather, *Roe* works a double transformation at a single leap: abortions move from the status of criminal acts into "fundamental rights," which are as strongly protected as religious beliefs. "It would belabor the obvious to expound at any great length on the illegitimacy of a state policy that interferes with the exercise of fundamental rights through the selective bestowal of governmental favors."[253]

---

[253] *Id.* at 334.

Appendix 11

This elevation of the abortion right must go down very hard with foes of abortion who believe *both* that the Constitution does not prevent abortions from being criminalized *and* that those who perform abortions should be punished criminally. These beliefs are critical to the funding side of the analysis, which was ignored by Justice Brennan, who silently assumed that government money is like manna from heaven: no individual has to pay for it. But once we pierce the government veil, it becomes necessary to examine what correlative duties that this expanded fundamental right of abortion may properly impose upon the opponents of *Roe*.

On this side of the issue, we must confront the free exercise of religion. Suppose that a special tax to fund Medicaid abortions were placed upon only those individuals who opposed abortions for religious reasons. In principle, these people should be entitled to object to the tax on much the same ground that union members can object to dues payments that are used to support political programs and candidates to whom they are personally opposed.[254] The free exercise of religion, like the free exercise of speech,[255] can be limited as much by direct taxation as it can by prohibitions.

Recalling the analysis of *Sherbert* (and the intellectual bankruptcy of *Lee*), one can see the overwhelming free exercise objection against taxing religious people to pay for abortions. These people, whether few or many, are forced to fund programs that they oppose on religious grounds. The right to escape this coercion seems as "fundamental" as the woman's right to have the abortion in the first place: to put the claim in the baldest way possible, who wants to be coerced into paying for the murder of unborn children? Thus the flip side of the "fundamental right" claim is far more powerful in *McRae* than the parallel establishment clause argument in *Sherbert*, for no one thinks that the modest subsidy, if any, to individuals like Mrs. Sherbert affronts the core religious beliefs of the persons who are made to pay it. Pushed to the limit, this free exercise argument would make it unconstitutional for the government to use public funds to fund abortions. Thus the unconstitutional conditions argument suggests that the Hyde Amendment is unconstitutional, given *Roe*, while the free exercise argument suggests that it is constitutionally mandated. Neither argument allows a middle ground.

Are there also, however, religious grounds on which to oppose the Amendment? The argument, here under the establishment clause, seems to turn on motive, and no one can deny the importance of

---

[254] *See* Communications Workers of Am. v. Beck, 108 S. Ct. 2641 (1988); Abood v. Detroit Bd. of Educ., 431 U.S. 209 (1977).

[255] For examples of taxes found to violate the free speech clause, see Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue, 460 U.S. 575 (1983), and Grosjean v. American Press Co., 297 U.S. 233 (1936).

Appendix 11

Page 273 of 293

motive in establishment clause cases.[256] Many of those who oppose
the funding of abortions do so on religious grounds. When they turn
their preferences into law, they have established, at least in part, their
religious beliefs under the Medicaid statutes. This argument, how-
ever, seems more strained in this context than does its free exercise
alternative. If the foes of abortion were able to exclude both abortion
funding and all pregnancy and neonatal care from Medicaid solely for
religious reasons, would federal funding of abortion (and other preg-
nancy and neonatal care) then be required because of the motive
behind its opposition, even with the entire issue of differential incen-
tives no longer in the case?

The funding issue thus reveals a house divided. Some substantial
fraction of taxpayers objects to abortions on religious grounds. Other
taxpayers strongly support abortion funding for indigent women, and
counter the free exercise claim with an establishment claim of their
own. The obvious lesson is that it is troublesome to use extensive
government power to force collective decisions in the teeth of these
wide and wholly irreconcilable divergences of opinions: any such de-
cision leaves a minority, or perhaps a majority, deeply disaffected
with the collective outcome. The deep moral and political divisions
over abortion cannot be papered over simply by writing, as Justice
Brennan did, solely about the differential incentives the Hyde Amend-
ment places on Medicaid recipients.

One problematic line of escape, analogizing to the proper treatment
of unemployment benefits in *Sherbert*,[257] would segregate contribu-
tions to the Medicaid program. The state could determine in advance
its budget requirements for Medicaid abortions, and then allow indi-
vidual taxpayers to decide whether or not they wished their moneys
spent on abortions. It could further insist that only those opposed to
abortions on religious grounds may refuse to contribute to the fund.
If the budget target were met without the contributions of those
opposed to abortions, then the program could go forward. If not,
then the program would have to cease, or operate on a reduced basis.

The suggestion presents some serious internal difficulties of its
own. It would be difficult to determine who refused to contribute out
of sincere religious conviction and who simply wanted others to bear
that portion of their social burden. Free-riding could thus distort
collective choice. On the other side, if the abortions were so funded,
then something would have to be done with the tax revenues from
those people opposed to the program on religious grounds. If these
moneys were simply put into general revenues, then nothing would

---

[256] *See, e.g.*, Wallace v. Jaffree, 472 U.S. 38, 55–56 (1985) (discussing the permissible degree
to which a statute can be motivated by a religious purpose).

[257] *See supra* pp. 79–86.

Appendix 11

really have changed at all. If any substantial fraction of the population supported abortions, then all federal programs, whether for abortions or anything else, would be funded exactly as if no one were opposed to abortions for religious reasons. Perhaps money is too fungible for such a separation to work. Even if these difficulties could be addressed, one problem would remain: what is to be said to people who are opposed to *their* government paying for something that they find morally reprehensible?

In the end, therefore, it seems quite difficult to protect the free exercise rights of opponents of abortion under a system that involves any affirmative government support of abortions. In this context, the funding of abortions through charitable contributions has at least the modest advantage of keeping the government from the middle of the abortion battle. Yet charitable deductions still make religious people bear part of the costs of the abortions, in effect, to which it can be said only that the current tax system uses charitable deductions that allow religious people to fund their institutions and practices at the expense of nonreligious ones. The only way to avoid these problems is to get the government out of both medicine and religion, which, although the only principled answer, is unlikely to be done in the near future. Until that day, however, the unconstitutional conditions question in *Harris* is far closer than the one in *Sherbert*, and far more divisive. The claim of indigent women to be free of financial incentives not to abort cannot be ignored. But it is not as important as a state policy offering a financial inducement to have an abortion inconsistent with her religious beliefs — which would be the precise *Sherbert* analogue. On the other side, the use of public moneys to support abortions taxes, and therefore coerces, other individuals to support practices that are against their religious convictions. As with *Sherbert*, none of these problems could arise in a constitutional order that imposed restrictions upon redistribution through taxation and state welfare benefits. Once that redistribution becomes part and parcel of the system as we know it, the proper strategy should be to choose the lesser of two evils, a very hard call here. On that uneasy note, the unconstitutional conditions challenge to the Hyde Amendment should fail — but perhaps only by a bare 5–4 vote.

### D. Tax Exemptions, Free Exercise, and the Antidiscrimination Principle

The most recent free exercise tax-exemption case, *Bob Jones University v. United States*,[258] is at sharp variance with *Sherbert* and *Hobbie*, but all too harmonious with *Lee*. In *Bob Jones*, the constitutional issue was whether Bob Jones University should be able to

---

[258] 461 U.S. 574 (1983).

Appendix 11

keep its charitable tax exemption, even though it had adopted, for genuine religious beliefs, a ban against interracial dating and marriage for its students.[259] For the Court, the case was easy. It started with the premise that "there can no longer be any doubt that racial discrimination in education violates deeply and widely accepted views of elementary justice,"[260] and cited its decision in *Brown v. Board of Education*[261] to show its opposition to any system of state-sponsored segregation. Set against this background, the free-exercise objection to the statute under the religion clauses received short shrift, given that "the Government has a fundamental, overriding interest in eradicating racial discrimination in education."[262] The Court concluded that "[d]enial of tax benefits will inevitably have a substantial impact on the operation of private religious schools, but will not prevent those schools from observing their religious tenets."[263]

The decision in *Bob Jones* has generally received a warm response,[264] but is nonetheless clearly incorrect, once the problem of unconstitutional conditions is forthrightly considered. The initial inquiry is whether the state could decide that its "compelling interest" in eradicating racial segregation in education is sufficiently strong to allow the state to impose a direct fine or criminal punishment on the school for imposing those conditions on its students. The answer, I take it, is no. The free exercise clause of the first amendment does not pertain only to the liturgy but to the full range of religious activities, of which schooling is most definitely a part.[265] Indeed, if *Bob Jones* is correct, then the government could claim that it has a "compelling state interest" to condition tax exemptions to religious institutions on their adherence to title VII prohibitions against gender discrimination, as practiced by Roman Catholics and Orthodox Jews, in the selection of religious leaders.[266] Even if it is assumed that the

---

[259] *See id.* at 580–81, 602–03. Also at issue in the case was whether the university's discriminatory practices disqualified it from tax exempt status under the "public policy" doctrine, a question that the Court answered affirmatively. *See id.* at 592–96.

[260] *Id.* at 592.

[261] *See id.* at 593 (citing *Brown*, 347 U.S. 483 (1954)).

[262] *Id.* at 604.

[263] *Id.* at 603–04.

[264] *See, e.g.*, Selig, *The Reagan Justice Department and Civil Rights: What Went Wrong*, 1985 U. ILL. L. REV. 785, 817–21; *see also* Freed & Polsby, *Race, Religion, and Public Policy: Bob Jones University v. United States*, 1983 SUP. CT. REV. 1, 1–2 (noting the various editorials and columns of the *New York Times* and the *Washington Post* denouncing the University and the Reagan Administration position). Freed and Polsby attack *Bob Jones* for its analysis of the "public policy" doctrine in the field of tax exemptions. *See id.* at 50–71.

[265] *See, e.g.*, Wisconsin v. Yoder, 406 U.S. 205 (1972).

[266] The tension between title VII and the religion clauses did surface in Corporation of Presiding Bishop v. Amos, 107 S. Ct. 2862 (1987), in which the Court held that the exemption from title VII for religious organizations, *see* 42 U.S.C. § 2000e-1 (1982), did not offend the establishment clause. The Court did not ask the harder question whether the exemption was

Appendix 11

denial of a tax benefit does not operate like a "fine," there still remains the question whether the government can deliver its economic benefits in ways that favor one religious set of beliefs over another, given its obligation not to use its coercive powers to advance or retard religion.[267] Under *Bob Jones*, the University and its supporters are forced to bankroll in part the subsidies provided for other institutions, without receiving any parallel subsidy of their own, thereby skewing the relative power of the two sets of institutions from what it would be in the tax-free world. The use of selective grants on matters of religious belief shows government power at its most dangerous. In this context it becomes idle to say that the greater power of withholding tax exemptions includes the lesser power to condition an exemption on the sacrifice of the prospective recipient's own religious convictions. As is usually the case, the setting of conditions on government grants is the result of powerful political pressures against which the Bill of Rights was designed to guard. Bob Jones University may be unfashionable and perverse in its religious beliefs and practices, but it is entitled to the same level of constitutional protection as everyone else.

### E. Food Stamps

We are at last in a position to reconsider the paradox of unconstitutional conditions as it applies to the case with which this Foreword began: *Lyng v. International Union, UAW*.[268] In *Lyng*, it will be recalled, the union argued that the legislative decision to exclude striking workers from the food stamp program constituted an impermissible "burden" upon their first amendment rights of association, while the disparate treatment between these striking workers and other workers eligible for food stamps constituted an impermissible classification that offended equal protection guarantees.[269] Stated otherwise, the union's claim is that the state uses impermissible "coercion" when it denies a benefit to striking workers that it grants to others. The rival position is that the state has chosen to "subsidize" certain kinds of workers, and is not duty-bound to extend that subsidy to workers who have chosen to strike. The case thus raises the unconstitutional conditions question whether the greater power — to eliminate the entire food stamp program — entails the lesser power — to exclude striking workers from the receipt of this set of government benefits.

---

required by the free exercise clause, to which I would answer in the affirmative. If that conclusion is correct, then *Bob Jones* must be clearly wrong. If the state cannot coerce compliance with the antidiscrimination norm against religious organizations by the use of force, then it cannot discriminate against them in the receipt of tax benefits.

[267] For a parallel discussion of the more difficult case of *Sherbert*, see pp. 79–86 above.

[268] 108 S. Ct. 1184 (1988).

[269] *See supra* p. 6.

Appendix 11

As before, the plaintiff's claim can be evaluated only if this legislative decision is placed within its larger constitutional context. The initial point of departure involves the National Labor Relations Act (NLRA). The statute itself represents a conscious program to displace market mechanisms with a system of collective bargaining, under which the majority of workers within a given bargaining unit are able to require their employer to negotiate with them in good faith. The central feature of this statute is that it explicitly repudiates the competitive norm and substitutes in its place a monopolistic structure whereby the employer is required to negotiate with the workers as a group. Ironically, the major historical opposition to the NLRA was that its duty to bargain in good faith violated the employer's right to freedom of association, by denying him the right to do business with whomever he saw fit. The inevitable consequence of the present labor statutes is to block free entry and exit, and thereby to increase the role of strategic behavior, given the attendant expansion in the size of the bargaining range. Hard, protracted negotiations over the division of the gains from trade become the rule, with strikes resulting from breakdowns in negotiations that both create private losses for the parties and inflict extensive social costs on third parties. In my opinion, the pre-1937 law on the subject was sound: the NLRA should have been struck down on both commerce clause and takings grounds,[270] in which case the entire issue in *Lyng* quickly disappears. However, for present purposes, my views are quite irrelevant. The important point is that the explicit rejection of a strong system of property rights made possible a level of government discretion that had not previously existed. The question then becomes whether the doctrine of unconstitutional conditions can sensibly cabin the use of that power.

Probably not, at least in this case. The doctrine of unconstitutional conditions was used in the contexts just considered to forestall redistribution of wealth along forbidden dimensions. In the foreign incorporation cases and the early highway cases, the competitive ideal forbidding economic redistribution by government still held sway. In the religion and speech cases, the marketplace of ideas is more than an idle economic image, as redistribution along political or religious lines continues to be prohibited even though economic redistributions are allowed. However, once redistribution of wealth and power is tolerated under the rational basis test in all relevant dimensions, then there is no forbidden use of government power to which the doctrine of unconstitutional conditions could respond. The search for some

---

[270] On application of the commerce clause, see Epstein, cited above in note 2; on application of the takings clause, see R. EPSTEIN, cited above in note 28, at 279–82, and Epstein, *A Common Law of Labor Relations: A Critique of the New Deal Legislation*, 92 YALE L.J. 1357 (1983).

Appendix 11

Page 278 of 293

fundamental right or freedom falls short on both the question of economic liberties, given the NLRA, and of welfare benefits, given the food stamp program. The intersection between two programs over which Congress has an acknowledged broad discretion does not yield any principle under which the discretion over the whole is less than the discretion over the parts.

Start with the legacy of the NLRA. The chief significance of the constitutional decisions in this area was the repudiation of the system of private property and competitive markets as the baseline against which permissible legislative enactments were measured.[271] Without accepting that baseline, the shift from competitive markets to cartel arrangements cannot be regarded as a "penalty" or a "taking" from employers made subject to the new restrictions. By the same token, the legal structure of the original Wagner Act[272] was held constitutionally permissible, although not constitutionally required. As long as union members have no "fundamental right" to the protection of labor statutes, then the current statutory framework, however well-established, does not establish any new definitive constitutional baseline against which subsequent legislative decisions must be tested. One immediate result was that the Taft-Hartley Act,[273] which prohibited a category of union unfair labor practices, could not be regarded as a penalty or a taking from workers that must be subjected to any form of heightened constitutional scrutiny. Any number of structural permutations have equal constitutional dignity. There is no impediment against oscillating back and forth between different economic orders, just as there is none against the repeal of Taft-Hartley in its entirety. In response, it might be suggested that the collective interest of the workers presents a fundamental claim of associational freedom that *requires* continuation of the system of collective bargaining. Yet under present law it is impossible to see how that might be done without repudiating the modern understanding that the state's police power trumps all economic liberties. Unions are large and complex organizations, making it implausible to claim that their members enjoy an "intimate" right of association such as that found in marriage and perhaps certain other highly personal forms of association.[274] The function and structure of unions are driven by the same

---

[271] *Cf.* Sunstein, *Lochner's Legacy*, 87 COLUM. L. REV. 873, 880–83 (1987) (attributing the decline of *Lochner* to the rejection of common law baselines of private property and free contract).

[272] National Labor Relations (Wagner-Connery) Act, ch. 372, 49 Stat. 449 (1935) (codified as amended at 29 U.S.C. §§ 151–166 (1982)).

[273] *See* Labor Management Relations Act of 1947, ch. 120, § 8, 61 Stat. 136, 140 (codified as amended at 29 U.S.C. § 158 (1982)).

[274] *Cf.* Roberts v. United States Jaycees, 468 U.S. 609, 620 (1984) (noting that "[a]s a general matter, only those relationships" that are "distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from

Appendix 11

economic considerations that govern ordinary business firms. In addition, unions themselves are not organizations formed by unanimous consent, but they have the power to bind individual dissenters by their decisions. Even if economic liberties were protected, freedom of association for some would not make it onto the list.

The new constitutional order thus comes to us bereft of the old common law baseline, and without a new baseline to replace it. Given this legal void, it is quite impossible to say that a certain reform introduces either a subsidy or a penalty that needs to be constitutionally justified. Rather, it is just a change among the class of equally permissible permutations. Once all baselines are extinguished, the doctrine of unconstitutional conditions has nothing on which to anchor itself, for there remains no dimension along which strategic behavior or the redistribution of wealth is forbidden. If the state can limit the power of unions under the Taft-Hartley Act,[275] then it can also do so under the food stamp program. Neither side in *Lyng* mastered the appropriate constitutional discourse. The Court was wrong to describe the food stamp program as a "subsidy."[276] By the same token, the dissent improperly called the exclusion of striking workers from the program a "penalty."[277] Strictly speaking, both sides are wrong because the statutory changes, in the present constitutional setting, are neither.

The two errors are not, however, of equal magnitude. Justice White, writing for the Court, need not have shown that the provision of food stamps to striking workers is a subsidy in order to sustain the statute's constitutionality. Rather, the burden was on Justice Marshall in dissent to show that the withholding of the food stamps is a forbidden "penalty" — that is, that it works some redistribution of income or wealth along some forbidden dimension. The obliteration of all constitutional landmarks in the labor relations area therefore does no damage to Justice White's majority position, but is fatal to Justice Marshall's dissent.

Justice Marshall tried to escape this problem by arguing that the mirage of government "neutrality" cannot possibly be used to uphold the statute.[278] After all, employers themselves receive many benefits from the welfare state that are in no way conditioned upon their behavior in labor disputes. To hit union workers with an exclusion from this program fits poorly with the maintenance of government

---

others in critical aspects of the relationship" qualify as intimate associations protected by the first amendment).

[275] Labor Management Relations Act of 1947, ch. 120, § 8, 61 Stat. 136, 140 (codified as amended at 29 U.S.C. § 158 (1982)).

[276] *See* 108 S. Ct. at 1190.

[277] *See id.* at 1198 (Marshall, J., dissenting).

[278] *See id.* at 1197–98.

benefits on the other side. But the argument about "neutrality" fares no better in this context than the argument about either penalty or subsidy. The complete response to Justice Marshall's point is that in the present constitutional world of labor relations, Congress could exclude employers from a wide variety of economic benefits, whether or not they were enmeshed in a labor dispute, without fear of over-stepping constitutional limitations. In this case, for example, the statute places heavy pressure on employers not to lock out workers, who would then be able to receive their food stamp benefits, but surely no one would say that this provision is unconstitutional because it "coerces" employers (who have long been forced to surrender their freedom of association) to abandon their rights not to do business with the union. The conscious, systematic elimination of all recognizable baselines makes the idea of "neutrality," powerful in a common law world as an argument against the NLRA, as empty as that of "penalty" and "subsidy." Again this absence of constitutional principle presents no obstacle to the party that wants to sustain the statute. It is fatal only to the party, be it management or labor, that wants to strike it down.

One must reach the same conclusion starting at the opposite pole with the food stamp program. Here too we have a system of in-kind benefits provided to recipients by the public at large. Yet there is a long line of Supreme Court cases holding that poverty is not a suspect classification,[279] and that the state is under no duty to redistribute wealth from rich to poor. Again there is no right to which the doctrine of unconstitutional conditions may be anchored. The decision to ex-clude striking workers from the program is based upon the sensible notion that the removal of payments to striking workers reduces the incidence of strikes. In turn, reducing the incidence of strikes is an end the state could pursue directly (as, for example, by repealing the collective bargaining rules), so it becomes one that the state may pursue by indirection as well. Looked at in retrospect, the exclusion of striking workers from the food stamp program may well treat persons with equal need differently, but it is hardly an instance of failing to treat "like cases alike," as Justice Marshall suggested.[280] There is still the question of incentives to be considered, and here Congress has decided that it is willing to suffer some inequality after the fact in order to reduce the frequency and severity of strikes. The weak rational basis test offers no reason to control the power of such state discretion, on which the entire unconstitutional conditions doc-trine rests.

---

[279] *See, e.g.,* Kadrmas v. Dickinson Pub. Schools, 108 S. Ct. 2481, 2487 (1988) (citing Harris v. McRae, 448 U.S. 297, 322–23 (1980), and Ortwein v. Schwab, 410 U.S. 656, 660 (1973)).

[280] *See Lyng,* 108 S. Ct. at 1194 (Marshall, J., dissenting).

Appendix 11

Page 281 of 293

The same conclusion follows when the matter is considered from the point of view of its funding. Here there is no way to match the taxes paid by striking workers with the level of food stamp benefits that they are entitled to receive. It is quite possible that, even if they cannot recover benefits while on strike, they receive a net benefit from the system, because they are still covered for the same contingencies as all other recipients.[281] If so, then some other parties must be net losers, but they are not allowed to complain either, even if they are shareholders whose tax dollars are being used to support the workers striking against their businesses. Who wins and loses is all quite impossible to determine anyway. There is no tracing mechanism to allow us to decide which set of benefits were funded by which person.[282] More fundamentally, there is no normative criterion to render any forms of redistribution impermissible. Without fundamental right or suspect classification, we remain mired in a constitutional wasteland.

The case is thus a far cry from *Sherbert.* Outside the context of the establishment clause, there exists no general requirement that persons not be taxed for benefits they do not receive. Nor does *Lyng* involve a state-imposed choice between the receipt of a government benefit and the waiver of constitutionally protected rights. Without the food stamp program, the workers know that they will have to

---

[281] It would be a closer question if the statute purported to deny striking workers all food stamp benefits in perpetuity. That statute could no longer be justified on the ground that the government should not provide payments to workers locked in economic conflicts with their employers, but it might be justified (in a rational basis world) as an effort to reduce the number of strikes under the labor statute. This special exclusion of striking workers is far more difficult to sustain in a world without collective bargaining, where the question of strikes would be controlled by the common law of property, contract, and tort. But even in this case it would be important to distinguish between a world in which common law rules prevailed by legislative grace and one in which they prevailed by constitutional mandate. In the former, rational basis world, the statute would probably prove acceptable. But with any stricter scrutiny, the perpetual restriction would fall (assuming that the food stamp program itself would not fall).

[282] The existence of such a mechanism can influence the outcome of cases. Ohio Bureau of Employment Services v. Hodery, 431 U.S. 471 (1977), involved a statute providing that workers for an employer whose business was shut down as part of a labor dispute other than a lockout were not entitled to receive unemployment compensation, even if they were nonunion workers who had not participated in the dispute itself. *See id.* at 471–77. The Supreme Court unanimously upheld the statute under rational basis review. It noted that each employer's contribution to the unemployment compensation fund was otherwise triggered by the number of its employees who received benefits. That basic structure, if unaltered, would have allowed the union to inflict heavy costs upon the employer if its strike forced the employer to close down its nonunion divisions. Such a union strategy would clearly influence the settlement of the strike. The funding imbalance was avoided by denying compensation to the innocent workers laid off. The same competitive balance could have been achieved if the nonunion workers received ordinary compensation from general revenues, not from the employer. But the rational basis test only required a good reason to avoid the payments by the employer; it did not require the adoption of an ideal compensation program that also protected innocent employees.

**Appendix 11**

Page 282 of 293

fend for themselves. After the passage of the food stamp program with this exception, they still have to fend for themselves. Basically they face the same costs and benefits from striking with the statute as they did striking before the food stamp programs were first introduced. At most the statute works a tiny change in the incentives faced by union workers who might delay striking, in order to induce the employer to lock them out first.[283] The dominant feature of this case is that the unions have lost in a struggle over political power, and the broad gulf between power and entitlement cannot be crossed when judicial deference is the order of the day.

## IX. CONCLUSION

The analysis of *Lyng* has brought us full circle in the analysis of unconstitutional conditions. It may now be useful to summarize where that journey has led. Initially it is useful to distinguish between the use of the doctrine as a matter of general legal theory and its use in connection with particular constitutional provisions. As a matter of theory, competitive markets and government power are often polar opposites. Within competitive markets, new entry is an effective check against private excesses. Accordingly, private contracts generally both advance the interests of the parties and make a positive contribution to the total welfare of the social system at large. Within this competitive setting, the emphasis of the law is rightly on transactional justice: whether particular contracts have been tainted by coercion, duress, fraud, or incompetence.

These transactional elements retain their importance whenever the government enters the market as an ordinary contracting party. But the traditional norms prohibiting coercion and duress are insufficient to police the legal monopoly that government exercises over certain critical domains. As a matter of general theory, the emphasis must shift from transactional to *institutional* justice, at which point three problems become paramount: monopoly, collective action dilemmas, and externalities. When the government uses only its monopoly of force to achieve its ends, classic constitutional questions arise under particular constitutional provisions. But when the government uses its power to contract or grant, then the issue of unconstitutional conditions proper is raised.

First, government monopoly power creates a broad range of bargaining outcomes that will allow the state and any individual to be better off than they were before the bargain. The costs of achieving some bargaining outcome, however, can dissipate a large portion of the achievable social gains. Limits on the types of gains that the state

---

[283] Similarly, employers have a small incentive to delay a lockout in order to induce a strike.

Appendix 11

Page 283 of 293

can hope to extract by bargaining with its citizens can limit the social losses associated with strategic behavior. In general, if the government can cover the costs of running the instrumentalities that it controls, it should not be allowed to hold out for any portion of the general surplus. The imposition of a condition on a grant is often an attempt to shift some portion of that surplus from some persons or interest groups to others. The factional politics it encourages and the social losses that it imposes are good reasons to incorporate protections against such abuse at a constitutional level.

Second, government regulation and taxation are means to effect implicit transfers of wealth between individuals. The bargain that is made with one citizen may have the effect of freezing other citizens out of the market or setting them at a competitive disadvantage. That is the lesson learned from both the corporate charter and the highway franchise cases. A firm cannot escape these external costs simply by reducing the prices it charges for goods and services. A legal rule that requires the government to make available to everyone on equal terms the privileges afforded to a few — for example, incorporation, or access to roads — largely controls this problem. The power to select confers greater powers on government officials than a rule that requires consistent treatment between rivals for government favors. At a normative level, the doctrine of unconstitutional conditions represents the sound limitation on public discretion.

Another part of the inquiry is not normative, but positive. How well do the cases conform to this model of unconstitutional conditions? In one sense they do not, because the language of externalities and strategic behavior is not drawn from Supreme Court cases. The Justices have worked more by hunch and intuition than by systematic theory. But the question is less one of words, and more one of judicial behavior. In this regard, the answer depends heavily on the extent to which the Supreme Court proceeds from the distrust of government power. In the pre-1937 period of the doctrine, there were clear hints that the preservation of a competitive system was an appropriate judicial function. The foreign incorporation cases and the regulation of highway cases both reflected that concern. Nonetheless, these pre-1937 cases showed at best an inconsistent and halting devotion to general principles of economic liberties.[284] Accordingly, unconstitutional conditions arguments were pressed forward with only modest vigor. In the foreign corporation cases, they achieved long-term beneficial outcomes, but in the highway cases they were easily circumvented.

---

[284] *See, e.g.,* Adkins v. Children's Hosp., 261 U.S. 525, 546–48 (1923) (listing four exceptions to the general principle of freedom of contract, most of which have little to do with the standard accounts of market failure).

In the post-1937 era, concern with economic liberties and competitive markets has been stripped of its normative constitutional authority. It is not surprising, therefore, that the doctrine of unconstitutional conditions has but weak application in these areas. Nonetheless, the far greater weight that has been attached to speech and religion has been matched by an increasing resort to unconstitutional conditions doctrine. The Court seems alert to the dangers that arise when governments externalize costs through regulation and taxation, and attempt to bargain strategically with individual citizens. Within specified subject matter areas, the emergent doctrine thus takes on the same contours that would have been imposed if the Court had continued to protect economic liberties and private property. Various forms of implicit transfers across religious or political groups are looked upon with deep suspicion, and controlled with a fair measure of sophistication and success. The efforts by the government to "lever" its monopoly advantage into protected areas are stoutly resisted.

But the court will not generalize to all areas of government activity. In order to account for its caution, we are thus brought back to the fundamental distinction that has dominated so much of constitutional law since the 1937 revolution. Why is the protection of economic liberties and property interests less a function of the judiciary than the protection of speech, religion, and other selected fundamental rights? To that question I think there is no satisfactory reply, because the same forms of government failure can pervade both areas. The object of government is to maximize the cooperative surplus of human activities in all domains, and the object of the Court is to help ensure effective government. The Court therefore should not sanction abuses of the political process, whether they offend speech, liberty, or property. Instead, a presumption of distrust should attach to all government action. That presumption should allow the Court to organize its thinking on unconstitutional conditions in particular and constitutional law in general around one proposition: where the Court routinely allows strategic behavior and implicit wealth transfers by government, there constitutionalism ends.

<u>AMICUS APPENDIX 12</u>: Gould, Stephen Jay, *Carrie Buck's Daughter*, 2 CONST. COMMENT 331 (1985)

**Carrie Buck's Daughter**

Stephen Jay Gould

(originally published in *Natural History* magazine, July 1984)

The Lord really put it on the line in his preface to that prototype of all prescription, the Ten Commandments:

> for I, the Lord thy God, am a jealous God, visiting the iniquity of the fathers upon the children unto the third and fourth generation of them that hate me (Exod. 20:5).

The terror of this statement lies in its patent unfairness—its promise to punish guiltless offspring for the misdeeds of their distant forebears.

A different form of guilt by genealogical association attempts to remove this stigma of injustice by denying a cherished premise of Western thought—human free will. If offspring are tainted not simply by the deeds of their parents but by a material form of evil transferred directly by biological inheritance, then "the iniquity of the fathers" becomes a signal or warning for probable misbehavior of their sons. Thus Plato, while denying that children should suffer directly for the crimes of their parents, nonetheless defended the banishment of a man whose father, grandfather, and great-grandfather had all been condemned to death.

It is, perhaps, merely coincidental that both Jehovah and Plato chose three generations as their criterion for establishing different forms of guilt by association. Yet we have a strong folk, or vernacular, tradition for viewing triple occurrences as minimal evidence of regularity We are told that bad things come in threes. Two may be an accidental association; three is a pattern. Perhaps, then, we should not wonder that our own century's most famous pronouncement of blood guilt employed the same criterion— Oliver Wendell Holmes's defense of compulsory sterilization in Virginia (Supreme Court decision of 1927 in *Buck v. Bell*): "three generations of imbeciles are enough."

Restrictions upon immigration, with national quotas set to discriminate against those deemed mentally unfit by early versions of IQ testing, marked the greatest triumph of the American eugenics movement—the flawed hereditarian doctrine, so popular earlier in our century and by no means extinct today (see my column on Singapore's "great marriage debate," May 1984), that attempted to "improve" our human stock by preventing the propagation of those deemed biologically unfit and encouraging procreation among the supposedly worthy. But the movement to enact and enforce laws for compulsory "eugenic" sterilization had an impact and success scarcely less

pronounced. If we could debar the shiftless and the stupid from our shores, we might also prevent the propagation of those similarly afflicted but already here.

The movement for compulsory sterilization began in earnest during the 1890s, abetted by two major factors—the rise of eugenics as an influential political movement and the perfection of safe and simple operations (vasectomy for men and salpingectomy, the cutting and tying of Fallopian tubes, for women) to replace castration and other obvious mutilation. Indiana passed the first sterilization act based on eugenic principles in 1907 (a few states had previously mandated castration as a punitive measure for certain sexual crimes, although such laws were rarely enforced and usually overturned by judicial review). Like so many others to follow, it provided for sterilization of afflicted people residing in the state's "care," either as inmates of mental hospitals and homes for the feebleminded or as inhabitants of prisons. Sterilization could be imposed upon those judged insane, idiotic, imbecilic, or moronic, and upon convicted rapists or criminals when recommended by a board of experts.

By the 1930s, more than thirty states had passed similar laws, often with an expanded list of so-called hereditary defects, including alcoholism and drug addiction in some states, and even blindness and deafness in others. It must be said that these laws were continually challenged and rarely enforced in most states; only California and Virginia applied them zealously. By January 1935, some 20,000 forced "eugenic" sterilizations had been performed in the United States, nearly half in California.

No organization crusaded more vociferously and successfully for these laws than the Eugenics Record Office, the semiofficial arm and repository of data for the eugenics movement in America. Harry Laughlin, superintendent of the Eugenics Record Office, dedicated most of his career to a tireless campaign of writing and lobbying for eugenic sterilization. He hoped, thereby, to eliminate in two generations the genes of what he called the "submerged tenth"—"the most worthless one-tenth of our present population." He proposed a "model sterilization law" in 1922, designed

> to prevent the procreation of persons socially inadequate from defective inheritance, by authorizing and providing for eugenical sterilization of certain potential parents carrying degenerate hereditary qualities.

This model bill became the prototype for most laws passed in America, although few states cast their net as widely as Laughlin advised. (Laughlin's categories encompassed "blind, including those with seriously impaired vision; deaf, including those with seriously impaired hearing; and dependent, including orphans, ne'er-do-wells, the homeless, tramps, and paupers.") Laughlin's suggestions were better heeded in Nazi Germany, where his model act served as a basis for the infamous and stringently enforced *Erbgesundhetsrecht*, leading by the eve of World War 11 to the sterilization of some 375,000 people, most for "congenital feeblemindedness," but including nearly 4,000 for blindness and deafness.

The campaign for forced eugenic sterilization in America reached its climax and height of respectability in 1927, when the Supreme Court, by an 8-1 vote, upheld the Virginia

sterilization bill in the case of *Buck v. Bell*. Oliver Wendell Holmes, then in his mid-eighties and the most celebrated jurist in America, wrote the majority opinion with his customary verve and power of style. It included the notorious paragraph, with its chilling tag line, cited ever since as the quintessential statement of eugenic principles. Remembering with pride his own distant experiences as an infantryman in the Civil War, Holmes wrote:

> We have seen more than once that the public welfare may call upon the best citizens for their lives. It would be strange if it could not call upon those who already sap the strength of the state for these lesser sacrifices. . . . It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. Three generations of imbeciles are enough.

Who, then, were the famous "three generations of imbeciles," and why should they still compel our interest?

When the state of Virginia passed its compulsory sterilization law in 1924, Carrie Buck, an eighteen-year-old white woman, was an involuntary resident at the State Colony for Epileptics and Feeble-Minded. As the first person selected for sterilization under the new act, Carrie Buck became the focus for a constitutional challenge launched, in part, by conservative Virginia Christians who held, according to eugenical "modernists," antiquated views about individual preferences and "benevolent" state power. (Simplistic political labels do not apply in this case, and rarely do in general. We usually regard eugenics as a conservative movement and its most vocal critics as members of the left. This alignment has generally held in our own decade. But eugenics, touted in its day as the latest in scientific modernism, attracted many liberals and numbered among its most vociferous critics groups often labeled as reactionary and antiscientific. If any political lesson emerges from these shifting allegiances, we might consider the true inalienability of certain human rights.)

But why was Carrie Buck in the State Colony, and why was she selected? Oliver Wendell Holmes upheld her choice as judicious in the opening lines of his 1927 opinion:

> Carrie Buck is a feeble-minded white woman who was committed to the State Colony. . . . She is the daughter of a feeble-minded mother in the same institution, and the mother of an illegitimate feeble-minded child.

In short, inheritance stood as the crucial issue (indeed as the driving force behind all eugenics). For if measured mental deficiency arose from malnourishment, either of body or mind, and not from tainted genes, then how could sterilization be justified? If decent food, upbringing, medical care, and education might make a worthy citizen of Carrie Buck's daughter, how could the State of Virginia justify the severing of Carries Fallopian tubes against her will? (Some forms of mental deficiency are passed by inheritance in family line, but most are not—a scarcely surprising conclusion when we consider the

Appendix 12

thousand shocks that beset fragile humans during their lives, from difficulties in embryonic growth to traumas of birth, malnourishment, rejection, and poverty. In any case, no fair-minded person today would credit Laughlin's social criteria for the identification of hereditary deficiency—ne'er-do-wells, the homeless, tramps, and paupers—although we shall soon see that Carrie Buck was committed on these grounds.)

When Carrie Buck's case emerged as the crucial test of Virginia's law, the chief honchos of eugenics knew that the time had come to put up or shut up on the crucial issue of inheritance. Thus, the Eugenics Record Office sent Arthur H. Estabrook, their crack fieldworker, to Virginia for a "scientific" study of the case. Harry Laughlin himself provided a deposition, and his brief for inheritance was presented at the local trial that affirmed Virginia's law and later worked its way to the Supreme Court as Buck v. Bell.

Laughlin made two major points to the court. First, that Carrie Buck and her mother, Emma Buck, were feeble-minded by the Stanford-Binet test of IQ, then in its own infancy. Carrie scored a mental age of nine years, Emma of seven years and eleven months. (These figures ranked them technically as "imbeciles" by definitions of the day, hence Holmes's later choice of words. Imbeciles displayed a mental age of six to nine years; idiots performed worse, morons better, to round out the old nomenclature of mental deficiency.) Second, that most feeblemindedness is inherited, and Carrie Buck surely belonged with this majority. Laughlin reported:

> Generally feeble-mindedness is caused by the inheritance of degenerate qualities; but sometimes it might be caused by environmental factors which are not hereditary. In the case given, the evidence points strongly toward the feeble-mindedness and moral delinquency of Carrie Buck being due, primarily, to inheritance and not to environment.

Carrie Buck's daughter was then, and has always been, the pivotal figure of this painful case. As I stated before, we tend (often at our peril) to regard two as potential accident and three as an established pattern. The supposed imbecility of Emma and Carrie might have been coincidental, but the diagnosis of similar deficiency for Vivian Buck (made by a social worker, as we shall see, when Vivian was but six months old) tipped the balance in Laughlin's favor and led Holmes to declare the Buck lineage inherently corrupt by deficient heredity Vivian sealed the pattern—three generations of imbeciles are enough. Besides, had Carrie not given illegitimate birth to Vivian, the issue (in both senses) would never have emerged.

Oliver Wendell Holmes viewed his work with pride. The man so renowned for his principle of judicial restraint, who had proclaimed that freedom must not be curtailed without "clear and present danger"—without the equivalent of falsely yelling "fire" in a crowded theater—wrote of his judgment in *Buck v. Bell*: "I felt that I was getting near the first principle of real reform."

And so the case of *Buck v. Bell* remained for fifty years, a footnote to a moment of American history perhaps best forgotten. And then, in 1980, it reemerged to prick our collective conscience, when Dr. K. Ray Nelson, then director of the Lynchburg Hospital

where Carrie Buck was sterilized, researched the records of his institution and discovered that more than 4,000 sterilizations had been performed, the last as late as 1972. He also found Carrie Buck, alive and well near Charlottesville, and her sister Doris, covertly sterilized under the same law (she was told that her operation was for appendicitis), and now, with fierce dignity, dejected and bitter because she had wanted a child more than anything else in her life and had finally, in her old age, learned why she had never conceived.

As scholars and reporters visited Carrie Buck and her sister, what a few experts had known all along became abundantly clear to everyone. Carrie Buck was a woman of obviously normal intelligence. For example, Paul A. Lombardo of the School of Law at the University of Virginia, and a leading scholar of the *Buck v. Bell* case, wrote in a letter to me:

> As for Carrie, when I met her she was reading newspapers daily and joining a more literate friend to assist at regular bouts with the crossword puzzles. She was not a sophisticated woman, and lacked social graces, but mental health professionals who examined her in later life confirmed my impressions that she was neither mentally ill nor retarded.

On what evidence, then, was Carrie Buck consigned to the State Colony for Epileptics and Feeble-Minded on January 23, 1924? I have seen the text of her commitment hearing; it is, to say the least, cursory and contradictory. Beyond the simple and undocumented say-so of her foster parents, and her own brief appearance before a commission of two doctors and a justice of the peace, no evidence was presented. Even the crude and early Stanford-Binet test, so fatally flawed as a measure of innate worth (see my book *The Mismeasure of Man*, although the evidence of Carrie's own case suffices) but at least clothed with the aura of quantitative respectability, had not yet been applied.

When we understand why Carrie Buck was committed in January 1924, we can finally comprehend the hidden meaning of her case and its message for us today. The silent key, again and as always, is her daughter Vivian, born on March 28, 1924, and then but an evident bump on her belly. Carrie Buck was one of several illegitimate children borne by her mother, Emma. She grew up with foster parents, J.T. and Alice Dobbs, and continued to live with them, helping out with chores around the house. She was apparently raped by a relative of her foster parents, then blamed for her resultant pregnancy. Almost surely, she was (as they used to say) committed to hide her shame (and her rapist's identity), not because enlightened science had just discovered her true mental status. In short, she was sent away to have her baby. Her case never was about mental deficiency; it was always a matter of sexual morality and social deviance. The annals of her trial and hearing reek with the contempt of the well-off and well-bred for poor people of "loose morals." Who really cared whether Vivian was a baby of normal intelligence; she was the illegitimate child of an illegitimate woman. Two generations of bastards are enough. Harry Laughlin began his "family history" of the Bucks by writing: "These people belong to the shiftless, ignorant and worthless class of anti-social whites of the South."

**Appendix 12**

We know little of Emma Buck and her life, but we have no more reason to suspect her than her daughter Carrie of true mental deficiency. Their deviance was social and sexual; the charge of imbecility was a cover-up, Mr. Justice Holmes notwithstanding.

We come then to the crux of the case, Carrie's daughter, Vivian. What evidence was ever adduced for her mental deficiency? This and only this: At the original trial in late 1924, when Vivian Buck was seven months old, a Miss Wilhelm, social worker for the Red Cross, appeared before the court. She began by stating honestly the true reason for Carrie Buck's commitment:

> Mr. Dobbs, who had charge of the girl, had taken her when a small child, had reported to Miss Duke [the temporary secretary of Public Welfare for Albemarle County] that the girl was pregnant and that he wanted to have her committed somewhere—to have her sent to some institution.

Miss Wilhelm then rendered her judgment of Vivian Buck by comparing her with the normal granddaughter of Mrs. Dobbs, born just three days earlier:

> It is difficult to judge probabilities of a child as young as that, but it seems to me not quite a normal baby. In its appearance—I should say that perhaps my knowledge of the mother may prejudice me in that regard, but I saw the child at the same time as Mrs. Dobbs' daughter's baby, which is only three days older than this one, and there is a very decided difference in the development of the babies.

> That was about two weeks ago. There is a look about it that is not quite normal, but just what it is, I can't tell.

This short testimony, and nothing else, formed all the evidence for the crucial third generation of imbeciles. Cross-examination revealed that neither Vivian nor the Dobbs grandchild could walk or talk, and that "Mrs. Dobbs' daughter's baby is a very responsive baby. When you play with it or try to attract its attention—it is a baby that you can play with. The other baby is not. It seems very apathetic and not responsive." Miss Wilhelm then urged Carrie Buck's sterilization: "I think," she said, "it would at least prevent the propagation of her kind." Several years later, Miss Wilhelm denied that she had ever examined Vivian or deemed the child feebleminded.

Unfortunately, Vivian died at age eight of "enteric colitis" (as recorded on her death certificate), an ambiguous diagnosis that could mean many things but may well indicate that she fell victim to one of the preventable childhood diseases of poverty (a grim reminder of the real subject in Buck v. Bell). She is therefore mute as a witness in our reassessment of her famous case.

When *Buck v. Bell* resurfaced in 1980, it immediately struck me that Vivian's case was crucial and that evidence for the mental status of a child who died at age eight might best be found in report cards. I have therefore been trying to track down Vivian Buck's school records for the past four years and have finally succeeded. (They were supplied to me by

Appendix 12

Dr. Paul A. Lombardo, who also sent other documents, including Miss Wilhelm's testimony, and spent several hours answering my questions by mail and Lord knows how much time playing successful detective *in re* Vivian's school records. I have never met Dr. Lombardo; he did all this work for kindness, collegiality, and love of the game of knowledge, not for expected reward or even requested acknowledgment. In a profession—academics—so often marked by pettiness and silly squabbling over meaningless priorities, this generosity must be recorded and celebrated as a sign of how things can and should be.)

Vivian Buck was adopted by the Dobbs family, who had raised (but later sent away) her mother, Carrie. As Vivian Alice Elaine Dobbs, she attended the Venable Public Elementary School of Charlottesville for four terms, from September 1930 until May 1932, a month before her death. She was a perfectly normal, quite average student, neither particularly outstanding nor much troubled. In those days before grade inflation, when C mean "good, 81-87" (as defined on her report card) rather than barely scraping by, Vivian Dobbs received A's and B's for deportment and C's for all academic subjects but mathematics (which was always difficult for her, and where she scored D) during her first term in Grade 1A, from September 1930 to January 1931. She improved during her second term in lB, meriting an A in deportment, C in mathematics, and B in all other academic subjects; she was on the honor roll in April 1931. Promoted to 2A, she had trouble during the fall term of 1931, failing mathematics and spelling but receiving A in deportment, B in reading, and C in writing and English. She was "retained in 2A" for the next term—or "left back" as we used to say, and scarcely a sign of imbecility as I remember all my buddies who suffered a similar fate. In any case, she again did well in her final term, with B in deportment, reading, and spelling, and C in writing, English, and mathematics during her last month in school. This offspring of "lewd and immoral" women excelled in deportment and performed adequately, although not brilliantly, in her academic subjects.

In short, we can only agree with the conclusion that'Dr. Lombardo has reached in his research on *Buck v. Bell*—there were no imbeciles, not a one, among the three generations of Bucks. I don't know that such correction of cruel but forgotten errors of history counts for much, but it is at least satisfying to learn that forced eugenic sterilization, a procedure of such dubious morality, earned its official justification (and won its most quoted line of rhetoric) on a patent falsehood.

Carrie Buck died last year. By a quirk of fate, and not by memory or design, she was buried just a few steps from her only daughter's grave. In the umpteenth and ultimate verse of a favorite old ballad, a rose and a brier—the sweet and the bitter—emerge from the tombs of Barbara Allen and her lover, twining about each other in the union of death. May Carrie and Vivian, victims in different ways and in the flower of youth, rest together in peace.

September 19, 2022                    Respectfully submitted,


                              BY:  /s/ Deana Pollard Sacks
                                   DEANA POLLARD SACKS, ESQ.
                                   CA Bar No. 145192
                                   Sacks Law Firm
                                   2323 S. Shepherd Drive, Suite 825
                                   Houston, Texas 77019
                                   Telephone: 713.927.9935
                                   deanapollardsacks@icloud.com
                                   Attorney for Amicus Curiae


## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, I filed Nations in Action's Supplemental Appendix to the Amicus Curiae Brief with the Clerk of the Court for the Third Circuit of the United States Court of Appeals using the Appellate CM/ECF system, which will automatically serve electronic copies upon all counsel of record.

September 19, 2022                    Respectfully submitted,


                              BY:  /s/ Deana Pollard Sacks
                                   DEANA POLLARD SACKS, ESQ.
                                   CA Bar No. 145192
                                   Sacks Law Firm
                                   2323 S. Shepherd Drive, Suite 825
                                   Houston, Texas 77019
                                   Telephone: 713.927.9935
                                   deanapollardsacks@icloud.com
                                   Attorney for Amicus Curiae

September 19, 2022                          Respectfully submitted,


                              BY:  /s/ Deana Pollard Sacks
                                   DEANA POLLARD SACKS, ESQ.
                                   CA Bar No. 145192
                                   Sacks Law Firm
                                   2323 S. Shepherd Drive, Suite 825
                                   Houston, Texas 77019
                                   Telephone: 713.927.9935
                                   deanapollardsacks@icloud.com
                                   Attorney for Amicus Curiae


# CERTIFICATE OF SERVICE

I hereby certify that on this date, I filed Nations in Action's Supplemental Appendix to the Amicus Curiae Brief with the Clerk of the Court for the Third Circuit of the United States Court of Appeals using the Appellate CM/ECF system, which will automatically serve electronic copies upon all counsel of record.

September 19, 2022                          Respectfully submitted,


                              BY:  /s/ Deana Pollard Sacks
                                   DEANA POLLARD SACKS, ESQ.
                                   CA Bar No. 145192
                                   Sacks Law Firm
                                   2323 S. Shepherd Drive, Suite 825
                                   Houston, Texas 77019
                                   Telephone: 713.927.9935
                                   deanapollardsacks@icloud.com
                                   Attorney for Amicus Curiae