# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

———————

## No. 22-2230

———————

Katie Sczesny, Jamie Rumfield, Debra Hagen, and Mariette Vitti,

*Plaintiffs-Appellants*

v.

The State of New Jersey,
Governor Philip Murphy (in his official & personal capacity),

*Defendants-Appellees,*

On appeal from 3:22-cv-02314-GC-RLS
in the United States District Court of New Jersey

## NATIONS IN ACTION'S AMICUS CURIAE BRIEF

## IN SUPPORT OF PLAINTIFFS-APPELLANTS FOR REVERSAL OF DISTRICT COURT'S ORDER APPLYING RATIONAL BASIS REVIEW IN DUE PROCESS CHALLENGE TO COVID-19 INJECTION MANDATES

Deana Pollard Sacks
CA Bar No. 145192
2323 S. Shepherd, Suite 825
Houston, TX 77019
deanapollardsacks@icloud.com
Telephone: (713) 927-9935
Facsimile: (713) 863-0502
Attorney for Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Nations in Action is a nonprofit organization founded by Maria Zack and dedicated to upholding the United States Constitution and all laws to protect and advance democracy and justice for all Americans. Nations in Action has no parent corporation, is not publicly traded, and no publicly held company owns any interest in Nations in Action. Nations in Action's interest in the case is to assure proper interpretation of the Liberty Clause to protect individual autonomy. Nations in Action supports the Plaintiffs-Petitioners and seeks a reversal of the District Court's ruling that applied rational basis review to medical (vaccine) mandates. Nations in Action has no financial interest in the outcome of the case.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF CONTENTS ...................................................................................... iii

TABLE OF AUTHORITIES ................................................................................. iv

STATEMENT OF IDENTIFICATION AND INTEREST OF AMICUS ................ 1

SUMMARY OF THE ARGUMENT ..................................................................... 2

ARGUMENT ......................................................................................................... 5

I.     THE STANDARD OF JUDICIAL REVIEW IS CRITICAL FOR PROPER LIBERTY CLAUSE ANALYSIS ................................................. 5

II.    FUNDAMENTAL RIGHTS ANALYSIS ...................................................... 6

     A.    History And Tradition ......................................................................... 9

     B.    The Nature Of The Right: Bodily Autonomy Is Fiercely Protected ......................................................................................... 18

     C.    International Policy: The Nuremberg Code ...................................... 25

III.   *JACOBSON V. MASSACHUSETTS* IS DISTINGUISHABLE ON NUMEROUS BASES AND DOES NOT SUPPORT RATIONAL BASIS REVIEW RELATIVE TO COVID-19 INJECTION MANDATES ................................................................................................ 32

IV.   UNCONSTITUTIONAL CONDITIONS AND HYBRID RIGHTS ............ 39

CONCLUSION ..................................................................................................... 41

CERTIFICATE OF COMPLIANCE .................................................................... 43

ELECTRONIC DOCUMENT CERTIFICATE .................................................... 44

CERTIFICATE OF BAR ADMISSION ............................................................... 44

CERTIFICATE OF SERVICE .............................................................................. 45

# TABLE OF AUTHORITIES

## United States Supreme Court

*Aguilar v. Texas*, 378 U.S. 108 (1964) ....................................................20

*Bowers v. Hardwick*, 478 U.S. 186 (1986) ............................................26

*Buck v. Bell*, 274 U.S. 200 (1927)..........................................................38

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ......................................41

*Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261 .............................................
 (1990) ................................................................. 10, 13, 14, 15, 16, 18

*Employment Division, Dept. of Human Resources of Oregon v. Smith*, 494
 U.S. 872 (1990)....................................................................................41

*Griswold v. Connecticut*, 381 U.S. 479 (1965)........................................7

*Jackman v. Rosenbaum Co.*, 260 U.S. 22 (1922) ...................................10

*Jacobson v. Massachusetts,* 197 U.S. 11 (1905) ..................... 16, 33, 34, 36, 37, 38

*Johnson v. U.S.*, 559 U.S. 133 (2010)....................................................15

*Lawrence v. Texas*, 539 U.S. 558 (2003)................................................26

*Loving v. Virginia,* 388 U.S. 1 (1967) .....................................................6

*Mapp v. Ohio*, 367 U.S. 643 (1961)........................................................20

*Meyer v. Nebraska*, 262 U.S. 390 (1923) .................................................6

*Moore v. City of East Cleveland*, 431 U.S. 494 (1977) ........................6, 7

*New York Times v. Sullivan,* 376 U.S. 254 (1964) .................................33

*Rochin v. California*, 342 U.S. 165 (1952)........................................19, 20

*Roper v. Simmons*, 543 U.S. 551 (2005)................................................26

*Schmerber v. California,* 384 U.S. 757 (1966)....................................21, 23

*Skinner v. Oklahoma*, 316 U.S. 535 (1942) ........................................18, 19

*U.S. v. Caroline Products Co.*, 304 U.S. 144 (1938).............................................34

*Union Pacific R. Co. v. Botsford*, 141 U.S. 250 (1890)..........................................13

*Washington v. Glucksberg,* 521 U.S. 702 (1997) ...............................6, 7, 10, 15, 16

*Washington v. Harper*, 494 U.S. 210 (1990) ....................................................17

*Winston v. Lee,* 470 U.S. 753 (1985) ........................................ 18, 20, 22, 23, 24, 25

### Third Circuit Court of Appeals

*ACLU v. Mukasey*, 534 F.3d 181 (3rd Cir. 2008) ........................................................5

### Other Courts

*Andre-Rodney v. Hochul*, 569 F.3d 128 (N.D.N.Y. 2021) .........................................5

*Association of American Physicians & Surgeons, Inc. et al. v. Adam Schiff et al.*, 23 F4th 1028 (D.C.Cir. 2022).........................................................................29

*Brown v. Kendall*, 60 Mass. 297 (1850) [AMICUS APPENDIX 9].............................12

*Commonwealth v. Pear. Same v. Jacobson*, 183 Mass. 242 (1903) ........................34

*Compassion in Dying v. Washington*, 85 F.3d 1440 (9th Cir. 1996).........................8

*Plaintiff Psychologist v. Order of Psychologists of Tuscany* r.g. 7360/2022 (Ordinary Court of Florence, July 6, 2022) [AMICUS APPENDIX 4]....................30

*Reynolds v. Clarke*, 1 Str. 634, 93 Eng. Rep. 747 (K.B. 1726) [AMICUS APPENDIX 5] ............................................................................................11

*Sczesny v. New Jersey*, No. 3-22-cv-02314, Doc. 19 (D.N.J. June 6, 2022)...........33

*Shuler v. Garrett,* 743 F.3d 170 (6th Cir. 2014) ....................................................16

*U.S. v. Biggs*, 441 F. 3d 1069 (9th Cir. 2006)..........................................................37

**Other Authorities**

American Law Institute, A CONCISE RESTATEMENT OF TORTS, Sec. 18-19
    *Battery: Offensive Contact* (3ʳᵈ ed. 2013) [AMICUS APPENDIX 7] ...........12, 14, 15

Berman, Mitchell N., *Coercion Without Baselines: Unconstitutional
    Conditions in Three Dimensions*, 90 GEO. L.J. 1 (2001) [AMICUS
    APPENDIX 8] ..................................................................................................40

Bigelow, M., *Elements of the Law of Torts: For the Use of Students* (5ᵗʰ ed.
    1894) ...............................................................................................................12

Blackman, Josh, *The Irrepressible Myth of Jacobson v. Massachusetts,* 70
    Buff. L. Rev. 131 (2022)........................................................33, 35, 38

Blackstone, *Commentaries on the Laws of England, Book The First, Of The
    Rights Of Persons, Chapter 1: Of the Absolute Rights Of Individuals* 129
    (1753) .........................................................................................11, 15

Deiser, George F., *The Development of Principle in Trespass*, 27 YALE L.J.
    220 (1917) .......................................................................................10

Dobbs, Dan B., THE LAW OF TORTS (2000) [AMICUS APPENDIX 10] ....11, 13, 14, 17

Epstein, Richard A., *Foreword: Unconstitutional Conditions, State Power,
    and the Limits of Consent*, 102 HARV. L. REV. 5 (1988-1989) [AMICUS
    APPENDIX 11] ..................................................................................40

Gould, Stephen Jay, *Carrie Buck's Daughter*, 2 CONST. COMMENT 331
    (1985) [AMICUS APPENDIX 12] ...........................................................39

Pollock, F. & F.W. Maitland, THE HISTORY OF ENGLISH LAW (1968)..................10

Records of the United States Nuernberg War Crimes Trials *United States of
    America v. Karl Brandt etal.* (case I) November 21, 1946 – August 20,
    1947, National Archives Microfilm Publications Pamphlet Describing
    M887 (Washington 1974) [AMICUS APPENDIX 6] ................................27

Sacks, Deana Pollard, *Elements of Liberty*, 61 SMU L. REV. 1557 ...........................
    (2008) ..........................................................................8, 18, 19, 26

Shuster, Evelyne, *Fifty Years Later: The Significance of the Nuremberg
    Code*, 337 N. ENGL. J. MED. 1436 (Nov. 13, 1997)............................28

## STATEMENT OF IDENTIFICATION AND INTEREST OF AMICUS

Amicus Curiae Nations in Action has no financial interest in the case and seeks to support the Third Circuit's constitutional analysis by supplying precedent concerning the Liberty Clause and the history and tradition of the Plaintiffs'-Appellants' fundamental right to reject medical procedures.  This Amicus Brief is filed pursuant to Federal Rules of Civil Procedure 26.1, 29, and 32, and Third Circuit Local Appellate Rules, L.A.R. 26.1.1.

Amicus Curiae attorney Deana Pollard Sacks authored the entire Amicus Brief and Nations in Action paid Sacks $10,000.00 plus out-of-pocket expenses for authoring the Amicus Brief.  No other person or entity contributed money for the Amicus Brief.

Sacks is a constitutional law scholar with expertise in Liberty Clause jurisprudence and provides herein precedent concerning the Liberty Clause as well as the predecessor English and American common law to enrich the authority provided to the Third Circuit in this complex area of constitutional law.

Amicus Curiae attorney Deana Pollard Sacks seeks to present oral argument to the Third Circuit.  Sacks was a professor of law 2000-2020, taught constitutional law and/or tort law for twenty years, and produced constitutional law scholarship concentrated on the Liberty Clause and tort scholarship concerning bodily integrity and the right of informed consent.  Sacks has expertise in both tort doctrine and

Liberty Clause jurisprudence.  The Amicus Brief contains precedent to support the Third Circuit's Liberty Clause analysis and related constitutional issues.

## SUMMARY OF THE ARGUMENT

Amicus Curiae Nations in Action submits this Amicus Brief to support the court's fundamental rights analysis and to establish that the right to reject all forms of unwanted bodily contact is a fundamental right implicit in liberty aspect of the Due Process Clause of the United States Constitution, also known as the Liberty Clause.  The Liberty Clause issue presented in this case is of monumental importance to the meaning of medical autonomy and individual freedom in America and also to the future of the United States.  Amicus Curiae is not aware of any Liberty Clause challenge to COVID-19 injection mandates that has been fully briefed and carefully analyzed by any American court with reference to the *history and tradition* of the right to reject medical procedures in conjunction with other elements of Liberty Clause interpretation established by United States Supreme Court precedent, including foreign law and international human rights policy.  The United States Supreme Court has not adopted a standard of judicial review for liberty challenges to COVID-19 injection mandates and has not ruled on the issue of whether COVID-19 injection mandates implicate a fundamental right implicit in the Liberty Clause.

The history and tradition of both English and American common law as well as American constitutional law make clear that the longstanding policy protecting

the "inviolability" of a person's body manifests a centuries-old natural right held by all persons not to be touched physically without valid and voluntary consent. This fundamental right of bodily autonomy – which has been termed "absolute" and treated as absolute or near-absolute for centuries – is a quintessential fundamental right implicit in the Liberty Clause based on American constitutional norms and historical English and American common law theory and precedent. The Amicus Brief provides the Third Circuit with historical tort and constitutional precedent to establish that the right to reject COVID-19 injections is fundamental. Accordingly, the proper standard of judicial review is strict scrutiny, not rational basis review.

The fact that the government in this case conditioned the benefit of employment on the relinquishment of a constitutional right does not alter the Liberty Clause analysis. Pursuant to the doctrine of unconstitutional conditions, the extraordinary level of coercion involved in the COVID-19 injection mandates render them presumptively unconstitutional and subject to the same judicial scrutiny as laws of general applicability. In addition, the irregularities, misinformation, and lack of democratic and legislative due process at the promulgation stage of the COVID -19 injection mandates in conjunction with the many constitutional infringements that attend the mandates (medical autonomy, religious freedom, and/or childrearing autonomy in some cases, *inter alia*) render

careful judicial review at the challenge stage absolutely critical to maintain some semblance of individual rights assured by the Constitution.

The District Court's deference to a medical mandate involving injections under the skin is dangerous considering the complete lack of due process at the promulgation stage of the mandates. At some point the government's invasive medical dictates must be subject to checks and balances and this duty falls on the judiciary under these circumstances. Strict judicial scrutiny concerning the efficacy, safety, and necessity of the COVID-19 injection mandates is essential to avoid medical oppression, and so far the judicial branch has failed to provide this critical check by erroneously applying rational basis review and deferring to executive branches' highly irregular and non-democratic medical mandates.

Amicus Curiae ask the Third Circuit to correct this error, to recognize that the right infringed by COVID-19 injection mandates is fundamental, and to adopt strict scrutiny as the standard of review so that the government must prove the safety, efficacy, and need for the COVID-19 injections. Under this standard, the government also must prove that no less restrictive alternatives are available. If the government cannot meet these burdens of proof, the mandates must be declared unconstitutional.

## ARGUMENT

## I.    THE STANDARD OF JUDICIAL REVIEW IS CRITICAL FOR PROPER LIBERTY CLAUSE ANALYSIS

The level of judicial scrutiny applied in Liberty Clause challenges to government action is critical and usually outcome-determinative.  Rational basis review is a "highly deferential review which presumes that a law is constitutional," and the "burden is on the challenger to negate every conceivable basis which might support the law." *Andre-Rodney v. Hochul*, 569 F.3d 128, 135 (N.D.N.Y. 2021) (emphasis added).  Strict scrutiny shifts the burden of proof:  Under strict scrutiny, the government has the burden of proving: 1) a compelling state interest; 2) the law is narrowly tailored to achieve the compelling state interest; and 3) no less restrictive means are available to meet the state's objective. *See, e.g., ACLU v. Mukasey*, 534 F.3d 181, 190 (3rd Cir. 2008).  Strict scrutiny is the standard when fundamental rights are infringed.

Accurate and complete fundamental rights analysis is essential to arrive at the proper standard of judicial review and to vindicate American liberty consistent with "history and tradition" as well as other elements of fundamental rights jurisprudence.  Amicus Curiae focuses on fundamental rights analysis for the purpose of assisting the Third Circuit in arriving at the proper standard of judicial review.

## II.    FUNDAMENTAL RIGHTS ANALYSIS

The Liberty Clause protects as *fundamental* rights "those personal activities and decisions that this Court has identified as so deeply rooted in our history and traditions, or so fundamental to our concept of constitutionally ordered liberty, that they are protected by the Fourteenth Amendment." *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) ("[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition.").  "Fundamental rights" have historically included "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923).

A "fundamental right" must be "objectively, deeply rooted in this Nation's history and tradition," which may be established by surveying the past several hundred years of "Anglo-American common law tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720-721 (1997).  Natural human rights that all people have enjoyed historically are generally considered "fundamental" rights implicit in the Liberty Clause.  For example, the right to marry is fundamental because "[m]arriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival." *Loving v. Virginia*, 388 U.S. 1, 12 (1967).

The Liberty Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests….  In a long line of cases, we have held that, in addition to the specific freedoms protected by the

Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the rights to marry…to have children…to direct the education and upbringing of one's children…to marital privacy…to use contraception… [and] *to bodily integrity*…**we have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment."** *Glucksberg*, 521 U.S. at 720 (citations omitted, emphasis added). Other rights historically recognized as basic to concepts of "ordered liberty" and grounded in "history and tradition" include:  the right to marry a person of a different race, the right to marry while in prison, the right to obtain contraceptives, the right to reside with relatives, and the right not to be sterilized without consent. Although not always officially termed "fundamental" by the Supreme Court, these rights have been carefully protected by the judiciary as part of "ordered liberty" grounded in "history and tradition."  The Supreme Court has not deferred to other branches when entrenched individual rights are infringed.

In analyzing whether a right is "fundamental," the Supreme Court begins by reviewing the "history and tradition" of the asserted right: "We begin, as we do in all due process cases, by examining our Nation's history, legal traditions, and practices." *Glucksberg*, 521 U.S. at 710.  The question is whether the asserted liberty right is "deeply rooted in this Nation's history and tradition." *Moore v. East Cleveland*, 431 U.S. 494, 503; *see also* *Griswold v. Connecticut*, 381 U.S. 479, 506 (1965).  The Court's Liberty Clause and related constitutional jurisprudence

concerning bodily autonomy reveal other elements of analysis that animate the Court in determining the level of judicial scrutiny to apply in Liberty Clause cases. These include: 1) the ***nature*** of the liberty right and whether it involves marriage, procreation, contraception, family relationships, **bodily autonomy**, sexual privacy, or **medical autonomy – particularly where <u>uncertain or unknown medical risks</u> to the individual are involved;** and 2) foreign law and global human rights policy. *See, e.g.,* Deana Pollard Sacks, *Elements of Liberty*, 61 SMU L. REV. 1557 (2008) (analyzing the Court's various interpretive methods and suggesting a synthesized interpretive Liberty Clause test that combines elements of liberty analysis identified by the Court).  These elements of liberty analysis are discussed separately herein.

American constitutional law makes clear that the right to *reject* medical treatment is deeply and historically rooted in English common law that fiercely protected bodily autonomy at least since the 13th century.  This centuries-old common law right spawned the right to reject medical procedures and produced the doctrine of informed consent.  "The right to refuse medical treatment is grounded in the common law right to be free of unwanted bodily contact." *Compassion in Dying v. Washington*, 85 F.3d 1440, 1444 (9th Cir. 1996) (O'Scannlain, J., dissenting from the order rejecting a request for rehearing en banc; certiorari granted by the Supreme Court and the Ninth Circuit's opinion was reversed in *Washington v. Glucksberg*).

It is therefore unsurprising that the Supreme Court has vigorously protected the right of bodily autonomy for decades under various constitutional provisions and has consistently applied some form of heightened scrutiny whether or not the Supreme Court has declared the asserted right of bodily autonomy "fundamental" in the cases.  The Supreme Court has consistently rejected government coercion invading an individual's right of bodily autonomy by means of an unwanted medical procedure, other than in very limited circumstances such as blood extraction due to the virtually risk-free nature of the procedure as explained herein below.  Unwanted medical injections coerced by the government raise the most urgent of liberty issues, particularly when the injections are new and experimental, the efficacy and need for the injections are disputed, and/or the health risks are deadly, serious, or <u>unknown</u>.  The urgency is particularly acute due to the lack of normal legislative due process at the promulgation stage of the mandates at issue in this case.  The duty to protect individual liberty in challenges to coerced medical procedures such as those involved in the instant case falls on the judiciary as part of the crucial separation of powers created by the Constitution to protect the American people.

## A.    History And Tradition

The right to reject medical treatment derives from the right to avoid unwanted physical contact.  This right of bodily autonomy is protected historically

by the law of battery.  The history and evolution of battery law is therefore the original "history and tradition" of the right of medical autonomy.

Under English and American common law, medical treatment of any type without informed and voluntary consent constitutes a battery: "The constitutionally protected right to refuse lifesaving hydration and nutrition that was discussed in [*Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261 (1990)] was not simply deduced from abstract concepts of personal autonomy, but was instead grounded in the Nation's history and traditions, given the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment." *Washington v. Glucksberg*, 521 U.S. 702, 703 (1997).  Where a right has been in place for "two hundred years," it is considered protected by the Liberty Clause absent a "strong case" to interfere with the right. *Id.* at 723, *quoting Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31 (1922).

The right to reject bodily contact has been powerfully protected by the law for centuries.  The right to be free from direct bodily contact developed from the writ of trespass in the 13th century. *See* George F. Deiser, *The Development of Principle in Trespass*, 27 YALE L.J. 220, 221 (1917) (explaining how the writ of trespass developed through 1285); 2 F. Pollock & F.W. Maitland, THE HISTORY OF ENGLISH LAW 526-527 (1968) (direct injury to another's body or property "by force and arms and against the King's peace" was actionable without evidence of intent or fault). *See also,* Dan B. Dobbs, THE LAW OF TORTS, Section 111, p. 259

(2000) ("The English common law of tort as it stood in the 14th century was very largely the law of trespassory torts…. That included cases of direct and immediate harm from the unauthorized use of physical force.") [AMICUS APPENDIX 10].

Sir William Blackstone wrote in 1753: "The right of personal security consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation." Blackstone, *Commentaries on the Laws of England, Book The First, Of The Rights Of Persons, Chapter 1: Of the Absolute Rights Of Individuals* 129 (1753). Blackstone further explained that this right is a natural birth right, endowed by the Creator:

> A man's limbs…are also the gift of the wise Creator, to enable him to protect himself from external injuries in a state of nature. To these therefore he has a natural inherent right; and they cannot be wantonly destroyed or disabled without a manifest breach of civil liberty. Both the life and limbs of a man are of such high value, in the estimation of the law of England, that it pardons even homicide if committed *se defendendo*, or in order to preserve them. For whatever is done by a man to save either life or member, is looked upon as done upon the highest necessity and compulsion…. Besides those limbs and members that may be necessary to a man in order to defend himself or annoy his enemy, the rest of his person or body is also entitled, by the same natural right, to security from the corporal insults of menaces, assaults, beating, and wounding; though such insults amount not to destruction of life or member. *Id.* at 130, 134.

Direct contact with another's body was a strict liability tort historically and actionable regardless of intent or motive. Direct bodily contact constituted a bodily "trespass" whereas indirect contact give rise to an action upon the "case." *See, e.g., Reynolds v. Clarke*, 1 Str. 634, 93 Eng. Rep. 747, 748 (K.B. 1726)

(Forescue, J.) ("[I]f a man throws a log into the highway, and in that act it hits me, I may maintain trespass, because it is an immediate wrong; but if as it lies there I tumble over it and receive an injury, I must bring an action upon the case….") [AMICUS APPENDIX 5].

The right to avoid physical contact with one's body was protected absolutely by *strict liability* in the United States until 1850, indicating a strong commitment to protect Americans from unwanted bodily contact and manifesting a strong policy to discourage people from touching others by threat of virtually certain civil liability. That is, any unconsented and direct bodily contact with another's body *with or without intent or fault* resulted in strict liability until *Brown v. Kendall*, 60 Mass. 297, 297-98 (1850) [AMICUS APPENDIX 9]. In *Brown v. Kendall*, American tort law shifted from strict liability for *unintended* contact with another's body to a negligence standard, but *intentional* contact that was harmful or offensive based on community standards remained a civil battery. *See, e.g.,* American Law Institute, A CONCISE RESTATEMENT OF TORTS, Sec. 18-19 *Battery: Offensive Contact* 21-23 (3rd ed. 2013) [AMICUS APPENDIX 7].

The right to be free from unwanted physical contact was categorized as a "Breach of Absolute Duty" by Melville Bigelow in the late 19th century. *See* M. Bigelow, *Elements of the Law of Torts: For the Use of Students* (5th ed. 1894). No intent or fault was required because an individual's right to bodily autonomy was considered absolute. Dobbs, THE LAW OF TORTS at §111, p. 259 (2000) (*citing,*

*Weaver v. Ward*, Hob. 134, 80 Eng. Rep. 284 (K.B. 1616)) (a defendant could be liable for accidentally discharging his musket during a military drill if another was harmed by the discharge, regardless of fault or innocence).  A claim for battery does not require proof of physical harm or actual losses because the interest protected is dignitary in nature: the harm lies in the unwanted touching *per se*.  "Battery today vindicates the plaintiff's rights of autonomy and self-determination, her right to decide for herself how her body will be treated by others, and to exclude their invasions as a matter of personal preference, whether physical harm is done or not." Dobbs, THE LAW OF TORTS at 54 (2000) [AMICUS APPENDIX 10].

In 1890 the Supreme Court clarified the "inviolability" of one's body:

> **No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others,** unless by clear and unquestionable authority of law.  As well said by Judge Cooley: 'The right to one's person may be said to be a right of complete immunity; to be let alone.' *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251-252 (1890) (emphasis added; internal citations omitted).

The Supreme Court reiterated verbatim the above quoted legal policy concerning the inviolability of the human body announced in *Union Pacific R. Co. v. Botsford* a century later, demonstrating the Court's enduring commitment to protect the historical right of bodily autonomy as part of American constitutional law. *See Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 269 (1990).  After reiterating *Botsford*'s sentiment concerning the "sacred" right of bodily autonomy,

the *Cruzan* Court went on to state,

> **Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages. The informed consent doctrine has become firmly entrenched in American tort law. The logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment.** *Id*. at 269-270 (internal quotations and citations omitted).

The "inviolability" of one's "person" continues to be fiercely protected as a "dignitary" interest by civil battery law into the 21st century, ***even when a person's body is not touched at all***, provided his interest in bodily autonomy is disturbed:

> Since the essence of the plaintiff's grievance consists in the offense to the dignity involved in the unpermitted and intentional invasion of the inviolability of his person and not in any physical harm done to his body, it is not necessary that the plaintiff's actual body be disturbed. Unpermitted and intentional contacts with anything so connected with the body as to be customarily regarded as part of the other's person and therefore as partaking of its inviolability is actionable as an offensive contact with his person. A CONCISE RESTATEMENT OF TORTS, at 22 [AMICUS APPENDIX 7].

This principle is known as the "extended personality" rule and manifests the depth and breadth of the right of unfettered bodily autonomy that extends even beyond the physical body to protect dignity and self-determination as opposed to just physical injury. *See, e.g.,* Dobbs, THE LAW OF TORTS at 61 (2000) [AMICUS APPENDIX 10].  The right to control who touches a person's body is so basic to a free society that it is actionable ***even if the person touched without consent was unaware of the contact and was not harmed by it*** because the "affront is as keenly

felt by one who only knows after the event that an indignity has been perpetrated upon him as by one who is conscious of it while it is being perpetrated." A CONCISE RESTATEMENT OF TORTS, at 21-23 [AMICUS APPENDIX 7].  The right to reject physical contact by others is central to the historical value of protecting individual autonomy and dignity.  It is a pillar of English and American common law.

The right to *reject* medical treatment can be traced hundreds of years back to English common law and early American law.  "At common law, even the touching of one person by another without consent and without legal justification was a battery." *Cruzan*, 497 U.S. at 269.  More recently the Supreme Court noted that the right to be free of even "mere" contact with another's body without consent has been a crime as far back as the 1700s: "At common law, battery – all battery, and not merely battery by the merest touching – was a misdemeanor…." *Johnson v. U.S.*, 559 U.S. 133, 141 (2010), *citing* 4 Blackstone 216-218 (1769) (other citations omitted).

In *Washington v. Glucksberg*, the Court acknowledged the historical right to reject medical treatment: "We have also assumed, and strongly suggested, that the Due Process Clause protects the **traditional right to refuse unwanted lifesaving medical treatment**." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), *citing,* *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 278-279 (1990) (emphasis added).  "The principle that a competent person has a constitutionally

protected liberty interest in declining an unwanted medical treatment can be inferred from our prior decisions." *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 277-278 (1990), *citing Jacobson v. Massachusetts*, 197 U.S. 11, 24-30 (1905).  "Given the common-law rule that forced medication was a battery, and the ***long legal tradition of protecting the decision to refuse unwanted medical treatment***, our assumption [in *Cruzan* …] was entirely consistent with this Nation's history and constitutional traditions…. The decision to commit suicide with the assistance of another…has never enjoyed similar legal protection. Indeed, the two acts are widely and reasonably regarded as quite distinct." *Glucksberg*, 521 U.S. at 725 (emphasis added).  That is, the right to reject medical treatment has been protected historically, unlike a claimed right to demand certain medical procedures.

The doctrine of informed consent buttresses the right to reject medical treatment.  "[T]he common law doctrine of informed consent is viewed as generally encompassing the right of a competent individual to refuse medical treatment…." *Cruzan*, 497 U.S. at 277.  An injection into the body is a medical procedure requiring informed, valid, and voluntary consent. *See, e.g., Shuler v. Garrett*, 743 F.3d 170, 173-174 (6th Cir. 2014) (injection of medication is a medical "procedure" that supports a claim of medical battery if performed without valid and informed consent).  The Supreme Court has recognized that the "forcible injection of medication into a nonconsenting person's body represents a substantial

interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 221-222 (1990).  Consent to physical contact is invalid if it is given without a full and fair understanding of the physical risks involved in the contact, or where the consent is attained through fraud, coercion, duress, or abuse of power. *See* DOBBS, THE LAW OF TORTS at 231-243. [AMICUS APPENDIX 10].  Where consent is attained by incomplete or false information concerning the risks or nature of the physical contact in conjunction with extraordinary economic duress arising from loss of employment (and indeed a loss of the ability to earn a living in an entire industry for which the coerced person has been trained as in the instant case), the coerced and/or uninformed consent should not be considered valid.[1]

The right to reject unwanted physical contact as a basic natural right to control one's own physical body predates the Fourteenth Amendment by at least 500 years.    The right of bodily integrity is historical, deeply entrenched, and fundamental to the concept of ordered liberty.  This right includes the right to reject medical treatment, rendering government action infringing the right subject

---

[1] All of the facts of the instant case, including the lack of normal legislative due process at the promulgation stage of the "emergency" COVID-19 injection mandates and the unprecedented economic coercion to force workers to inject experimental and very dangerous (VAERS data) medication into their bodies or lose the ability to provide for their families, render any "consent" to the COVID-19 so-called "vaccines" in this case highly suspect and likely invalid. *See* Appellants' Brief in Support of Reverse and Remand for Entry of a Preliminary Injunction (hereinafter "Appellants' Brief"), Pacer Doc 9 (September 6, 2022) at pp. 3-8, 19-25, 31-36, 38-40.

to strict scrutiny.  The COVID-19 injection mandates infringe the fundamental right of bodily autonomy and therefore must be reviewed by the judiciary under a standard of strict scrutiny.

### B.    The Nature Of The Right: Bodily Autonomy Is Fiercely Protected

The Supreme Court's fundamental rights jurisprudence historically and consistently has placed great weight on the *nature* of the right infringed.  The Court has strongly protected personal choices concerning sexuality, family relationships, private spaces, and bodily autonomy. Sacks, *Elements of Liberty*, 61 SMU L. REV. at 1578-1580.  Protecting individuals' bodies as central to the individual right of privacy has been a motivating judicial policy: "Because our notions of liberty are inextricably intertwined with our idea of physical freedom and self-determination, **the Court has often deemed state incursions into the body repugnant to the interests protected by the Due Process Clause**." *Cruzan*, 497 U.S. at 287 (O'Connor, J., concurring).  Dignitary interests protected by intentional torts such as battery have always been a focus relative to the *nature* of the right in Liberty Clause jurisprudence: "Another factor is the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity." *Winston v. Lee,* 470 U.S. 753, 761 (1985).

In *Skinner v. Oklahoma*, 316 U.S. 535, 536 (1942), the Court explained that a key aspect of individual liberty arises from the nature of the right involved, and

found that coerced sterilization of "habitual criminals" involves a "sensitive and important area of human rights…which is basic to the perpetuation of a race – the right to have offspring," rendering "strict scrutiny of the classification which a State makes in a sterilization law essential."   The Court pointed out that the medical procedure involved – sterilization – was ***irreversible***: the individual subject to sterilization is "forever deprived of a basic liberty." *Id*. at 541.   The fundamental nature of the right required strict scrutiny under an Equal Protection Clause analysis[2] just as strict scrutiny is the proper test in Liberty Clause challenges concerning fundamental rights. *See* Sacks, *Elements of Liberty*, 61 SMU L. REV. at 1580-1582 (reviewing cases in which the Court declared unconstitutional state action that infringed the right of bodily autonomy including unwanted surgical procedures, medication, and stomach-pumping under various constitutional provisions).

The Supreme Court has generally prohibited coerced medical procedures regardless of the constitutional provision invoked to challenge the unwanted medical procedures.   For example, in the Fourteenth Amendment Due Process Clause case of *Rochin v. California*, 342 U.S. 165 (1952) (forced stomach

---

[2] The sterilization law protected embezzlers but not those guilty of grand larceny despite very similar intent involved in both crimes, rendering the law a violation of the Equal Protection Clause: "Embezzlers are forever free. Those who steal or take in other ways are not." *Skinner*, 316 U.S. at 542.

pumping to recover morphine to prove the crime of possession)[3] and the Fourth Amendment case of *Winston v. Lee*, 470 U.S. 753 (1985) (proposed surgery without consent to obtain a bullet that would prove whether or not Winston was the suspect who shot a shopkeeper during a robbery), the Court declined to allow coerced bodily invasion of a suspect's body or to allow into evidence the fruits produced by coerced invasion despite the government's need for the criminal evidence and the compelling public interest in proving crimes. The concept of constitutional "due process" concerning bodily autonomy is essentially the same in all constitutional challenges, despite differences in the specific balancing tests applied: "Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental' or are 'implicit in the concept of ordered liberty.'" *Rochin v. California*, 342 U.S. 165, 169 (1952).

The Supreme Court's policy statements and focus on the medical risks involved in challenges to governments' attempts to force medical procedures on unwilling subjects create the parameters of constitutional protection of bodily

---

[3] The Fourth Amendment had not yet been incorporated into the Fourteenth Amendment, so the state-action case arose under the Due Process Clause of the Fourteenth Amendment as opposed to the Fourth Amendment (via the Fourteenth Amendment incorporation doctrine) post *Mapp v. Ohio*, 367 U.S. 643 (1961) (unreasonable searches and seizures) and *Aguilar v. Texas*, 378 U.S. 108 (1964) (warrant requirements).

autonomy and make clear that <u>the Court has never applied rational basis review in</u> <u>challenges to any type of government-coerced medical procedure</u>.  In relation to the virtually unfettered right of bodily autonomy relative to medical self-determination, the Court has consistently reviewed the medical risks with care and has required a compelling government purpose to justify coercive medical procedures.  Even with a compelling purpose, the Court has struck down nearly all medical mandates other than those that carry ***virtually no medical risks and no unknown medical risks***, and has pointed out less-intrusive means to reach the government's objective (such as an eyewitness instead of forensic evidence in *Winston v. Lee*).

The judicial standard of review for government medical mandates historically has been investigative and strict to protect the fundamental right of bodily autonomy.  Based on Supreme Court precedent, a medical mandate must: 1) involve virtually ***no risk*** to the individual subject to the procedure; 2) be ***necessary*** to achieve the government's compelling purpose; and 3) be the only efficacious option with ***no less intrusive alternatives***.  Coerced blood extraction to prove drunk driving meets this rigorous standard due to the extraordinary and deadly public risk caused by the crime, the near-zero risk of the medical procedure, and the fact that a blood test is necessary to prove the crime by means of the time-sensitive forensic evidence for which there are no less intrusive alternatives. *See, e.g.,* *Schmerber v. California,* 384 U.S. 757 (1966) (finding coerced blood

extraction constitutional under exigent circumstances to prove drunk driving based on the virtually non-existent medical risks involved and the necessity for the fast-dissipating evidence).

In *Winston v. Lee*, 470 U.S. 753 (1985) the Supreme Court analyzed a challenge to unwanted surgery to produce forensic evidence under the Fourth Amendment, but the Court spoke in traditional due process terms concerning the constitutional repugnancy of state-coerced medical treatment:    "A compelled surgical intrusion into an individual's body for evidence, however, implicates expectations of privacy and security of such magnitude that the intrusion may be 'unreasonable' even if likely to produce evidence of a crime." *Id*. at 759.   The Court referred to the right of medical autonomy as part of longstanding "expectations of privacy" and "the right to be let alone – the most comprehensive of rights and the right most valued by civilized men." *Id*. at 758 (citations omitted). Accordingly, despite the relatively deferential constitutional standard in Fourth Amendment analysis (reasonableness), the Court nonetheless found the forced medical procedure repugnant to the Constitution.

The *Winston v. Lee* Court made clear that medical invasion "beneath the skin" is necessarily subject to exacting judicial review and that challenges to medical mandates must be decided on a "case by case" basis. *Id*. at 765, 760. There was conflicting evidence concerning the risks of the bullet-extraction surgery sought by the state due to differing testimony concerning the depth of the

bullet below Winston's skin and its proximity to internal organs that could be at risk during surgery to extract the bullet. Ultimately, the "uncertainty about the medical risks" swayed the Court to protect the individual right of bodily autonomy even though the outcome was the loss of critical forensic evidence: "The medical risks of the operation, although apparently not extremely severe, are a subject of considerable dispute; **the very uncertainty militates against finding the operation to be 'reasonable**.'" *Id*. at 764, 766 (emphasis added). The *Winston v. Lee* Court distinguished *Schmerber v. California*: "A crucial factor in analyzing the magnitude of the intrusion in *Schmerber* is the extent to which the procedure may threaten the safety or health of the individual. '[F]or most people [a blood test] involves virtually no risk, trauma, or pain.'" *Winston,* 470 U.S. at 761.

The Court reviewed the government's need for the ballistic evidence and whether there were alternative ways to meet the government's need to stop violent gun crime that often results in human death. In *Winston v. Lee*, the shopkeeper (Watkinson) identified Winston as the shooter, so the government's "assertions of a compelling need for the bullet are hardly persuasive…. The Commonwealth has available substantial evidence that respondent was the individual who accosted Watkinson…." *Id*. at 765. The available alternative evidence showed a lack of a compelling government purpose, a lack of necessity for the coercive procedure, and the availability of non-bodily-intrusive measures to meet the government's purpose.

The *Winston v. Lee* Court specifically recognized its duty to conduct a "discerning inquiry" relative to the coercive medical procedure by reference to *Schmerber v. California*, recognizing that even blood extraction "implicated Schmerber's most personal and deep-rooted expectations of privacy…" *Id.* at 760. The Court did not use the term "strict scrutiny" in *Winston v. Lee* as that term is not used in Fourth Amendment analysis, but the Court engaged an analysis more akin to strict scrutiny than rational basis review despite the Fourth Amendment test of "reasonableness" which is a key term used in rational basis review. The more protective analysis is grounded in the physically invasive ***nature*** of the right infringed and the historical law that the human body is inviolable. The Court has consistently protected bodily autonomy with vigor under various constitutional provisions and has engaged strict scrutiny or tests akin to strict scrutiny due to the deeply rooted and historical value of bodily autonomy.

Risk of harm and ***unknown risks*** have always been central to the Supreme Court's analysis when reviewing a challenge to an unwanted medical procedure. Accordingly, where the risks are unknown, such as in the case of ***new or experimental*** medication, injections, or ***never-before-tested-on-human-populations "gene therapy,"*** (as in the mRNA COVID-19 injections), the Court's Liberty Clause jurisprudence requires careful scrutiny or strict scrutiny regardless of the constitutional provision invoked or the semantics of the constitutional tests employed. *See* Appellants' Brief at pp. 38-39. The circumstances in *Schmerber v.*

*California* were exigent, but the case really turned on the <u>known near-zero risk of</u> <u>blood extraction</u>: "A crucial factor in analyzing the magnitude of the intrusion in *Schmerber* is the extent to which the procedure may threaten the safety or health of the individual. '[F]or most people [a blood test] involves virtually no risk, trauma, or pain.'" *Id*. at 761. To the contrary, most people who received a COVID-19 injection have reported negative reactions up to and including death, as shown both by the VAERS reporting system and other official reports. *See* <u>Appellants' Brief pp. 31-40</u>. The unknown medical risks involved in COVID-19 injection mandates in conjunction with the bypassing of protective legislative processes at the promulgation stage warrant judicial attention and very careful review.

The fundamental and very private nature of medical decisions is why the right to reject medication and all forms of unwanted physical contact have been strictly protected throughout history. Amicus Curiae requests that the Third Circuit rule that the right to reject medical procedures is fundamental and requires the government to prove its case specifically under strict scrutiny to justify imposing unwanted medical procedures on Americans.

## C.    International Policy: The Nuremberg Code

In determining whether an asserted liberty right is fundamental, the Supreme Court has looked to global norms concerning human rights and individuals' expectations of autonomy. "Over the course of nearly half a century, the Court has

consistently referred to foreign and international law as relevant to its assessment of evolving standards of decency." *Roper v. Simmons*, 543 U.S. 551, 604 (2005) (O'Connor, J., dissenting).  In *Lawrence v. Texas*, 539 U.S. 558, 577 (2003) the Court stated, "The right petitioners seek in this case has been accepted as an integral part of human freedom in many other countries.  There has been no showing that in this country the government interest in circumscribing personal choice is somehow more legitimate or urgent."[4]  *See also* Sacks, *Elements of Liberty*, 61 SMU L. REV. at 1587-1598 (analyzing Supreme Court liberty precedent relying on foreign and international law standards of privacy expectations and human dignity).

Global human rights standards are therefore relevant to determining the parameters of the Liberty Clause under the American Constitution.  The global humanitarian norms concerning experimental medical procedures are governed by the Nuremberg Code.

The Nuremberg Code is a set of ten principles for medical experiments on humans produced by the Nuremberg Military Tribunal's decision in the case of

---

[4] It is noteworthy that the sexual privacy right at issue in *Lawrence v. Texas* (sodomy) did not involve a right recognized historically, and to the contrary, involved a "right" that traditionally was subject to criminal sanctions including capital punishment. *See Bowers v. Hardwick*, 478 U.S. 186, 192-194 & nn. 5-6 (1986) (listing state laws making sodomy illegal).  The instant case involves a much stronger claim of personal liberty, based on centuries of history and tradition fiercely protecting the right of personal physical autonomy, which includes the right to reject even lifesaving medication.

Records of the United States Nuremberg War Crimes Trials *United States of America v. Karl Brandt etal.* (case I) November 21, 1946 – August 20, 1947, National Archives Microfilm Publications Pamphlet Describing M887 at 3 (Washington 1974) [AMICUS APPENDIX 6].[5]   The Nuremberg Code provides in pertinent part:

"The protagonists of the practice of human experimentation justify their views on the basis that such experiments yield results for the good of society that are unprocurable by other methods or means of study.   All agree, however, that certain basic principles must be observed in order to satisfy moral, ethical and legal concepts:

> The **voluntary** consent of the human subject is **absolutely essential**. This means that the person involved should have legal capacity to consent; should be so situated as to be able to exercise **free power of choice**, **without the intervention of any element of force, fraud, deceit, duress, overreaching, or other ulterior form of constraint or _coercion_**; and should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision.   This latter element requires that before the acceptance of an affirmative decision by the experimental subject there should be made known to him the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconveniences and hazards reasonably to be expected; and **the effects upon his health or person which may possibly come from his participation in the experiment**.   The duty and responsibility for ascertaining the quality of the consent rests upon each individual who initiates, directs, or engages       in       the       experiment."       (Emphasis       added).

---

[5] *See* Nuremberg Code, UNC Research available at
https://research.unc.edu/human-research-ethics/resources/ccm3_019064/.

*See* Nuremberg Code, available at
https://media.tghn.org/medialibrary/2011/04/BMJ_No_7070_Volume
_313_The_Nuremberg_Code.pdf

"The Nuremberg Code is the most important document in the history of the ethics of medical research." Evelyne Shuster, *Fifty Years Later: The Significance of the Nuremberg Code*, 337 N. ENGL. J. MED. 1436 (Nov. 13, 1997). The Nuremberg Code "included a new, comprehensive, and absolute requirement of informed consent (principle 1), and a new right of the subject to withdraw from participation in an experiment (principle 9)." *Id*. "Informed consent, the core of the Nuremberg Code, has rightly been viewed as the protection of subjects' human rights." *Id*. The Nuremberg Code's informed consent provisions have been "universally accepted and is articulated in Article 7 of the United Nations International Covenant on Civil and Political Rights (1966) …[and] is also the basis of the International Ethical Guidelines for Biomedical Research Involving Human Subjects, the most recent guidelines promulgated by the World Health Organization and the Council for International Organizations of Medical Sciences." *Id*.

The extraordinary economic coercion by means of employment termination and total loss of financial stability and ability to provide for oneself and one's family for refusing to submit to experimental COVID-19 injections violates the Nuremberg Code because it violates the global norm that consent to medical experimentation must be ***truly voluntary*** and ***not coerced***. Misleading the public

to believe that the injections were "vaccines" when the COVID-19 injections did **not** fit into the definition of "vaccines" at the time (i.e., prior to the CDC and many other entities altering the definition of "vaccine" to render it vague and inclusive of the COVID-19 DNA-altering and probably irreversible injections) played a role in the coercion by unfairly lowering subjects' resistance to the injections. *See* Appellants' Brief pp. 19-25.

In addition to so many and varied red flags concerning the COVID-19 vaccines mandates, credible entities such as the Association of American Physicians and Surgeons sued the government (Adam Schiff) for manipulating or colluding with private companies such as Facebook ***to withhold important medical risk information concerning the COVID-19 injections from the public***. *See Association of American Physicians & Surgeons, Inc. et al. v. Adam Schiff et al.*, 23 F4th 1028 (D.C.Cir. 2022) (alleging that social media companies refused to publish or otherwise thwarted public access to scientific data concerning the risks of COVID-19 injections and even referred to the peer-reviewed scientific studies as "misinformation").  The many claims of <u>government</u> misinformation concerning the safety and efficacy of the COVID-19 injections, government oppression, and very coercive government employment practices render a meaningful judicial review of the COVID-19 injection mandates absolutely critical to maintaining separation of powers and preserving individual liberty.

It would be contrary to the entire concept of American "ordered liberty" if the American Constitution provided inferior protection of individual rights than international norms. It would render American liberty inferior to global human rights policy. This does not comport with Americans' expectation of liberty grounded in centuries of the unfettered and virtually absolute right of bodily autonomy. The level of manipulation and coercion involved in enforcing the COVID-19 injection mandates is repugnant to both the history of the American Constitution and the Nuremberg Code.

Foreign courts have begun to recognize that COVID-19 injection mandates are contrary to foreign constitutions and international human rights laws that protect bodily autonomy and the ability to sustain oneself by earning a living. On July 6, 2022, an Italian court found that a psychologist's employment termination for refusing to submit to COVID-19 injections was unlawful. *See Plaintiff Psychologist v. Order of Psychologists of Tuscany* r.g. 7360/2022 (Ordinary Court of Florence, July 6, 2022) [AMICUS APPENDIX 4]. Judge Dr. Susanna Zanda found that: 1) the COVID-19 injections "show a phenomenon opposite to what was intended to be achieved with the vaccination, that's to say a spread of contagion with the formulation of multiple viral variants and the ***numerical prevalence of infections and deaths among those vaccinated with three doses***.... We know that in the short term they have already caused thousands of deaths and serious adverse events." *Id.* at 2 (emphasis added).

These medical findings drove Judge Zanda's conclusion that a psychologist's termination of employment for refusing to submit to COVID-19 injections was unconstitutional based on numerous Italian (and German, as noted by the court) provisions protecting "dignity" and fundamental human rights. *Id*. **The Italian court referenced the human death rate of the COVID-19 injections** multiple times, and "held that for these reasons Dr… [the Plaintiff-Psychologist] cannot be forced, in order to be able to support herself and her family, to undergo **these experimental injection treatments which are so invasive that they insinuate themselves into her DNA, altering it in a way which could be <u>irreversible</u>, with effects which cannot as yet be foreseen for her life and health**; whereas, from an epidemiological point of view, the condition of the vaccinated person is not dissimilar to that of the unvaccinated person, since both can become infected, develop the disease and transmit contagion." *Id*. at 3. (Emphasis added). Termination of employees who refuse COVID-19 injections was also found to be unlawful employment discrimination under Italian law. *Id*.

This recent Italian court decision demonstrates the danger of deferring to non-judicial branches when traditional and deeply rooted human rights are infringed by medical mandates, especially when they are promulgated with a dangerous lack of legislative procedural due process. Under rational basis review, American courts have not investigated the medical evidence as a check on other branches' decision to coerce novel medical procedures with unknown risks on

Americans.  Coercive medical procedures on the bodies of unwilling participants is globally shunned and contrary to the most basic of human rights.  Strict judicial review is necessary and proper.

The long history and tradition of Americans' right to reject unwanted physical contact and unwanted medical procedures in conjunction with the internationally accepted Nuremberg principles render the right to reject COVID-19 injections a fundamental right under the Liberty Clause.  The government must bear the burden of justifying the mandates subject to strict judicial scrutiny so that evidence of the safety, efficacy, and need for the mandates may be considered fully and properly by the judiciary and less-intrusive options may be considered carefully as well.  All government medical mandates, including the COVID-19 injections, must be subject to strict scrutiny.  This court should declare the right to reject all medical procedures a fundamental right subject to strict scrutiny and reverse the District Court's adoption of rational basis review.

## III.   *JACOBSON V. MASSACHUSETTS* IS DISTINGUISHABLE ON NUMEROUS BASES AND DOES NOT SUPPORT RATIONAL BASIS REVIEW RELATIVE TO COVID-19 INJECTION MANDATES

The vaccination law at issue in *Jacobson v. Massachusetts* provided in relevant part:

> [T]he board of health of a city or town, if, in its opinion, it is necessary for the public health or safety, shall require and enforce the vaccination and revaccination of all the inhabitants thereof, and shall provide them with the means of free vaccination.  **Whoever, being**

**over twenty-one years of age and not under guardianship, refuses or neglects to comply with such requirement shall forfeit $5**. 197 U.S. 11, 12 (1905) (emphasis added).

Contrary to many lower courts' remarkable mischaracterization of *Jacobson v. Massachusetts,* there was no compulsory or coercive vaccination law involved in the case: The law provided for a reasonable fine in lieu of vaccination, and the issue before the Court was whether Jacobson was constitutionally entitled to a refund of the $5.00 penalty for noncompliance.[6]  Jacobson's decision to avoid the smallpox vaccine during a worldwide pandemic in which **hundreds of millions** of people died from the disease subjected him to criminal prosecution technically but ultimately to a criminal sanction of merely $5.00 (about $166.08 in 2022).[7]  The Massachusetts appellate court that upheld Jacobson's criminal conviction upon

---

[6] *See*, e.g., Josh Blackman, *The Irrepressible Myth of Jacobson v. Massachusetts*, 70 BUFF. L. REV. 113 (2022) (dissecting the lower court rulings on COVID-19 injection mandates to show the inaccurate and poor legal reasoning in challenges to the mandates).

[7] The concept that the criminal penalties in *Jacobson v. Massachusetts* were more serious than the penalties that attend rejection of the COVID-19 injections in the instant case cannot withstand scrutiny. *See* Opinion, *Sczesny v. New Jersey*, No. 3-22-cv-02314, Doc. 19, p. 12 (D.N.J. June 6, 2022).  In *New York Times v. Sullivan,* 376 U.S. 254 (1964), the Supreme Court compared criminal and civil penalties relative to their punitive effects.  The Court explained why civil monetary sanctions can be far more punitive, oppressive, and "chilling" of free speech than criminal sanctions.  In *Sullivan*, the Court recognized that criminal fines may be a drop in the bucket compared to civil penalties, particularly where the civil penalty was "one thousand times greater" than the maximum criminal fine for the same conduct. *Id* at 277.  The idea that losing your livelihood and your ability to pay for daily needs is merely a civil penalty that is less punishing or more palatable than a small criminal fine is silly for the reasons the Court expressed in *Sullivan*.

constitutional challenge specifically made clear that the case was about paying $5.00, not forced vaccination:   "If a person should deem it important that vaccination should not be performed in his case, and the authorities should think otherwise, **it is not in their power to vaccinate him by force, and the worst that could happen to him under the statute would be the payment of the penalty of $5.**" *See Commonwealth v. Pear. Same v. Jacobson*, 183 Mass. 242, 249, 66 N.E. 719, 722 (1903) (emphasis added).   The United States Supreme Court also explained that the issue turned on the constitutionality of the $5.00 fine: "**The defendant insists that his liberty is invaded when the state subjects him to fine or imprisonment [pending payment of the $5.00 fine] for neglecting or refusing to submit to vaccination.**" *Jacobson,* 197 U.S. at 26.

*Jacobson v. Massachusetts* did not involve coercive vaccination and coercive vaccination was never alleged. *Jacobson* is essentially a refund case and the jab-or-pay-a-reasonable-fine law was upheld after the Court reviewed the medical facts as a check on the legislative branch.   Whether the government could coerce vaccination was not an issue in the case, and the case has no precedential value where unwanted medical injections are coerced financially or through false safety information.

The *Jacobson* Court articulated neither strict scrutiny nor rational basis as the standard of judicial review because the standards had yet to be created by the famous fourth footnote in *U.S. v. Caroline Products Co.*, 304 U.S. 144 (1938).  But

the Court conducted a meaningful review of the medical facts, common law, and constitutional law consistent with heightened scrutiny to assure that the law was a valid exercise of the police power (in regular legislative session).  The Court did not simply defer to the legislature or rely on a government narrative concerning medical safety and efficacy as lower courts have done in COVID-19 injection mandate challenges after adopting rational basis review. *See* Josh Blackman, *The Irrepressible Myth of Jacobson v. Massachusetts,* 70 Buff. L. Rev. 131 (2022) (providing numerous examples of lower courts mischaracterizing *Jacobson* and other Supreme Court precedent).

The *Jacobson* Court engaged an analysis and language that does not fit neatly into either rational basis review or strict scrutiny.  The case does not stand for the proposition that the judiciary should defer to the other branches relative to **invasive and experimental medical mandates promulgated in emergency, expedited processes that lacked notice, hearings and other normal legislative lawmaking processes.**  The *Jacobson* Court specifically limited its holding to the smallpox law at issue for important reasons such as those presented by the unprecedented COVID-19 "emergency" injection mandates, most of which were promulgated over a year after the "emergency" was announced – yet another red flag.

In *Jacobson*, the Court discussed constitutional separation of powers and the judiciary's role to protect individual liberty when a public health law "went beyond

the necessity of the case, and, under the guise of exerting a police power, invaded…rights secured by the Constitution…. There is, of course, a sphere within which the individual may assert the supremacy of his own will, and rightfully dispute the authority of any human government….” *Jacobson,* 197 U.S. at 26. The Court specifically addressed the limits of the state's police power:

> [N]o rule prescribed by a state, nor any regulation adopted by a local governmental agency…shall contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument. A local enactment or regulation, even if based on the acknowledged police powers of a state, must always yield in case of conflict with the exercise by the general government of any power it possesses under the Constitution, or with any right which that instrument gives or secures. *Id.* at 25.

The Court ultimately found the Massachusetts law to be a "reasonable" health regulation while ***also*** finding that it was ***"necessary"*** to slow the enormous death toll caused by smallpox ***and*** that ***there were no known alternatives***. *See Jacobson,* 197 U.S. at 28-30 (reasonable), 27-28 (necessary).[8] **This is not rational basis review** because the Court did not defer to the legislative branch without first conducting its own review of the medical facts, the need for the smallpox vaccine, and alternative options. The opinion contained elements and language of what ultimately became tiers of judicial scrutiny known as rational basis review and strict scrutiny, but the *Jacobson* Court's level of review was not rational basis as it

---

[8] The Court also used the word "necessity" repeatedly concerning the vaccine mandate. *See id* at 27-28, 30.

is applied today.  It was a mix of strict scrutiny and a reasonableness standard arising from its analysis of the constitutional separation of powers concerning when the Court must protect individual liberties and when it should defer to the democratic, legislative process.

As part of its analysis of the **necessity** for the smallpox vaccine law in *Jacobson*, the Court explained that sometimes the government may choose a socially repugnant medical policy to avoid a greater evil.  The Court made an analogy to the criminal and tort defense of <u>necessity</u> to engage in socially destructive conduct because it is the lesser of two evils, i.e., the vaccine was the lesser evil compared with the very deadly smallpox pandemic.  To be clear, the Court allowed the medically invasive state action <u>by analogy to common law justifications for conduct that is usually prohibited by law</u>: "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id*. at 27.  Self-defense, like necessity, is a "lesser evils" common law defense to crimes and torts that excuses unlawful conduct only to avert a greater public evil.  To establish the defense, the defendant must prove: "(1) a reasonable belief that the use of force was necessary to defend himself or another against the immediate use of unlawful force, and (2) the use of no more force than was reasonably necessary in the circumstances." *See U.S. v. Biggs*, 441 F. 3d 1069, 1071 (9th Cir. 2006).

The COVID-19 crisis has been mired in many allegations of government and pharmaceutical industry corruption, and the industry has been found guilty of civil and <u>criminal</u> misconduct relative to safety information provided to the public. *See* Appellants' Brief pp. <u>31-33</u>, <u>40-44</u>.  The court can take judicial review of the well-publicized multibillion dollar injury settlement in the Vioxx and Bextra litigation. These facts in conjunction with unchecked "emergency" executive promulgation procedures render individuals' fear of the COVID-19 injections understandable. People have an entrenched and historical right to reject the injections.

The many distinguishing characteristics between the reasonable law in *Jacobson* imposing a $5 fine and the extraordinarily coercive COVID-19 injection mandates causing financial ruin for objectors is precisely why the *Jacobson* Court ***specifically limited its holding to the Massachusetts law at issue in the case***. *Jacobson,* 197 U.S. at 39. *See* Appellants' Brief pp.<u>14-15</u>, <u>23-27</u>, <u>31-44</u>.

The lower courts' error in adopting rational basis review of coercive and risky "emergency" government medical mandates cannot be overstated. *See, e.g.,* Josh Blackman, *The Irrepressible Myth of Jacobson v. Massachusetts*, 70 Buff. L. Rev. 131, 190 (2022) (demonstrating how lower courts have made factually false statements and engaged indefensible legal analysis in challenges to COVID-19 injection mandates).  The risk to individual health and happiness cannot be overemphasized.  In *Buck v. Bell*, 274 U.S. 200, 207 (1927), the Court relied on *Jacobson* to uphold Virginia's 1924 Sterilization Act and to force-sterilize a

woman the Court believed was stupid after she became pregnant while unmarried, stating "three generations of imbeciles is enough."  But many years after Carrie Buck was sterilized (along with nearly 20,000 other "forced eugenic sterilizations" that took place by 1935) it was discovered that she was a woman of average intelligence and that her pregnancy was the result of intrafamilial rape, not Carrie's imbecility. *See* Stephen Jay Gould, *Carrie Buck's Daughter*, 2 CONST. COMMENT 331, 336 (1985) [AMICUS APPENDIX 12].

The Court realized its error and corrected it in *Skinner v. Oklahoma*, applying strict scrutiny to strike down a forced sterilization law.

But the risk of egregious medical oppression continues to lurk in the 21st century, and it has reared up with unprecedented manipulation relative to the COVID-19 injection mandates.  The human suffering that has been caused by the COVID-19 injection mandates continue to surface as noted by the recent Italian opinion and the number of VAERS reported injuries and deaths following COVID-19 injections.  It is the duty of the judiciary to halt the medical oppression, and strict scrutiny is necessary to place the burden on the government to try to justify its coercive COVID-19 injection mandates.

## IV.   UNCONSTITUTIONAL CONDITIONS AND HYBRID RIGHTS

The fact that the COVID-19 injection mandates are conditions for employment as opposed to laws of general applicability does not change the

constitutional analysis. The doctrine of unconstitutional conditions prevents the government from coercively infringing civil rights by withholding government benefits to those who refuse to submit if the government could not require the condition as part of a law of general applicability. The level of government coercion has historically been the cornerstone of unconstitutional conditions doctrine: where coercion is significant, the condition is unconstitutional.

Scholars agree that **coercion** is the cornerstone of unconstitutional conditions doctrine. When the government offers a benefit such as employment or education in exchange for giving up a constitutional right (the condition), the "conditional governmental offer is (presumptively) unconstitutional if it is coercive …." Mitchell N. Berman, *Coercion Without Baselines: Unconstitutional Conditions in Three Dimensions*, 90 GEO. L.J. 1, 5-6, 10 (2001) [AMICUS APPENDIX 8]. The doctrine of unconstitutional conditions "prevents the government from asking the individual to surrender by agreement rights that the government could not take by direct action…. The problem of unconstitutional conditions arises whenever a government seeks to achieve its desired result by obtaining bargained-for *consent* of the party whose conduct is to be restricted." Richard A. Epstein, *Foreword: Unconstitutional Conditions, State Power, and the Limits of Consent*, 102 HARV. L. REV. 5, 7 (1988-1989) (Emphasis in original) [AMICUS APPENDIX 11].

COVID-19 injection mandates involve an enormous amount of financial coercion to obtain reluctant and largely uninformed "consent" from employees to avoid financial devastation. This type of coercion violates the constitutional right of medical autonomy and the Nuremberg Code. It creates an unconstitutional condition of employment.

The fact that COVID-19 injection mandates often also infringe people's religious freedom rights and/or childrearing rights render the challenges to COVID-19 injection mandates more suspect due the multiple or "hybrid" constitutional infringements. Anytime a law or mandate infringes multiple constitutional rights, this alone is a basis for heightened judicial scrutiny. This is yet another basis for subjecting all COVID-19 injection mandates to strict scrutiny or at least heighted review in accordance with the hybrid-rights doctrine announced in *Employment Division, Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) (superseded in part by the Religious Freedom Restoration Act, *see City of Boerne v. Flores*, 521 U.S. 507 (1997)). It is *a priori* common sense and recognized by the Court in *Smith* that highly oppressive and invasive government action will often violate multiple constitutional provisions and therefore heightened judicial scrutiny is appropriate.

## CONCLUSION

The right to reject medical procedures is traceable to ancient battery law and the writ of trespass. The right of bodily autonomy is firmly entrenched in English

and American common law and American constitutional law.  The right of medical autonomy is fundamental.  The mandates must be subject to strict judicial scrutiny, even if all of the red flags surrounding the COVID-19 injection mandates were not present.  Their presence further increases the need for checks and balances.

The COVID-19 injection mandates are shrouded in unprecedented promulgation procedures lacking democratic due process and allegations of government corruption and pharmaceutical company greed-based misconduct.  The injections involve novel and experimental substances that have reportedly caused enormous human suffering that includes human death.  The mandates involve extraordinary and unprecedented financial coercion.  All of these facts render protection of the historical and entrenched right to reject medical procedures especially important to protect.

Very careful judicial review of COVID-19 injection mandates is necessary to uphold the Constitution's critical separation of powers and to safeguard the public from oppressive government action.  Our Constitution is structured such that the judicial branch is charged with the duty to safeguard individual rights from legislative and executive overreaching, as the Supreme Court explicitly stated in *Jacobson v. Massachusetts*.

If the Liberty Clause means anything, it means that Americans may not be coerced into giving up deeply rooted constitutional rights to bodily and medical autonomy absent clear and unequivocal evidence produced by the government that

the medical procedure is truly efficacious and necessary and that no less intrusive or less risky alternatives are available.  Amicus Curiae asks the Third Circuit to recognize that the right to reject the unwanted COVID-19 injections at issue in this case is fundamental.  The challenges to the COVID-19 injection mandates must therefore be reviewed under the standard of strict scrutiny.

September 19, 2022                    Respectfully submitted,


 **/s/Deana Pollard Sacks**
Deana Pollard Sacks
CA Bar No. 145192
2323 S. Shepherd, Suite 825
Houston, TX 77019
deanapollardsacks@icloud.com
Telephone:  (713) 927-9935
Telephone:  (713) 863-8400
Amicus Curiae Attorney


## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(a)(7)(B).   Amicus Curiae has sought leave to file an over length brief because of the complex constitutional issues and the necessity to brief the "history and tradition" of hundreds of years to establish the critically important fundamental right of protecting bodily autonomy that is involved in this appeal. The Amicus Curiae brief is 10,416 words (excluding the parts of the brief exempted by Fed. R. App. P. 32(f)), which was necessary to adequately brief the Court.

## ELECTRONIC DOCUMENT CERTIFICATE

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

Pursuant to Third Circuit Local Appellate Rule 31.1(c), I hereby certify that the text of the electronic brief is identical to the text in the paper copies.

Pursuant to Third Circuit Local Appellate Rule 31.1(c), I hereby certify that a virus detection program was run on the electronic version of this brief using Trend Micro Security Agent, and that no virus was detected.

## CERTIFICATE OF BAR ADMISSION

Amicus Curiae attorney Deana Pollard Sacks was admitted to the Third Circuit bar on September 7, 2022.  Sacks was also admitted to the United States Supreme Court on April 27, 2020 and the Fifth Circuit Court of Appeal on September 22, 2020.

September 19, 2022                    Respectfully submitted,

                                    **/s/Deana Pollard Sacks**
                                    Deana Pollard Sacks
                                    CA Bar No. 145192
                                    2323 S. Shepherd, Suite 825
                                    Houston, TX 77019
                                    deanapollardsacks@icloud.com
                                    Telephone: (713) 927-9935
                                    Telephone: (713) 863-8400
                                    Amicus Curiae Attorney


## CERTIFICATE OF SERVICE

I hereby certify that on this date, I filed the foregoing Amicus Curiae Brief of Nations in Action with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the Appellate CM/ECF system, which will automatically serve electronic copies upon all counsel of record.

September 19, 2022                    Respectfully submitted,

                                    **/s/Deana Pollard Sacks**
                                    Deana Pollard Sacks
                                    CA Bar No. 145192
                                    2323 S. Shepherd, Suite 825
                                    Houston, TX 77019
                                    deanapollardsacks@icloud.com
                                    Telephone: (713) 927-9935
                                    Telephone: (713) 863-8400
                                    Amicus Curiae Attorney